**United States v. Nassif, --- F.Supp.3d ---- (2022)**
2022 WL 4130841

2022 WL 4130841
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

UNITED STATES of America
v.
John Maron NASSIF, Defendant.

Criminal Action No. 21-421 (JDB)
|
Signed September 12, 2022

**Synopsis**
**Background:** Defendant, who was charged by information with four offenses related to his alleged participation in riot at United States Capitol, including willfully and knowingly parading, demonstrating, and picketing in Capitol Building, moved to dismiss that count and sought change of venue or, in the alternative, expanded examination of potential jurors.

**Holdings:** The District Court, John D. Bates, Senior District Judge, held that:

[1] statute prohibiting parading, demonstrating, and picketing was not overbroad;

[2] statute prohibiting parading, demonstrating, and picketing was not vague;

[3] count of information charging defendant with violating that statute stated an offense;

[4] consideration of size and characteristics of community in which crime occurred did not weigh in favor of transferring venue due to extraordinary local prejudice;

[5] consideration of whether media coverage of defendant's crime contained a confession or other blatantly prejudicial information did not weigh in favor of transferring venue;

[6] consideration of whether time between crime and trial had diminished level of media attention did not weigh in favor of transferring venue; and

[7] District Court would deny defendant's requests for additional procedural mechanisms beyond standard voir dire process.

Motions denied.

**Procedural Posture(s):** Pre-Trial Hearing Motion.

West Headnotes (53)

[1]   **Indictments and Charging Instruments**⟵Nature, Elements, and Incidents of Offenses in General

Because main purpose of charging document is to inform defendant of nature of accusation against him, information need contain only plain, concise, and definite written statement of essential facts constituting offense charged. Fed. R. Crim. P. 12(b)(3)(B)(v).

[2]   **Indictments and Charging Instruments**⟵Statutory Offenses

Information may fail to state offense in two relevant ways: if charged statutory provision is unconstitutional, or if offense charged does not apply to defendant's conduct. Fed. R. Crim. P. 7(c)(1), 12(b)(3)(B)(v).

[3]   **Indictments and Charging Instruments**⟵Sufficiency of accusation

In considering a defendant's motion to dismiss information for failure to state an offense, the sole question before the court is the legal sufficiency of the information. Fed. R. Crim. P. 7(c)(1), 12(b)(3)(B)(v).

| | | |
|---|---|---|
| **[4]** | **Constitutional Law ⇌ Prohibition of substantial amount of speech** | |

Under First Amendment, statute is facially invalid as overbroad if it prohibits substantial amount of protected speech. U.S. Const. Amend. 1.

| | | |
|---|---|---|
| **[5]** | **Constitutional Law ⇌ Overbreadth in General**<br>**Constitutional Law ⇌ Substantial impact, necessity of** | |

Statute may be facially invalid under First Amendment even if it also has legitimate application, but overbreadth must be substantial; mere fact that one can conceive of some impermissible applications of statute is not enough to render it susceptible to overbreadth challenge. U.S. Const. Amend. 1.

| | | |
|---|---|---|
| **[6]** | **Constitutional Law ⇌ Substantial impact, necessity of** | |

There must be realistic danger that statute itself will significantly compromise recognized First Amendment protections of parties not before court for it to be facially challenged on overbreadth grounds. U.S. Const. Amend. 1.

| | | |
|---|---|---|
| **[7]** | **Constitutional Law ⇌ Prohibition of substantial amount of speech** | |

To maintain the appropriate balance between protecting free speech and avoiding the harmful effects of invalidating a law that in some of its applications is perfectly constitutional, courts vigorously enforce the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep; thus invalidation for overbreadth is strong medicine that is not to be casually employed. U.S. Const. Amend. 1.

| | | |
|---|---|---|
| **[8]** | **Constitutional Law ⇌ Legislative buildings and offices**<br>**United States ⇌ Buildings and offices** | |

Statute prohibiting parading, demonstrating, and picketing in the United States Capitol building was not overbroad restriction on speech in violation of the First Amendment on its face, as alleged by defendant in seeking dismissal of count of information charging him with violating that statute for his alleged participation in riot at Capitol, where inside of Capitol building was a nonpublic forum, and statute was limited to interior of Capitol buildings, was viewpoint-neutral, given that it did not apply to a particular viewpoint, political or otherwise, and was reasonable in light of the statute's purposes of limiting activities reasonable concluded to be disruptive to Congress's legislative process. U.S. Const. Amend. 1; ⚑ 40 U.S.C.A. § 5104(e)(2)(G).

| | | |
|---|---|---|
| **[9]** | **Constitutional Law ⇌ Overbreadth in General** | |

It is impossible to determine whether a statute reaches too far, for purposes of a First Amendment overbreadth facial validity challenge, without first knowing what the statute covers, a court's first step in overbreadth analysis is to construe the challenged statute. U.S. Const. Amend. 1.

| | | |
|---|---|---|
| **[10]** | **Constitutional Law ⇌ Property and Events** | |

When considering statute's constitutionality

under First Amendment Free Speech Clause, forum to which statute applies is of great importance. U.S. Const. Amend. 1.

**[11]    Constitutional Law⚖︎Government Property and Events**

There are three types of public property for purposes of a First Amendment free speech analysis: (1) the traditional public forum; (2) the designated public forum; and (3) the nonpublic forum. U.S. Const. Amend. 1.

**[12]    Constitutional Law⚖︎Nature and requisites**

"Traditional public forums," for purposes of First Amendment free speech analysis, include locations like streets and parks which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. U.S. Const. Amend. 1.

**[13]    Constitutional Law⚖︎Justification for exclusion or limitation**

In a public forum, the rights of the state to limit expressive activity are sharply circumscribed under the First Amendment, limited to regulations necessary to serve a compelling state interest and narrowly drawn to achieve that end. U.S. Const. Amend. 1.

1 Case that cites this headnote

**[14]    Constitutional Law⚖︎Nature and requisites**

A "designated public forum," for purposes of a First Amendment free speech analysis, consists of public property which the state has opened for use by the public as a place for expressive activity. U.S. Const. Amend. 1.

**[15]    Constitutional Law⚖︎Designated Public Forum in General**
**Constitutional Law⚖︎Justification for exclusion or limitation**

In a designated public forum, under the First Amendment Free Speech Clause, the government is not required to indefinitely retain the open character of the facility, but while it does, it is bound by the same standards as apply in a traditional public forum. U.S. Const. Amend. 1.

**[16]    Constitutional Law⚖︎Nature and requisites**

A "nonpublic forum," for purposes of a First Amendment analysis, consists of public property which is not by tradition or designation a forum for public communication. U.S. Const. Amend. 1.

**[17]    Constitutional Law⚖︎Justification for exclusion or limitation**

In a nonpublic forum, the government has far more leeway under the First Amendment to regulate speech, and restrictions are examined only for reasonableness. U.S. Const. Amend. 1.

[18]    **Constitutional Law**⚖**Justification for exclusion or limitation**

Under First Amendment, government may reserve nonpublic forum for its intended purposes, communicative or otherwise, as long as regulation on speech is reasonable and not effort to suppress expression merely because officials oppose speaker's view. U.S. Const. Amend. 1.

1 Case that cites this headnote

[19]    **Constitutional Law**⚖**Narrow tailoring requirement; relationship to governmental interest**
**Constitutional Law**⚖**Existence of other channels of expression**

Under First Amendment, government may impose regulations of time, place, and manner of expression which are content-neutral, are narrowly tailored to serve significant government interest, and leave open ample alternative channels of communication. U.S. Const. Amend. 1.

[20]    **Constitutional Law**⚖**Legislative buildings and offices**

The inside of the United States Capitol is a nonpublic forum for First Amendment free speech forum analysis purposes. U.S. Const. Amend. 1.

