**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-509 (TSC)** |
| **v.** | : | |
| | : | |
| **ANTONY VO,** | : | |
| | : | |
| **Defendant.** | : | |

**MOTION IN LIMINE TO PRECLUDE ENTRAPMENT RELATED DEFENSES AND ARGUMENTS AND EVIDENCE ABOUT ALLEGED LAW ENFORCEMENT INACTION**

**INTRODUCTION**

The government respectfully requests that the Court issue an order precluding Defendant Antony Vo from presenting evidence or argument for any of the following: (1) claims that he was entrapped, (2) that former President Trump (or any other Executive Branch official) gave permission for them to enter or attack the U.S. Capitol, which would raise the affirmative defenses of public authority or entrapment by estoppel, (3) claims that by allegedly failing to act, law enforcement made the Defendant's entry into the United States Capitol building or grounds or his conduct therein lawful; or (4) any assertion concerning alleged inaction by law enforcement unless the Defendant specifically observed or were otherwise aware of such conduct.

Motions *in limine* are "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 10 (D.D.C. 2011) (*quoting Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1070 (3d Cir. 1990)).   The government presents these issues to the Court in an effort to prepare this case for an efficient trial. For each motion herein, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial. For the Court's awareness, the government also anticipates filing a trial memorandum in which it

will discuss additional legal or evidentiary issues that may arise during trial, but on which the government would not be seeking a pretrial ruling.

As an initial matter, the government notes the unique circumstances surrounding the offenses charged, and their location.   As of July 6, 2023, more than 1,069 defendants have been arrested for their participation in the events of January 6, 2023.   *See* https://www.justice.gov/usao-dc/30-months-jan-6-attack-capitol.   Specific to the Upper West Terrace door (the "UWT door") where the Defendant made entry, the government is aware of more than 25 charged defendants, with at least 24 defendants who made entry through the any Upper West Terrace door having been found guilty.[1]   The government is unaware of UWT door defendant who was not found guilty of an offense related to the January 6, 2021 Capitol insurrection, or their entry into the Capitol.   Similar or related motions *in limine* have been filed in other UWT door cases.[2]   Similar motions *in limine* have been filed in other January 6 cases

---

[1] *See United States v. Jason Gerding*, 1:21-cr-00131-PLF-1 (ECF No. 78), *United States v. Christina Gerding*, 1:21-cr-00131-PLF-2 (ECF No. 80), *United States v. Jordan Revlett*, 1:21-cr-00281-JEB-1 (ECF No. 46), *United States v. Sara Carpenter*, 21-305 (JEB) (ECF No. 99), *United States v. Luke Bender*, Case No. 21-508 (BAH) (ECF No. 93), *United States v. Landon Mitchell*, Case No. 21-508-2 (BAH) (ECF No. 95), *United States v. Josiah Colt*, 1:21-cr-00074-DLF-1 (ECF No. 22), *United States v. Nicole Prado*, 1:21-cr-00403-RC-1 (ECF No. 47), *United States v. Richard Michetti*, 1:21-cr-00232-CRC-1 (ECF No. 54), *United States v. Bruno Cua*, 1:21-cr-00107-RDM-1 (Minute Order 2/24/2023), *United States v. Johnny Harris,* 1:21-cr-00274-RDM-1 (ECF No. 50), *United States v. Mick Chan*, 1:21-cr-00668-TNM-1 (Minute Order 1/24/2023), *United States v. Louis Valentin*, 1:21-cr-00702-JEB-2 (ECF No. 43), *United States v. Julio Baquero*, 1:21-cr-00702-JEB-1 (ECF No. 41), *United States v. Jeremy Baouche*, 1:21-cr-00733-CRC-1 (ECF No. 33), *United States v. Eduardo Nicholas Alvear Gonzalez*, 1:21-cr-00115-CRC-1 (ECF No. 52), *United States v. Andrew Wrigley*, 1:21-cr-00042-ABJ-1 (ECF No. 40), *United States v. Chance Uptmore*, 1:21-cr-00149-RCL-1 (ECF No. 74), and *United States v. Ryan Suleski*, Case No. 1:21-cr-376 (RDM) (ECF No. 50), *United States v. Jared Cantrell*, 1:22-cr-00121-TNM (Minute Entry April 4, 2023), *United States v. Quentin Cantrell*, 1:22-cr-00121-TNM (Minute Order April 4, 2023), *United States v. Eric Cantrell*, 1:22-cr-00121-TNM (ECF No. 84), *United States v. Stacy Hager*, 1:21-cr-00381-TSC-1 (Minute Entry April 4, 2023), and *United States v. Ronald Sandlin*, 1:21-cr-00088-DLF-1 (ECF No. 99).

[2] *See United States v. Patrick Montgomery, et al.,* 1:21-cr-46-RDM (ECF No. 132); *United States v. Johnny Harris*, 1:21-cr-00274-RDM-1 (ECF No. 35, Minute Order 12/21/2022), *United States*

where entry was made through a different door as well.[3]   The government does not suggest that collateral estoppel could apply in this situation because the other UWT door cases involved separate defendants with separate facts, but the significant number of cases with nearly identical factual and legal issues related to entry through the UWT door establishes a robust evidentiary, and legal, record that the Court can and should consider.   *Cf. Laughlin v. United States*, 344 F.2d 187, 189 (D.C. Cir. 1965) (The collateral estoppel doctrine, which has its roots in the civil law, prevents repetitious litigation of the same issue by the same parties).

