UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      .
                               .
          Plaintiff,           .   CR No. 21-CR-0509 (TSC)
                               .
     v.                        .
                               .
ANTONY VO,                     .   Washington, D.C.
                               .   Friday, September 1, 2023
          Defendant.           .   10:07 a.m.
. . . . . . . . . . . . . . .

ARRAIGNMENT/PRETRIAL CONFERENCE
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:            ERIC BOYLAN, AUSA
                               LYNNETT M. WAGNER, AUSA
                               U.S. Attorney's Office
                               601 D Street NW
                               Washington, DC 20530

For Defendant:                 EUGENE OHM, AFPD
                               KATELYN ADAMS, AFPD
                               Federal Public Defender Office
                               625 Indiana Avenue NW
                               Suite 550
                               Washington, DC 20004

Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                               U.S. Courthouse, Room 4704-A
                               333 Constitution Avenue NW
                               Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1                    P R O C E E D I N G S

2                    (Via Videoconference)

3            THE DEPUTY CLERK:  Your Honor, we're on the record

4    in Criminal Case No. 21-509, United States of America versus

5    Antony Vo.

6        Starting with government counsel, please state your

7    appearances for the record.

8            MR. BOYLAN:  Good morning, Your Honor.  I'm Assistant

9    United States attorney Eric Boylan, representing the

10   government.  I'm joined by my co-counsel, Lynnett Wagner, and

11   our paralegal specialist, Taylor Wilbert.

12           THE COURT:  Good morning.

13           MR. OHM:  Good morning, Your Honor.  Eugene Ohm on

14   behalf of Mr. Vo.

15           THE COURT:  Good morning.  Mr. Vo, can you hear me?

16           THE DEFENDANT:  Yes, Your Honor.  Good morning.

17           THE COURT:  Good morning.  Okay.  So we initially set

18   this hearing as a pretrial conference, which it still is,

19   trial scheduled to begin on September 18.  But on August 17

20   the government filed a superseding information in this case,

21   which is ECF No. 79, and Mr. Vo hasn't been arraigned on these

22   charges.

23       So, Mr. Boylan, are you handling this hearing?

24           MR. BOYLAN:  Yes, Your Honor.  Lynnett Wagner, my

25   co-counsel, and I have kind of broken it up.  I know we have

1    several things to talk about, but if you --

2         THE COURT:  Okay.  Well, with regard to the superseding

3    information, I'm assuming it's just a language changes.  There

4    haven't been any -- as far as I can tell, there are no

5    additional counts.  Is that correct?

6         MR. BOYLAN:  That's correct, Your Honor.

7         THE COURT:  All right.

8         MR. BOYLAN:  Yes.  It's just language.

9         THE COURT:  All right.  So let's arraign Mr. Vo on the

10    new information, Madam Clerk.

11         THE DEPUTY CLERK:  Mr. Antony Vo, you are charged in a

12    four-count superseding information with the following charges:

13    Entering and remaining in a restricted building; disorderly

14    and disruptive conduct in a restricted building; violent entry

15    and disorderly conduct in a capitol building; parading,

16    demonstrating, or picketing in a capitol building.

17    Do you wish to waive the formal reading of the information,

18    and, if so, how do you wish to plea?

19         MR. OHM:  Your Honor, on behalf of Mr. Vo, we waive

20    formal reading of the information and enter pleas of not

21    guilty on each count.

22         THE COURT:  All right.  Thank you.

23    Before we begin, I know that, Mr. Ohm, you were not the

24    original counsel in this case.  Is that correct?

25         MR. OHM:  That's correct, Your Honor.

1          THE COURT:  And I believe, if my memory serves me

2     correctly, this case we were actually in the process of doing

3     a change of plea hearing, which broke down.  After that point,

4     Mr. Ohm became counsel for Mr. Vo.  And so I know that Mr. Ohm

5     is very experienced and diligent counsel, and I know he's gone

6     over all the ramifications and potential outcomes and

7     consequences of proceeding to trial.  And I'm here every day.

8     I don't get involved in plea negotiations, and I don't ever

9     punish anyone for going -- for exercising their right to put

10    the government to its burden.

11         However, as I recall, the plea in this case was to one

12    count with dismissal of the remaining counts.  Mr. Vo, in

13    rejecting that, has therefore chosen to go to trial on all

14    the counts in the information, which would mean he's facing a

15    different range should he be convicted of more than one those

16    counts.  So I'm sure Mr. Ohm has gone over that with him, but

17    I'm just putting that on the record.

18         Okay.  Both parties have moved to exclude certain evidence,

19    and I'm going to rule on those motions first, then I'm going

20    to address some additional pretrial matters including the

21    parties' objections to the other side's exhibits as well as

22    disagreements regarding voir dire questions and jury

23    instructions.

24         A now housekeeping matters before we begin.  I do not have

25    a housekeeping day.  I sit every day.  However, because I

don't have a housekeeping day, there may be days where I give

the jury a longer lunch so I can take care of status hearings

or other matters or I break a little early so I can do the

same.  I've tried to limit it, but given all our calendars, it

occasionally happens.  But I do sit every day.

So with regard to Mr. Vo's motions in limine, as you all

know, under Federal Rule of Evidence 403, I can exclude

relevant evidence if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the

jury, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence.

Mr. Vo moves to preclude the government from referring

to him or other participants in the -- that day's events as

rioters, insurrectionists, or attackers, arguing that that

language is irrelevant, and under -- it is irrelevant under

Rule 401, and more prejudicial than probative under 403.

The government responds that it shouldn't be required to

dilute its language and step gingerly around defendant's

alleged crimes; and what took place on January 6 was, in fact,

a riot and an attack on the U.S. Capitol, and cites to

numerous sentencing hearings when at least three judges in

this district have referred to individuals convicted of

January 6 offenses as rioters or described the event as an

attack.

All right.  I'm going to deny that motion.  It is not

unduly prejudicial in this case at this time under these
circumstances to refer to the events of January 6 as a riot.
And Mr. Vo is not being charged with rioting, insurrection,
or overthrowing the government.  I think it's a factual
description, and I don't think it's -- the whole country knows
what happened on January 6.  I don't think we'll find a juror
who doesn't know about January 6.

    And I don't think that describing it as a riot is factually
incorrect, but I don't think -- because he's not charged with
rioting, I don't think Mr. Vo is unduly prejudiced by that
language.  I don't think we need to -- this is not a situation
where the jury's going to be asked to determine if there was a
riot.  They're asked to determine Mr. Vo's participation in
the events of that day.  So the government has to prove every
element of its case, and referring to what the jury will see
and hear about a riot does not relieve them of that burden.

    Moreover, the words that the government uses are not
evidence.  The jury will be instructed on that, both before
and after the evidence.  And as the Ninth Circuit has
observed, there's no rule that requires the prosecutor to use
a euphemism for a crime or preface it every single time by
using the word "alleged."

    The jury is going to be instructed, both at the beginning
and end of the case, that Mr. Vo is presumed to be innocent
and that that presumption stays with him until the government

1  has met its burden of proof beyond a reasonable doubt.

2        And I similarly don't find it more prejudicial than

3  probative to refer to other participants who are doing other

4  things on that day as rioters.  Again, Mr. Vo is going to be

5  -- certainly the government can use evidence of what other

6  people were doing to address issues of Mr. Vo's *mens rea*.

7        In other words, to show that he was surrounded by people

8  who were conducting -- you know, doing certain actions and

9  therefore he -- you know, according to the government, anyway,

10  he could not have reasonably thought that what he was doing

11  was lawful.  So, you know, I'm not going to stop the

12  government from referring to those people as rioters.

13        "Insurrectionist" I think is a little unnecessary, and I'd

14  ask the government not to use that term.  It's a little more

15  loaded and a little more -- has a greater legal weight.  He's

16  not charged here with insurrection or sedition or anything

17  like that.  All right.  So I'm going to deny that motion.

18        The other thing is Mr. Vo asks to preclude the government

19  from introducing a 23-minute video compilation which he claims

20  highlights violence and activities from January 6 in which he

21  was not involved and which should be excluded under Rule 401

22  and 402 because, and I quote, "any portion of the video that

23  does not involve him does not make any fact more or less

24  probable and does not determine any fact of consequence with

25  regards to his conduct."

He also argues that the video should be excluded under Rule 403 because its prejudicial value outweighs its probative, and it could mislead or confuse the jury.  And he argues that the government has an evidentiary alternative because it could introduce other video evidence showing Vo's actions as opposed to other individuals'.

Well, first of all, I note that the government can put on its case how they seek to put on their case.  And as I've already said, there may be actions of others which seek to put into context Mr. Vo's actions and any claim that he had a reasonable belief that what he was doing was lawful if people around him are doing unlawful things.

The government responds that the nature of the crime is a collective action, given that it was the mob's collective action that disrupted Congress, and that defendant's knowledge of the collective riot bears on the *mens rea* for each of the charged offenses, which is kind of what I said.

It further argues that the video is necessary to show the overall riot, its effects, and why the certification of the Electoral College vote was suspended.  And to the extent that the Court finds that the actions of other participants to be prejudicial, I could issue a limiting instruction.

I'm going to deny that motion as well.  Mr. Vo is charged with acting knowingly and with intent to impede and disrupt the orderly conduct of government business and official

functions.  The government intends to introduce this video
to show why the certification of the Electoral College was
suspended.  And as I understand it, part of the government's
theory is that Mr. Vo was one of many thousands of people who
elected to disrupt official business.

The actions of others is relevant to that disruption and is
relevant to the government's obligation to prove that Mr. Vo
had the necessary intent to do what he is charged with, and I
do find that the video montage's probative value outweighs any
prejudicial effect.  I am willing to issue a limiting
instruction if the parties can come up with one, so I'll ask
the parties to meet and confer concerning an appropriate
limiting instruction.

And now, Mr. Boylan and Ms. Wagner, I have to tell you,
I've tried a few of these by now.  And it's your decision how
to put on your case, and I'm not going to get into that, but I
do think, for a four-misdemeanor-count case -- and I've seen
this in the other two trials I've done which were also
four-misdemeanor count cases -- it's a lot.  Twenty-three
minutes is a long time given all the other evidence you're
going to put on.  So I'm going to ask that you try to
streamline that.  I think 23 minutes is too long.

I'm not going to set a time limit other than to tell you I
believe 23 minutes is too long.  And I think you are going to
have -- from everything I've seen, the government has lots of

1    angles and photographs and witness testimony and video

2    testimony to choose from, and I'm certain that you can make

3    your case without putting on 23 minutes of a video montage

4    when it won't be the only video testimony or video evidence

5    that the jury will see.