[21]    **Constitutional Law**⚖**Legislative buildings and offices**

Restrictions on speech within the United States Capitol buildings, as nonpublic fora, are permissible under the First Amendment so long as they are viewpoint neutral and reasonable in light of the purpose served by the forum. U.S. Const. Amend. 1.

[22]    **Constitutional Law**⚖**Legislative buildings and offices**

The United States Capitol, as the seat of the legislative branch of the federal government, might well be considered to be the heart of the nation's expressive activity and ideas, but the expression of ideas inside the Capitol may be regulated under the First Amendment in order to permit Congress peaceably to carry out its lawmaking responsibilities and to permit citizens to bring their concerns to their legislators. U.S. Const. Amend. 1.

[23]    **Constitutional Law**⚖**Government property**
**Constitutional Law**⚖**Right to Petition for Redress of Grievances**
**Constitutional Law**⚖**Legislative buildings and offices**

Congress enacted statute prohibiting willfully and knowingly parading, demonstrating, and picketing in the United States Capitol building so that citizens would be assured of the rights of First Amendment freedom of expression and of assembly and the right to petition their Government, without extending to a minority a license to delay, impede, or otherwise disrupt the orderly processes of the legislature which represents all Americans. U.S. Const. Amend. 1; ⚑40 U.S.C.A. § 5104.

[24]    **Constitutional Law**⚖**Legislative buildings and offices**

Although Congress allows public to observe its

proceedings and visit inside of Capitol, government nevertheless has legitimate interest, for purposes of First Amendment free speech analysis, in ensuring that activities of Congress proceed without disruption, so Congress may enact reasonable statutes to further that interest. U.S. Const. Amend. 1.

[25]  Constitutional Law — Nature and requisites

The government does not create a public forum for First Amendment free speech purposes by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. U.S. Const. Amend. 1.

[26]  Constitutional Law — Legislative buildings and offices
United States — Buildings and offices

Purpose of the United States Capitol building is permitting Congress peaceably to carry out its lawmaking responsibilities and allowing citizens to bring their concerns to their legislators, and thus it is reasonable under First Amendment Free Speech Clause for Congress to effect this purpose by providing rules that members of Congress must follow, as well as rules for their constituents, such as statutory ban on "parading, demonstrating, and picketing" in Capitol, which targets activities that Congress reasonable concluded would disrupt the legislative process, to ensure that the Capitol is used in support of Congress's primary work of legislating. U.S. Const. Amend. 1; 40 U.S.C.A. § 5104(e)(2)(G).

[27]  Statutes — Plain, literal, or clear meaning; ambiguity

Legislative history is an uneven tool that cannot be used to contravene plain text in performing statutory analysis.

[28]  Constitutional Law — Vagueness

Criminal statute violates due process if it permits government to deprive defendant of his liberty under criminal law so vague that it fails to give ordinary people fair notice of conduct it punishes, or so standardless that it invites arbitrary enforcement. U.S. Const. Amend. 5.

1 Case that cites this headnote

[29]  Constitutional Law — Vagueness

In First Amendment context, defendant may argue that statute is overbroad as vague, and thus does not comport with due process requirement, because it is unclear whether it regulates substantial amount of protected speech. U.S. Const. Amends. 1, 5.

[30]  Constitutional Law — Disorderly conduct and breach of the peace
United States — Buildings and offices

Statute prohibiting parading, demonstrating, and picketing in the United States Capitol building was not vague in violation of Due Process protections for purposes of defendant's First Amendment facial invalidity challenge to statute in seeking dismissal of count of information charging him with violating that statute for his alleged participation in riot at Capitol, where text of statute made clear that it prohibited taking part in an organized demonstration or parade that advocated a particular viewpoint, and statute did not contain the kinds of wholly subjective terms, like "annoying" or "indecent,"

that had no narrowing context or settled legal meanings, providing sufficient guidance as to what conduct was prohibited. U.S. Const. Amends. 1, 5; 40 U.S.C.A. § 5104(e)(2)(G).

**[31]** **Constitutional Law** ⚷ Certainty and definiteness; vagueness
**Constitutional Law** ⚷ Speech, press, assembly, and petition

Perfect clarity and precise guidance are not required for due process even of regulations that restrict expressive activity under the First Amendment. U.S. Const. Amends. 1, 5.

**[32]** **Constitutional Law** ⚷ Certainty and definiteness; vagueness

A statutory term is not rendered unconstitutionally vague for failure to comport with due process requirement because it does not mean the same thing to all people, all the time, everywhere. U.S. Const. Amend. 5.

**[33]** **Constitutional Law** ⚷ Certainty and definiteness; vagueness

Courts are not concerned with vagueness in violation of due process requirement in the sense that a statutory term requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask, and instead will find a statute unconstitutionally vague only where, after applying the rules for interpreting legal texts, a statute's meaning specifies no standard of conduct at all. U.S. Const. Amend. 5.

**[34]** **Indictments and Charging Instruments** ⚷ Exceptions to rule

Although charging documents must do more than simply repeat the language of the criminal statute, even very concise charging documents may clear this low bar. Fed. R. Crim. P. 7(c)(1).

1 Case that cites this headnote

**[35]** **Indictments and Charging Instruments** ⚷ Purpose of Accusation
**Indictments and Charging Instruments** ⚷ Nature, Elements, and Incidents of Offenses in General

A charging document is generally sufficient if it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend and enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. Fed. R. Crim. P. 7(c)(1).

**[36]** **Indictments and Charging Instruments** ⚷ Place of Offense
**Indictments and Charging Instruments** ⚷ Time of Offense
**Indictments and Charging Instruments** ⚷ Necessity and sufficiency of using statutory language

If a charging document echoes the operative statutory text while also specifying the time and place of the offense, then it is generally sufficient. Fed. R. Crim. P. 7(c)(1).

**[37]** **Indictments and Charging**

Instruments⚖︎Certainty, particularity, and directness in general

The validity of an indictment is not a question of whether it could have been more definite and certain. Fed. R. Crim. P. 7(c)(1).

1 Case that cites this headnote

[38]  **Indictments and Charging Instruments**⚖︎Manner or means

A charging document need not inform the defendant as to every means by which the prosecution hopes to prove that the crime was committed. Fed. R. Crim. P. 7(c)(1).

1 Case that cites this headnote

[39]  **United States**⚖︎Buildings and offices

Count of information charging defendant with violating statute prohibiting parading, demonstrating, and picketing in the United States Capitol building stated an offense, contrary to defendant's contention in seeking dismissal of that count, which arose from his alleged participation in riot at Capitol building, where information contained the elements of the offense charged, namely that defendant paraded, demonstrated, or picketed within a Capitol building, and informed defendant of the charge against him which he was required to defend, namely his violation of the statute on January 6, 2021, in the District of Columbia. 🚩 40 U.S.C.A. § 5104(e)(2)(G); Fed. R. Crim. P. 7(c)(1).

[40]  **Constitutional Law**⚖︎Right to fair trial in general
**Criminal Law**⚖︎Local Prejudice
**Jury**⚖︎Competence for Trial of Cause

Criminal defendant has due process right to fair trial in fair tribunal, and Sixth Amendment right to impartial jury, and thus transfer of venue is not impeded if extraordinary local prejudice will prevent a fair trial. U.S. Const. art. 3, § 2; Fed. R. Crim. P. 18.

[41]  **Criminal Law**⚖︎Local Prejudice

Three important factors to consider when assessing extraordinary local prejudice, for purposes of a motion to transfer venue in a criminal case, are: (1) the size and characteristics of the community in which the crime occurred; (2) whether media coverage of the crime contained a confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight; and (3) whether the time between the crime and the trial has diminished the level of media attention. Fed. R. Crim. P. 21(a).