## FACTUAL BACKGROUND

### I.   DEFENDANT'S ACTIONS

The Defendant is charged via information with offenses related to crimes that occurred at the United States Capitol on January 6, 2021.   Even a cursory review of the events of that day, and the circumstances surrounding entry into the United States Capitol demonstrates that no one who entered the building that day was ignorant of the egregious violation of law that was taking place.   The Defendant's specific conduct, location, and circumstances demonstrates his intent to engage in disorderly and disruptive conduct in the Capitol and its grounds, as well as commit the other violations charged.   The Defendant is charged with four misdemeanor charges, including Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C.

---

*v. Nordean*, Case No. 21-CR-175 (TJK) (ECF No. 494), *United States v. Cantrell*, Case No. 22-CR-121 (TNM)(ECF No. 55), *United States v. Bender and Mitchell*, Case No.: 1:21-CR-508 (BAH) (ECF Nos. 68 and 76), and *United States v. Carpenter*, No. 21-cr-305 (JEB) (ECF Nos. 56, 78).

[3] *See United States v. Williams*, No. 1:21-cr-377 (BAH) (ECF No. 37), *United States v. Sheppard*, No. 21-cr-203 (JDB)(ECF No. 60), *United States v. Alford*, No. 21-cr-263 (TSC).

§ 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

The Defendant attended the "Stop the Steal" rally, then joined the crowds that approached the Capitol on Pennsylvania Avenue, NW.   He entered the restricted area on the west side of the Capitol.   Pictures from the Defendant's cell phone show him in the restricted area, where rioters were climbing over walls as he approached the Lower West Terrace.



*Figure 1, Rioters on West Lawn of Capitol, image from Defendant's phone.*



*Figure 2, Defendant approaches Scaffolding, image from Defendant's phone.*

On the west side of the Capitol, there were scaffoldings that were being set up for the upcoming inaugural ceremonies.   There were barriers preventing the public from entering the west side of the Capitol, the scaffoldings and the Upper West Terrace of the Capitol.   Also, law enforcement tried to prevent rioters from entering the scaffoldings or the stairs to get to the Upper West Terrace, but rioters breached the law enforcement lines and barriers.   Rioters ripped the white covering off part of the scaffoldings and climbed through the scaffolding and up the stairs to the Upper West Terrace.

The Defendant passed rioters screaming and climbing on the bannisters and scaffolding. The Defendant walked into the scaffolding, past the ripped canvas, and up the stairs to the Upper West Terrace.



*Figure 3, Reporter video, MAH02944.MP4*



*Figure 4, U.S. Capitol Police surveillance video (CCTV) of rioters on the stairs on West side of Capitol leading to Upper West Terrace at approximately 2:20 pm.*

The Defendant then made his way up the stairs under the scaffolding.   At the top of the stairs, there was wreckage of the barricades that, a short time before, prevented the rioters from entering the Upper West Terrace.



*Figure 5, Colt GoPro Video*
*Showing destruction of Barricades at Upper West Terrace*

The Defendant proceeded to take photographs and videos of the rioters on the Upper West Terrace, including rioters that had scaled the side of the Capitol above the Senate Wing Doors.

 

*Figures 6, 7, Rioters on Upper West Terrace and rioter scaling the side of the Capitol Building. Images from video on Defendant's phone.*

The Defendant and a companion posed defiantly on the Upper West Terrace.



*Figure 8, Defendant on Upper West Terrace,*
*image from Defendant's phone.*

It is apparent that the MPD Civil Disturbance Unit (CDU) officers were responding to and forming up in that area and blocking the UWT door and that the UWT door is locked and not open. At approximately 2:27 p.m., MPD CDU officers put on their personal protective gear due to chemical irritants that had been sprayed near the UWT door.



*Figure 9, MPD blocking UWT door – marked with Red Arrow*

As the Defendant approached the UWT door, he took photographs of the rioters, including rioters standing on the structure and demonstrating from a balcony on the second story of the Capitol.



*Figure 10, Image from Defendant's phone of rioters by UWT door.*

Rioters moved a heavy cart holding scaffolding material for the inauguration, possibly to provide greater ingress into the Capitol and/or to block police attempts to retake the UWT door. After the rioters breached the door from the inside, the Defendant captured the MPD officers who had retreated to other areas of the Upper West Terrace.



*Figure 11, Line of MPD Officers who retreated from the Upper West Terrace Door. Image from Defendant's phone.*

A dolly cart was pushed and used as a barricade to block police from retaking the UWT door.   Rioters continued to throw metal pipes and bike racks onto the barricade. The UWT door through which the Defendant gained entry was breached at approximately 2:33 p.m. by rioters forcing the door open from the inside.



*Figure 12, CCTV Video – Showing breach by rioters from inside UWT door*

The breach of the doors started a piercing alarm that sounds continuously.   On the inside of each door was a prominent sign that read, "Emergency Exit Only – Push Until Alarm Sounds (3 Seconds) Door Will Unlock in 15 Seconds."



*Figure 13, Colt GoPro391.MP4 – Showing Emergency Exit Only Sign on UWT door.*

The Defendant paused and had a brief conversation with his female companion on the landing outside the UWT Door.   The Defendant entered the UWT door at approximately 2:38:23, leaving his companion behind.   He entered approximately five minutes after the initial breach of the UWT door.   As he enters, the Defendant placed his left hand on the door and looked directly at one of the "Emergency Exit Only" signs.



*Figure 14, CCTV video showing Defendant's entry into UWT door at 2:38:23 p.m.*

The Defendant continued down the hallway, deeper into the Capitol Building.   Numerous packing boxes are stacked on either side of the hallway.   There is no metal detector, check-in desk, or any other indicator that the UWT door is used for public access to the Capitol.