6        And there's always a possibility you can anesthetize the

7    jury, too, or cause them such distress that the prejudicial

8    value outweighs the probative value.  I mean, we've all seen

9    this footage over and over.  I've often said it's still quite

10   shocking.  But we're talking about people who have not seen

11   it, and I think that 23 minutes is too long.

12       MR. BOYLAN:  Thank you, Your Honor.  Your concern is

13   well heard, and it's the government's intent to put on a

14   streamlined, efficient presentation for the jury.  We do not

15   intend to play all 23 minutes of that video, and so it's -- we

16   agree with Your Honor.

17       THE COURT:  Okay.  All right.

18       Now turning to the government's in limine motions.  First,

19   they seek to preclude -- and I realize the government's taking

20   a belt-and-suspenders, an overinclusive approach here, but

21   some of these motions are actually sort of premature.  They

22   seek to preclude the defense from introducing any evidence

23   concerning the exact location of U.S. Capitol Police security

24   cameras or the protocols of the U.S. Secret Service because

25   both categories of evidence would have minimal probative value

1    in the context of this trial, and obviously there are security

2    concerns at issue.

3         MR. BOYLAN:  Thank you.

4         THE COURT:  Mr. Vo responds that he does not intend on

5    eliciting testimony regarding the location of the cameras or

6    Secret Service protocols, but requests the right to reserve

7    eliciting this testimony or cross-examining on this testimony

8    should it become relevant on cross-examination.

9      I've had this exact issue in the other cases I've had, and

10   I've ruled that -- I've granted the government's motion, which

11   I'm going to do here, with the exception that should -- as

12   Mr. Ohm has said, should the location of those cameras or the

13   Secret Service protocols become an issue, then he would have

14   to approach the Court, alert the Court that he intends to

15   elicit this information or go into this information, and then

16   I will rule on whether he can.  But I haven't seen it happen.

17     So I'm going to grant the motion as unopposed with the

18   caveat that should the government open the door or should

19   Mr. Ohm feel that a testimony has necessitated him going into

20   this area, then he'll alert the Court.

21     Okay.  The second is the government seeks to preclude

22   Mr. Vo from making arguments or attempting to introduce

23   irrelevant evidence that encourages jury nullification.  More

24   specifically, they argue that Mr. Vo should not be permitted

25   to introduce any evidence of, or attempt to argue about, the

1   hardships of prison, potential effect of incarceration on

2   defendant's family, or the possibility that a significant

3   portion of his life may be spent in prison.

4       I'm going to deny this motion.  I don't think it's

5   necessary.  It's not an appropriate -- really an appropriate

6   subject for any in limine motion.  Should those questions or

7   should the defense seek to go into that area, they can make an

8   objection at trial.

9       But Mr. Ohm is an officer of the court, a very experienced

10  trial lawyer, tried cases in front of me.  I don't have any

11  reason to believe that -- I mean, he's aware of the rules of

12  evidence and his professional obligations.  I don't have any

13  reason to believe that he would make such arguments.

14  All right.  So I'll deny that.

15      Third and fourth, the government seeks to admit Mr. Vo's

16  out-of-court statements consisting of text messages, emails, and

17  Facebook posts in its case-in-chief, and also asks the Court to

18  preclude the defense from admitting Mr. Vo's statements in the

19  government's case-in-chief.

20      Again, this is sort of, maybe back when I was trying cases,

21  not the kind of thing we'd do in a motion in limine.  But, yes.

22  I mean, Mr. Vo's statements are admissible as an opposing party

23  statement.  Federal Rule of Evidence 801(d)(2)(A) does not

24  permit a party to introduce its own statements.  So, obviously,

25  Mr. Vo cannot introduce his own statements.

1      However, under Rule 106, which is the rule of completeness,

2  Mr. Ohm argues that Mr. Vo should be permitted to complete the

3  record if the government were to introduce portions of Mr. Vo's

4  statements so that the jury would have the full context.  If

5  that happens, I will address -- you know, the government can

6  make an objection.

7      And, Mr. Ohm, obviously, if you're going to do that, you have

8  to lay a foundation and allow the government to object and me to

9  rule on this before the statement is elicited in the presence of

10  the jury.

11      The rule of completeness is not a catch-all to therefore put

12  in all of a defendant's self-serving statements.  It is a rule

13  designed to complete a statement so that the full import and

14  understanding of the statement is conveyed to the jury.  So I'll

15  deal with that.

16      I'm going to grant the government's motion to introduce

17  the defendant's out-of-court statements, provided the proper

18  foundation is laid.  And I will deny the government's motion to

19  keep Mr. Vo's statements elicited by the defense out of its

20  case-in-chief, but they will be subject to proffer and to

21  foundation, and they will have to meet the requirements of Rule

22  106 should the defense seek to elicit them.

23      Fifth, the government asks the Court to take judicial notice

24  of the electoral certification law, the 12th Amendment to the

25  Constitution and Article II, Section 1 of the Constitution.

I've never been asked to take judicial notice of the Constitution before.  But I'm bound by it, so, yes, I will take judicial notice of it and the federal -- Mr. Vo has no objection to the Court taking notice of those things, so obviously I will.

The government also asks the Court to take judicial notice of the January 6, 2021, congressional proceedings that are memorialized in the congressional record.  Again, Mr. Vo doesn't object to me taking judicial notice of established law and public records, but he does request that the jury instruction regarding judicial notice caution the jury that the government must still prove each elements of the crimes alleged.

I will grant the motion, and I will take judicial notice. We can discuss an appropriate -- if an addition to the judicial-notice instruction is required -- I doubt it will be -- but they will obviously be instructed more than once that the government has to meet each element.  And the fact that I'm taking judicial notice simply means that it's something that's not challenged by either side.  But we'll talk about that in our charging conference.

Sixth, the government moves to preclude Mr. Vo from arguing the following defenses:

(1) that he was entrapped;

(2) that former President Trump or any other executive branch official gave him permission to enter or attack the U.S. Capitol, which would raise the affirmative defenses of public

authority or entrapment by estoppel;

(3) that by failing to act, law enforcement made Vo's entry into the United States Capitol building or grounds or his conduct therein lawful;

(4) any assertion concerning alleged inaction by law enforcement, unless the defendant specifically observed or was otherwise aware of such conduct.

Mr. Vo has responded that he has not noticed these defenses under Federal Rule of Criminal Procedure 12.3 and has no intention of raising these defenses, so I'll grant the motion as unopposed.  Mr. Vo notes that he may potentially raise evidence regarding the actions or inactions of law enforcement personnel in support of his defense that he lacked the requisite intent of the crimes that he's charged with.

You know, again, this is something we'll deal with at trial, but obviously that would have to be the actions or inactions of law enforcement personnel that Mr. Vo observed, not as a general matter.  Does anybody have any dispute with that?

MR. OHM:  I think generally, yes, Your Honor.  But I do think that given the government's theory of admissibility through the compilation videos and all these other individuals and what their actions are, that if we can establish that Mr. Vo observed even one of those people, that all of the information comes in because we get a chance to explain why he would think that the members of -- that all of the members of

1   a mob were not necessarily intending to do what the government

2   says they were intending to do but were -- that those

3   individuals might have been following the lead of these

4   officers --

5          THE COURT:  No.  He can't speculate as to what other

6   people might have been doing.  He can say what he saw, what

7   his state of mind was when he did whatever he did.  He cannot

8   then comment on what other people were doing and testify as to

9   what he thought they were doing.  He can simply say what he

10  saw and what his observations led him to believe, and that's

11  it.  No speculation about why others were acting.  And,

12  obviously, I wouldn't let the government put in such evidence.

13         MR. OHM:  Just to be clear, Your Honor, so the

14  government can also not argue that and speculate that Mr. Vo

15  would have been this and that because of what he would have

16  observed with what other people were doing -- other rioters

17  were doing.

18         THE COURT:  If the government can show that Mr. Vo

19  from where he was or, you know, his vantage point saw what

20  was going on, they can argue it.  But they can't say he --

21  you know, they have to connect it up.  They have to make the

22  connection that he was in a position to see what was happening

23  and therefore that what he saw should have or had -- you know,

24  negates his defense that he didn't realize he was committing a

25  crime or whatever it is.  But we're not going to get into what

1    people might have thought, should have thought.  It has to be

2    related to what Mr. Vo saw from where he was.

3        And certainly there may be video footage that you elicit

4    through other witnesses regarding what was going on.  That's

5    admissible.  But the government cannot argue that if -- say,

6    for example, video footage from the other side of the Capitol

7    where Mr. Vo wasn't, or from the tunnels where he wasn't, is

8    somehow relevant to his state of mind, but it certainly may

9    be relevant to a law enforcement witness, for example.  Okay.

10        MR. OHM:  I just want to make sure I'm clear, Your

11   Honor.  I apologize.  So, because in terms of what the

12   government -- if the government can argue -- so the

13   government's allowed to argue that based upon what he was in a

14   position to see, they can argue what they believe his state of

15   mind would be, and then we can also make those same arguments

16   based upon --

17        THE COURT:  Well, I think they can say, based on what

18   was going on around him, based on what he was in a position to

19   see and hear, he had to have known that what he was doing --

20   that he shouldn't have been going where he was going and that

21   he shouldn't have been where he was or going inside that

22   building.

23        MR. OHM:  And the same rule applies to us?  I just want

24   to make sure that I --

25        THE COURT:  What do you mean?

1          MR. OHM:  Because, based upon what he's seen, he could

2     have known what --

3          THE COURT:  Look, if there's a videotape that shows

4     some police officer, you know, saying, come on in, Mr. Vo,

5     sure, you can put that in to -- that negates his intent.  You

6     can put that in.  But you can't put in videos of officers

7     letting other people in that he didn't see.  You'd have to

8     establish that he saw that.

9          MR. OHM:  But, Your Honor, if he -- I think it just

10     makes sense for us to hash this out now.  So I apologize if

11     the Court wants to move on, and I'm happy to, but --

12          THE COURT:  I mean, what other people -- this is one

13     individual.  It's not a conspiracy case.  It's one individual.

14     And if on the other side of -- this cuts both ways.  If on the

15     other side of the building there are people fighting and

16     hitting officers and setting off alarms and he's not and the

17     government can't show that he's in a position to see that,

18     then it's not really relevant.  It may be relevant for other

19     things.