[42]  **Criminal Law**⚖︎Local Prejudice

Where jury has not yet been empaneled, defendant may show that jury bias has violated his rights based on presumption of extraordinary local prejudice, for purposes of a motion to transfer venue based on extraordinary local prejudice, but that presumption attends only extreme case. Fed. R. Crim. P. 21(a).

[43]  **Criminal Law**⚖︎Time for making

It is well established procedure to refuse criminal defendants' pre-voir dire requests for transfer of venue except in extreme

circumstances. Fed. R. Crim. P. 21(a).

[44]   **Criminal Law** ⚖ Particular offenses

Consideration of size and characteristics of community in which crime occurred did not weigh in favor of granting defendant's motion to transfer venue based on extraordinary local prejudice in criminal case arising from defendant's alleged participation in riot at United States Capitol; District of Columbia's jury pool comprised approximately 600,000 individuals, and master list of available jurors was large enough to include individuals who had paid little or no attention to cases involving the riot in which defendant allegedly participated, and several hundred thousand District residents who may not have been involved in policy or politics or operation of the federal government at all, and who traveled and to and from work or school without coming near the Capitol. Fed. R. Crim. P. 21(a).

[45]   **Criminal Law** ⚖ Local Prejudice

Political leanings are not, by themselves, evidence that jurors cannot fairly and impartially consider the evidence presented, for purposes of considering a motion to transfer venue based on extraordinary local jury prejudice in a criminal case. Fed. R. Crim. P. 21(a).

[46]   **Criminal Law** ⚖ Particular offenses

Consideration of whether media coverage of defendant's crime, namely alleged participation in riot at United States Capitol, contained a confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight, did not weigh in favor of granting defendant's motion to transfer venue based on extraordinary local prejudice, where media coverage did not focus on defendant specifically, it was likely that no members of the venire would ever have heard of defendant, and media coverage was neither sufficiently intense nor sufficiently specific to defendant to require a change of venue. Fed. R. Crim. P. 21(a).

1 Case that cites this headnote

[47]   **Criminal Law** ⚖ Local Prejudice

The mere existence of intense pretrial publicity is not enough to make a trial unfair, for purpose of assessing a criminal defendant's motion for transfer of venue, nor is the fact that potential jurors have been exposed to this publicity. Fed. R. Crim. P. 21(a).

[48]   **Criminal Law** ⚖ Local Prejudice
       **Jury** ⚖ Competence for Trial of Cause

Sixth Amendment right to an impartial jury does not require that jurors be totally ignorant of the facts and issues involved in a case, for purposes of assessing a criminal defendant's motion for transfer of venue. U.S. Const. Amend. 6; Fed. R. Crim. P. 21(a).

[49]   **Jury** ⚖ Competence for Trial of Cause

For purposes of Sixth Amendment requirement of an impartial jury, it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. U.S. Const. Amend. 6.

[50]   **Criminal Law** Local Prejudice

When publicity is about an event, rather than directed at an individual defendant, this may lessen any prejudicial impact, for purposes of assessing whether to grant a criminal defendant's motion to transfer venue based on extraordinary local prejudice of jurors. Fed. R. Crim. P. 21(a).

[51]   **Criminal Law** Local Prejudice
       **Jury** Summoning and impaneling;  voir dire

Voir dire, not transfer of venue, is the best process during which to root out those individualized biases that would prevent a juror from rendering a fair verdict in accordance with the Sixth Amendment guarantee of an impartial jury. U.S. Const. Amend. 6; Fed. R. Crim. P. 21(a).

[52]   **Criminal Law** Particular offenses

Consideration of whether time between crime and trial had diminished level of media attention did not weigh in favor of granting defendant's motion to transfer venue based on extraordinary local prejudice in criminal case arising from defendant's alleged participation in riot at United States Capitol, where defendant's trial was scheduled to take place almost two years after the riot at issue, and even if media coverage of the riot was fresh in prospective jurors' minds, it was not of the type or tenor requiring a transfer of venue. Fed. R. Crim. P. 21(a).

[53]   **Jury** Mode of examination

District Court would deny defendant's requests to send questionnaire drafted by defendant to summoned prospective jurors, to permit the parties to attend pre-screening questioning before formal voir dire, and that counsel be permitted to question prospective jurors individual during voir dire, which defendant sought in alternative to motion to transfer venue based on extraordinary local prejudice in criminal case arising from defendant's alleged participation in riot at United States Capitol, where additional procedural mechanisms beyond standard voir dire process would not be necessary to ensure empanelment of full and impartial jury. Fed. R. Crim. P. 21(a).

**Attorneys and Law Firms**

Graciela Rodriguez Lindberg, Assistant U.S. Attorney, United States Attorney's Office, Laredo Division, Laredo, TX, Brian Morgan, Assistant U.S. Attorney, Human Rights & Special Prosecutions, Washington, DC, Elizabeth Nash Eriksen, Assistant U.S. Attorney, DOJ-CRM, Washington, DC, for United States of America.

James T. Skuthan, Public Defender, Federal Public Defender Florida Middle, Orlando, FL, for Defendant.

## MEMORANDUM OPINION

JOHN D. BATES, United States District Judge

*\*1* Defendant John Nassif is charged by information with four offenses related to his alleged participation in the riot at the U.S. Capitol on January 6, 2021. See generally Information [ECF No. 12]. In advance of the jury trial scheduled to begin on December 5, 2022, Nassif moves to dismiss Count Four of the information, which charges that he "willfully and knowingly paraded, demonstrated, and picketed in a Capitol Building" in violation of 🚩 40

**United States v. Nassif, --- F.Supp.3d ---- (2022)**
2022 WL 4130841

U.S.C. § 5104(e)(2)(G). See generally Def.'s Mot. to Dismiss Count Four of the Information [ECF No. 30] ("Mot. to Dismiss"). Nassif also seeks a change of venue or, in the alternative, expanded examination of potential jurors. See generally Def.'s Mot. for Transfer of Venue or, in the Alternative, to Allow Expanded Examination of Prospective Jurors Before & During Voir Dire [ECF No. 31] ("Venue Mot."). For the reasons explained below, the Court will deny both of Nassif's motions.

### Background[1]

At 1:00 p.m. on January 6, 2021, a joint session of Congress assembled to certify the Electoral College vote of the 2020 Presidential Election. Opp'n to Mot. to Dismiss at 1. A crowd began to gather outside the U.S. Capitol. Id. "The mob ... scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol," with the first rioters entering shortly after 2:00 p.m. Trump v. Thompson, 20 F.4th 10, 18 (D.C. Cir. 2021); Opp'n to Mot. to Dismiss at 1. Members of the House and Senate evacuated at around 2:20 p.m. Opp'n to Mot. to Dismiss at 2. "All told, the riot caused millions of dollars of damage to the Capitol, and approximately 140 law enforcement officers were injured in the fighting—the January 6th riot was, in short, 'the most significant assault on the Capitol since the War of 1812.'" McHugh I, 583 F.Supp.3d at 8 (quoting Trump, 20 F.4th at 18–19).

On January 9 and January 20, 2021, the Federal Bureau of Investigation ("FBI") received two separate tips that Nassif had posted videos and pictures of himself inside the Capitol building on January 6. Aff. in Supp. of Compl. ¶¶ 11, 14. In subsequent interviews with the FBI, the tipsters identified Nassif in photos taken from closed-circuit surveillance video footage from within the Capitol. Aff. in Supp. of Compl. ¶¶ 17–18; Opp'n to Mot. to Dismiss at 2. That surveillance footage, and video from other individuals inside the Capitol on January 6, shows "Nassif chanting outside the East Rotunda doors" at around 3:00 p.m. before entering the Capitol through those doors at 3:13 p.m. Opp'n to Mot. to Dismiss at 2. Officers prevented Nassif from moving further into the building, turning him back as he approached the Rotunda; Nassif exited at 3:23 p.m. Id.