*Figure 15, CCTV video showing the Defendant proceeding down hallway, Time 3:28:35 p.m.*

The Defendant did not pass through security and there was no indication that this was a legitimate entryway to the U.S. Capitol.   In fact, the alarm was blaring and the door he entered through was clearly marked "Emergency Exit Only."   As Judge McFadden observed in rendering a verdict in a different case in which the defendant entered at the same door around the same time, "[i]ndisputably, there were no officers at the door or indicia that this was a public door.   Indeed, boxes lined the narrow hallway inside the door, suggesting this is a private area."   Transcript of verdict, *United States v. Mick Chan*, No. 21-00668 (TNM) pg. 6 (finding the defendant guilty of entering or remaining in a restricted building or grounds and other offenses).   After making his entry, the Defendant walked down a hallway toward a set of interior doors that led to a stairway to the Rotunda.   The Defendant passed by five USCP officers who were standing on the sides of the hallway.

The Defendant entered the Rotunda on the second floor of the Capitol.   He wandered through the nearby Statutory Hall where he engaged with other rioters in conversations and took selfie photos.   He then re-entered the Rotunda, where he met up with the female companion who he had left behind at the UWT door.   The Defendant and the female companion spent time in the Rotunda, including using another rioter's flag and posing for photographs in the middle of the Rotunda.   During this time, there were other rioters streaming around them, alarms going off, and MPD officers blocked the doorway that Defendant had used to enter the Rotunda.



*Figure 16, Defendant and companion in the Capitol Rotunda, image from Defendant's phone.*

At approximately 3:05 p.m., the Defendant exited the Capitol through a door leading to the plaza on the East side of the Capitol.   The Defendant had been in the Capitol for approximately 27 minutes.

II.    <u>OFFICERS' ACTIONS AT THE UWT DOOR</u>

At 2:35:59 pm, five officers with the U.S. Capitol Police Department (USCP) responded to the breached outer UWT door in an apparent attempt to secure this breach.



*Figure 17, CCTV Video of Officers approaching exterior UWT door*

Multiple rioters crowded into the part of the hallway near the UWT doorway and the ramp outside the doorway.    The rioters confronted the officers, and at approximately 2:36:53, the officers moved to the side of the hallway, and rioters entered the UWT door and hallway, moving further into the Capitol.



*Figure 18,CCTV Video of Rioters Stacked Up at UWT door*

At 2:37 pm, an individual with a video camera talked to one of the of five USCP officers, who told her no one is allowed inside the building, saying "No you can't come in.   Nobody can come in."   The Defendant entered the UWT door and passed by this officer less than a minute later.



*Figure 19, open source video, https://www.youtube.com/watch?v=L5hksM_R59M –*
*Officer at UWT door telling reporter she can't come into the Capitol*

Video footage also captures rioters threatening the officers who were guarding the UWT door.



*Figure 20, open source video, https://www.youtube.com/watch?v=270F8s5TEKY*

Because of allegations by rioters that they were let in at the Upper West Terrace Doorway, all five officers who were present at one time or another near the interior second set of doors during this time period were interviewed as part of an investigation into their conduct. Those interviews were produced to the defense in Global Discovery.    Officer 1 stated:

> On January 6, 2021, I was assigned to the Inaugural Task Force at GPO building. Upon hearing the protest situation at the Capitol become dire, I responded over to assist... Arrived at Upper West Terrace door. Protestors were entering and exciting door. Door was in fire alarm mode. Sgt. Millard called over radio and asked for a key to secure. No radio response. I looked for a lockdown button but nothing but a phone was nearby. The door is a push bar, opening outward, with no way to even stick an object in the handles to prevent opening. Attempted to hold a line at the door to prevent further entry. Protestors formed on the outside. Other protestors inside appeared at our rear to exit or remained at rear. Crow[d] size significantly outnumbered officers. Decision was made to fall back. I was under the impression that CDV was nearby inside. We did not have the resources to effect any arrests, as only a few officers, few pair of handcuffs between the officers, significantly more protestors, no way to safely get the protestors if arrested to a transport. An[y] attempt to go hands on with the protestors would have yielded injury to officers and no achievable objective. Crowd flow entered building. Additional protestors exited, which again allowed protesters outside to recognize the door was open. Additional protestors entered. Began to make another attempt at a police line. Was able to hold crowd temporarily. [Fellow Officer] tried to rationalize with the crowd to no avail. Rear of crowd began pushing, causing front of group to advance on the line. Another decision was made [to] fall back. With no safe and achievable objectives, the goal was to find a larger contingent of officers and push the crowd outside the building. Moved back to the OAP hallway and responded to the House Chamber for the call of "shots fired."

Officer 2 stated:

> We began to fall back to the area inside the Upper West Terrace door where there were no support elements. When the group arrived at the door, I began attempting to direct the crowd to the nearest exit which was the Upper West Terrace door. I believed the door to be in alarm and to have been breached. Several people exited out of the door from the group where then I observed people from the crowd outside begin to enter the door. I along with [the other officers] made an initial effort to repel the group of people that were entering the door. A physical confrontation occurred where we began pushing and hitting the leading edge of the crowd in an attempt to expel them from the building. There was an older lady in the front of the group carrying a protest sign that began to scream in pain as she was crushed between us. The group stopped their physical effort to push into the building and this is where I made a second attempt to de-escalate the situation and attempted to