20        But the same goes for you.  If there's video footage or

21     some evidence that officers were, you know, welcoming people

22     inside the Capitol, it's not relevant to Mr. Vo unless you can

23     establish that he saw that or he -- you know, he was -- and he

24     could see it happening or something.  But what other people

25     were doing, you know, whether there were officers letting

1     people in is not relevant to Mr. Vo's case unless they were

2     letting Mr. Vo in.

3          MR. OHM:  So, Your Honor, I guess in the middle ground

4     where if he is in a group of people or a line of people and

5     that 50 that feet in front of him where we couldn't

6     necessarily prove that he saw it, the officers were letting

7     individuals in, and then those individuals were all peacefully

8     walking in, then that could inform him of what -- because the

9     government is arguing that what other individuals are doing in

10    his sight is relevant to his state of mind, then it feels like

11    if other individuals in our sight are responding to those

12    officer commands, regardless of whether he heard those

13    commands, that it seems like --

14         THE COURT:  He doesn't know if they're responding to

15    the officers' commands.  You know, there's -- I'll only tell

16    you what I know from other trials.  I mean, there's lots of

17    evidence where people are walking into the Capitol and the

18    officer is standing there, but that -- alarms are going off.

19    Sirens are blaring.  There are messages saying leave, you

20    know.  And that cuts both ways.

21         And unless he can say, I heard somebody saying come on in

22    or I saw somebody waving me in, the fact that 50 feet ahead

23    people are walking in -- he's not sure why, but they're

24    walking in, no, that doesn't -- I mean, it may be you can

25    cross-examine a witness on that fact, but I don't see you

1    being allowed to elicit that evidence in your case.

2        You know, sure.  I mean, the government puts on a police

3    officer that's talking about footage of people coming through

4    the doors and you see, you know, hundreds of people pouring

5    through the entrances, couldn't you say, well, there's Mr. Vo

6    way back there and there are all kinds of people walking in

7    and he's just walking in with them?  Yeah, you could elicit

8    that.  But you can't argue that he was somehow told that he

9    could come in unless you have evidence of that.

10        MR. OHM:  Okay.  I understand.

11        THE COURT:  All right.  Okay.  So I will -- I've ruled

12    on that motion.  It's unopposed subject to the exceptions I've

13    talked about if the defense has evidence of what Mr. Vo saw

14    and heard with regard to law enforcement's actions.

15        Okay.  Seventh.  The government seeks a pretrial ruling on

16    the authenticity of certain exhibits under Federal Rules of

17    Evidence 901 and 902 that it seeks to admit in its

18    case-in-chief.  These exhibits appear to fall into several

19    categories:

20        One is United States Capitol Police security camera

21    footage; the other is Metropolitan Police Department body-worn

22    camera footage; third, video images from Mr. Vo's phone and

23    Facebook account; the fourth, third-party videos, images and

24    other electronic evidence.

25        So let's start with the U.S. Capitol Police footage.  The

1    government argues it should be admitted pursuant to Rules

2    901(b)(4) and 901(b)(9).  I don't see any reason why --

3        Well, Mr. Vo responds that the Court should deny the

4    government's motion to the extent that it seeks to

5    preemptively authenticate open-source videos and images.

6    We haven't gotten to those yet.

7      With regard to U.S.  Capitol Police security camera footage,

8    do you have any objection, Mr. Ohm?  I don't see how it's not --

9    I mean, assuming the foundation is laid, I don't see how that

10   doesn't come in.

11       MR. OHM:  I guess for all of these things, I mean,

12   generally, you know, we -- and for all of these -- normally

13   somebody does it, authenticates it, and foundation is laid,

14   and then we wouldn't object.

15       THE COURT:  Yeah.  I mean --

16       MR. OHM:  Doing it in advance --

17       THE COURT:  -- you're allowed to put in all this stuff.

18   So I'm granting the government's motion.  I don't think we

19   need a pretrial ruling.  Lay the foundation.  It's video

20   camera footage, it's body-worn camera footage, it comes in.

21       Let's talk about, however, the open-source footage, the

22   third-party videos, images, and other electronic evidence.

23       MS. WAGNER:  If I may, Your Honor?

24       THE COURT:  Yes.

25       MS. WAGNER:  Just -- I don't want to get in the way

1 here, but there's kind of two categories of the open-source

2 videos.  One group is there's a series of, I think, eight or

3 so video clips from a reporter, Laura Brickman, and we did

4 provide notice and a certification under 902 to defense to

5 make those -- we believe that those are business records,

6 electronic records in the course of her work, and they are

7 self-authenticating.  So we -- that's sort of one category

8 of the open-source.  And then the --

9    THE COURT:  Well, why would they be sort of

10 contemporaneously recording -- I mean, I think there's another

11 exception that they come in.  But let me stop you, Ms. Wagner,

12 for a minute.

13  Mr. Ohm, you object to those recordings that were --

14 obviously, you have the source, the person who made the

15 recordings and information about the circumstances under which

16 the recording was made.  Do you have any objection to those?

17    MS. ADAMS:  No, Your Honor.

18    THE COURT:  Oh, Ms. Adams.  I'm sorry.

19    MS. ADAMS:  I'm sorry.  I was handling the government's

20 objections.  And, no, Your Honor, no objection to those.

21    THE COURT:  Okay.  Now the -- Ms. Wagner, the other

22 open-source information?

23    MS. WAGNER:  Yes.  And the other ones are going to be

24 more compared with the otherwise authenticated videos.

25    THE COURT:  So this is like stuff you got off the

1       internet?

2               MS. WAGNER:  Correct.

3               THE COURT:  Okay.  And, Ms. Adams, your objection is

4       that you don't know where these things came from, basically.

5       Right?

6               MS. ADAMS:  Yes.  Essentially, Your Honor.  I think

7       some of these videos, like, appear to be taken on a wide angle

8       camera.  We don't know what the government would compare them

9       to.  They are, you know, from the internet.  We don't

10      necessarily have who took these videos, what circumstances,

11      whether they were distorted in any way.  So we --

12              THE COURT:  All right.  Just so we can keep -- I need

13      to keep logistically clear, I am granting the government's

14      motion.  The defense does not oppose the use of the body-worn

15      camera footage, the U.S. Capitol Police footage, the third-

16      party footage that's been -- to which they have information.

17          With regard to the open-source footage taken from the

18      internet, for example, which the government doesn't know who

19      made it, I'm going to allow it because there's no dispute --

20      no one, I believe, is disputing that it's video footage of the

21      events of that day.

22          Therefore, I think any concern -- it goes to the weight,

23      not the admissibility, because it's not like there's an

24      argument that that -- you know, that's not really the January

25      6, that's not really -- wasn't taken on that date, some other

1     riot at the Capitol.

2         The issue is going to be the circumstances under which the

3     photograph or videotape evidence was made.  And I think --

4     frankly, I think the prejudicial effect does not outweigh the

5     probative value simply because there's just going to be a lot

6     of videotape evidence and a lot of photographic and other

7     evidence about what was going on that day.

8         And to the extent that there's some open-source footage, as

9     Ms. Adams said, might have been a wide-angle lens or we don't

10    know what angle it was from, the defense can cross-examine the

11    proponent of that footage and say, well, you know, you don't

12    know where this was taken from; you don't know what kind of

13    lens was used.

14        I mean, it goes to the weight.  And I think any potential

15    prejudicial effect can be minimized by cross-examination, and

16    the jury will be allowed to compare it to the footage that

17    they see from known sources and from authenticated sources.

18    So I'm going to grant the government's motion for that.

19        Again, I caution everybody, this is a four-misdemeanor-

20    count case.  There's no need to -- you know, there's no need

21    to come at it with everything you got.  And, obviously, I'm

22    not going to tell the government how to put on its case, but

23    sometimes more is not more.  Anyway.

24            MS. WAGNER:  Your Honor, just briefly, I appreciate

25    that.  In particular, on the defendant's phone or his Facebook

1   account, your ruling includes that those are authenticated?

2   That's just going to save me calling a couple of CART examiners.

3          THE COURT:  Well, let me ask you, how do you intend to

4   elicit that, that video evidence?

5          MS. WAGNER:  This would have been information -- they

6   seized the phone during a search warrant, or execution of the

7   arrest warrant, and so we have the officer that will be coming

8   that assisted in the search and seized the phone.

9          THE COURT:  But this is not Mr. Vo's phone, is it?

10          MS. WAGNER:  This is Mr. Vo's phone.

11          THE COURT:  Okay.

12          MS. WAGNER:  And it was then processed by two forensic

13   examiners, one who downloaded it and the other one who

14   processed it into a program called Cellebrite.  And then we

15   will have the -- what I'd like to do is not have those two

16   witnesses have to come about that technical part of it.  But

17   then the case agent again will be testifying as to these are

18   the items that were taken from Mr. Vo's phone.

19          THE COURT:  Mr. Ohm, are you challenging that that

20   evidence comes from Mr. Vo's phone?  Or, I mean, you can

21   stipulate --

22          MR. OHM:  We're not willing to stipulate at this point.

23   I'm not sure the extent and to how we're going to challenge

24   it, but we're not willing to do it at this point.

25          THE COURT:  Okay.  You're not willing to stipulate.

1     I guess what I'm asking, are you alleging that those images

2     and that footage does not come from Mr. Vo's phone?

3          MR. OHM:  I don't know, Your Honor.  But I'm taking the

4     approach that this is like any other case, and if it was any

5     other situation or any other client that had evidence against

6     them that was substantial, I know that it would make it easier

7     for the government for me to stipulate, but I try not to

8     follow that --

9          THE COURT:  Well, I mean, I understand you don't want

10     to stipulate to anything, but there's also -- you know, I

11     can't make you stipulate.  To the extent that maybe the jury

12     gets a little tired of hearing evidence about which there

13     clearly is no dispute, that's a risk you want to take.

14       But, Ms. Wagner, are you asking me to somehow rule that

15     it's authentic?  I haven't heard -- you know, the government

16     still has to lay the foundation with regard to every piece of

17     evidence they seek to introduce.

18          MS. WAGNER:  Correct.  And basically we've laid out --

19     we'd be doing it through one witness, through the case officer

20     who acquired the phone from Mr. Vo, and then the same case

21     officer who reviewed the evidence from the Cellebrite report.

22          THE COURT:  I mean, I think that's -- it sounds like

23     it's sufficient, but again, they're not willing to stipulate,

24     so I'll hear you.  But that sounds like the proper foundation

25     to me, but I'm not giving an advisory opinion on that.