**\*2** On April 29, 2021, Nassif was charged by complaint with entering and remaining in a restricting building or grounds and violent and disorderly conduct on Capitol grounds. See Compl. [ECF No. 1]. He was arrested and, after an initial appearance on May 17, 2021, released on personal recognizance. Min. Entry, May 17, 2021. On June 22, the government filed an information charging Nassif with four counts, including parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G). Information at 1–3. Nassif has pleaded not guilty to all four charges. See Min. Entry, June 30, 2021. Nassif now moves to dismiss Count Four, charging him with parading, demonstrating, or picketing in a Capitol building, see Mot. to Dismiss at 1, and for a transfer of venue or for the expanded examination of potential jurors, see Venue Mot. at 1. The government opposes both requests. See Opp'n to Mot. to Dismiss at 1; Gov't's Opp'n to Venue Mot. [ECF No. 35] ("Opp'n to Venue Mot.") at 1. Nassif's motions are fully briefed and ripe for decision. See generally Def.'s Reply to Opp'n to Mot. to Dismiss [ECF No. 39] ("Reply").[2]

### Analysis

#### I. Motion to Dismiss Count Four of the Information

[1] [2] [3]Before trial, a criminal defendant may move to dismiss the information against him for, among other reasons, "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). Because the main purpose of a charging document is to inform the defendant of the nature of the accusation against him, Ballestas, 795 F.3d at 148–49, an information need contain only "a plain, concise, and definite written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1). An information may fail to state an offense in two relevant ways: if the charged statutory provision is unconstitutional, McHugh I, 583 F.Supp.3d at 9, or the if the offense charged does not apply to the defendant's conduct, United States v. Montgomery, 578 F. Supp. 3d 54, 58–59 (D.D.C. 2021). In considering Nassif's motion to dismiss, "the sole question before the court is the legal sufficiency of the" information. Montgomery, 578 F. Supp. 3d at 58.

Nassif moves to dismiss Count Four, which charges that he "paraded, demonstrated, and picketed in a Capitol Building" in violation of 40 U.S.C. § 5104(e)(2)(G). Information at 3. He argues that § 5104(e)(2)(G) is "unconstitutional on its face" because it is "both overbroad and unconstitutionally vague" in violation of the First Amendment. Mot. to Dismiss at 2.[3] He also contends that Count Four does not apply to his alleged

conduct and so "fails to state an offense" against him. Id. at 11. The Court will address Nassif's arguments in turn.

### A. Overbreadth

[4] [5] [6] [7] [8]Under the First Amendment, "a statute is facially invalid if it prohibits a substantial amount of protected speech." United States v. Williams, 553 U.S. 285, 292, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). A statute may be "facially invalid even if [it] also ha[s] legitimate application," City of Houston v. Hill, 482 U.S. 451, 459, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), but the overbreadth must be "substantial": "the mere fact that one can conceive of some impermissible applications of a statute is not enough to render it susceptible to an overbreadth challenge," Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." Taxpayers for Vincent, 466 U.S. at 801, 104 S.Ct. 2118. To maintain the appropriate balance between protecting free speech and avoiding the "harmful effects" of "invalidating a law that in some of its applications is perfectly constitutional," courts have "vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." Williams, 553 U.S. at 292, 128 S.Ct. 1830. Thus, "[i]nvalidation for overbreadth is 'strong medicine' that is not to be 'casually employed.' " Id. at 293, 128 S.Ct. 1830 (cleaned up) (quoting L.A. Police Dep't v. United Reporting Publ'g Corp., 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999)); accord Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (noting that, in the First Amendment context, "[f]acial challenges are disfavored").

**\*3** [9]Because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers," a court's "first step in overbreadth analysis is to construe the challenged statute." Williams, 553 U.S. at 293, 128 S.Ct. 1830. Section 5104(e)(2)(G) provides that "[a]n individual ... may not willfully and knowingly ... parade, demonstrate, or picket in any of the Capitol Buildings." Focusing first on the operative verbs—parade, demonstrate, and picket—Nassif argues that this "plain language itself is strikingly broad, covering enormous swaths of protected First Amendment activity," and that the statute is not limited to "disruptive speech, protests, gatherings, or even audible oral expressions of ideas." Mot. to Dismiss at 3.[4]

[10] [11] [12] [13] [14] [15] [16] [17] [18] [19]When considering a statute's constitutionality under the First Amendment, the forum to which the statute applies is of great importance. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 805–06, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The Supreme Court has identified three types of public property for First Amendment analysis: (1) the traditional public forum, (2) the designated public forum, and (3) the nonpublic forum. Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45–46, 103 S.Ct. 948 (1983). Traditional public forums include locations like "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " Id. at 45, 103 S.Ct. 948 (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). In a public forum, "the rights of the state to limit expressive activity are sharply circumscribed," limited to regulations "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." Id.[5] A designated public forum "consists of public property which the state has opened for use by the public as a place for expressive activity." Id. In a designated public forum, the government "is not required to indefinitely retain the open character of the facility," but while it does, "it is bound by the same standards as apply in a traditional public forum." Id. at 46, 103 S.Ct. 948. Finally, a nonpublic forum consists of "[p]ublic property which is not by tradition or designation a forum for public communication," id.; here, the government "has far more leeway to regulate speech," and restrictions are "examined only for reasonableness," Price v. Garland, 45 F.4th 1059, 1068 (D.C. Cir. 2022) (quoting United States v. Kokinda, 497 U.S. 720, 727, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990)). The government "may reserve" a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view." Perry, 460 U.S. at 46, 103 S.Ct. 948.

**\*4** Forum analysis is important in assessing statutory overbreadth because, as is clear from the varying tests the

Supreme Court has articulated, a statute applied in a traditional public forum could be unconstitutional, but the same statute, as applied in a nonpublic forum, could pass constitutional muster. Thus, though Nassif would have the Court focus only on the operative verbs in § 5104(e)(2)(G)—parade, demonstrate, and picket—this argument ignores the six words following those verbs: "in any of the Capitol Buildings." Section 5014(e)(2)(G) thus bars parading, picketing, or demonstrating only within the Capitol buildings themselves, rather than on the Capitol grounds. Armed with a decision from another court in this District—Judge Friedman's decision in Bynum v. U.S. Capitol Police Board, 93 F. Supp. 2d 50 (D.D.C. 2000), which classified the interior of the Capitol as a nonpublic forum—the government urges that this distinction cabins the overbreadth of which Nassif complains. See Opp'n at 6–7.

[20] [21]In Bynum, Judge Friedman considered a constitutional challenge to a U.S. Capitol Police regulation implementing a prior version of § 5104(e)(2)(G) (then codified at 40 U.S.C. § 193f(b)(7)). See 93 F. Supp. 2d at 53–54. The plaintiff in that case sought an injunction against enforcement of the regulation, which he argued was "an impermissible restriction on speech in a public place." Id. at 54. But Judge Friedman assessed "the nature of the forum"—the Capitol buildings—and concluded that "the inside of the United States Capitol is a nonpublic forum for First Amendment forum analysis purposes." Id. at 54, 56. Thus, under Supreme Court precedent, restrictions on speech within the Capitol buildings are permissible so long as they "are 'viewpoint neutral' and 'reasonable in light of the purpose served by the forum.' " Id. at 56 (quoting Cornelius, 473 U.S. at 806, 105 S.Ct. 3439). Nonetheless, Judge Friedman went on to reject the challenged Capitol Police regulation as an unreasonable restraint on free speech because "the regulation's proscriptions [we]re not limited to the legitimate purposes set forth in the statute"—"the need ... to prevent disruptive conduct in the Capitol." Id. at 57. The government now contends that, at least in dictum, Judge Friedman concluded that § 5104(e)(2)(G) itself was not substantially overbroad, both because it applies within a nonpublic forum and because it prohibits only "disruptive" conduct. See Opp'n at 6–7.