convince the group to leave. At some point, I specifically told the group that the building was closed and that's why they were not allowed in. During this dialogue, the main individual in the group is using language to provoke me to respond with physical force.  . . . The group began chanting to let us in. Throughout the entire dialog with the group, I used techniques to attempt to calm the group, I told the group that what they were doing was wrong, that in their arguments of defending the constitution that they were disrespecting the [Capitol] building and disrespecting the process. At this point, an individual in the group asked if l was ready to die to protect these people, I immediately attempted to deflect the question and de-escalate, [when] the same individual asked for a second time if I was ready to die for this place at which point I responded that l swore an oath to protect this place and that's what I'm going [to] do. At this point [the senior officer] grabs me by the shoulder, and pulls me back away from the crowd where the people at the door then begin to enter the building. I believe at this point I voiced a request over the USCP radio to have the key brought to the door to re-secure it.  . . . I was prepared to fight, I recognized that we were outnumbered by an adversary that was provoking a violent confrontation. I resolved that had a second confrontation to expel this group occurred, that the end result would have been lethal force. When [the senior officer] pulled me back, it caused me to break the cycle of thought of preparing to fight where I then transitioned in my mind to do what was necessary to preserve life. This included a strategic fall back and regroup to a position where we had better numbers and were in a better position to engage another effort to remove these people from the Capitol.

As a result of the internal investigation, it was determined that the officers at this doorway did not permit rioters into the building nor did they behave inappropriately.    In short, no officers invited the defendants into the U.S. Capitol on January 6, 2021.[4]

The time period from when rioters breached the UWT door from the inside until it was secured by MPD officers was relatively short.    At approximately 2:32 p.m., MPD Civil Disturbance Unit (CDU) officers fell back from the secured UWT door.

---

[4] Many defendants who entered the Capitol through the UWT door near the time the Defendant made entry have specifically acknowledged that they "knew at the time [they] entered the U.S. Capitol Building that that [they] did not have permission to enter the building.    *See United States v. Nicole Prado*, No. 21-CR-403 (RC), ECF No. 33, *United States v. Jordan Revlett*, No. 21-cr-281, ECF No. 34, *United States v. Josiah Colt*, No. 21-cr-74, ECF No. 22, *United States v. Andrew Rigley*, No. 21-cr-42 (ABJ), ECF No. 29, *United States v. Ryan Suleski*, No. 21-CR-376 (RDM), ECF No. 40, *United States v. Chance Uptmore*, No. 21-CR-149, ECF No. 49.



*Figure 21, BWC Video of Officer MF*

The first rioter entered through the breached door at approximately 2:34:05 p.m.   MPD

CDU officers resecured the UWT door area at approximately 2:46 p.m.



*Figure 22, BWC Video of Officer ML – showing barricaded path*

21

In the intervening twelve minutes, as a few dozen individuals entered the UWT door, members of the mob immediately in front of the door were throwing and stacking scaffolding and other building materials, chemical irritants filled the air, an alarm at the doorway was blaring, a sign on the door read "Emergency Exit Only", and the entryway was filled with packages for storage.

## ANALYSIS

I. THIS COURT SHOULD PRECLUDE THE DEFENDANT FROM ARGUING ENTRAPMENT, AND THE RELATED AFFIRMATIVE DEFENSES OF AN ENTRAPMENT BY ESTOPPEL OR A PUBLIC AUTHORITY DEFENSE.

The government moves *in limine* to prohibit the Defendant from making arguments or attempting to introduce irrelevant evidence that 1) he was entrapped, 2) that former President Trump (or any other Executive Branch official) gave permission for him to enter or attack the U.S. Capitol, which would raise the affirmative defenses of public authority or entrapment by estoppel, or 3) that the Defendant was enticed or entrapped by law enforcement in entering or attacking the U.S. Capitol.

Insofar as the Defendant may seek to claim that he was entrapped by law enforcement officers at the U.S. Capitol into committing some or all of the crimes with which he is charged, he should also be precluded from raising this defense as a matter of law at trial.   The government is aware of no evidence that could support such a defense.   Therefore, absent a proffer as to how such a defense could arise at trial, the government seeks an order precluding the Defendant, through the introduction of evidence or counsel's questions or argument, from arguing or claiming that he was entrapped by law enforcement officers into committing the charged offenses.

"A valid entrapment defense has two related elements: government inducement of the crime and a lack of predisposition on the part of the defendant to engage in criminal conduct."

*Matthews v. United States*, 485 U.S. 58, 63 (1988).   A defendant arguing entrapment must show that "the criminal design originate[d]" with the law enforcement officers, "and [that] they implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce[d] its commission in order that they may prosecute."   *Sorrells v. United States*, 287 U.S. 435, 442 (1932).   "At a minimum, this requires a showing that the government agent actually solicited or suggested the criminal conduct."   *United States v. Solofa*, 745 F.3d 1226 (D.C. Cir. 2014) (internal citations omitted); *United States v. Robinson*, No. CR 16-98 (CKK), 2021 WL 2209403, at *11 (D.D.C. May 31, 2021) (laying out case law as quoted above).

The Government alleges that the Defendant passed police perimeters and barricades into a restricted security area and active construction site, entered into the U.S. Capitol Building, all in an effort to knowingly enter a restricted building, i.e., the Capitol, to create disorder and disrupt the orderly conduct of Government business in the Capitol, and to parade and demonstrate within the Capitol.   There is no evidence that any government agent or law enforcement officer induced the Defendant to commit any of these alleged crimes.   And there is certainly no evidence that a law enforcement agent or officer "actually solicited or suggested the criminal conduct" to the Defendant. *Solofa*, 745 F.3d 1226.   Absent any such evidence, a defendant may not present such an entrapment theory to the jury. E.g., *Robinson*, 2021 WL 2209403, at *11 (affirming denial of entrapment instruction when defendant "failed to point to any evidence" of entrapment).