1          MR. BOYLAN:  Your Honor, can I raise it this way?

2          THE COURT:  Yes.

3          MR. BOYLAN:  I think that your pretrial order says

4    that if objections to exhibits aren't raised within 10 days

5    of being shared with defense counsel that those objections

6    are waived.  You know, I know that you -- we shared these

7    exhibits, you know, quite awhile ago, and the defense has

8    shared their objections with us, with the Court, and there

9    hasn't been an authenticity objection to these exhibits to

10   this point.  I'd suggest that there shouldn't be one after

11   now.

12         THE COURT:  That's a point.  I'm not going to find a

13   waiver, though.  Again, this is a four-count-misdemeanor case.

14   I mean, I doubt very strongly that there's going to be a

15   credible challenge to the authenticity of material taken from

16   Mr. Vo's phone, and I'm not going to require the government to

17   bring in six witnesses to talk about the chain of custody or

18   any of that.  So I'll hear any objection to foundation at the

19   time the information is adduced.

20         MR. OHM:  Your Honor, I mean, obviously, part of

21   holding the government to its evidence is making sure that

22   they have to follow all the rules, and if I could block

23   evidence in a technical way, then I'm certainly going to do

24   that.

25         THE COURT:  Well, Mr. Ohm, you know, I'm going to cite

1   the case of goose versus gander here, because if you're going

2   to talk about the government following the rules, then I am

3   going to raise Mr. Boylan's challenge.  You didn't follow the

4   rules.  Why didn't you challenge the authenticity within the

5   time you were supposed to, since we're going to be all picky

6   about the rules?

7        MR. OHM:  Well, on behalf of gander, I'm going to

8   say that -- (laughter) -- we -- it's impossible for us to

9   challenge foundation and authenticity, because we don't know

10  -- they haven't said -- I mean, we don't have a preview or a

11  crystal ball on what the trial is going to be.

12       THE COURT:  Oh, Mr. Ohm.  I would be shocked if they --

13  you knew they were going to seek the video footage from his

14  phone.  Come on.

15       MR. OHM:  Sure.  But I didn't think that not saying

16  that we assume that if they did everything properly at trial

17  and said all the things they needed to say to get something

18  admitted authenticity-wise, that that would be considered a

19  stipulation into the authenticity of the evidence.  I'm not

20  used to doing all this stuff in advance, too, Your Honor.

21       THE COURT:  I understand.  I hear you.  You know, I'm

22  from the old Superior Court style:  Go to trial, and let it

23  all rip.  But over here in federal court, you know, we have

24  procedures.

25     So, look.  You have to have known that this evidence was

1    going to be offered, and the government has proffered how

2    they intend to offer it.  When they do that, you can make

3    objections if you believe you have a basis to make objections,

4    and I'll hear them.

5         MR. OHM:  Very well, Your Honor.

6         THE COURT:  Ms. Wagner, was there something else you

7    wanted to add?

8         MS. WAGNER:  Just for the Court's information, we also

9    did provide to Mr. Ohm certifications under 902 from all of

10   the forensic examiners that looked at the phone, and provided

11   notice under 902 for that authentication purpose as well.  So

12   he has at least had some additional information of who touched

13   the phone and what they did.

14        THE COURT:  Thank you, Ms. Wagner.

15    All right.  Exhibits.  Parties have each filed notice of

16   objection to the other party's exhibit.  Many of them track

17   the objections that the parties have made in their motions in

18   limine, and since I've ruled on them, they should be fairly

19   brief.

20    The defense objections to Government's Exhibits 217 to 221,

21   that's 217 to 221 which depict barricades and signage outside

22   the Capitol, they object because these photos do not represent

23   an accurate depiction of what the exterior of the Capitol

24   actually looked like when Mr. Vo approached the Capitol on

25   that date.  This, to me, goes to relevancy, and I'm going to

1    deny that motion.

2         The government obviously has to lay a foundation.  Maps

3    and photos of the Capitol as the outside of the Capitol

4    appeared on that day are relevant to a number of issues in

5    this case: whether an official proceeding was occurring, why

6    the certification of the Electoral College vote was suspended,

7    what the level of security was that day, where the building is

8    located, and whether persons were being permitted access to

9    the building.

10        Certainly Mr. Vo is entitled to cross-examine as to whether

11   he -- Mr. Ohm is entitled to cross-examine as to whether his

12   client would have seen those signs and those barriers and so

13   on, and I assume that goes to his defense, but that doesn't

14   mean the government can't elicit it.  And so I'm going to

15   overrule that objection and allow the evidence.

16        Second, the defense objects to Government's Exhibits 302 to

17   305, and 307 to 308, which is security camera footage, either

18   because the videos do not include Mr. Vo or because he's only

19   included in a few seconds.  That's ECF No. 81.

20        Per my earlier ruling, that evidence will be admissible.

21   Again, I caution the government to streamline its presentation

22   there, and as with everything, the proponent of the evidence

23   needs to lay the proper foundation.

24        Third, the defense objects to Government's Exhibit 458

25   because it's duplicative of 457.  Ms. Wagner?

1              MS. WAGNER:  I believe Mr. Boylan is going to talk on

2       these.

3              MR. BOYLAN:  Your Honor, I think the defense is right

4       on that one, so we'd be happy to omit either 457 or 458.

5              THE COURT:  All right.  Just withdraw one.  It's fine.

6       Just use one.  You can decide which one.  Okay.  So I will

7       sustain that objection to that, and the government has agreed

8       to withdraw one of those exhibits.

9           Fourth, the defense objects to Government's Exhibits 454 to

10      461, which are text messages taken from Mr. Vo's phone.  To

11      the extent that those messages were sent by people other than

12      Mr. Vo, which is obvious since they were sent to him, because

13      they're not relevant and should be excluded as hearsay, I

14      assume those are not -- the government's offering those as

15      non-hearsay to show their effect on Mr. Vo.  They are not

16      being offered for the truth of the matter asserted, but maybe

17      I'm wrong.

18          Ms. Wagner, can you tell me what the purpose is of the

19      government seeking to elicit those text messages?

20             MR. BOYLAN:  That's exactly --

21             THE COURT:  Or Mr. Boylan.  Go ahead.

22             MR. BOYLAN:  Yeah, thank you.  That's exactly right.

23      They're not hearsay.  They're not -- we're not seeking to

24      admit them for the truth of the matter contained in the

25      statements but rather the effect on the recipient, Mr. Vo, or

1      to provide context for the text messages that are sent

2      surrounding those other text messages.

3           THE COURT:  All right.  I'm going to allow those,

4      obviously, subject to the proper foundation.

5           Fifth, the Defense objections to Government's Exhibits 507

6      to 512, which are messages from Mr. Vo's social media account

7      dated November 2020, because they're not relevant to the events

8      on January 6.  The government responds that they demonstrate

9      his knowledge that a session of a house of Congress was in

10     progress, that he intended to disrupt it, and they are his

11     statements.

12          In terms of relevancy, again, the foundation has to be

13     laid, but November 20 is not that far from January 6, and if

14     the messages are -- I don't have them with me, but if they are

15     relating to his knowledge of what was going on or what was

16     supposed to be going on at the Capitol that day or his intent

17     to go there or his awareness that, you know, people were

18     planning to go there, I think they're all relevant and they

19     would come in, obviously subject to cross-examination and the

20     proper foundation, and they are his statements.  So I'll allow

21     them in.

22          The defense also objects to Government's Exhibits 501 to

23     512, which are messages from Mr. Vo's social media accounts,

24     to the extent that they include messages that were not sent by

25     him, because they're not relevant and should be excluded as

1    hearsay.

2        Ms. Wagner, what's the purpose of those messages -- or

3    Mr. Boylan?

4        MR. BOYLAN:  Thank you, Your Honor.  The same as with

5    the cell phone text messages.  They're not being admitted to

6    prove the truth of the matter of what these people are saying

7    to Mr. Vo, but instead to prove the effect on him or to

8    provide context for what Mr. Vo says in response.

9        THE COURT:  When are the dates of these messages?

10        MR. BOYLAN:  They vary.  501 to 512 are from November

11    2020 through after January 6.  They talk about a variety of

12    things, some related to the presidential election, some

13    related to Mr. Vo's actions on January 6.

14        THE COURT:  All right.  I'll allow them, subject again

15    to the proper foundation for relevance and timing.  But I'll

16    allow them.

17        The defense also objects to Government's Exhibits 601 to

18    625, third-party videos, for the same reasons detailed in his

19    motion in limine, which is open-source.  Per my earlier

20    ruling, those exhibits will be admitted, subject again to the

21    appropriate foundation being laid.

22        I believe they're -- those are subject to -- you know, the

23    jury can weigh those exhibits.  The issue of admissibility and

24    authenticity is less relevant here where the jury is going to

25    be provided extensive video from known sources to which they

1    can compare the open-source evidence.

2        The defense also objects to Government's Exhibits 701 to

3    709, just a Metropolitan Police Department body-worn camera

4    footage being played in their entirety.  I have ruled that

5    these exhibits are admissible; and I have cautioned the

6    government to streamline their presentation, and I believe

7    that the government has said that they will.  So that

8    objection is overruled.

9        Next, the defense objects to Government's Exhibits 901 to

10   905, which are the video montages.  Per my earlier ruling,

11   those will be admissible, again with the caution that the

12   government should try and streamline its presentation.

13       The defense also objects to the titles of the open-source

14   videos being included on the government exhibit.  For example,

15   "New footage shows what it was like inside the Trump mob at

16   the Capitol on the ground."  I can't see why this should be

17   allowed in.  It's descriptive statements, somebody else's

18   interpretation or viewpoint of what was going on.  It invades

19   the province of the jury.  It's hearsay.

20       Ms. Wagner, are you going to take those off?

21           MR. BOYLAN:  Yes.  We'll rename those.

22           THE COURT:  All right.  So I'll sustain that objection.

23       The government's objections.  The government objects to

24   Defense Exhibits 2 to 5 and 11, which are five video clips

25   which were produced to Vo, and they state that the five videos

occur in sequence to one another and were captured by a GoPro
camera worn by a plainclothes MPD officer.  Throughout the
video the officer makes several statements to the crowd,
including go, go, go, drain the swamp, USA, and keep going.

The government argues that such evidence can only be used
to support an agent-provocateur theory and that it is not
admissible for that purpose.  And they also argue that, to the
extent that the defense would seek to introduce the videos for
some other purpose, it should proffer that purpose.