In reply, Nassif argues that the Court should not rely on the dictum from Bynum restricting § 5104(e)(2)(G) to "disruptive conduct," pointing instead to a more recent decision from another court in this District that defined the elements of the offense as "t[aking] part in a 'public manifestation' in furtherance of 'some political or other cause.' " Reply at 4 (quoting United States v. Rivera, Crim. A. No. 21-060 (CKK), ---- F.Supp.3d ----, ----, 2022 WL 2187851, at *7 (D.D.C. June 17, 2022)). But this Court need not decide whether § 5104(e)(2)(G) bars only disruptive conduct to conclude that it is not overbroad; instead, it is enough that the statute is limited to the interior of the Capitol buildings, is viewpoint-neutral, and is reasonable in light of the statute's purposes.

[22] [23] [24] [25]First, this Court concludes that the interior of the Capitol building is a nonpublic forum where the government may limit First Amendment activities so long as the restrictions "are reasonable in light of the purpose of the forum and are viewpoint neutral." Cornelius, 473 U.S. at 806, 105 S.Ct. 3439. As Judge Friedman explained in Bynum, the Capitol, "[a]s the seat of the legislative branch of the federal government, ... might well be considered to be the heart of the nation's expressive activity and ideas," but it has long been recognized that "the expression of ideas inside the Capitol may be regulated in order to permit Congress peaceably to carry out its lawmaking responsibilities and to permit citizens to bring their concerns to their legislators." 93 F. Supp. 2d at 55. Congress thus enacted § 5104 "so that citizens would be 'assured of the rights of freedom of expression and of assembly and the right to petition their Government,' without extending to a minority 'a license ... to delay, impede, or otherwise disrupt the orderly processes of the legislature which represents all Americans." Id. at 55–56 (alteration in original) (quoting H.R. Rep. No. 90-745, at 2 (1967)). And though Congress "allows the public to observe its proceedings and visit the inside of the Capitol," the government nevertheless "has a legitimate interest in ensuring that the activities of Congress proceed without disruption," so "Congress may enact reasonable statutes ... to further that interest." Id. at 56. "The government does not create a public forum ... by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802, 105 S.Ct. 3439.

*5 Further, and again as Judge Friedman explained (albeit in dictum) in Bynum, this Court concludes that § 5104(e)(2)(G) is both viewpoint-neutral and reasonable. See 93 F. Supp. 2d at 56 ("The Court finds that [the statute] enacted by Congress is a viewpoint neutral, reasonable regulation of both conduct and expressive

activity that satisfies the Supreme Court's test for nonpublic fora."). The statute contains nothing limiting its application to a particular viewpoint—political or otherwise. Indeed, § 5104(e)(2)(G) has been applied to the demonstration activities of a defendant protesting Justice Brett Kavanaugh's nomination to the Supreme Court, see United States v. Barry, No. 18-00111 (RMM), 2019 WL 2396266, at *1 (D.D.C. June 5, 2019), as well as to the participants in the January 6 riot. The statute accordingly satisfies the first prong of the test for permissible restrictions on protected activity in a nonpublic forum.

[26]Second, the Court concludes that § 5104(e)(2)(G) is "reasonable in light of the purpose served by the forum." Cornelius, 473 U.S. at 806, 105 S.Ct. 3439. In Bynum, Judge Friedman identified the purpose of the Capitol as permitting "Congress peaceably to carry out its lawmaking responsibilities" and allowing "citizens to bring their concerns to their legislators." 93 F. Supp. 2d at 55. The Court agrees that it is reasonable for Congress to effect this purpose by providing "rules that members of Congress must follow, as well as rules for their constituents," to ensure that the Capitol is used in support of Congress's primary work: legislating. Id. at 55–56. The ban on "parading, demonstrating, and picketing" is one such reasonable rule: it targets activities that Congress reasonably could have concluded would disrupt its legislative process.

This conclusion accords with a long line of cases rejecting challenges to complete bans on otherwise permissible First Amendment activity as reasonable, viewpoint-neutral regulations in nonpublic fora. See, e.g., Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 674, 685, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (upholding as reasonable a complete ban on solicitation in the interior of an airport terminal in light of "inconveniences to passengers" and "burdens on ... officials" caused by pedestrian congestion); Kokinda, 497 U.S. at 723–24, 733, 110 S.Ct. 3115 (upholding as reasonable a complete ban on solicitation on sidewalks in front of post offices because solicitation was "unquestionably ... disruptive of business"); Taxpayers for Vincent, 466 U.S. at 808, 817, 104 S.Ct. 2118 (upholding as reasonable a complete ban on the posting of signs on utility poles because it advanced the city's "interest in eliminating visual clutter").[6] Given the permissive standard applicable to nonpublic forums, it is reasonable for the Congress to conclude that its interest in peaceful lawmaking requires a limitation on the demonstrative activities of non-legislators.

*6 [27]Instead of addressing the narrowing element of location, Nassif points to legislative history to suggest that § 5104(e)(2)(G) is unconstitutionally overbroad. He points both to floor statements of individual Representatives expressing various concerns about the 1967 version of the statute, see Mot. to Dismiss at 3–4, 5–6, 10 (citing 90 Cong. Rec. 29374, 2388–89, 29392, 29394–95 (daily ed. October 19, 1967) (statements of Reps. O'Neal, Bingham, Edwards, Cramer, and Colmer)), and to the minority view expressed in the House Report on the 1967 bill on a previous version of the statute, id. at 9; Reply at 6 (citing H.R. Rep. No. 90-745 (1967), as reprinted in 1967 U.S.C.C.A.N. 1739, 1746–47). As the government notes, legislative history "is an uneven tool that cannot be used to contravene plain text," Opp'n to Mot. to Dismiss at 8 (quoting United States v. Bingert, No. 1:21-cr-91-RCL, ––– F.Supp.3d ––––, ––––, 2022 WL 1659163, at *11 (D.D.C. May 25, 2022)), and floor statements are "particularly 'unreliable,' " id. (quoting Order at 6, United States v. Powell, Crim. A. No. 21-179 (RCL) (D.D.C. July 8, 2022), ECF No. 73); accord Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474, 41 S.Ct. 172, 65 L.Ed. 349 (1921) ("By repeated decisions of this court it has come to be well established that the debates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the law-making body."). This unreliability is especially acute where the legislative history is of a previous version of a statute, and a version that—importantly—forbade "parad[ing], stand[ing], or mov[ing] in processions or assemblages in [the] United States Capitol Grounds." 40 U.S.C. § 193g. The same is not true here. Section § 5104(e)(2)(G) in its current form is narrower—it applies only in the Capitol building and not to the broad terms "standing" or "moving." Accordingly, the Court concludes that the plain text of § 5104(e)(2)(G), which applies to narrower conduct only in the nonpublic forum of the Capitol building, is not unconstitutionally overbroad on its face.

### B. Vagueness

[28] [29] [30]The Fifth Amendment ensures that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." A criminal statute violates this fundamental principle if it permits the government to deprive a defendant of his liberty "under a criminal law so vague that it fails to give ordinary people fair notice of the

conduct it punishes, or so standardless that it invites arbitrary enforcement." Johnson v. United States, 576 U.S. 591, 595, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015). In the First Amendment context, a defendant may "argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." Williams, 553 U.S. at 304, 128 S.Ct. 1830.