In short, the conduct of the Defendant was plainly beyond any conduct that could be reasonably sanctioned, and he was not actively misled or entrapped into committing the alleged crimes.   The Defendant should be prohibited from making arguments or attempting to introduce non-relevant evidence—either through cross-examination or their own case-in-chief—that he had

permission to commit any of the crimes charged or that he was entrapped by law enforcement into doing so.

    A.    <u>This Court should preclude any entrapment by estoppel defense.</u>

Any assertion that the Defendant cannot be held criminally liable because his actions were authorized by former President Trump must be precluded because, as former Chief Judge Beryl Howell has recognized, "following orders, without more, can[not] transform an illegal act into a legal one" and "even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability." *United States v. Chrestman*, 525 F. Supp. 3d 14, 32-33 (D.D.C. 2021). Indeed, judges in this District have repeatedly rejected a defendant's attempt to rely on the entrapment-by-estoppel defense to counterbalance the strength of the government's case during a challenge to the defendant's pretrial detention. *See also United States v. Chansley*, 525 F. Supp. 3d 151, 168 (D.D.C. 2021) ("The Court need not dwell on defendant's invocation of the estoppel by-entrapment defense. The same argument was raised and rejected in another case involving a participant in the January 6th events, and the Court adopts the reasons for rejecting that argument set forth there by Chief Judge Beryl Howell.").

Moreover, on at least two occasions, other judges of this District have precluded defendants from raising one or both defenses at trial. Judge Walton, applying the case law described below, precluded a January 6 defendant from invoking the entrapment-by-estoppel and public authority defenses at trial. *See United States v. Thompson*, No. 21-cr-161-RBW, Dkt. 69 at 3-4 (D.D.C. Mar. 25, 2022). Judge Kollar-Kotelly did the same with respect to the first of those defenses. *United States v. Grider*, No. CR 21-022 (CKK), 2022 WL 3030974, at *2-4 (D.D.C. Aug. 1, 2022). As demonstrated by those cases, judges of this District have determined well in advance of trial

that those defenses can and should be precluded.    The question of whether a defendant may seek to introduce evidence in support of public authority and/or entrapment by estoppel defenses presents a threshold legal determination for the judge, and not the trier of fact, to adjudicate. Where, as a here, the defendant cannot meet his threshold burden, the Court should preclude the defendant as a matter of law from making arguments or attempting to introduce non-relevant evidence in support of those affirmative defenses.

As a matter of law, neither defense could apply on these facts and so the Defendant cannot invoke either at trial.    The entrapment-by-estoppel defense applies only if the defendant was "actively misled . . . about the state of the law defining the offense," and relied on that misleading advice.    *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018).    No such advice was given to the Defendant on or before January 6, and the Defendant has not proffered any evidence to the contrary.    The public authority defense, meanwhile, applies only to a "defendant who knows the conduct he has been authorized to commit is illegal," but believes he is acting as an agent of a government official who possessed actual authority to order his conduct.    *United States v. Alvarado*, 808 F.3d 474, 485 (11th Cir. 2015).    The defense is

> narrowly defined . . . and a defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites. First . . . a federal law enforcement officer must have actually authorized the defendant to commit the particular criminal act at issue, and the defendant must have reasonably relied on that authorization when engaging in that conduct. Second, the government official on whom the defendant purportedly relied must have actually had the authority to permit a cooperating individual to commit the criminal act in question.

*Id*. at 484.    Here, no executive official had actual authority to ask the Defendant to unlawfully enter the Capitol, to wander through the Rotunda and Statutory Hall, and to engage with other rioters and remain in the Rotunda, despite the alarms and disruptive conduct of the rioters, when law enforcement was clearly trying to clear the building.    Moreover, both defenses also require

that the Defendant's reliance or belief be reasonable.    Even if the Defendant believed that former President Trump authorized him to engage in illegal conduct, or that the statutes he is now charged with violating had been interpreted to permit his conduct, neither belief would be reasonable.

"In a variety of procedural contexts, the vast majority of cases have held, as a matter of law, that the defense was unavailable on the facts of the case."    *United States v. Conley*, 859 F. Supp. 909, 926 (W.D. Pa. 1994).    Courts have routinely rejected either jury instructions or requests to put on evidence by defendants whose proffered evidence fails, as a matter of law, to meet the defenses' requirements. *E.g.*, *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994) (affirming denial of motion to appoint psychological expert to testify in support of entrapment by estoppel defense); *United States v. Weitzenhoff*, 35 F.3d 1275, 1290 (9th Cir. 1993) (upholding refusal to instruct jury on entrapment-by-estoppel defense); *United States v. Brebner*, 951 F.2d 1017, 1024-27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *United States v. Etheridge*, 932 F.2d 318, 320-21 (4th Cir. 1991) (order granting motion *in limine* precluding evidence upheld).

In *United States v. Thompson*, No. 21-cr-161-RBW, the defendant was charged with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) and (2) (Count One); Theft of Government Property under 18 U.S.C. § 641 (Count Two); Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Four); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Six).    In early January 2022, Thompson filed a pretrial motion seeking to have the U.S. Marshals Service serve subpoenas on former President Trump and others (including Rudolph

Giuliani and other members of the former President's "inner circle"). *Id.* Dkt. 44 at 2.  Judge

Walton denied that motion, *id*. Dkt. 51, and directed Thompson to explain why those witnesses

had relevant testimony. Thompson's filing asserted, in relevant part, that he intended to rely upon

their testimony in support of two affirmative defenses: public authority and entrapment by

estoppel.   In response, the United States argued that the defendant should be precluded from

asserting both defenses.   Judge Walton agreed and issued an order finding that the "testimony of

the putative witnesses . . . is inadmissible in support of either of the first two versions of the public

authority defense as described by the defendant." *Id*. Dkt. 69 at 2.