So, Mr. Ohm, what's the purpose of eliciting this evidence?
I mean, I know why.  You want to show that somehow Mr. Vo
thought he had permission, police officers saying "go, go, go,"
but are you going to elicit that Mr. Vo saw this, was in a
position to see it, hear it?

MR. OHM:  Your Honor, again, doing this federal court
thing where we have to put in all of what would be our defense
and preview it, it's difficult.  But I can tell the Court that
we understand the Court's ruling about relevance, and we would
only introduce it subject to foundation for relevance.

THE COURT:  Okay.  All right.  Well, I will defer
ruling on that, but if you seek to elicit that particular
evidence -- because I think its prejudicial value could
outweigh its probative effect, and I think it could mislead
and confuse the jury were the appropriate foundation not laid.
Before you elicit that evidence, you need to alert the Court

1     and get leave of court and --

2             MR. OHM:  I understand, Your Honor.  But I should say,

3     also, that it is relevant to Mr. Vo's state of mind regardless

4     of the agent-provocateur defense, because obviously the

5     government -- his state of mind would be different if he was

6     following rather than intending to go in to obstruct.  But I

7     understand the Court's ruling and --

8             THE COURT:  Yeah, it may be --

9             MR. OHM:  -- I mean, we may be lying in wait for the

10    government to open this door, but I think it's a door that the

11    government should be mindful of.  And that's why --

12            THE COURT:  There's a lot I don't know about this.

13    Sure.  Sure.  There may be -- you know, if your defense is

14    simply he thought he had permission to go in, and you can show

15    that he heard this officer saying "go, go, go" and "keep

16    going," maybe.  But we're not there.  And certainly I would

17    require more information before I allow that evidence in.

18       But, again, if you think the government's opened the door

19    or you think you're somehow -- you know, that you can lay a

20    foundation to elicit it in your case, I'll hear you on it.

21    But for right now, you're not allowed to present that to the

22    jury.

23            MR. OHM:  Certainly, Your Honor.  I'm not just going to

24    press play on it.

25            THE COURT:  Yes.  All right.

1     Now voir dire.  The parties have proposed 54 voir dire

2     questions that span nearly 15 pages.  I'm not giving 54

3     questions, I'm just telling you right now.  Many of these

4     questions the parties agree to and appear to be based on

5     questions that the court asked -- that this Court asked in

6     *United States v. Alford*.

7     I mean, that's not -- you know, doesn't mean that I'm

8     not willing -- it's a different case and doesn't mean that

9     that's it and that's all I'm going to ask, but I can tell you

10    that the defense proposes nearly 20 additional questions to

11    which the government objects.  I've reviewed them, and I'm

12    inclined to reject most of them.  So -- hold on.  Let's get

13    them out.

14         MS. WAGNER:  Your Honor, we did receive a copy of some

15    proposed compromise from the Court on the voir dire questions;

16    and we've reviewed those, and we would agree with that revised

17    voir dire.

18         THE COURT:  All right.  Yeah, I'm going to --

19    actually -- okay.  So you don't have any objections to my cut.

20    Is that right?

21         MS. WAGNER:  Correct, Your Honor.

22         THE COURT:  That's just Mr. Ohm.  Okay.

23      Okay.  Where is Mr. Ohm's proposed voir dire?

24         MR. OHM:  It's under Attachment C, Your Honor, but it

25    will have to be the Tracked Changes copy.

1          THE COURT:  Right.  I see it.  All right.

2        So No. 5, you want me to tell them who the U.S. Attorney

3    is, Mr. Graves?

4          MR. OHM:  Not these days.  Your Honor, I --

5          THE COURT:  He's not going to be in the courtroom.

6    He's not in the pleadings.  They're not going to have the

7    pleadings.  I am not going to tell them who the -- you know,

8    I don't need to ask them if they know Mr. Graves.  They may

9    know who he is.  They're going to be asked if they know the

10   prosecutors and the case agent.

11         MR. OHM:  Your Honor, I think we can do this in a way

12   where -- I mean, because we generally don't disagree with the

13   Court's voir dire.

14         THE COURT:  Tell me the ones you really want to fight

15   for.

16         MR. OHM:  That was my plan.  So the thing that we

17   were concerned about, and I don't think the Court's voir dire

18   necessarily captures, is that there are a lot of individuals

19   who are following these trials and these prosecutions and the

20   amount of time that people are getting and the amount of --

21   and the victory rate that the government has.  And that's,

22   frankly, something that I think would be prejudicial to the

23   defense, to Mr. Vo, if jurors walk in thinking, well, you

24   know, government's got basically a perfect win rate on these.

25        Those are the people we want to identify, because those

1    people are very likely to be prejudiced.  Mr. Vo's case is

2    obviously very different from any one of those cases.  The

3    allegations are different, and the conduct that he's alleged

4    to have done are different.

5        So knowledge -- or too much knowledge about how those

6    cases were resolved and how those trials went in particular,

7    including all the -- I mean, Your Honor knows, social media

8    is sort of insane with these sorts of cases, on both sides,

9    and the people are following the prosecutions and the course

10   of these trials closely.  I think that that's something that

11   Mr. Vo is entitled to know.

12           THE COURT:  Well, you know, I think -- we here in D.C.,

13   it's a lot of inside baseball.  I don't think people are

14   sitting around with score cards saying, oh, another one for

15   the government.  I think, sure, there is probably a perception

16   out there that the government's been winning these cases, that

17   they've been racking up convictions.

18       But as you know, Mr. Ohm, the government hasn't won every

19   conviction.  They haven't won every count.  Some defendants

20   have been acquitted of counts, and I think there's been one

21   outright acquittal.

22       I can certainly instruct the jury that, you know, you all

23   may have heard -- the first thing I'm going to say to people

24   is, look, you all may have opinions.  You know, we all have

25   opinions.  And you may know about this, but this is different.

1      You're being asked to judge one person on their actions and

2      what they did.  And every case is different, and you should --

3      you know, if you can't keep an open mind, I want to know.  If

4      you've already decided what happened, I want to know.  That's

5      what my question is designed to elicit.  If you've already

6      decided his guilt or innocence, then we need to know about

7      that.

8          Similarly, if people think this is just, you know, a pro

9      forma procedure to an inevitable result, I want to elicit that

10     too.  So, certainly I'm willing to ask the question, you may

11     have heard about -- and I think it's in here -- you may have

12     heard about this, you may have you views on this, but you're

13     going to be instructed that this individual is presumed to be

14     innocent.  The government has to prove the evidence against

15     him, and can you treat this case -- you know, can you look at

16     this case individually and assess the evidence and only the

17     evidence that you hear in this courtroom, or words to that

18     effect.  So, I mean, I'm willing to probe on that, but I'm not

19     willing to add 20 more questions designed to get at that.

20         MR. OHM:  I'm just asking for the one, Your Honor.

21     At this point, I'm cutting my losses.  For No. 34, perhaps,

22     the Court could just add on --

23         THE COURT:  Okay.  Hold on.

24         MS. WAGNER:  Eugene, are you working off the Court's

25     revision or the original --

1           MR. OHM:  Yeah.

2           MS. WAGNER:  Okay.

3           THE COURT:  So 34.

4           MS. WAGNER:  Political views.

5           THE COURT:  Was your 34, "have you followed closely

6    media coverage?  Or you have you or a close friend or family

7    member ever worked in a federal government?

8           MR. OHM:  I'm sorry.  34, I think, is Your Honor's,

9    "Have you closely followed media coverage of what happened at

10   the U.S. Capitol on January 6 or the investigation on the news

11   or on the internet?"

12      I think we could add perhaps something about, have you

13   followed media coverage of prosecutions and trials by the U.S.

14   Attorney's Office on January 6-related events?

15          THE COURT:  Ms. Wagner?  Mr. Boylan?  I mean, I don't

16   see what's wrong with that one.  I'm inclined to give that one

17   with the language saying have you closely followed the

18   prosecutions.

19          MS. WAGNER:  We would not have an objection to that,

20   Your Honor.

21          THE COURT:  You said you would not?

22          MS. WAGNER:  We do not have an objection.

23          THE COURT:  Okay.  I'll ask that one, and then we can

24   take follow-ups.  If they say yes, we can take -- I mean, I'm

25   going to tell them, look, we're not hiding the ball here.

1    Everybody knows what happened.  We're not interested in --

2    we're interested in whether you can be fair and whether you

3    can put aside what you think you know and judge the evidence

4    based on what you see in this courtroom.  And that's what I

5    intend to sort of hammer home.  But I think that's a fair

6    question with regard to the prosecution, so I'll give that.

7         Anything else you want to raise, Mr. Ohm?

8         MR. OHM:  Your Honor, we did want to ask a question

9    about protest rallies and demonstrations against --

10         THE COURT:  I'm sorry.  You're breaking up a bit.

11         MR. OHM:  We did want to add some question about

12   whether any individual has attended any protest rallies or

13   demonstrations against Donald Trump.  I think that's different

14   then having general views one way or the another.

15         THE COURT:  Why is that relevant?  I mean, they may

16   hate Donald Trump and not have gone to a protest.  Why is

17   their attendance at a rally against the former president

18   relevant?

19         MR. OHM:  Well, certainly, the Court's first statement

20   is true.  It's relevant to us finding out the extent to which

21   people feel -- I understand the Court is going to instruct

22   them that this isn't supposed to matter, but we're trying to

23   weed out people who can't really follow that instruction.  And

24   there are people who --

25         THE COURT:  I don't see what the attending a protest or

1    a rally is intended to elicit.  I mean, you can say -- you

2    know, I mean, they're going to have strong feelings, and if

3    they have such strong -- this case is not about the former

4    president.  If they have such strong feelings about the former

5    president that they can't be fair, we want to know about that,

6    but I don't see whether you've attended a rally.

7        I mean, you know, they could have written a letter to the

8    editor.  They could have, you know, given speeches.  They

9    could have -- there's a whole lot of things that they could

10   have done, have done, and I'm not sure why I want to go into

11   whether they've attended a rally, especially since it's very

12   much protected First Amendment activity, and I'm not getting

13   into, you know, do you watch Fox News.  I'm not asking any of

14   that stuff.