[31] [32] [33] "But 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.' " Williams, 553 U.S. at 305, 128 S.Ct. 1830 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). "[A] statutory term is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.' " United States v. Bronstein, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (second alteration in original) (quoting Roth v. United States, 354 U.S. 476, 491, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). Thus, courts "are not concerned with vagueness in the sense that [a statutory] term 'requires a person to conform his conduct to an imprecise but comprehensible normative standard,' whose satisfaction may vary depending upon whom you ask," id., and instead will find a statute unconstitutionally vague only where, after "applying the rules for interpreting legal texts," a statute's "meaning 'specifies' 'no standard of conduct at all,' " id. (cleaned up) (quoting Coates v. Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971)); see also United States v. Lanier, 520 U.S. 259, 267, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (explaining that the "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal").

Nassif first contends that § 5104(e)(2)(G) "does not define the offense so as to put ordinary people on notice of what is prohibited." Mot. to Dismiss at 7. He argues that " 'demonstrating' is an ambiguous word" that permits selective enforcement. Id. at 8. The Court disagrees. The definition of demonstrate—"to make a public demonstration; esp. to protest against or agitate for something," Oxford English Dictionary (3d ed. 2005), or "to make a public display of sentiment for or against a person or cause," as by "students demonstrating for the ouster of the dictator," Webster's New International Dictionary (3d ed. 1993)—is not so vague as Nassif contends. When read "in light of its neighbors," McHugh I, 583 F.Supp.3d at 22, "parade,"[7] and "picket,"[8] it is clear that § 5104(e)(2)(G) prohibits taking part in an organized demonstration or parade that advocates a particular viewpoint—such as, for example, the view that the 2020 U.S. Presidential Election was in some way flawed.

*7 Nassif next contends that § 5104(e)(2)(G) is so "broadly-worded" that it could be "selectively employed to silence those who expressed unpopular ideas," Mot. to Dismiss at 8 (quoting Lederman v. United States, 89 F. Supp. 2d 29, 41 n.11 (D.D.C. 2000)), an argument he claims is supported by the legislative history of the statute, id. at 9–10.[9] As explained above, Nassif's reliance on legislative history is misplaced where the plain text of the statute leaves no need to resort to alternative methods of interpretation. See, e.g., Bingert, ––– F.Supp.3d at ––––, 2022 WL 1659163, at *11. More fundamentally, though, Nassif's argument fails because § 5104(e)(2)(G) does not contain the kinds of "wholly subjective" terms, like "annoying" or "indecent," that have no "narrowing context" or "settled legal meanings." Williams, 553 U.S. at 306, 128 S.Ct. 1830; see also McHugh I, 583 F.Supp.3d at 27 (rejecting vagueness argument because statute did not "condition criminal liability on individualized, subjective judgments" and instead concluding there were "specific fact-based ways to determine whether a defendant's conduct" violated the statute (citation omitted)). Section 5104(e)(2)(G) requires that an individual willfully and knowingly parade, picket, or demonstrate inside the Capitol building. This language provides sufficient guidance as to what is prohibited. That § 5104(e)(2)(G) may " 'require[ ] a person to conform his conduct to an imprecise but comprehensible normative standard,' whose satisfaction may vary depending upon whom you ask," Bronstein, 849 F.3d at 1107 (citation omitted), does not render the statute constitutionally infirm. Accordingly, the Court concludes that § 5104(e)(2)(G) is not unconstitutionally vague on its face.

### C. Statement of an Offense

[34] [35] [36] [37] [38] [39] Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment or information "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Although charging documents "must do more than simply repeat the language of the criminal statute," Russell v. United States, 369 U.S. 749, 764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), even very concise charging documents may "clear[ ] this low bar," United States v. Sargent, No. 21-cr-00258 (TFH), 2022 WL 1124817, at *1 (D.D.C.

Apr. 14, 2022). Thus, a charging document is generally sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend and ... enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). If a charging document "echoes the operative statutory text while also specifying the time and place of the offense," then it is generally sufficient. United States v. Williamson, 903 F.3d 124, 130 (D.C. Cir. 2018).[10] "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain,' " United States v. Verrusio, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting United States v. Debrow, 346 U.S. 374, 378, 74 S.Ct. 113, 98 L.Ed. 92 (1953)), and the charging document need not inform the defendant "as to every means by which the prosecution hopes to prove that the crime was committed," United States v. Haldeman, 559 F.2d 31, 124 (D.C. Cir. 1976) (en banc) (per curiam).

*8 Count Four of the Information alleges that, "[o]n or about January 6, 2021, within the District of Columbia, [Nassif] willfully and knowingly paraded, demonstrated, and picketed in a Capitol Building." Information at 3. Nassif argues that any interpretation of the operative verbs—parade, demonstrate, or picket—must "require some form of verbal or symbolic expression of a feeling, belief, or idea" (or in the case of "parading," "some sort of marching or participation in a processional"), and that, because the information provides "no specifics" and does "not allege [that he] engaged in any form of speech or expressive conduct," it fails to state an offense. Mot. to Dismiss at 12. But although the information is pithy, it "contains the elements of the offense charged"—that Nassif "paraded, demonstrated, or picketed" within a Capitol building—and "fairly informs" Nassif of the charge against which he must defend—that he violated the statute on January 6, 2021, in the District of Columbia. Hamling, 418 U.S. at 117, 94 S.Ct. 2887. No more is required,[11] and hence the Court concludes that Count Four of the information states an offense.

## II. Motion to Transfer Venue or for Expanded Examination of Potential Jurors

### A. Motion to Transfer Venue

[40] [41]Criminal trials generally occur in the state and district where the offense was committed. See U.S. Const. art. III, § 2; Fed. R. Crim. P. 18. But a criminal defendant has a due process right to a "fair trial in a fair tribunal," Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (citation omitted), and a Sixth Amendment right to an "impartial jury"; neither Article III nor Rule 18 "impede transfer ... if extraordinary local prejudice will prevent a fair trial," Skilling v. United States, 561 U.S. 358, 378, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). Thus, on a defendant's motion, a court "must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). Three important factors to consider when assessing prejudice are (1) "the size and characteristics of the community in which the crime occurred"; (2) whether media coverage of the crime "contained [a] confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; and (3) whether the time between the crime and the trial has "diminished" the "level of media attention." Skilling, 561 U.S. at 382–83, 130 S.Ct. 2896.

[42] [43]Where a jury has not yet been empaneled, a defendant may show that jury bias has violated his rights based on a presumption of prejudice, but that "presumption of prejudice ... attends only the extreme case." Id. at 381, 130 S.Ct. 2896. Further, it is "well established procedure" in this Circuit to refuse defendants' "pre-voir dire requests for" transfer of venue except in "extreme circumstances," Haldeman, 559 F.2d at 60, 64. In January 6 prosecutions in particular, every court in this District—including this Court—that has ruled on a motion for a change of venue has denied it, see, e.g., United States v. Brock, Crim. A. No. 21-140 (JDB), ––– F.Supp.3d ––––, ––––, 2022 WL 3910549, at *5 (collecting cases), and juries have successfully been empaneled in multiple cases.[12]

Nassif argues that all three of the Skilling factors support his motion to transfer. Specifically, he asserts that the Court must transfer his trial for fairness reasons because of the size and characteristics of District of Columbia community, Venue Mot. at 4–7; the pervasiveness and persistence of media coverage of the January 6 riot, id. at 7–10; and the short time between the attack and the scheduled trial date, id. at 10–11. The government opposes on all three points. See Opp'n to Venue Mot. at 4–24. "Given the in-depth treatment afforded to this issue already, the Court will only briefly summarize its reasons for denying [Nassif]'s motion, which are in line with those of other courts in similar

cases." Brock, ––– F.Supp.3d at ––––, 2022 WL 3910549, at *5.