At trial, the jury heard evidence of certain statements made by former President Trump and

Rudolph Giuliani on January 6, 2021, but the Court cautioned the jury that such statements "had

been admitted for a limited purpose" and instructed the jury that "[y]ou're not to consider that

evidence for any other purposes.   Neither former president Donald Trump nor Rudy Giuliani

actually had the power to authorize or make legal the alleged crimes charged in this case."   April

14, 2022 Transcript at 618-619.   The Court did not instruct the jury on the public authority or

entrapment-by-estoppel affirmative defenses.

Likewise, in *United States v. Grider*, No. CR 21-022 (CKK), the defendant was charged

with Civil Disorder under 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official

Proceeding under 18 U.S.C. § 1512(c)(2) and (2) (Count Two); Destruction of Government

Property under 18 U.S.C. § 1361 (Count Three); Entering and Remaining in a Restricted Building

or Grounds under 18 U.S.C. § 1752(a)(1) (Count Four); Disorderly and Disruptive Conduct in a

Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Five); Engaging in Physical

Violence in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(4) (Count Six);

Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Seven); Act of

Physical Violence in the Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(2)(F); and Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Nine).    On June 22, 2022, Grider filed a "Notice of Intent to Raise Public Authority Defense," *id.* Dkt. 102, and the following day, Judge Kollar-Kotelly issued a Minute Order directing legal briefing on the issue.    On July 7, 2022, Grider filed his "Brief in Support of Defendant's Notice of Intent to Raise Public Authority Defense."    *Id*. Dkt. 108.    In his brief, Grider pointed to language from former President Trump's speech on January 6, 2021, as the basis for his assertion of the affirmative defense. *Id*. at 3.    The Government filed its opposition on July 20, 2022, noting that the entrapment-by-estoppel defense applies only where a defendant was "actively misled . . . about the state of the law defining the offense" and relied upon that misleading advice, and asking that the Court preclude the defense in advance of trial.    *Id*. Dkt. 111 at 6 (citing and *quoting United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)).

Judge Kollar-Kotelly rejected Grider's proposed affirmative defense and issued a Memorandum and Order explaining that "[b]ecause no such defense is available under Defendant's proffered facts, the Court shall not read an entrapment-by-estoppel instruction to the jury."    *United States v. Grider*, 2022 WL 3030974, *1 (D.D.C. Aug. 1, 2022) (Kollar-Kotelly, J.).    In particular, Judge Kollar-Kotelly cited and quoted Chief Judge Howell's description of the defense as requiring the defendant to meet four separate elements:

> To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (internal quotations and brackets omitted) (*quoting Cox*, 806 F.3d at 1191).    In that case, the Chief Judge's analysis focused on the fourth element, namely, whether reliance upon former President Trump's statements was reasonable.    *Id*. 31-33.    In *Grider*, however, Judge Kollar-Kotelly focused on the first, rather than final prong, to reject the applicability of the affirmative defense, observing that "[r]egardless of whether Defendant can satisfy the fourth prong, reliance, he certainly cannot satisfy the first prong, that President Trump 'actively misled him about the state of the law.'" *Grider*, 2022 WL 3030974, *3.

Here, the Defendant cannot meet the requirements set out by Chief Judge Howell in *Chrestman*.    To start, the Defendant has not and cannot point to any government official who advised him that his conduct was legal or who provided any interpretation of the law that covered his alleged criminal conduct.    Former President Trump's speech on January 6 could not serve this purpose.    As but just two examples, former President Trump did not state that the U.S. Capitol grounds were no longer "restricted" under 18 U.S.C. § 1752(a), nor that efforts to corruptly obstruct the certification of the Electoral count would be permissible notwithstanding 18 U.S.C. § 1512(c)(2).    He therefore did not "actively mis[lead]" defendants "about the state of the law defining the offense." *Cox*, 906 F.3d at 1191.    The Defendant has not identified anyone else who might have authority to do so who did so either.

Just as "no President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters," no member of law enforcement could use his authority to allow individuals to enter the Capitol building during a violent riot, and after "obvious police barricades, police lines, and police orders restricting entry at the Capitol" had already been put in place by the United States Capitol Police and the Secret Service. *Id*. at 32.

Indeed, recently, a judge of this Court ruled in another January 6, 2021, case that "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building."   Memorandum and Order, *United States v. Williams*, No. 21-cr-377-BAH, at *2 (D.D.C. June 8, 2022).

The government notes that the unambiguous, and uncontested, video footage demonstrates that no police officers were immediately outside the UWT door.   In short, the Defendant had already breached the Capitol building, past numerous indications that such an entry was unlawful, when he first walked past USCP officers on the interior side of the set of doors.   Consequently, no officers could have let him into the Capitol, or signaled that it was ok to enter the Capitol. While there were five officers in the hallway when the Defendant entered, these officers had been trying to block rioters from entering the UWT doorway.   The officers did not invite rioters into the building, but were overwhelmed by the sheer number and violence of the rioters seeking to enter the Capitol.   Less than a minute before the Defendant entered the UWT, one of the officers told an individual that no one was allowed inside the building, saying, "No you can't come in. Nobody can come in."