15       MR. OHM:  Well, there are further limitations on the

16   First Amendment.

17       THE COURT:  Oh, I know there are.  I'm going to be

18   asked to delve into those at some point.  But I just don't

19   think --

20       MR. OHM:  -- it's about the trigger.  I mean, one

21   question is factual that they can answer honestly without

22   giving too much thought.  The other is asking them to be

23   introspective and identify in a subjective point of view

24   whether they think they can be fair or not.  And I think

25   having that factual trigger will allow us to delve in when

1    there might be a potential issue and make sure we have a fair

2    jury --

3              THE COURT:  I'm not going to ask it, because I don't

4    think that attending a rally, as opposed to anything -- any

5    other kind of political activity -- it sort of, you know, this

6    did arrive out of, in large part, of a rally.  And I don't

7    want to think that it's some kind of, you know, tit-for-tat.

8    Did you go to a rally -- you know, I don't want to highlight

9    that or any other protected political activity.

10   I think the other questions are designed to get at whether,

11   you know, they have such strong feelings for or against the

12   former president that they can't be fair, so I'm not going to

13   ask whether they have attended a rally.

14             MR. OHM:  Could I ask, Your Honor, then to strike the

15   "could be fair" part and then we could just elicit that during

16   the individual live voir dire?

17             THE COURT:  I'm sorry, I didn't get that.

18             MR. OHM:  To strike the "could be fair" part.  I know

19   like, for example, for victims of crime question, that "could

20   be fair" is not necessarily asked.  Rather than having them, I

21   guess, mute themselves if they feel like they could be fair,

22   they could just identify whether they have strong political

23   feelings one way or the other, and then we can inquire as to

24   whether they can be fair.  We would prefer that.  We just

25   don't want individuals who are, like, yeah, no, I hate them,

1    but I probably could be fair --

2         THE COURT:  Is there a specific question you're

3    addressing that you want me to modify?  I'm looking at my

4    proposed now, which is No. 85.  Hold on.

5      No.  Those are jury instructions, sorry.

6      Yeah.  Okay.  Can you point where you want on my proposed

7    questions?

8         MR. OHM:  Your Honor, I guess maybe it would be sort of

9    an offshoot of 31.

10        THE COURT:  Hold on.

11        MR. OHM:  Which I think...

12        THE COURT:  It would be 32.  So 32 is -- and I'm taking

13   out 33 -- but, "Were you or anyone close to you so affected or

14   inconvenienced by the events which transpired at the U.S.

15   Capitol on January 6 that you could not be a fair and

16   impartial juror in this case?"  Why isn't that a sufficient --

17   I say "could."

18        MR. OHM:  That's fine.  Is that in Your Honor's version?

19        THE COURT:  Yeah, that's in my version.  No. 32.

20        MR. OHM:  Maybe I'm looking at the wrong one.

21        MS. WAGNER:  And that's the one, Eugene, where she

22   added -- or she did not take out the word "or inconvenienced."

23   And then she did add in "could you be a fair and impartial

24   juror."

25        THE COURT:  Yeah.  I did put in "affected or

1    inconvenienced."

2          MR. OHM:  I am.

3          THE COURT:  And remember we're going to have follow-up.

4    I mean, we're all aware of how strongly some people feel about

5    this.  So, I mean, you know, I'm not going to -- I'll allow

6    the parties to probe some in follow-up.

7        But I think -- I think 32 captures that, as well as 30 and

8    31, which talks about whether they have a connection to the

9    events or whether they have a close friend or family member

10   who worked there.  And then 34, which says, "Do you think that

11   you'll be able to put aside your political views or those of

12   your spouse or partner and be a fair or impartial juror?"

13      I think Questions 30 through 34 really go to whether they're

14   just, you know, so affected or have such strong feelings that

15   they can't be fair.

16         MR. OHM:  I'm sorry, Your Honor.  I was able to find

17   it.  But the Court is saying -- because we have the -- 30 is

18   about close connections to the events, 31 is about working at

19   the Capitol, 32 is about affected or inconvenienced, and then

20   34 is about the political view -- okay.  So I guess there's

21   no -- I feel like there should be a precursor to the 34

22   question that says do you have any strong political views that

23   might affect your opinion in this case, or something to that

24   effect, because --

25         THE COURT:  Yeah, I can put that in in 34, do you have

 1      strong political views.  But it kind of...

 2           MR. OHM:  Or do you or your spouse or partner have

 3      strong political views that would make it -- I would just

 4      ask --

 5           THE COURT:  But the next question will be asking if

 6      they will be able to put them aside, so it's kind of --

 7           MR. OHM:  Right.  I would like to take that out.

 8           THE COURT:  What I would say is -- I'm willing to say,

 9      for 34, if you have strong political views regarding what

10      happened on January 6, do you think -- or if you or your

11      spouse or partner have strong political views regarding the

12      circumstances of January 6 -- well, I would say just strong

13      political views.

14           MR. OHM:  And I think that we could -- I would actually

15      end it there, because then we could follow up --

16           THE COURT:  If you and/or your partner have strong

17      political views, do you think that you'll be able to put aside

18      your political views or those of your spouse or partner and be

19      a fair and impartial juror in this case.  That's what I'll

20      ask.  That's a catch-all.

21           MR. OHM:  Yeah.  I guess what I'm asking, Your Honor,

22      is sort of like when we're talking about the victim of crime

23      question, to not have that last part and let us sort of delve

24      into that so that we're not left with the subjective

25      self-analysis of the jury about whether they could put it

1    aside or not.

2              THE COURT:  Well, I don't think it will, because if I

3    say do you think you can put them aside and they say no, right

4    there, you know, you have -- you flag it.  If they say yes

5    and if they don't answer 34, we have 30, 31, and 32.

6         I mean, everybody is going to have strong political views,

7    and we're going to question every single person.  That's my

8    desire.  I don't want any potential juror that we haven't

9    talked to sitting on the jury.  That's my goal, anyway.  And

10   if they haven't answered anything, I'm still going to put them

11   up here and ask them, you know, what do you do for a living,

12   something.

13             MR. OHM:  Sure.

14             THE COURT:  So I think we'll be able to -- I will say,

15   unlike some of my colleagues, I do allow follow-up by the

16   attorneys.  No arguing.  Generally, the lawyers are pretty

17   good about that.  Sometimes, if I feel we're going into

18   argument with a juror or crossing a line, I will say, thank

19   you, you know, and sort of cut it off.  But generally that

20   doesn't happen.

21             MR. OHM:  I guess my last suggestion, do we do --

22   if you -- do you, your spouse, or partner have any strong

23   political views that may question your -- that might affect

24   your ability to be a fair and impartial juror in this case.

25             THE COURT:  How is that different from "could"?

1      MR. OHM:  I think there was another clause the Court

2    had in there.  That's what I was trying to -- but "could" is

3    fine.

4          THE COURT:  That's what I'm asking.  Might/could, I

5    mean, it's -- "could" is even broader, frankly.

6          MR. OHM:  Okay.  I just -- I thought the Court had

7    some other language in there after that that --

8          THE COURT:  I don't think so.  Let me look.  Hold on.

9      32.  It doesn't go to political views, but it says "you or

10   anyone close to you so affected or inconvenienced that you

11   could not be a fair and impartial juror."

12     And then the next one says, "Do you have strong political

13   views and do you think you'll be able to put aside your

14   political views and be a fair and impartial juror."

15     I think those two questions combined capture it all.

16         MR. OHM:  I didn't like the putting aside your

17   political values, but just go right to the fair and impartial.

18   And then if Ms. Adams --

19         THE COURT:  Hold on.  Let me see.  Hold on.

20     Do you have strong political views -- do you or your spouse

21   or partner have strong political views, and, if so, do you

22   think you'll be able to be a fair -- no, I think I want to

23   leave "put aside," or you can give me another language.  But I

24   want to say, basically, your political views don't make you an

25   inappropriate juror.  You may have strong political views and

 1    still be an appropriate juror if you can set those aside.

 2        So I'm going to keep that language, if you want to propose

 3    alternative words, but that I'm going to ask.  Because I think

 4    people think that, if I have strong views, I'm not an

 5    impartial juror, and that's not the test.

 6        The test is you can have strong views -- this is D.C.,

 7    everybody's got an opinion -- can you set those aside?  Put

 8    aside, set aside, not have them affect your -- whatever

 9    language you want.  But I want to know -- the fact that they

10    have views is less concerning to me than whether they can put

11    those views aside and focus simply on what they hear in the

12    courtroom.  So that's what I'm going to ask.

13        MR. OHM:  Your Honor, could the Court then consider for

14    No. 26 striking "that would affect your ability to be a fair

15    and impartial juror?"  That's a lot more focused.

16        THE COURT:  Are we looking at the same 26, which is

17    "Do you have strong feelings about persons who do not accept

18    the results of the election?"

19        MR. OHM:  Yes, Your Honor.

20        THE COURT:  What do you want me to strike?

21        MR. OHM:  Just end the question at "election."

22        MS. WAGNER:  But, again, people are going to --

23        THE COURT:  No.  No.  Because, again, I'm not

24    interested in what people think about election deniers or not.

25    What I want to know is whether those feelings would affect

1    their ability.  So, no.  I mean, everybody's got feelings and

2    opinions.  That's not what I'm going to.  And I said before,

3    your opinions don't disqualify you.  Whether your opinions

4    could prevent you from being objective is what I want to get

5    at.

6         MR. OHM:  Certainly, Your Honor.  But we have

7    preemptory strikes that we can exercise, and I think we are

8    entitled to know the individuals who say that election deniers

9    are crazy, you know, automatons who follow Trump.  And I don't

10   think it's a question that would unfairly prejudice the

11   government in any way.

12        THE COURT:  I can -- you know what I can do, I'm not

13   going to -- I can break it down.  Say, do you have strong

14   feelings about persons who do not accept the result -- who do

15   not accept the results of the 2020 presidential election?

16      That can be part A.  And part B, and would those feelings

17   affect your ability to be a fair and impartial juror?

18      And that way you could get go that information.

19      Ms. Wagner?

20        MS. WAGNER:  That's fine with the government, Your

21   Honor.

22        THE COURT:  Okay.  We'll break it down into 26A and B.

23      All right.  Jury instructions.  So -- hold on.

24      Oh, as far as logistics, everybody does it differently.

25   I cannot think in three dimensions.  So how I do it, jury

1    selection, is I have the panel come in, I have them do the

2    cards with the numbers.  And then I'm going to have them leave

3    and taken one at a time and have them sit in the jury box so

4    we don't have to all crowd up or use the intercom, which I

5    don't even have right now, one at a time.

6        After -- and then, you know, if you have a motion to strike

7    for cause, you should make it when the juror's excused, before

8    the next juror has come up.  If a juror is so obviously

9    unsuitable, I may just say, you know, do you have any

10   objections or something and not -- you know, we don't need to

11   go further with the voir dire.