**\*9** [44]On the first factor, Nassif contends that D.C.'s jury pool is "unusually small and geographically compact." Venue Mot. at 4. Nassif is correct, of course, that D.C.'s jury pool—comprised of "approximately 700,000 residents[,] about 600,000 of [whom] may be in the jury pool in this case," Garcia, 2022 WL 2904352, at *8 & n.14—is smaller than the pool of "4.5 million" eligible residents the Supreme Court approved in Skilling. But courts have rejected the presumption of prejudice when confronted with similarly sized—and indeed smaller—populations. See, e.g., Skilling, 561 U.S. at 382, 130 S.Ct. 2896 (noting that there is a "reduced likelihood of prejudice where the venire was drawn from a pool of over 600,000 individuals") (citing Gentile v. State Bar of Nev., 501 U.S. 1030, 1044, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (plurality opinion)); United States v. Taylor, 942 F.3d 205, 223 (4th Cir. 2019) (affirming denial of venue transfer motion where local population "was approximately 621,000 residents").

[45]As to the characteristics of D.C.'s jury pool, Nassif contends that "the government's allegations ... stoke partisan passions that in this District would be overwhelmingly hostile" because the "events of January 6 have affected D.C. residents much more directly than persons outside the District," and because "President Biden received more than 92 percent of the vote in the 2020" presidential election here. Venue Mot. at 5–6. But "political leanings are not, by themselves, evidence that those jurors cannot fairly and impartially consider the evidence presented." Order, Apr. 18, 2022, at 6, United States v. Alford, Crim. A. No. 21-263 (TSC) (D.D.C. Apr. 18, 2022), ECF No. 46 ("Alford Order"); see Haldeman, 559 F.2d at 64 n.43; Brock, ––– F.Supp.3d at ––––, 2022 WL 3910549, at *6. And "[t]he master list of available jurors is large enough to include individuals who have paid little or no attention to the January 6 cases," and "several hundred thousand District residents who may not have been involved in policy or politics or the operation of the federal government at all; [and] who travel to and from work or school without coming near the Capitol." Garcia, 2022 WL 2904352, at *8. Accordingly, the Court concludes that the District's size and characteristics do not weigh in favor of granting Nassif's motion and transferring the case.

[46]On the next factor, Nassif describes media coverage of the January 6 riot as "breathtakingly pervasive and persistent," and he contends that it "has focused on collective blame rather than on individual ringleaders." Venue Mot. at 7. Thus, though he acknowledges that the coverage "has not focused significantly" on himself, or indeed any individual, Nassif contends that this is "largely beside the point" because "[w]hat will matter in this case is not individualized prejudice, but prejudice to all." Id. at 7–8. This threat of prejudice is particularly serious, he argues, because "the most disputed element" in his case "will be mens rea." Id. at 8. In support of these arguments, Nassif relies heavily on a "Federal Public Defender-commissioned survey," attached as an exhibit to his motion. Id. at 8; see generally Ex. A to Venue Mot. [ECF No. 33-1] ("Select Litigation Survey").[13]

[47] [48] [49] [50]"The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." United States v. Childress, 58 F.3d 693, 706 (D.C. Cir. 1995). And "[i]t is not required ... that ... jurors be totally ignorant of the facts and issues involved." Irvin, 366 U.S. at 722–23, 81 S.Ct. 1639. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. at 723, 81 S.Ct. 1639. The Supreme Court has presumed prejudice based on pretrial publicity only once, in a case where a defendant's unlawfully obtained confession was broadcast three times shortly before his trial to large audiences, in a community of only 150,000 people. Rideau v. Louisiana, 373 U.S. 723, 724–25, 727, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Courts have successfully empaneled juries and conducted trials in the locations of highly publicized crimes. See Brock, ––– F.Supp.3d at ––––, 2022 WL 3910549, at *7 (collecting cases); Opp'n to Venue Mot. at 15 (same). And importantly, "[w]hen publicity is about the event, rather than directed at the individual defendants, this may lessen any prejudicial impact." Skilling, 561 U.S. at 384 n.17, 130 S.Ct. 2896 (citation omitted).

**\*10** [51]Nassif has not presented any evidence regarding media focused on himself. It is likely that not a single member of the venire will ever have heard of John Nassif, much less have formed an opinion of his guilt. And although media coverage of the events of January 6, and subsequent investigations and prosecutions, has continued since the time of Nassif's alleged crimes, that coverage is neither sufficiently intense nor sufficiently specific to Nassif to require a change of venue. See Brock, 2022 WL 3910549, at *8. Nor does the Select Litigation Survey compel a different conclusion. This Court has previously considered the same survey in both United States v. McHugh, Crim. A. No. 21-453, and United States v. Brock, Crim. A. No. 21-140, and concluded that the results did not warrant a pre-voir dire transfer of venue.

Other courts in this District have reached the same conclusion. See, e.g., Garcia, 2022 WL 2904352, at *10–13. Nassif focuses on a few of the survey's specific conclusions, see Venue Mot. at 8–9, but the survey does not—and cannot—answer the essential question: whether an individual juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court," Irvin, 366 U.S. at 723, 81 S.Ct. 1639. Because voir dire is the best process during which to root out those individualized biases that would prevent a juror from rendering a fair verdict, see Garcia, 2022 WL 2904352, at *5, the pretrial media coverage of the events of January 6 does not support Nassif's motion to change venue.

[52]Finally, Nassif contends that the Court should transfer venue because "[t]he events of January 6, 2021[ ] remain fresh in prospective jurors' minds." Venue Mot. at 10. Although his trial is scheduled to take place almost two years after the riot at the Capitol, Nassif urges that "the reckoning over January 6 continues to generate front-page news," pointing specifically to the House Select Committee investigation and "entertainment media" released since the attack, id. at 10 & n.15,[14] as well as media coverage of other criminal prosecutions in this District, id. at 11. Nassif's argument on this basis fails for much the same reasons as his argument regarding pre-trial publicity: the news and media coverage of the events of January 6, even if "fresh in prospective jurors' minds," Venue Mot. at 10, is not of the type or tenor requiring a transfer of venue.

Though Nassif contends that "public discourse has shifted away from the raw details of events at the Capitol and toward ... diagnosing protestors' motives," a subject that he argues is "far more prejudicial," Venue Mot. at 11, he "offers no evidence to support that proposition, nor does he explain why voir dire is ill-suited to determine whether prospective jurors will maintain an open mind about his alleged motives." Alford Order at 13. The passage of time between January 6 and the presumptive date of Nassif's trial, 22 months since the attack on the Capitol, does not weigh in favor of granting Nassif's motion. Accordingly, because Nassif falls short of showing "extraordinary local prejudice," Skilling, 561 U.S. at 378, 130 S.Ct. 2896, the Court concludes that transferring venue to another district is inappropriate at this time.

### B. Alternative Requests

[53]Should the Court deny his venue transfer motion, Nassif argues that "expanded examination of prospective jurors before and during formal voir dire would be crucial to mitigate actual prejudice." Venue Mot. at 12. He requests three measures: (1) that the Court send a questionnaire, drafted by Nassif and approved by the Court, to summoned prospective jurors; (2) that the parties be permitted to attend any pre-screening questioning before the Court conducts formal voir dire; and (3) that counsel be permitted to question prospective jurors individually during voir dire. Id. The government opposes Nassif's request for a jury questionnaire because Nassif does not suggest that he, in particular, "has received significant, unfavorable pretrial publicity," so "any potential prejudice due to general media coverage ... can be adequately probed through in-person voir dire examination." Opp'n to Venue Mot. at 25.