Even if the Defendant could establish that a member of law enforcement told him that it was lawful to enter the Capitol building or allowed him to do so, the Defendant's reliance on any such statement would not be reasonable in light of the "obvious police barricades, police lines, and police orders restricting entry at the Capitol."   *Chrestman*, 525 F. Supp. 3d at 32.   Moreover, the Defendant's actions belie any argument that he actually relied on any such statement by law enforcement when he made a decision to unlawfully enter the Capitol building through a door broken open with a piercing alarm sounding.

Other Courts have also considered January 6 defendants' claims that concern the entry through the UWT door, including the conduct of Bruno Cua, who entered through the UWT door. *United States v. Cua*, Criminal Action No. 21-107 (RDM).    Based upon facts presented during a stipulated trial, the Court found:

> At some point, Cua "left his parents' side," and, around 2:30 p.m., "climbed up the scaffolding on the Northwest front of the Capitol building while holding a black asp [(Armament Systems and Procedures)] baton in his hand."    *Id*. (SOF ¶¶ 11–12).    He reached the Upper West Terrace via the scaffolding, and entered the Capitol through the Upper West Terrace doors (which were affixed with signs stating "EMERGENCY EXIT ONLY") at approximately 2:36 p.m.    *Id*. (SOF ¶¶ 13–14).    After walking through the doors, Cua encountered five U.S. Capitol Police officers, who had formed a police line a few feet inside and were stopping unauthorized people, including Cua, from entering the building.    *Id*. at 7 (SOF ¶ 14).    Members of the crowd began chanting, "Let us in!;"    Cua yelled "'we have your backs' while holding his cell phone in his right hand and waving the baton in his left hand."    *Id*.    After "several seconds," the police moved back and the "unauthorized people," including Cua, moved into the Capitol. *Id*.

Memorandum Opinion and Order, *United States v. Cua*, Criminal Action No. 21-107 (RDM), ECF No. 288, pg. 3 (emphasis added).    The stipulated facts further proved that, "[a] s the defendant approached, the double doors were propped open and a loud alarm was sounding as people were streaming into the Capitol through the doors."    ECF No. 281, pg. 6.    That Court also previously considered briefing on the issue of entry into the UWT door in *United States v. Johnny Harris*, Case No. 21-cr-274 (RDM), ECF No. 35 wherein the government argued, as the government argues here, that the defendant should be precluded from arguing law-enforcement inaction or entrapment by estoppel.    The defendant agreed with the government and did not object to the motion.    ECF No. 40.    On December 21, 2022, that Court granted the government's motion concerning the UWT door "as unopposed." *See* Minute Order, 12/21/2022.

Proud Boy Ethan Nordean also entered the Capitol through the UWT door.    On October 14, 2022, the government filed a motion *in limine* similar to the instant motion.    *United States v.*

*Nordean*, Case No. 21-CR-175 (TJK), pg. 30-31.   The motion was unopposed, and subsequently granted by the Court.   *See* transcript of hearing, Dec. 14, 2022, pg. 30.

*United States v. Carpenter*, Criminal No. 21-cr-305 (JEB) is also instructive.   In that case, the defendant entered the Capitol through the UWT door at 2:44:17 pm.   The government filed a motion *in limine* similar to the instant motion. *Carpenter*, Criminal No. 21-cr-305 at ECF No. 56. The Court granted the government's motion to preclude any entrapment by estoppel defense based upon then President Trump's statements.   *United States v. Carpenter*, Criminal No. 21-cr-305, 2023 U.S. Dist. LEXIS 21774 *; 2023 WL 1860978 (D.D.C). The Court ruled that the motion was premature as it related to any defense claim that any failure to act by law enforcement to prevent protesters from entering the Capitol rendered the defendant's conduct legal.   *Carpenter*, Criminal No. 21-cr-305, 2023 U.S. Dist. LEXIS 21774 *8; 2023 WL 1860978.   Subsequently, the defendant was tried and convicted of all charged offense, including the offense of Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1).

     B.     <u>This Court should preclude any public authority claim or defense.</u>

The Defendant should also be prohibited from making arguments or attempting to introduce evidence that law enforcement gave him permission to enter the U.S. Capitol.   The government notes that the Defendant has not given notice of a Public Authority Defense pursuant to Federal Rule of Criminal Procedure 12.3(a).   The government requests that the Court instruct the Defendant to assert any claim under Fed. R. Crim. P. 12.3(a) here or be barred from making such claim at trial.   As reasoned in *Chrestman*, "*Cox* unambiguously forecloses the availability of the defense in cases where a government actor's statements constitute 'a waiver of law' beyond his or her lawful authority." *Chrestman*, 525 F. Supp. 3d at 32 (*quoting Cox v. Louisiana*, 379 U.S. 559, 569 (1965)).

"The public authority defense allows 'the defendant [to] seek[ ] exoneration based on the fact that he reasonably relied" on the "actual authority of a government official to engage him in a covert activity.'"   *United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001); Fed. R. Crim. P. 12.3(a)(1).   "The difference between the entrapment by estoppel defense and the public authority defense is not great."   *Burrows*, 36 F.3d at 882; *United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006) ("The elements that comprise the two defenses are quite similar.").   Any such defense would fail for the same reasons identified above.

First, "[t]he validity of" the public-authority "defense depends upon whether the government agent in fact had authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the 'public authority' [defense]."   *Burrows*, 36 F.3d at 881-82 (*quoting Baptista-Rodriguez*, 17 F.3d at 1368 n.18).[5] The circuits that have considered the issue are unanimous on that point.   Neither the President nor any other Executive Branch official has the authority to empower citizens to enter restricted Capitol grounds, assault Capitol Police officers, or obstruct congressional proceedings.   *E.g.*, *North*, 910 F.2d at 891 n.24.