12       The jury will be -- when we start the strikes, I have a

13   different form that I use.  I'll give it to you all.  What I

14   want us to do is do, I think, two rounds -- I can't remember.

15       Do you have the form?

16       We can talk about it in the morning, but I want -- I want

17   you to put your strikes on the form, and then we'll -- so the

18   first 14 will come in.  We're going to, in a minute, designate

19   the alternate seats.  You can't strike alternates till the

20   last round, till the end.

21       We'll do -- because the defense has more strikes than

22   the government, we'll do two for the defense, one for the

23   government, two for the defense, one for the government,

24   till it's evened out.  I'll have a form.  You can see it.

25       After every round, I will have the courtroom deputy excuse

1   the jurors that you have stricken, have them sit in the back
2   of the courtroom in case there's a *Batson* challenge.  And if
3   there's a *Batson* challenge, it needs to be made promptly.
4   The next jurors in the panel will then come up and fill those
5   seats.
6       You are allowed to strike into the panel.  Two consecutive
7   strikes into the panel will indicate to me that you're done.
8   Two consecutive passes will also indicate to me that you're
9   satisfied with who's in the box.  And -- yeah, that's it.
10          MR. BOYLAN:  Your Honor, can I clarify the number of
11  peremptory strikes that we get?  I thought for a misdemeanor
12  case that it was three per side, which is different than a
13  felony case.
14          THE COURT:  You know what, I think you might be right.
15  My current strike form has 10 and 6, but you might be right.
16          MR. BOYLAN:  I'm looking through the rules right now;
17  and I haven't found it yet, but I think 10 and 6 is only for a
18  felony case.
19          THE COURT:  Yeah.  You know what, you might be right.
20  As I recall, Alford was -- yeah.  I think --
21      Mr. Ohm, is that your recollection?
22          MR. OHM:  This is my first misdemeanor one, Your Honor,
23  but I'm happy --
24          THE COURT:  This is my second, but the last one --
25      Check the Alford docket (to law clerk.)

1          Okay.  We'll double-check, but the form will be adjusted

2     based on that number.  You're allowed to ask limited follow-up

3     when --

4          MR. OHM:  Your Honor, the rule, apparently, is Rule 24.

5     I was able to pull it up.  It seems like the government is

6     right.  It says, "When the defendant is charged with a crime

7     punishable by fine, imprisonment of one year or less or both."

8          I think if the government is taking the position that there

9     could not be any sort of consecutive time imposed in these

10    sentences, I think that that's right, but if they're going to

11    take the position that they could ask for consecutive time,

12    then I think we get the 10.

13         THE COURT:  I don't know about that.

14       Mr. Boylan, what's your position?

15         MR. BOYLAN:  Your Honor, could we have some time to

16    brief that issue?

17         THE COURT:  Yeah.  Take a look.  I'm going to take a

18    look.  I'm going to look at what I did in Alford.  But I'm not

19    surprised you're taking that position, Mr. Ohm, but let me

20    look at it and I will let you know.

21       So with regard to preliminary instructions, have you all

22    seen my joint proposed instructions?  Any objections to them?

23       I mean, I will say this, Mr. Ohm, you have submitted

24    instructions.  You agree on almost all of them, but you seek

25    to modify the Red Book version of the presumption of

innocence, burden of proof, which is Red Book 2.107; and right

of defendant not to testify, Red Book 2.208; or defendant as

a witness, Red Book 2.209.  And you have objections to the

elements.  We can deal with the elements discussion at our

charging conference.

   With regard to the preliminary instructions, I don't

understand what the basis is of your objection to the Red Book

instructions, Mr. Vo.  You haven't -- Mr. Ohm.  You haven't

cited any case in support, and I'm not sure what's your basis

of your objection to the presumption of innocence, burden of

proof 2.107.

        MR. OHM:  Your Honor, I wouldn't say it's so much of an

objection but that our version is a more accurate statement of

the law.  I don't think anybody could say that it's not.

        THE COURT:  Has any court given it yet?

        MR. OHM:  I believe Judge Cobb did in a recent trial.

There is an aspect to the -- sorry.  I'm... there is an aspect

to the reasonable doubt instruction that seems somewhat

potentially misleading.  I think we talked about it in a

footnote.  It sort of implies -- the duty to find him guilty.

It parallels a duty to find him guilty and a duty to find him

not guilty.  But, obviously, it's not a duty to find him not

guilty; it's a requirement to find him not guilty, and our

version sets that out more clearly.

        THE COURT:  All right.  I'm not going to deviate.  I'm

1    not one of these judges that is wedded to the Red Book.   Jury

2    instructions were my thing when I was a defense attorney.   And

3    I'll always consider alternate language if I'm provided the

4    proper case authority, but not only do I not have any case

5    authority, I really don't see the problem.

6        You're right, there are different aspects to finding, you

7    know, you must acquit or, you know, you have a duty to find

8    him guilty, but I think the Red Book instruction is

9    appropriate.   It's the one I have used in Alford, and I don't

10   see any reason to deviate from it.

11       The right of the defendant not to testify or defendant as a

12   witness, do you not want it given, or you just have a problem

13   with it?

14            MR. OHM:   Your Honor, I think that, from anecdotal

15   experience, I probably lost more trials than Your Honor has,

16   but if you talk to a jury after trial, it turns out that the

17   jury, regardless of what the instruction says, there

18   inevitably is somebody who says or makes a comment about the

19   defendant not testifying.

20            THE COURT:   You know what, Mr. Ohm?   I mean, I don't

21   have to give these preliminarily.   I can give them at the

22   end --

23            MR. OHM:   Sure.

24            THE COURT:   -- because you may not -- but here's

25   the thing:   I used to feel that way, and then I decided I

1   didn't -- you know, as a defense lawyer I thought, do I want

2   to highlight that?  But now I have found that jurors do not

3   expect a defendant to testify anymore.  It's become almost de

4   rigueur.

5       You know, I don't know if it's TV shows or coverage of

6   trials -- you know, trials didn't use to be covered like this,

7   but it's almost like a juror is surprised when a defendant

8   testifies.  I think they expect that the defendant won't

9   testify nowadays.  I think that is a definite change from 10,

10  15, 20 years ago.  But if you don't want to give it, I don't

11  have to give it in the preliminary instructions.  Hold on.

12      MR. OHM:  Your Honor, we're okay with the Court just

13  doing a Red Book instruction and a preliminary instructions,

14  and then we can talk about this in the final --

15      THE COURT:  All right.  All right.

16      Anything else I need to address?  We'll start at 9:30.

17      MR. OHM:  I guess, Your Honor, in terms of our

18  additional -- we're not really contesting the elements.  We're

19  just asking for some additional definitions for entering and

20  remaining.  I think that some of those things would be helpful

21  for us to know for opening because, you know, this isn't the

22  kind of --

23      THE COURT:  I lost you at the beginning.  I'm sorry.

24  I don't mean to interrupt.  You said -- I didn't hear the

25  beginning sentence.

1    MR. OHM:  We're not really contesting the elements.

2    We're just asking for some additional definitions.  And it's

3    something that we think would be helpful to know prior to

4    opening.  Just, you know, this is -- when I go and this ID

5    here, the elements are going to matter in terms of definitions,

6    and in particular the entering and remaining.  We just want to

7    make sure that we can argue this -- well, not argue this, but

8    set forth our theory of the defense in opening in an

9    appropriate way.

10    So we don't have to talk about it now, especially since we

11    raised those objections later, but if we could perhaps do

12    that, you know, maybe the weekend -- or the Friday before our

13    trial, that would be great.

14    THE COURT:  Okay.  If you have objections to the

15    elements as stated and proposed alternative language, then you

16    need to get them to me by Sunday.

17    MR. OHM:  Okay.  They're essentially the redline

18    definitions that we sent over two nights ago.  I felt bad

19    about it, because obviously it is past our deadline and the

20    government, you know, didn't necessarily have ample time to

21    look into our request.  So to the extent that --

22    THE COURT:  Hold on.  So Number 10.  These are your

23    proposed jury instructions.  Now, where did I put those?

24    Hold on.

25    MR. OHM:  I think they're in the Attachment D.  It

1      starts at page 19, Your Honor.

2              THE COURT:  I know.  I'm looking for my --

3              MR. OHM:  I'm sorry.  Proposed instruction 19 on

4      page --

5              THE COURT:  We're looking at proposed instruction

6      number...

7              MR. OHM:  20.

8              THE COURT:  20.  That's where I am.

9              MR. OHM:  I'm sorry.  19 is the first one.  19 on

10     page -- the redline version, page 6.

11             THE COURT:  Proposed instruction No. 19.  You want --

12     okay.

13             MR. OHM:  The substance of the initial redline part

14     I think is less important --

15             THE COURT:  You're adding an element here.  So the

16     government says that -- the Red Book -- hold on.  The

17     traditional instruction has first and second:  First, that the

18     defendant entered or remained in a restricted building;

19     second, that the defendant did so knowingly.

20         And you want three:  The government has to prove, first,

21     that the defendant entered or remained in a restricted

22     building or grounds; second, that he did so without lawful

23     authority; and third, that he did so knowingly.  And what

24     you're doing is breaking down the first into two things.

25         Now, obviously, they have to prove that he entered or

1    remained in a restricted building or grounds.  I don't think

2    we need to make it into three steps.  I think the first

3    conveys that simply entering or remaining is not enough.  They

4    have to do it without lawful authority.  I think what you're

5    doing is adding an element that's not there.

6         MR. OHM:  And, Your Honor, I don't think that either of

7    our instructions came from the Red Book.  I think we're all

8    just sort of working off what other --

9         THE COURT:  Right.

10        MR. OHM:  But I mean the question in the end becomes,

11   does the government have to prove beyond a reasonable doubt

12   whether he entered or remained in a restricted building or

13   grounds and then also prove beyond a reasonable doubt that he

14   did so without lawful authority.  I think they do, and that's

15   why we formulated it this way.

16        MR. BOYLAN:  If I may respond, Your Honor?

17        THE COURT:  Yes.

18        MR. BOYLAN:  I would just say, Your Honor, that that's

19   captured in the instructions as the government presented them.

20   You know, those two things are essentially one in the same,

21   that he entered or remained and that he did so without lawful

22   authority.  And the government's overarching concern for this

23   instruction, Your Honor, and for I think all of the

24   instructions that we proposed on the elements, is consistency.