*11 The Court agrees with the government. Nassif's alternate requests fail for fundamentally the same reasons as his motion to transfer venue: the Court is not persuaded that any additional procedural mechanisms will be necessary to ensure the empanelment of a full and impartial jury. Although Judge Chutkan has agreed to employ Nassif's requested procedures in United States v. Alford, Crim. A. No. 21-263, other courts in this District have empaneled juries in January 6 cases without resorting to enhanced protocols, see Garcia, 2022 WL 2904352, at *10 (collecting cases), and this Court is confident that the standard voir dire process will be sufficient here. Accordingly, the Court will deny Nassif's request for expanded examination of prospective jurors before and during voir dire.

### Conclusion

In sum, the Court concludes that 40 U.S.C. § 5104(e)(2)(G) is neither overbroad nor vague on its face, and that the statute applies to Nassif's conduct and accordingly Count Four of the Information states an offense. Further, the Court concludes that there is no overwhelming local prejudice that compels transferring venue at this stage of the proceedings, and that Nassif's requests for expanded voir dire are unnecessary for many of the same reasons. Accordingly, the Court will deny Nassif's motion to dismiss and his motion to transfer venue or, in the alternative, for expanded voir dire. A separate Order to that effect shall issue on this date.

**All Citations**

--- F.Supp.3d ----, 2022 WL 4130841

**Footnotes**

1    The following factual background draws in part from the government's brief in opposition to Nassif's motion to dismiss, see Gov't's Opp'n to Mot. to Dismiss [ECF No. 34] ("Opp'n to Mot. to Dismiss") at 1–3, and the affidavit in support of the criminal complaint against Nassif, see Aff. in Supp. of Criminal Compl. & Arrest Warrant [ECF No. 1-1] ("Aff. in Supp. of Compl."), which may be accepted as true for present purposes, United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015); cf. United States v. McHugh (McHugh I), 583 F.Supp.3d 1, 8 n.2 (D.D.C. 2022); United States v. Mostofsky, 579 F. Supp. 3d 9, 13 (D.D.C. 2021) (noting that the court "glean[ed] its understanding of the case by assuming as true the facts set forth in the Indictment and associated filings").

2    Nassif did not file a reply in support of his motion for transfer of venue.

3    Nassif raises only facial challenges to § 5104(e)(2)(G); he does not argue that the statute is unconstitutional as applied. Mot. to Dismiss at 2 n.1; Reply at 2 n.2.

4    The government notes that the operative verbs in § 5104(e)(2)(G) "principally target conduct rather than speech," Opp'n to Mot. to Dismiss at 5, but this distinction means little because the operative verbs—parade, demonstrate, and picket—cover expressive conduct, see, e.g., Spence v. Washington, 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam) (concluding that displaying an American flag with a peace symbol affixed to it was protected First Amendment activity because "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it"); Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (applying the same standard to conclude that burning a flag was protected First Amendment activity).

5    The government may also impose "regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Perry, 460 U.S. at 45, 103 S.Ct. 948.

6    Nassif cites Jeannette Rankin Brigade v. Chief of Capitol Police, 342 F. Supp. 575 (D.D.C.), aff'd, 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972), for the proposition that a statute "forbid[ding] all demonstrative assemblages of any size, no matter how peaceful their purpose or orderly their conduct" would be "void on its face on First and Fifth Amendment grounds," Mot. to Dismiss at 10 (quoting 342 F. Supp. at 587). But that case dealt with a previous version of § 5104(e)(2)(G) that prohibited "parad[ing], stand[ing], or mov[ing] in processions or assemblages in the Capitol Grounds," not within the Capitol building itself. Jeannette Rankin Brigade, 342 F. Supp. at 583 (emphasis added) (quoting 40 U.S.C. § 193g (1967)). The court in Jeannette Rankin Brigade explained that "[t]he Capitol Grounds ... have traditionally been open to the public," id. at 584; but as the Court has explained

above, the same is not true of the Capitol building.

7   Parade, Webster's New Int'l 3d Dictionary (3d ed. 1993) ("[T]o assemble (as troops) in formation; cause to maneuver or march ceremoniously[.]"); Parade, Oxford English Dictionary (3d ed. 2005) ("To march in procession or with great display or ostentation; to walk up and down, promenade, etc., in a public place, esp. in order to be seen[.]").

8   Picket, Webster's New Int'l 3d Dictionary (3d ed. 1993) ("[T]o walk or stand in front of as a picket; to take up the station and duties of a military or labor picket[.]"); Parade, Oxford English Dictionary (3d ed. 2005) ("In an industrial or other dispute: to surround or occupy as a picket; to station pickets at or in (a place); to patrol with pickets," or "To act as a picket in a dispute or demonstration[.]").

9   Nassif also argues that the word "demonstrate" could be applied to such activities as "a child on a field trip remarking 'We love our Capitol Police' ... or a staffer cheerfully singing 'Battle Hymn of the Republic.' " Mot. to Dismiss at 8. At bottom, Nassif is arguing that the word "demonstrate" could reach too far and cabin in too much conduct, an argument more relevant to Nassif's overbreadth challenge than to vagueness. As the Court has already explained, read in context, § 5104(e)(2)(G) applies to organized conduct advocating a viewpoint, not to off-handed expressive conduct or remarks.

10   As the government notes, see Opp'n to Mot. to Dismiss at 12–13, some cases involve a crime "that must be charged with greater specificity," United States v. Resendiz-Ponce, 549 U.S. 102, 109, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007). For example, in Russell, the Supreme Court concluded that an indictment was deficient because the witness was charged with failing to give testimony "upon any matter under inquiry before either House" of Congress, 369 U.S. at 751 n.2, 82 S.Ct. 1038 (quoting 2 U.S.C. § 192), but the indictment stated only that the witnesses failed to answer questions that "were pertinent to the question then under inquiry," without explaining the subject of the investigation, id. at 752, 767–68, 82 S.Ct. 1038. Here, as in many other cases where courts have declined to apply Russell, the nature of Nassif's charges does not depend upon a "specific identification of fact." Resendiz-Ponce, 549 U.S. at 110, 127 S.Ct. 782 (citation omitted); see also United States v. Apodaca, 275 F. Supp. 3d 123, 153–56 (D.D.C. 2017) (not applying Russell to indictment under a statute criminalizing the use of firearms in connection with drug trafficking crimes).

11   In reply, Nassif asserts that § 5104(e)(2)(G) does not " 'expressly' set forth the purportedly required 'disruptive conduct' " element of the offense, so a violation of § 5104(e)(2)(G) "must be charged with greater specificity.' " Reply at 15 (quoting Resendiz-Ponce, 549 U.S. at 109, 127 S.Ct. 782). As explained above, the Court does not conclude that the statute requires a "disruptive" element, so this argument fails.

12   See United States v. Garcia, Crim. A. No. 21-0129 (ABJ), 2022 WL 2904352, at * 10 (D.D.C. July 22, 2022) (collecting cases and concluding that, "[t]o date, courts have had little difficulty qualifying enough jurors to empanel juries, with the requisite number of alternates, in January 6 cases").

| | |
|---|---|
| 13 | Nassif inadvertently attached only a single appendix from the Select Litigation Survey to his initial submission, but, with the Court's leave, he supplemented his filing. See Unopposed Mot. to Supplement Venue Mot. [ECF No. 33] at 1–2; Min. Order, July 11, 2022. Nassif's supplemental filing contains his memorandum in support of his motion and the Select Litigation Survey in a single document. For convenience, the Court will cite pages of the Select Litigation Survey using electronically generated CM/ECF page numbering. |
| 14 | The Court notes that the three media sources Nassif cites—documentaries available on HBO and Hulu, and a video feature produced by the New York Times—were all released in 2021. See Venue Mot. at 10 n.15. |

**End of Document**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.