---

[5] In *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) (per curiam), the court reversed the convictions of two defendants who participated in the burglary of Daniel Ellsberg's psychiatrist's office.   The defendants claimed they did so at the behest of E. Howard Hunt, a long-time CIA agent who worked under the supervision of John Ehrlichman in the White House.   *North*, 910 F.2d at 879.   The case featured fractured separate opinions from the three-judge panel. Judge Wilkey, half of the two-judge majority, wrote that a defendant's reasonable reliance on the "apparent authority" of a government official (there, Hunt) to authorize his conduct could make out a defense.   *Id*. (*quoting Barker*, 546 F.2d at 949 (opinion of Wilkey, J.).   But that portion of *Barker* was not the controlling rationale, and the panel majority in *North* subsequently rejected North's request for an instruction invoking his superiors' "apparent authorization of his action." *Id*. at 881.   In any event, Judge Wilkey's application of reasonable reliance in *Barker*—where the defendants, each of whom had worked with the CIA, claimed that a government official (and previous CIA supervisor) authorized what they allegedly were told was a counter-espionage operation—has no analogue here.

Second, "a defendant makes out a defense of public authority only when he has shown that his reliance on governmental authority was reasonable as well as sincere."   *Burrows*, 36 F.3d at 882; *Fulcher*, 250 F.3d at 254; *Sariles*, 645 F.3d at 318-19.   Again, any reliance on an Executive Branch official's statements would here be objectively unreasonable for the reasons given above, and again, the Defendant should be precluded from raising this defense as a matter of law.

II.   THIS COURT SHOULD PRECLUDE THE DEFENDANT FROM ARGUING THAT ALLEGED INACTION BY LAW ENFORCEMENT OFFICERS MADE HIS CONDUCT ON JANUARY 6, 2021, LEGAL.

In addition to prohibiting any defense argument that law enforcement officers actively communicated to the Defendant that entering the Capitol building or grounds was lawful, the Court should also bar the Defendant from arguing that any failure to act by law enforcement rendered his conduct legal.   The same reasoning that applied in *Chrestman* again applies here.   That is, like the Chief Executive, a Metropolitan Police Officer or Capitol Police Officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction.   *Chrestman*, 525 F. Supp. 3d at 33.   An officer cannot shield an individual from liability for an illegal act by failing to enforce the law or ratify unlawful conduct by failing to prevent it.   Indeed, another judge of this District expressly reached that conclusion recently. *United States v. Williams,* No. 21-cr-377-BAH, at *3 ("Settled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct.").   This Court should apply the same principle in this case.   Accordingly, the Defendant should be prohibited from arguing that his conduct was lawful because law enforcement officers allegedly failed to prevent it or censure it when it occurred.

III.  THIS COURT SHOULD PRECLUDE THE DEFENDANT FROM ARGUING OR
      PRESENTING EVIDENCE OF ALLEGED INACTION BY LAW ENFORCEMENT
      OFFICERS UNLESS THE DEFENDANT SPECIFICALLY OBSERVED OR WAS
      OTHERWISE AWARE OF SUCH CONDUCT.

The government acknowledges that the conduct of law enforcement officers may be relevant to the Defendant's state of mind on January 6, 2021.   However, unless a defendant shows that, at the relevant time, he specifically observed or was otherwise aware of some alleged inaction by law enforcement, such evidence is irrelevant to the defendant's intent.   Federal Rule of Evidence 401 states that evidence is relevant if it "has any tendency to make a fact more or less probable … and the fact is of consequence in determining the action."   Fed. R. Evid. 401.

Here, if the Defendant was not aware of law enforcement's alleged inaction at the time of his entry onto restricted grounds or into the Capitol building (or at the time he committed the other offenses charged in the Information), any alleged inaction would have no bearing on the defendant's state of mind and therefore would not meet the threshold for relevance.   Again, another judge of this district adopted the same reasoning in granting an analogous motion in *limine* last year.   *See Williams*, No. 21-cr-377-BAH, at *3-4.   The Court should reach the same conclusion in this case and should exclude testimony and evidence of any alleged inaction by the police as irrelevant, except to the extent the Defendant shows that he specifically observed or was aware of the alleged inaction by the police when he committed the offenses charged in the indictment.

It is particularly significant that the Defendant entered the UWT door – an Emergency Exit -- with the alarm blaring and the Emergency Exit sign clearly visible.   That is where he breached the Capitol Building, and no subsequent claimed contact or conversation can ratify his illegal entry.

## CONCLUSION

For the reasons set forth herein, the government respectfully requests that this Court preclude improper argument or evidence related to (1) entrapment, (2) entrapment by estoppel, (3) any Public Authority defense, (4) and claim that law enforcement's alleged inaction rendered the defendant's actions lawful, and (5) any evidence or argument relating to alleged inaction by law enforcement except to the extent that the Defendant specifically observed or was otherwise aware of such conduct at the relevant time.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Lynnett M. Wagner*_____
        LYNNETT M. WAGNER
        Nebraska Bar No. 21606
        Assistant United States Attorney
        601 D Street, N.W.
        Washington, D.C. 20530
        Tel: (402) 661-3700
        Email: lynnett.m.wagner@usdoj.gov

And:    /s/ Eric Boylan_____
        Eric Boylan
        Texas Bar No. 24105519
        Assistant United States Attorney
        601 D Street, N.W.
        Washington, D.C. 20530
        Email: eric.boylan@usdoj.gov