25       These are the instructions that we proposed in all of the

1    January 6 cases, basically, and there's a strong reason to

2    have that consistency across the cases, not just for trial

3    reasons, but for appellate reasons too.

4         THE COURT:  All right.  But as you know, simply saying

5    this is what we always do is never going to be a good reason

6    for me.  And every judge has to consider the case and make

7    the -- which is why we have different judicial rulings going

8    up to the Court of Appeals on some of these statutes, right?

9      So simply because it's been done before, even if I did it

10   before, the defense may not have raised the objection.  The

11   facts may have been different.  I mean, you know, not

12   everybody objects as much as Mr. Ohm.  I know it's hard to

13   imagine, but it's true.

14     So I understand you want consistency in terms of your

15   prosecutions of this case, but every case is different and I

16   look at the individual arguments presented.  So I don't think

17   that's a good reason.  However, I do think it's a good reason

18   not to give it, because I don't see anything wrong with the

19   instruction as written.

20     You know, it's obvious that simply being there, being on --

21   he's not being charged with that.  He's being charged with

22   being on restricted grounds without lawful authority, and I

23   don't think I need to break this down into three requirements.

24   I think, as written, it is clear.  It's understandable.  And

25   more importantly, there's no risk that the jury will punish

1    Mr. Vo for lawful conduct, because it says quite clearly,

2    "without lawful authority."

3        I think the times when it's necessary to break things down

4    happens when there's a danger that the jury would conflate

5    requirements, or elements, and could punish lawful activity,

6    and that's not the case here.  So I'm not going to give the

7    defense proposed version.  I think it's essentially the same

8    as the version as I give it, but I think it breaks it down and

9    adds an unnecessary element which is not required here.

10        MR. OHM:  And to be clear, Your Honor, I can still

11   argue that the government has to prove both beyond a

12   reasonable doubt, right?

13        THE COURT:  I don't see why not.  I think you can

14   argue it.

15        MR. OHM:  Okay.

16        THE COURT:  I mean, the whole case is going to turn --

17   I mean, there's not going to be any -- I don't think there's

18   going to be much -- again, I haven't heard the evidence; I

19   haven't seen the evidence.  But from what I'm aware, I mean,

20   there's not going to be a serious challenge that he was there.

21   Okay?  And there's not going to be a serious challenge that,

22   you know, there wasn't something going on and that the grounds

23   were not restricted.  What it's going to turn on is his

24   awareness, his knowledge.

25        And so, yeah.  You know.  I don't think it's confusing to

1     the jury or misstating the law to say that they have to find

2     that not only was he there, but he was there without lawful

3     authority.  But I don't think you can break it down.  I'm not

4     going to give the language that you've presented.

5          Mr. Boylan, do you take a different position?

6               MR. BOYLAN:  No, Your Honor.

7               THE COURT:  Okay.  All right.

8          Any other particular instruction that you --

9               MR. OHM:  That was actually not the one I was -- the

10    part that I was raising.  But, again, I need to say this,

11    that because of the situation that -- our late filing on this,

12    I'm happy to wait if the government wants to, but if the Court

13    wants to go forward and the government's okay with that, then

14    it's really the proposed -- well, first of all, the perceived

15    language which we do not believe was in other --

16              THE COURT:  Where are we?  Are we still on 19?

17              MR. OHM:  We're on the next page in the same

18    instruction.

19              THE COURT:  Twenty?

20              MR. OHM:  Nineteen, Your Honor.

21              THE COURT:  Oh, it's on 19.  Oh, in Definitions.

22              MR. OHM:  Yes.

23              MR. BOYLAN:  Your Honor, may I quickly, just to

24    Mr. Ohm's point, the defense offered some late proposals.

25    And there's no hard feelings, not casting aspersions, pointing

1    fingers, but some of the proposals from the defense we just

2    haven't had the opportunity to look at it and research yet.

3    The perceived question, if that's the thing we want to talk

4    about at this moment, I'm fine talking about that.  There are

5    some other proposals that I would ask the Court to give us

6    time on.

7              THE COURT:  Okay.  I can tell you right here -- so

8    you're proposing, Mr. Ohm, here, Vice President Pence?

9              MR. OHM:  I don't particularly care about that one,

10   Your Honor.

11             THE COURT:  Yeah.  I'm going to give it as I originally

12   had it:  "The term 'person protected' by the Secret Service

13   includes the vice president and the immediate family of the

14   vice president."

15      All right.  So you want "perceived."  And, again, I don't

16   see a single case here.  I know it says the government

17   proposes instruction in *United States v. Price*.  I assume that

18   Chief Judge Boasberg did not give it.  And if you can tell me

19   what is deficient in the term "perceived."

20             MR. OHM:  So "perceived" -- well, I think that next

21   footnote refers down to the "furthermore" paragraph.  The

22   "perceived" language I don't believe has been instructed in

23   any case, or at least the government didn't cite to any case

24   where that language was used in this definition.  So they're

25   adding to what has been the traditional definition of

1    "knowingly."

2        And I think the reason that "perceived" is not in the

3    "knowingly" is that it invites the jury to speculate on what

4    a person sees, because we don't -- the government can't prove

5    what a person's perceived.  They can prove what the defendant

6    did or said.  And certainly what a defendant did or said in

7    response to things that are around them, that's something

8    that's factual that they can argue, but they certainly can't

9    speculate as to what somebody perceived, because they don't

10   know in particular what somebody --

11       THE COURT:  Well, let me stop you.  You can certainly

12   ask the jury to make findings based on what the evidence shows

13   that the person would have perceived.  But, you know what?

14   You filed these late.  We don't have to talk about these now.

15   This is for a charging conference.  So let me take a look, let

16   me do a little research, and we don't need to discuss these to

17   get this case it trial.

18       We can take a couple of hours or, you know, an hour or

19   whatever we need to do a charging conference as we get closer

20   to the end of the government's case or, you know, the end of

21   the case, but I'm not going to rule on the proposed instructions

22   as they pertain to the elements of the charges, because I'm

23   not -- well, I don't think I'm planning on -- I don't usually

24   give those as preliminary instructions.  Yeah, I'm not going

25   to give them as preliminary instructions.  Those are final

1      instructions.

2          Do you say you need them because of your opening

3      statements?

4          MR. OHM:  Not the "perceived" one.  That one is

5      actually the one we got in on time.

6          THE COURT:  Yeah.  You're not arguing the law in your

7      opening statements.  The opening statements --

8          MR. OHM:  No.  It's just the -- well, it's the

9      remaining language and what it really means to remain and just

10     to make sure that we get an instruction that a person is

11     trying to leave but there's a whole big crowd that's in front

12     of them and that that's not remaining.  I mean, we just want

13     to make sure that we can point out those facts and that they

14     would actually matter.

15         THE COURT:  We'll discuss it at -- these were filed

16     late.  I'm not going to say you waive them, though you kind of

17     did.  They are late filed, and I could just deny them all as

18     untimely, but I don't want to do that.  But we're not going to

19     discuss them today.  We can have a further discussion once we

20     get started.

21         MR. OHM:  Understood.

22         THE COURT:  And I need to do some more looking at them,

23     and I also need the government to have a chance to respond.

24         All right.  Anything else?  Ms. Wagner?

25         MS. WAGNER:  When would you like the government's

1    response by, Your Honor?

2          THE COURT:  Well, Mr. Ohm, I'll say this:  I don't see

3    any case law to support any of these.  So if you have any

4    cases that indicate, or any legal authority as to why the

5    instructions as I have them are insufficient and as I have

6    given them as I did give them in Alford are wrong or

7    insufficient, then you need to let me know.  If it's just that

8    you don't like the language, that's another thing.

9      Next week, you know, Tuesday is fine.

10      Okay?  Anything else?

11         MR. BOYLAN:  Your Honor, could I ask a couple of

12    scheduling questions?

13         THE COURT:  Yes.

14         MR. BOYLAN:  I understood that trial's going to start

15    at 9:30 on Mondays.  Does the Court intend to go from 9:30 to

16    5:00 every day?

17         THE COURT:  Yes.  And I want you all here closer

18    to 9:00.  If there are any preliminary matters, we need to

19    discuss them before.  I hate keeping the jury waiting if

20    they're all here.  And sometimes they're not.  We can't help

21    that.  But if they're all here, I want to start as quickly as

22    possible.  So if you have preliminary matters, you need to let

23    me know, preferably the night before, but at least in the

24    morning so I can look into whatever the issue is.  And we can

25    do that at 9:00.

1    I will never go past 5:00.  I will take a short midmorning

2    break.  Lunch will be somewhere between 12:30 and 1:00,

3    depending on where we are with the witness.  If we can finish

4    up testimony, then I'll push it to 1:00.  The cafeteria closes

5    at 2:00.  I don't want them to miss lunch.  I'll take a

6    midafternoon break.  And, again, I'll go to 5:00 depending on

7    where we are.  If we finish a witness and it's 4:45, fine, we

8    can stop.

9    Again, there may be days when I have to stop a little early

10   or take a little longer lunch because of other matters I have

11   to deal with, but I'll let you know the day before.  You

12   should all let each other know your schedule for the next day

13   in terms of witnesses who you plan to have so you can plan

14   appropriately.  All right?

15           MR. BOYLAN:  One more, Your Honor.

16           THE COURT:  Yes.

17           MR. BOYLAN:  How long would the Court anticipate for

18   opening statements?  15 minutes?  20 minutes?

19           THE COURT:  I haven't given -- you know, I have enough

20   to do without maintaining time limits.  Mr. Ohm knows my

21   feelings on this, is you don't win hearts and minds when you

22   go, you know, too long.  For opening statements, yeah.  I mean

23   15, 20 minutes should do it.  This is not a complicated case.

24   We can talk about time limits at closings.  Generally -- I may

25   regret it at some point, and I think I have once or twice --

1    sort of letting the parties' discretion control.  But we don't

2    need to go more than 15 or 20 minutes for an opening.

3        If there are exhibits you intend to use, you need to clear

4    them with the other side, especially if they haven't been

5    admitted.  And you should have your exhibits premarked.

6        I have a new form -- I think you'll get it from the

7    courtroom deputy -- for logging all exhibits.  Or at least --

8    actually, I have a form that I use.  You all probably use your

9    own form.  I won't tell you what form to use for those, but I

10    have a different form I use for keeping track.

11        All right.  See you all on the 18th.  Thank you.  Have a

12    good weekend.

13        (Proceedings adjourned at 11:48 a.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne