```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2    _____

3    United States of America,    ) Criminal Action
                                  ) No. 1:21-cr-00509-TSC
4                   Plaintiff,    )
                                  ) Jury Trial (Day 1)
5    vs.                          ) a.m. session
                                  )
6    Antony Vo,                   ) Washington, D.C.
                                  ) September 18, 2023
7                   Defendant.    ) Time:  9:00 a.m.
     _____

8
         Transcript of Jury Trial (Day 1) a.m. session
9                       Held Before
              The Honorable Tanya S. Chutkan
10               United States District Judge
     _____
11
                    A P P E A R A N C E S
12
     For the Plaintiff:       Eric W. Boylan
13                            UNITED STATES ATTORNEY'S OFFICE
                              FOR THE DISTRICT OF COLUMBIA
14                            601 D Street, Northwest
                              Washington, D.C. 20579
15
                              Lynnett M. Wagner
16                            UNITED STATES ATTORNEY'S OFFICE
                              1620 Dodge Street, Suite 1400
17                            Omaha, Nebraska 68102-1506

18   For the Defendant:       Eugene Ohm
                              Katelyn (Kate) Adams
19                            FEDERAL PUBLIC DEFENDER FOR THE
                              DISTRICT OF COLUMBIA
20                            625 Indiana Avenue, Northwest
                              Washington, D.C. 20004
21   _____

22   Stenographic Official Court Reporter:
                              Nancy J. Meyer
23                            Registered Diplomate Reporter
                              Certified Realtime Reporter
24                            333 Constitution Avenue, Northwest
                              Washington, D.C. 20001
25                            202-354-3118
```

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Good morning, Your Honor.

3    This is Criminal Case 21-509, the United States of America v.

4    Antony Vo.  And this matter is set for jury selection and

5    trial.

6          Parties, please introduce yourselves for the record,

7    starting with the government.

8              MR. BOYLAN:  Good morning, Your Honor.  I am Eric

9    Boylan, Assistant United States Attorney, representing the

10   government; joined by my co-counsel Lynnett Wagner, Case Agent

11   Joseph Henry, and our paralegal specialist Taylor Wilbert.

12             THE COURT:  Good morning.

13             MR. OHM:  Eugene Ohm on behalf of Antony Vo.  Good

14   morning, Your Honor.

15         Kate Adams is my co-counsel, and Adam Moran is our

16   paralegal.

17             THE COURT:  Good morning.

18         Good morning, Mr. Vo.  I think this is the first time

19   you've appeared in person before me; is that right?

20             THE DEFENDANT:  Yes.  Good morning, Your Honor.  Very

21   nice to meet you.

22             THE COURT:  Good morning.

23         All right.  Okay.  First of all, I hate to start on a

24   negative note, folks, but Mr. -- we had a trial called -- jury

25   supposed to be -- jury panel supposed to be here at 9:30.

1      Mr. Ohm filed a motion to dismiss, a motion for

2  spoliations and sanctions for *Brady* violations on Saturday

3  night.  Therefore, everybody should have been on notice, and

4  the government filed a motion under seal -- motion *in limine*

5  under seal today.  Everybody should have been on notice that we

6  were going to have preliminary matters this morning.  And,

7  Mr. Ohm, you weren't here until 9:30.  That means that we have

8  a panel waiting.  And one thing I hate to do, having been a

9  juror myself, is to keep a jury waiting.

10      So I said this -- I thought I said this at our pretrial

11  conference; if you have preliminary matters, you need to be

12  here at 9:00, not 9:30.  That being said, let's talk about

13  this and -- these motions.  We might as well deal with the

14  motion to dismiss first, since that's a motion to dismiss.

15      Mr. Ohm has moved for a motion to dismiss for failure to

16  preserve and produce *Brady* evidence.  Excuse me.  So he argues

17  that the government has intentionally withheld exculpatory

18  evidence and argues that dismissal of the information is

19  warranted as a sanction.

20      In the alternative, he seeks a missing evidence

21  instruction, leave to argue that further investigation may have

22  revealed that officers were repeating similar statements to

23  other protesters walking through the upper west terrace during

24  the relevant time period, and an instruction that the jury must

25  draw all inferences and make all material factual findings in

1    favor of Mr. Vo and against the government.

2         The alleged *Brady* failures are, one, that on

3    September 11th, six days ago, the government for the first time

4    identified a video in which one of five Capitol Police officers

5    told passing protesters:  I disagree with it but respect it.

6    But it was not identified as *Brady* material.

7         And the defense proffers that Mr. Vo is depicted in the

8    video at .02 seconds in line to enter the building and the

9    officer's statement occurs at 20 minutes, looks like,

10   22 seconds.

11        He argues that this places Mr. Vo in the immediate

12   vicinity of an officer whose statement could be reasonably

13   interpreted as permission to enter the building.  So let's deal

14   with that one first.

15        I actually disagree.  I mean, you could argue it, but I

16   don't think that's -- I don't think that's *Brady* information.

17   I think it has been widely reported -- and there's been

18   testimony in many trials, and it has been widely reported in

19   the media and elsewhere that many Capitol Police officers stood

20   and let people enter the building or, you know, said words to

21   this effect.

22        That's -- I don't see how that's *Brady* information.  In

23   other words, what the officer appears to be saying to me is

24   they have their opinions.  I don't agree with them.  I respect

25   them.  How does that -- I -- how does that contribute or how is

1   that exculpatory to Mr. Vo's defense that he was given

2   permission to enter the building?  That's completely different.

3              MR. OHM:  Your Honor, so --

4              THE COURT:  And, Mr. Ohm, before we get that --

5   because I know you to be an excellent lawyer -- you had this

6   information on the 11th.  Why are you filing the motion to

7   dismiss on Saturday night?

8              MR. OHM:  I had this -- I had --

9              THE COURT:  If you got the information on the 11th of

10  September, why are you filing a motion to dismiss it on

11  Saturday night?

12             MR. OHM:  Because I -- Your Honor, I had -- I mean,

13  frankly, like, I don't -- I'm not -- I'm not just waiting for

14  what the government provides and get to go through it all, I

15  mean, immediately.  I was on duty.  I was in magistrate court

16  on the 11th.  I had multiple hearings on the 12th, multiple

17  hearings on 13th.  I spent most of the 14th at the jail.

18       And so the 15th is when I started turning to trial prep.

19  And when I looked at it, I was shocked, actually, to see that

20  this information was out there.  Because, Your Honor, the whole

21  point is, as the Court said, that we can't use anything like

22  this -- even if we knew that there was statements out there, we

23  can't use any of those statements unless there was some

24  evidence that this happened around the time that Mr. Vo could

25  see or perceive.  And we had no idea when this was.

1          THE COURT:  But stop.  You're assuming that that

2     statement is somehow exculpatory.  Whether or not he could hear

3     it or see it or was aware of it, how does that statement help

4     him?

5          MR. OHM:  It's potentially exculpatory, Your Honor,

6     because he is in that line.  So there's a line of people that

7     are just hanging out there who would not have gone in but for

8     the fact that the officers started to let people in.  And so

9     he, in that line -- within -- I think it was --

10          THE COURT:  That's different.  That statement

11     says one of five Capitol Police told passing protesters.  He

12     didn't say:  Y'all come on in.  I respect your position.  I

13     don't agree with it but come on in.  He says it to -- assuming

14     to a colleague or something as the people are walking by.

15          That does not constitute permission.  That doesn't

16     constitute encouragement.  That doesn't go to Mr. Vo's state of

17     mind as to whether he was -- he was authorized to be in the

18     building.  That's simply one officer's statement that he

19     doesn't agree with the people's opinions, but he has to respect

20     it.  And that's not controversial.  And I don't -- I mean, you

21     could certainly argue to the jury that somehow that contributes

22     to his state of mind if he's in a position to hear it, but I

23     don't agree with you that it's exculpatory.

24          MR. OHM:  Your Honor, number one, he does say it

25     directly to a -- so the exchange is -- and we didn't know about

1    this until we got the report that was, I believe -- I believe

2    turned over also on the same day.  But the exchanges:  We

3    appreciate you, from a rioter or protester -- I have to learn

4    how to say that -- the sergeant saying in response:  I

5    respect -- well, I don't agree with it.  I respect it.  Respect

6    the building.

7         So it is directly to an individual who was about 45 --

8    40 seconds, maybe 10 yards away from Mr. Vo.

9         Right before that --

10        THE COURT:  Respect the building, how is that

11   exculpatory?  He's basically telling him not to tear up the

12   place, which, by the way, some of them did.  Not that your

13   client did.

14        But how is respect the building giving them permission

15   to come in?  The testimony that has been offered at trial

16   repeatedly has been there were more of them than us.  We were

17   outnumbered.  We didn't know what they had.  They were coming

18   in.  We didn't want to start some kind of a big battle with

19   people who we didn't know if they were armed or not, so we just

20   stood by and let them come in.

21        That's consistent with these statements here.  Respect

22   the building is basically saying don't tear the place up.  So

23   how is that exculpatory?

24        MR. OHM:  Your Honor, because what we're talking

25   about is Mr. Vo's state of mind and his intent and his

1    willfulness.

2            I understand that the officers might -- and I'm not

3    saying like the government is arguing that they committed

4    misconduct by what they did.  That's not the exculpatory

5    nature.  What's exculpatory is that Mr. Vo, who is standing

6    around there with no intention of going inside, and then all of

7    a sudden people go inside because -- first -- and a minute

8    before this, Your Honor -- this is also the context that I did

9    not -- we did not understand because we didn't have the timing

10   of that statement.

11           Just a minute and a half before that is the "Let it

12   go [sic]" chant, which is in earshot of Mr. Vo.  So individuals

13   are saying "Let us in.  Let us in."  And then all of a sudden

14   the officers just let them in.  And they're making these

15   statements as people are filing in.

16           So I don't see how that's not --

17           THE COURT:  Well, there's a couple things.  One,

18   perhaps that's -- yes.  So let's say for the purpose of

19   argument -- I don't agree it's exculpatory.  But you can

20   certainly argue it is, and you're free to do that.

21           Assume for the purposes of argument that that's

22   exculpatory; you want to argue that.  You still have to link it

23   up.  In other words, whether it's -- you know, to say it's

24   within earshot is simply your opinion.  You'd have to put on

25   Mr. Vo or someone who's standing right next to him to say we

1    heard that; right?  And that meant -- you have to link it up in

2    some way in your case --

3              MR. OHM:  Your Honor, I --

4              THE COURT:  -- unless you can establish this through

5    cross-examination.

6              MR. OHM:  I can, Your Honor, because in the video

7    where the "Let us in" chant is happening, you can see Mr. Vo

8    right behind them.  With -- like, they're at the -- they're at

9    the doorway, and he's just down the stairs behind them.

10             THE COURT:  That's not to mean -- that's not to

11   evidence that he can hear it.  He'd have to testify that he

12   could hear it.

13             MR. OHM:  Yelling, Your Honor.  I mean, I think

14   it's --

15             THE COURT:  I mean, you could argue that the jury can

16   draw that inference, sure.  Sure.

17        All right.  So the next statement is -- and I'm going to

18   come back to -- I want to hear how you're prejudiced by --

19   by -- at this point.

20        Oh, yeah, there's Officer Millard's testimony -- or

21   statement to OPR that a senior officer told them.  So that's

22   double hearsay.  So that's not Officer Millard.  Millard is

23   telling OPR that a senior officer told them:  It's not worth

24   it.  It's just a building.

25        Again, that's actually inculpatory.  Basically, you

1   know, the inference is it's not worth you getting killed over.

2   It's a building, you know.  But I don't see how that -- there's

3   no -- there's no -- I don't hear any proffer that Mr. Vo hears

4   this or it's told to anybody.  This is what Officer Millard

5   tells OPR that a senior officer tells them.

6        I don't believe that's exculpatory.  I don't believe

7   that's *Brady* evidence.

8             MR. OHM:  May I, Your Honor?

9             THE COURT:  Yes.

10            MR. OHM:  So, again, I'm not saying that they decided

11  all of a sudden just to let folks in and that it was misconduct

12  on the part of the officers.  But it informs what is going on

13  with the group of individuals who are standing at the door, and

14  it -- it is not a violent confrontation that makes them all of

15  a sudden decide to let folks in.  There's another report that

16  says -- they notice that there are people behind them.  Like,

17  what's the point?

18        So -- but in terms of the perspective of --

19            THE COURT:  Let me -- let me stop you.  It says --

20  you say it informs the people who are at the door of what's

21  going on.  Yeah, I mean, it informs them that an officer

22  thinks, look, it's not worth us getting killed over this.  It's

23  just a building.  At most.  So that's not permission.

24            MR. OHM:  Your Honor, that's -- I'm sorry,

25  Your Honor.  I mean, in terms of, like, the line of individuals

1  who are standing there who don't know what's going on behind

2  the officers and don't know what's going on necessarily in

3  terms of what the officers are doing, you have this line of

4  individuals, this group of individuals who are going in, and

5  it's -- if there was a violent conflict there in the front,

6  which I believe the government might try and elicit, then it

7  would be a completely different story.

8       What this is saying is that the officers looked and

9  because of the -- what they perceive as -- to be the volume of

10  people and thought, you know, it's a building, it's not worth

11  it, that the individuals -- that they would just let them know.

12       THE COURT:  That's an inference that you can draw,

13  but I don't think it rises to *Brady*.  There's a whole lot of

14  inferences you can draw from those words, including there's

15  more of them than us; it's not worth getting killed over this;

16  let them in; it's just a building.  Unless -- unless he's

17  saying -- come on in, everybody.  I mean, in other words,

18  there's been a lot of argument at trials before me up to now,

19  similar -- similar facts, similar scenarios, where that was a

20  defense.  And there's lots of evidence that -- you know, the

21  testimony is that officers just stood there and we walked in

22  and so I thought it was okay.

23       But there's also evidence produced -- and I assume the

24  government will be producing it -- that at the same time

25  there's sirens going off.  There's the sound of broken glass.

1    There's tear gas.  There's all sorts of indicia that this is

2    not -- you know, you're not going in with permission.

3          Now, I agree you're certainly able to argue what -- he

4    didn't hear.  He didn't realize.  He's way in the back.  He

5    doesn't know.  But these statements by these officers,

6    I don't -- I certainly believe you're allowed to elicit them.

7    I certainly believe you're allowed to argue what you believe a

8    fair inference is from them, but I don't believe -- first of

9    all, I don't -- I think it's a reasonable -- and I'll hear from

10   the government.

11         I don't think there's any bad faith here.  I don't think

12   that this is the sort of *Brady* information that's exculpatory

13   that they sat on.  I think the government has a reasonable

14   argument that we didn't think this was *Brady* and we turned this

15   over in the normal course.

16         I'll hear more from you on that, but these statements so

17   far that I've discussed are not the kinds of statements that I

18   would say, yeah, that's definitely exculpatory; they should

19   have been turned over.  I think they're statements that -- and

20   here's where you always get a compliment, Mr. Ohm -- that a

21   talented lawyer, such as yourself, can easily cross-examine on

22   and say, you said this; right?  You stood there; right?  Mr. Vo

23   is right there.  You didn't stop him.  I mean, that's all

24   subject for cross-examination.  But that doesn't mean it's

25   *Brady*.

1          So I disagree that it's exculpatory.  But -- okay.  But

2     now you have it.  Okay?  You want -- you want a motion -- you

3     filed a motion to dismiss.  And I'll go over the rest of this,

4     but I'm not going to hide the ball.  I don't think this is the

5     kind of bad faith, you know, withholding of *Brady* information

6     that should warrant dismissal of a case.  So I'm not going to

7     grant your -- I'm going to deny your motion to dismiss.

8          But articulate for me your prejudice.

9          MR. OHM:  Okay.

10          THE COURT:  Tell me what you would have done

11     differently.  I know you're asking for the identities of the

12     people who passed in front of these officers.  I can tell you,

13     I don't know how that's relevant because, really, it doesn't

14     matter who was passing in front of the officers.  It matters

15     what Mr. Vo heard because the case turns on his intent.

16          What would you do differently, or what would you need

17     more time to do with this information?

18          MR. OHM:  Okay.  Your Honor, can I go back a little

19     bit?

20          THE COURT:  Yeah.  Sure.

21          MR. OHM:  Okay.  So in terms of why -- I mean, I

22     think -- and I wonder if I'm just talking past Your Honor in

23     terms of what's potentially exculpatory.  I mean, the reason

24     that I would cross-examine on it is because it is -- it would

25     demonstrate that Mr. Vo did not have the *mens rea* to commit a

1    crime to go into the building if he thought that individuals

2    were being allowed in.  And he has made statements -- all

3    throughout his social media there are statements like, they let

4    us in, they let us in.

5         The -- the reason that we were caught off guard by it --

6    and I know the Court has heard these sorts of arguments and the

7    Court -- and I know that -- but what's different here and what

8    we did not know was different here was the timing of all of

9    this.  So in between -- the fact that within less than a

10   two-minute period the "Let us in" chant, they -- actually, "Let

11   us in."

12        I mean, because people aren't moving inside when those

13   chants begin about -- about two minutes.  They're all sort of

14   standing there, lined up.  The five officers actually do seem

15   to have control of the door.  Then one person slips through,

16   and then -- and then they let everybody in.  And the people go

17   in.  They say thank you --

18        THE COURT:  Well, everybody comes in.  That -- that's

19   arguable.

20        MR. OHM:  Sure.  I mean -- but -- but they do stand

21   aside.  You hear people saying thank you to the officers as

22   they walk in.  And that's just about a minute and 30 seconds

23   before Mr. Vo goes in.  We didn't have this timing at all.

24        A minute later is when the individual go in and -- and

25   has the interaction where he says -- or she says:  I appreciate

1    you, to the officer.  And the officer says:  I don't agree with

2    it, but respect.  Respect the building.

3           Now, it's -- that is what Sergeant Millard says about

4    what he said.  On the video it actually just sounds like:  We

5    disagree with it, but respect.  Which is also very different in

6    terms of what the -- what -- the individuals and how they are

7    behaving, how they would act.

8           Now, because if Mr. Vo could perceive this line being

9    forceful and angry and pushing through, it would be much, much

10   different and be much more inculpatory than the situation that

11   actually occurred.

12          So what we now know -- because, remember, Your Honor, we

13   have no audio of any of this stuff except for these open-source

14   videos.  So that open-source video tells us the audio that was

15   happening then and the timing of what happened -- and when that

16   happened right -- right before Mr. Vo -- we weren't even

17   looking for Mr. Vo within the context of that first video

18   because we didn't know any of the timing of it until -- well, I

19   should say, that first video was my client.  So I kind of knew

20   the timing of it, but the statement of facts, actually, was

21   three minutes off in terms of when they went in.  So --

22              THE COURT:  Slow down a little, Mr. Ohm.

23              MR. OHM:  Pardon me?

24              THE COURT:  Slow down a little bit.

25              MR. OHM:  Okay.  Sorry.

1          So the timing matters, obviously, because that's what

2    the government was arguing in their motion *in limine*; that the

3    timing matters.  If Mr. Vo wasn't in that vicinity, then

4    there's no relevance to this.  That was -- that was what the

5    Court granted.  And as it turns out, Mr. Vo was in the vicinity

6    of all this, and we would have known that if we had that video

7    which told us what time that -- that -- that there was an

8    interaction with the officers where they -- not necessarily in

9    their mind "Let us in" but certainly could be reasonably

10   interpreted to say words that conveyed permission by --

11          THE COURT:  Well --

12          MR. OHM:  -- their actions and also by their words.

13          THE COURT:  You also have your client.  I mean, it's

14   not -- you know, what your client was able to hear -- the best

15   evidence of that is your client.  So you're not completely

16   caught unaware.  I mean, you have a client who you, no doubt,

17   talked to.  And I'm, obviously, not trying to get into

18   privileged communication.  In other words, you're not caught

19   flatfooted that these statements are being made.  Because if

20   your argument is that the statements are being made in earshot

21   of your client, that would have to be corroborated anyway by

22   your client's statement.

23          So it's not, you know --

24          MR. OHM:  I hear you, Your Honor.  I would say, I

25   guess, number one, that *Brady* obligations should not be

1    triggered by that.

2              THE COURT:  I agree.

3              MR. OHM:  And if it's potentially exculpatory, it's

4    potentially exculpatory, you know, no matter what he says,

5    remembers, or reports.

6         We have him -- I'm not saying that that second

7    statement, "the respect," is something that would have been

8    audible by my client, but that informed the individuals that he

9    was looking to -- and it's very clear.  They're all just

10   standing there.

11             THE COURT:  How do you know that informs the

12   individuals he's looking to?  He doesn't know what's in their

13   mind.

14             MR. OHM:  Because they're all standing outside this

15   door.  No one is pushing forward to go in and the -- not even

16   the back of the line, but in the middle of the line.  It's only

17   the fact that people just started to walk in without any

18   resistance that had my client go in.

19             THE COURT:  That's your argument.  That's an

20   inference, but that's not clearly established by that video.

21   There are other inferences that can be drawn from the

22   surrounding evidence and the context in which this was

23   happening.

24             MR. OHM:  Sure.

25             THE COURT:  So, again, you know, you're starting

1    from -- you're argument is all based on the assumption that

2    these statements are *Brady*.  And, I mean, even if they're

3    subject for -- and they are, obviously, subject to

4    cross-examination.  I don't think they're exculpatory.

5            MR. OHM:  But they're potentially exculpatory, Your

6    Honor; otherwise, they're an argument that I wouldn't even

7    bother making.

8            THE COURT:  And so they were disclosed to you on the

9    11th, and I understand why you may have filed this motion on

10   the -- you know, on Saturday night because you were busy.  But

11   why isn't their disclosure on the 11th, you know, enough?

12   You're going to do your cross-examination, incorporate these

13   statements into your cross-examination.  How are you -- so I'm

14   back to how are you prejudiced?

15           MR. OHM:  Sure.  And so the Court knows, what -- the

16   timing of events was on -- I reviewed it -- I probably reviewed

17   it on Thursday, and then on the 14th I wrote the discovery

18   letter that's in the docket.  And then I got the response -- I

19   think -- no, by the 15th it became clear to us that we weren't

20   going to get a response, and that's when we -- I started

21   drafting the motion.

22           THE COURT:  While I have you up here, let me ask

23   you what the other -- so we might as well discuss all the other

24   statements.

25           So there's an OPR report for five officers, and the

1    report revealed the following additional statements.  One, some

2    did leave, though, so that helped, but some leaving also gave

3    the indication that the door was able to open for anyone to

4    come back in.

5           Again, that's somebody's -- that's an officer saying

6    some left, but some -- the ones who were leaving also left the

7    door as they were leaving open so that may have -- that may

8    have indicated that people could walk through the door.  But

9    that's, again, a theoretical opinion of an officer.  That's not

10   saying an officer -- I told anybody y'all can come back in.

11          So the second one, I mean, personally, I wanted to hold

12   the line there.  I wanted to fight them so at least we could

13   give time so if members needed to get out or if things need to

14   be secured, maybe another door could have been secured while we

15   held those people back.

16          That's not exculpatory.  That's saying -- the officer is

17   saying he wanted to fight.  He wanted to try and stop -- stem

18   the tide, but it wasn't practical.

19          The third is, personally, yes.  Words to the effect of

20   there was a failure to take appropriate police action during

21   the incident at the upper west terrace door, but seeing it from

22   an official standpoint that was there, I understand the

23   decision.  Based on the day, based on what was going on, other

24   locations at the Capitol, we were vastly outnumbered.  Who

25   knows whether we would have gotten hurt or worse if we tried to

1   stop them there, but I personally was frustrated that at least

2   we didn't try.

3          How is that possibly exculpatory?  What he's saying is

4   what the government is saying.  The reason the Capitol Police

5   officers are standing there and letting people pour into the

6   Capitol is because they were vastly outnumbered.

7          How is that exculpatory?

8          MR. OHM:  So, Your Honor, the theory behind these

9   statements is a little bit different than -- this is more

10  impeachment material.  Because our understanding is that

11  Sergeant -- I guess he's now Lieutenant Millard -- that his

12  take on all of this was that the door couldn't be secured and

13  that's why they let people in.  And so about three minutes

14  before all of this happened, the door is not -- there's nobody

15  at the door.  The door is, essentially, like --

16         THE COURT:  I remember the video.

17         MR. OHM:  -- propped, and there's nobody there.  So

18  they could've secured -- or at least tried to secure the door.

19  So these -- these statements are actually calling into question

20  Sergeant Millard and to impeach what he is going to testify.

21  The reality is, Your Honor, we're not stuck with what the

22  officers are going to say.

23         THE COURT:  Right.

24         MR. OHM:  And so their opinion -- and if their

25  opinion is unreasonable, then we get to challenge those

1    opinions.  But we can't do that if we don't know what the other

2    people's statements are until right before trial.

3              THE COURT:  Let me stop you.  Their opinions may not

4    even be relevant.  What we're talking about is their actions

5    and their words that might have given rise to your client's

6    belief that he was allowed to come in.  Their opinions -- I

7    think I've said this -- may not be relevant.

8              So, I mean, this is -- this is Officer -- Lieutenant --

9    whatever -- Millard telling OPR after January 6th -- you know,

10   for example, the third -- the fourth statement, this is a

11   result of the department's failures on so many levels here.

12             MR. OHM:  That's a different officer.

13             THE COURT:  Okay.  A different officer.  But, again,

14   that's an opinion after the fact.  And so, personally, yes, I

15   believe that there was -- that's -- that's an interview after

16   January 6th.  That says nothing about what he or other officers

17   were telling or conveying to rioters as they came into the

18   building.  So I don't think it's --

19             MR. OHM:  I agree, Your Honor.  And if the -- if the

20   officers are not allowed to testify about their opinions as to

21   these sorts of things, then we -- then this -- this part of the

22   *Brady* motion we will withdraw.

23             THE COURT:  The officers can testify -- and I'm

24   talking to, you know, the government here -- as to what they

25   saw and what they did and why they did what they did.  But

1    their opinions given to OPR about, you know, whether there was

2    a failure or, you know, the post-talk rationalizations, those

3    aren't -- I don't believe the government intends to elicit

4    those.

5           Does the government intend to elicit those?

6           MR. BOYLAN:  I'm sorry.  Could you repeat the last

7    question.

8           THE COURT:  The officers' interview statements,

9    they're after-the-fact opinions about what went wrong and why

10   this happened.  I assume you're not --

11          MR. BOYLAN:  We're not, Judge.

12          MR. OHM:  Well, Your Honor, I guess maybe I shouldn't

13   have used the word opinion because I am equating the why to

14   the opinion.  Because the why is their -- their response when

15   they were asked why did you do what you did, this is their

16   response.

17          THE COURT:  Well, anything that starts with

18   personally, yes, I believe that back then -- no, that's an

19   opinion.  That doesn't have -- if he said, look, yeah, on that

20   day, I saw this and I did this and I did this because of

21   whatever, yes.  But simply sitting around and being debriefed

22   as to -- you know, this is a sort of -- what's the phrase that

23   people use?  You know, what went wrong kind of --

24          MR. OHM:  Postmortem.

25          THE COURT:  Yeah.  Well, it's not postmortem.

1          MR. OHM:  Sorry.

2          THE COURT:  But you know what I mean?  It's like an

3    after the fact, like, what happened?  How did this -- how did

4    this all happen?  Why do we think this happened?  That's not

5    relevant.  The jury can't hear this officer's opinions of, you

6    know, why we didn't have the equipment, why we didn't have

7    enough officers, any of that.  They can hear that they didn't

8    have the equipment or they didn't have enough officers, but the

9    why is not relevant.

10          MR. OHM:  Your Honor, and if I could just expand,

11   though, on this point.  We didn't even know the -- well, I

12   don't think we even knew the names of the individuals who were

13   standing there until last Monday because that wasn't turned

14   over in that manner until we got the report.  Actually, we

15   didn't know until Friday night when I asked for an unredacted

16   version of the report who the individuals were that were

17   standing there.  So in terms of prejudice, we didn't get an

18   opportunity to look into those individuals.

19          THE COURT:  Wait, wait.  The individuals, you mean

20   the officers --

21          MR. OHM:  The five officers.

22          THE COURT:  -- or the rioters?

23          MR. OHM:  The five officers at the door.  So we

24   didn't have -- I mean, we're left with -- at the 11th hour, we

25   get -- these are the statements that the officers made, and

1      then we don't have an opportunity to challenge it, to consider

2      it, to look at different videos to see whether they're credible

3      people or not.  We just have what they give us, and this is

4      what the general problem is with the government's approach on

5      this discovery.

6            It's the same thing with the time stamps.  I can't even

7      get time-stamped videos for the ones I want.  The ones we get

8      in discovery have no time stamps, because they don't feel like

9      giving it to us.

10           And so there are -- and then they always have this

11     fallback, like it was one of our 9 terabytes of information

12     that we gave to the, you know, defenders generally, which is a

13     preposterous notion for us to be able to be responsible for all

14     of that when they are arguing in a motion *in limine* that

15     there's no evidence that Mr. Vo was in that vicinity and then,

16     boom, on Friday before trial, that's when we first get the

17     evidence, we first have the witnesses who would actually be --

18     know, and we could have attempted to interview.  We could have

19     attempted to --

20           THE COURT:  Wait, wait.  You're making some leaps

21     here.  Let's stop.  You're making some leaps here.

22           You said in the beginning that according to the

23     time stamp of what you have when the officer says I don't -- I

24     don't agree with it but I respect it or, you know, something

25     like that, he's nearby.  So, first of all, I don't -- I don't

1    agree that's exculpatory; right?  But, you know, you can

2    certainly cross-examine.  You can certainly draw -- argue that

3    inference.

4         But you do have a time stamp, and you do -- you know,

5    you do have that -- and to get the jury to have -- to have that

6    information, you'd have to elicit that your client heard it.

7    Not that he was able to hear it, because that -- that's asking

8    the jury to speculate.  But that he heard it.

9         So that would have to come through -- that would have to

10   come through your client.  Even if you could show that he was

11   20 seconds away, you still have to show that he heard it

12   because if you simply say it was said and -- and you can't show

13   that he heard it, then it's not relevant.  You can't argue

14   that -- that it informed his intent.

15        MR. OHM:  I guess, Your Honor, respectfully, I would

16   disagree with that point.  And I understand the government is

17   seeking to put in evidence of things that they have no evidence

18   that he actually saw or heard, but they were right around him,

19   and so it's a reasonable inference that he would have seen or

20   heard this or that happen --

21        THE COURT:  The difference there is that this is

22   stuff that the jury can assess.  In other words, the jury can

23   hear the sirens.  The jury can hear the crowd.  The jury can

24   hear, you know -- they can hear and they can assess.  Oh,

25   that's really loud.  You know?

1          But what you're -- what you're talking about is evidence

2     that goes to your client's state of mind and whether he, in

3     that crowd, is able to hear it, and that's different.

4          MR. OHM:  Well, Your Honor --

5          THE COURT:  I mean, if you have an audio of this

6     officer, you know, bellowing through a loudspeaker, I don't

7     agree with it, but I don't respect it, maybe so.

8          MR. OHM:  Well, the "Let us in" is very loud and

9     audible, so I don't think we're talking about that.  But what

10    our argument is that it is affecting the -- it's what he can

11    see.  He sees a bunch of people standing there not being

12    violent.  He hears the "Let us in," and then he sees them

13    walking in.  So the fact that they are walking in peacefully

14    informs him; and so it's relevant to him, whether we put him on

15    to say he heard it or not.

16         THE COURT:  But you had that before Friday.  I mean,

17    you always had that.

18         MR. OHM:  I didn't --

19         THE COURT:  The new evidence doesn't affect that.

20    You always had the video and the photographs of what he could

21    see.  What you have now is an alleged statement by an officer

22    saying I don't -- I disagree with it, but respect it -- respect

23    the building, and, again, you still have to tie up that he

24    heard it.

25         And, like I said, if the jury can't hear the officer say

1    it, what you've been provided is a statement that the officer

2    said it, but you still -- and even if you were to elicit that

3    the officer made that statement, for you to make the argument

4    that it informed your client's state of mind, he has to have

5    heard it.

6              MR. OHM:  Your Honor -- okay.  So in terms of -- I

7    feel like we're dancing around -- I feel like I'm dancing

8    around prejudice, but I do want to address that.  So I think

9    that's what we really need to talk about.

10             THE COURT:  Okay.

11             MR. OHM:  So the video that we have from the Capitol

12   is no audio; right?  So the only audio that we can have is that

13   which can be heard by individuals passing by.  So those little

14   clips of audio -- and most of the people have their cell phones

15   out.  Those little clips of audio come from those cell phones.

16   So the reason that we ask for the individuals and their data

17   and the statements that they made those about is those are the

18   sources of the audio in terms of what the officers are saying.

19   Sergeant Millard can get up there and say I said this once and

20   that was it, but we don't have to take that to be true.

21        We know that there's a 2-minute period there where

22   individuals are walking in and they're standing aside.  We are

23   entitled to see the evidence that the government has that says

24   whether or not Sergeant Millard was making similar statements

25   to other individuals because we know that those officers made

1  the statements two times to people in that minute and a half.

2       THE COURT:  But, again, Mr. Ohm, the problem is it

3  doesn't matter if the officers are making those statements to

4  other individuals if your client doesn't hear them.  The

5  evidence that goes to your client's state of mind is what he

6  heard, not what people around him heard.  Because, as we know

7  from these kinds of cases -- not just January 6th cases -- but

8  people in a group, in a situation, hear and perceive things

9  very differently, and you can't argue your client's state of

10  mind without establishing that he heard it.  It doesn't -- I

11  mean, certainly, you know, you can put on statements from other

12  people saying we heard it, but that still doesn't mean that he

13  heard it.

14       MR. OHM:  But, Your Honor, that -- while that might

15  be -- an ultimate question in terms of admissibility, in terms

16  of what the government is required to do before trial in order

17  to make sure that Mr. Vo's due process rights are protected and

18  we can properly prepare is to provide that information and in a

19  timely manner.

20       THE COURT:  Well, you're assuming it exists.  I mean,

21  what you're doing is you're saying we don't know if this

22  officer said it multiple times.  We don't know if the people in

23  front of Mr. Vo heard.  There's a lot you don't know.  The

24  government is not required to prove the absence of -- you know,

25  what they're required to do is to give you what they have.

```
 1              MR. OHM:  Right.

 2              THE COURT:  And I'm -- so I'm going to talk to them

 3     about that right now, but let -- what I'm trying to get to,

 4     again, is for you to articulate your prejudice because we're

 5     here for trial.  We've got a jury panel.

 6              And if you -- if you're asking that this trial be

 7     delayed, I want to know why.  In other words, you have to have

 8     a good faith basis to say, you know, I'm going to do this, I'm

 9     going to do that.  This -- you know, you know what you need to

10     do.

11              MR. OHM:  Sure.

12              THE COURT:  Because I'm not going to dismiss it.

13     But, again, you and I are disagreeing as to whether this is

14     exculpatory.  You know?  But, again, I'll proceed from the

15     assumption that this is material you would use in your

16     cross-examination, which takes it within the Brady conundrum.

17              But the other --

18              MR. OHM:  Can I answer the Court's last question,

19     though?

20              THE COURT:  Yes.

21              MR. OHM:  What I -- well, number one, I do think we

22     have a good faith basis to say the government has additional

23     audio in their possession because you can see individuals

24     holding their cell phones, and we know that the government

25     arrested just about everybody.  If they didn't, then they can
```

1      tell us that, but we don't have -- we haven't even gotten to

2      that point because the government, basically, just said no,

3      we're shutting this down.  We're not answering any of these

4      questions.

5            So I don't know, but they know what's in all of their

6      possession and that can be found, and we did not have enough

7      time to go through this because we got this late.

8            THE COURT:  All right.  Remember, a true *Brady*

9      violation under *Strickler* is -- it's three components.  So it

10     must have been favorable to the accused either because it's

11     exculpatory or because it's impeaching.  I disagree that it's

12     impeaching, but let's just assume for your purposes that it is.

13           That evidence must have been suppressed by the

14     government.  And, again, we don't have a basis for me to find

15     it must have been suppressed.  There may be a difference -- a

16     good faith difference of opinion as to the exculpatory nature.

17           MR. OHM:  That's not what always happens, Your Honor.

18     I mean --

19           THE COURT:  No.  No.  I'll tell you, Mr. Ohm, you and

20     I know -- have seen willful suppression of *Brady* materials.

21           MR. OHM:  That's true.  That's true.  But it

22     always --

23           THE COURT:  I've seen it.  It's happened to me.

24           MR. OHM:  But that's -- that's -- they used to call

25     it big -- capital B *Brady*.

```
1              THE COURT:  I don't believe in big B and little B.

2              THE COURT REPORTER:  Hold on.

3              THE COURT:  Sorry.

4         MR. OHM:  Sorry.

5              THE COURT:  I've had many argument about big B and

6    little B Brady.  I don't believe there's a difference.

7              MR. OHM:  But the problem is -- and there's so much

8    case law that says -- like prosecutors, you can't trust

9    yourselves -- the defense lawyers know their jobs.  You don't

10   get to decide.  You just turn it over and let the defense

11   lawyers decide.

12             THE COURT:  Right, but you still have to have -- you

13   still have to -- in other words, what the case law says is if

14   there's any doubt, turn it over; right?

15             MR. OHM:  Right.

16             THE COURT:  It's overinclusive.  It's not your

17   decision to say, well, I didn't believe it was true.  That's

18   what I've had prosecutor -- when I was a defense lawyer -- I

19   don't believe it's true so I didn't turn it over.  That's not

20   the basis if it could be potentially exculpatory, and in this

21   court that's how I view it; right?  It's an overinclusive view.

22             But I'm sitting here, and I don't -- I can -- I think --

23   and I'll hear from the government.  I don't think this is one

24   of these situations where, like, oh, this is helpful.  Let's

25   sit on this.  I don't see any evidence of that.  But I'll hear
```

1    from the government.  But this is the kind of statement that --

2    again, I don't think it's exculpatory.  I don't think it's

3    particularly helpful.

4         So -- but, more importantly, the third requirement is

5    for prejudice to have ensued, and that's why I've been asking

6    you to articulate your prejudice.  And I've heard you.  So I

7    think I need to hear from the government as to the

8    circumstances of this.

9         But go on.  Finish your point.

10        MR. OHM:  If I could just go back to why -- it should

11   have been obvious that this is something that the defense would

12   want to know about.  It's a three-minute period where Mr. Vo

13   is, essentially, lining up and walking in.  Everybody -- I

14   mean, there was enough of a scandal that this -- the sergeant

15   self-reported himself about allowing people in, and there was

16   an OPR investigation about this very three-minute segment.

17   Whether it's restricted is clearly the -- it's a defense in all

18   of these cases.

19        Whether -- whether somebody has the *mens rea* -- well,

20   there's some crazy defenses also -- but whether the protester

21   had the *mens rea* and the intent knowing that it was restricted

22   to them or whether they felt like they were permitted to go in.

23        THE COURT:  Now, I'm not saying that should control,

24   but it must have been a losing defense every single time.

25        MR. OHM:  But it's still potentially exculpatory, and

1    the "potentially" is what guides us.

2          So that three-minute period -- and then on top of that,

3    we have motions *in limine* filed where the government is taking

4    advantage of the fact that we don't know this information by

5    saying there's no way Mr. Vo would have known this information.

6    There's no relevant basis that the defense can proffer.

7          Well, one of the reasons we can't proffer it is because

8    we didn't know that it existed and we didn't know the timing of

9    this.  And that's why they're left to argue, I think what the

10   Court started with, is that it's -- it's in public knowledge.

11   But, Your Honor, there's case law that's very clear that just

12   because something is publicly available, that doesn't alleviate

13   the government of their *Brady* obligations.

14          THE COURT:  But it certainly minimizes your

15   prejudice, doesn't it?

16          MR. OHM:  Well, this is what's going to happen in

17   terms of -- frankly, we just didn't know the timing.  I think

18   the combination of the video itself and what time it occurred,

19   that's not publicly available.  So we didn't know that it's

20   part of the group that Mr. Vo was following in.

21          THE COURT:  And three minutes is a long time.  I

22   mean, three minutes -- as you know, as a trial lawyer, whenever

23   people say it happened in a matter of minutes and you say look

24   at the clock up there, let's look at three minutes, it's a long

25   time.  So that in and of itself doesn't establish that Mr. Vo

1    was able to hear what the officers said.

2            MR. OHM:  Sure, Your Honor.  And I'm sure the jury

3    will assess that.  I'm sure the government will make that

4    argument, but it certainly is still something that the

5    government should disclose.

6            And in closing, Your Honor, the prejudice is the

7    government is going to call Sergeant Millard to testify, and

8    we're not going to have a way to be able to challenge him,

9    because the audio evidence that's out there somewhere in the

10   cloud of something has not been identified to us and we haven't

11   had the time -- we haven't had -- well, they haven't produced

12   it to us, and because of the late disclosure, we can't

13   challenge -- if he says, yeah, I said it once, we would

14   otherwise have been able to challenge this, but we can't.

15           If he said, yeah, no, I mean, I was like wink, wink or

16   something to the effect of like -- you know, I gave them a look

17   that says you really do need to get out of there, there's

18   nothing I can do.  I'm just stuck with that answer because I

19   don't have the impeachment material.

20           THE COURT:  But you're assuming that exists.  And

21   that's why I'm going to hear from the government, because they

22   can tell me if it exists.  If it doesn't exist, there's no

23   prejudice.  You can cross-examine him all you want, but -- but

24   I'm going to hear from them.

25           MR. OHM:  But they don't get to decide whether I

1    think it exists or not -- right? -- because if there is video

2    with his image and his statements then that's something that I

3    might be able to make something out of --

4            THE COURT:  Then it exists.

5            MR. OHM:  Well, I think it exists just because you

6    can see people with -- with their -- with their cameras out.

7            The other thing that makes this important is -- is that

8    even in the CCTV video, you don't see Sergeant Millard.  You

9    only see two of the five officers.  They're just out of view.

10   So you're kind of left in the blind.  The jury is going to be

11   only left to trust what Sergeant Millard is saying about what

12   happened at that time.  So there -- in -- in our view, there is

13   video images and audio images -- there has to be -- in their

14   possession unless, I guess, they didn't arrest any of those

15   people.

16           THE COURT:  But there may be audio images or video

17   images in their possession, and I think that's a may.  It's not

18   there should be because, again, they don't have -- they don't

19   have the video images from every single phone.  They have --

20   I'm assuming they have video images from the phones of people

21   arrested, but they haven't arrested everybody yet or, you know,

22   they -- they haven't arrested everybody who came in.  So I

23   don't know, but you're operating on a lot of assumptions.

24           So let me hear from Mr. Barclay [sic].

25           MR. OHM:  As another factual matter, some people

1    did -- who weren't arrested also uploaded videos to social

2    media, and the law enforcement might be in possession of those

3    also, but I don't know any of that because they didn't -- they

4    didn't want to respond to our request.

5             THE COURT:  Unless they got them by subpoena, you

6    would have equal access to them, though, wouldn't you?

7             MR. OHM:  I don't know who they are.  That's why I

8    wanted to know who they are.

9             THE COURT:  All right.  While you're up here --

10   sorry, Mr. Barclay [sic].

11            Can you respond to the government's last-minute motion

12   *in limine* that was filed under seal.  And because it was filed

13   under seal, we don't have to -- let's not use any names

14   regarding personal records.

15            I don't -- based on what the government says in its

16   motion, I don't think that material is relevant for

17   cross-examination, but do you agree or disagree?

18            MR. OHM:  Your Honor, I disagree.

19            THE COURT:  Of course you do, Mr. Ohm.

20            MR. OHM:  Shockingly.

21            THE COURT:  No.  You're doing your job.  I appreciate

22   that.

23            MR. OHM:  Well, I disagree, first, with the

24   government saying that they don't get to provide the source

25   materials to us, because I can't really make a fulsome argument

1    because the government has not provided the fulsome --

2             THE COURT:  What do you mean the source materials?

3             MR. OHM:  So what we get is -- we get this, like,

4    little table with little notes that somebody wrote that

5    summarizes what happened.  What we know is that they're

6    sustained findings for both of these officers -- I'm not

7    really -- they're -- one that I'm not -- one of them I'm not

8    concerned about, the person who, you know, missed the meeting

9    or whatever.  I don't care about that, and I'm sure there's not

10    many source materials, but ███████████'s source materials

11    are kind of --

12             THE COURT:  Don't use the names.

13             MR. OHM:  Sorry.

14        The other one, the description is kind of convoluted and

15    complicated, and it seems like relates to things that he did in

16    his supervisory capacity that I'm just not sure about because

17    we don't have any of the information.

18        So on Monday, I believe, I requested those source

19    materials, which as a matter of course, Your Honor, in this

20    courthouse, the government generally provides.  This is the

21    first time I've gotten pushback on that; and then we come back

22    and argue about whether it's relevant or not or how.

23        But as Your Honor knows, the MPD system, the punitive

24    system is based on a graduating scale.  So if you have one

25    infraction where a complaint is sustained, then the second

1    time, the general orders say that you are likely to be punished

2    in a more severe manner.  So it's relevant as a concept, but I

3    don't know what actually happened --

4           THE COURT:  Right.  And it's only relevant if

5    you're -- if you're using it to impeach for motive to curry

6    favor, motive to -- and that may not even be an issue.

7           MR. OHM:  I don't even know what --

8           THE COURT:  But let me hear from Mr. Barclay [sic].

9           MR. OHM:  I don't what they're going to testify to.

10   So I don't know if I'm going to need to attack their

11   credibility.  But, I mean, this is the -- Stage 1 of the

12   process that we normally are in.  At Stage 4, nothing might

13   have come of it, but if I can't even get past Stage 1, I

14   really -- it really feels like there's this -- and you're not

15   entitled to it because we don't feel like giving it to you kind

16   of -- I mean, here's a protective order.  We're not allowed to

17   talk about it, and it's under seal anyway.

18          So it's not clear to me why -- other than the fact that

19   they don't feel like it, we're not getting what -- I mean,

20   these source materials that potentially could be fodder for

21   cross-examination.

22          Thank you, Your Honor.

23          THE COURT:  All right.  Mr. Barclay.

24          MR. BOYLAN:  Thank you, Your Honor.

25          THE COURT:  Mr. Boylan.  It's Boylan?

1        MR. BOYLAN:  It's Boylan, yes, Your Honor.

2        THE COURT:  I'm sorry.  There's another lawyer in

3    front of me Barclay.  I'm sorry.

4        MR. BOYLAN:  That's all right.  No worries, Your

5    Honor.  Thank you.

6        First let me start with, Your Honor, the idea that the

7    defense would file a *Brady* dismissal motion on the Saturday

8    before trial at 9 o'clock at night based on what's alleged here

9    is patently ridiculous.

10        THE COURT:  Wait, wait, wait.  Tell me why you didn't

11    give them the material until the 11th.

12        MR. BOYLAN:  We gave -- we gave -- so there's two

13    issues:  The OPR report and the video.  Let me talk about the

14    OPR report first.

15        First of all, we did give that to them.

16        THE COURT:  When?

17        MR. BOYLAN:  It's been in global discovery since --

18    October?  Since 2021 -- since fall of 2021.  Mr. Ohm says, oh,

19    there's terabytes of data.  Your Honor -- Your Honor, true.

20    There's a lot of discovery in this case.  We do a pretty darn

21    good job of giving it to the defense in all these cases.  We

22    have letters.  We have charts.  We have Excel documents.  This

23    OPR report was Global Discovery No. 1.  It was the first global

24    discovery that went out.

25        So the idea that, you know, we didn't give it to them

```
 1        is -- is incorrect.

 2                 THE COURT:  So -- we're talking about the OPR report

 3        where Officer Millard makes the statements --

 4                 MR. BOYLAN:  Correct.

 5                 THE COURT:  -- or the OPR report from -- because it

 6        says what the -- what I have is on September 15th Mr. Ohm

 7        requested and the government produced unredacted copies of the

 8        OPR report for all five officers.  Are you saying that you had

 9        given him that before?

10                 MR. BOYLAN:  Was it unredacted -- when it was

11        produced in global, was it unredacted?

12                 MS. WAGNER:  It was redacted --

13                 MR. BOYLAN:  It was redacted.

14                 MS. WAGNER:  -- in global with the names.

15                 MR. BOYLAN:  The names were redacted, but the

16        statements were there.

17                 THE COURT:  Okay.  You have to talk into the

18        microphone if you're --

19                 MR. BOYLAN:  I'm clarifying, Your Honor.  I'm sorry.

20                 THE COURT:  Why don't you go confer.

21                 MR. BOYLAN:  When it was produced in the first

22        instance, Your Honor, the names were redacted; the statements

23        were present.

24                 THE COURT:  And Mr. Ohm didn't request the unredacted

25        version until the 15th?
```

1          MR. BOYLAN:  I believe that's right, Your Honor.

2          THE COURT:  All right.  What about the file labeled

3    *Jencks* that was turned over on the 11th in which the -- there

4    was a redacted OPR report dated March 18th, 2021, with the

5    statements from Sergeant Millard?

6          MR. BOYLAN:  Same file, Your Honor.  We produced it

7    again.  It's the same thing.  It was produced in global

8    discovery to -- available to every defendant.  We produced it

9    again as *Jencks* because Sergeant Millard is going to testify.

10          THE COURT:  What about Mr. Ohm's argument that this

11    is *Brady* material and should have been disclosed earlier?

12          MR. BOYLAN:  It's not *Brady*, Your Honor.  There's

13    nothing *Brady* here.  These officers were bullied out of the

14    way.  They didn't let anyone in.  And, furthermore, even if

15    they did, the defendant didn't hear him.  He was --

16          THE COURT:  Well, we don't know.  Mr. Ohm's

17    argument -- and it's not without merit -- or not without a

18    plausible basis -- is that this -- this is *Brady* material

19    because it is fodder for impeachment, assuming -- I'm not

20    saying it's fodder for successful impeachment, but it's fodder

21    for impeachment in that -- the theory is that Mr. Vo did not

22    have the required intent to enter the Capitol Building without

23    permission, then the officer's statements of I don't -- I don't

24    agree, but I respect and respect -- I disagree with it, but

25    respect it and respect the building -- that those statements --

1    and it's not worth it.  It's just a building -- that those

2    statements are somehow enough to allow Mr. Vo to believe that

3    he has permission to enter the building.

4            MR. BOYLAN:  That -- that's --

5            THE COURT:  It may not -- it may not be -- the jury

6    may not agree, but why isn't he entitled to cross-examine the

7    witness, and why isn't that, therefore, impeachment?

8            MR. BOYLAN:  It supposes, Your Honor, that Mr. Vo

9    heard those statements.  They can't form the basis for his

10   intent if he hasn't heard them.  And he didn't hear them.

11           THE COURT:  Well, we don't know.  He may testify that

12   he heard them, but why isn't that -- I agree there has to be a

13   foundation laid and they have to close up the circle.  All

14   right?  But before they get to what Mr. Vo heard or didn't

15   hear, they have to elicit that the statements were made by the

16   officer and Mr. Ohm's argument is that get- -- us getting this

17   on the 15th, unredacted versions, somehow has -- has impeded us

18   from putting on an effective defense and violates *Brady* because

19   it could have been used in impeachment and was somehow, you

20   know, suppressed.

21           MR. BOYLAN:  Sure.  So, Your Honor, I think what

22   Mr. Ohm said when he was standing here -- he said if there's

23   any doubt, then turn it over.  Well, Your Honor, it was turned

24   over.  It was turned over in 2021.

25           You know, Mr. Ohm can't have it both ways; right?  You

1    can't say, oh, I want everything, turn everything over to me,

2    and then -- but also, oh, government, you don't get to decide

3    how I argue my case.

4         Well, if that's the case, what we've done is we've

5    produced this report.  We produced it twice.  We produced it

6    once --

7              THE COURT:  So the only difference between the report

8    that you turned over to him -- that you turned over to the

9    defense -- because Mr. Ohm is the second lawyer in this case --

10   that you turned over to defense early and this -- these

11   statements that were disclosed in *Jencks* are the -- what is the

12   difference?  What was redacted?  The names of the officers or

13   the statements?

14             MR. BOYLAN:  So I -- go ahead.  I think Ms. Wagner

15   can speak to this.

16             THE COURT:  Thank you.

17             MS. WAGNER:  I apologize, Your Honor, for jumping in

18   here.

19        So the original reports that went out in Global

20   Production No. 1 had the names redacted and there may have been

21   some other PII information, but --

22             THE COURT:  But the statements were --

23             MS. WAGNER:  The statements were there.  And then

24   what we produced --

25             THE COURT:  Did you ever -- did the government ever

1    receive a request from the defense after you produced those

2    statements, redacted with the names of the officers, for the

3    unredacted version?

4              MS. WAGNER:  Yes.

5              THE COURT:  And when did you receive that request?

6              MS. WAGNER:  It's kind of running together right now.

7    So it was at least a couple of days after we had turned them

8    over.  I did want to clarify just one point co-counsel made.

9              What we turned over on Monday was the report -- this OPR

10   report has five parts because there's five officers.  The

11   report --

12             THE COURT:  And you turned that over as *Giglio*

13   material?

14             MS. WAGNER:  As *Giglio* on -- and potentially *Jencks*

15   because it includes Officer Millard's statement.

16             THE COURT:  Okay.

17             MS. WAGNER:  With -- I did unredact Officer Millard's

18   statement that was in that OPR report.  So the rest of the

19   report, the other officer statements, their names were still

20   redacted; but I did take the redaction off of -- of

21   Sergeant Millard's statement so that did reveal the names of

22   the other officers.  So I did disclose it to defense as a

23   highly sensitive document, but -- so he could at least see who

24   the names were in that part.

25             And then Friday, we turned over another copy of what was

1    provided in global discovery with the names redacted, and I

2    believe at that time is when I provided the call log which had

3    the names identified of these five -- or four of the officers

4    when they were making calls looking for a key or calling back

5    to dispatch.

6            THE COURT:  With regard -- I don't know which one of

7    you is the right person, so you can both come on up.

8            The defense argues that they need footage or the names

9    or more information about the people who were passing by

10   Officer Millard, and -- and who may have been -- who may have

11   heard other statements Officer Millard made that are similar to

12   the ones at issue.  Is there -- does that information exist?

13           MR. BOYLAN:  Your Honor, the idea that the defense

14   was prejudiced and didn't know to ask for information -- or

15   didn't know to look into information about when Antony Vo came

16   in and what was produced here, last week, prompted some idea

17   that we should ask about these people who he came in with is

18   ridiculous.  They've had the CCTV.  They knew when he came in.

19   They knew where he was in --

20           THE COURT:  All right.  But with respect to the

21   timing, which is what Mr. Ohm talked about -- to the

22   time stamp.

23           MR. BOYLAN:  It's -- it's -- it's incorrect,

24   Your Honor, that the defense does not have time-stamped copies

25   of CCTV.  They do.  The copies that they get in evidence.com

1    are the same ones that I work with every day; right?  They are

2    15 -- 10- to 20-minute files and the video in the file name

3    says when the video starts.  So you can deduce from how much

4    time is on the clock exactly what time Mr. Vo came in.  What

5    they don't get, and what we don't get either until we request

6    it for trial purposes only, is the one that has the time stamp

7    on the camera.

8         THE COURT:  Do you have any -- does the government

9    have in its possession or control any video or audiotape of

10   Officer Millard in or around the time that is at issue here,

11   when Mr. Vo comes into the Capitol, saying anything other than

12   what -- saying anything to any of the rioters coming in about I

13   disagree with it, but respect it.

14        I know we have the statement that's in the -- his

15   statement to OPR, but do you have any audio or videotape of him

16   actually saying that?

17        MR. BOYLAN:  To -- not in -- not in an instance where

18   Mr. Vo would have heard it, Your Honor.

19        The idea that we would have any evidence of Mr. Vo or --

20   that we haven't turned over -- we have been looking.  We've

21   been scouring for evidence of Mr. Vo coming into the upper west

22   terrace doors.  We've turned over every video that I know of

23   personally that the government has of him in that time frame.

24        THE COURT:  Within that -- so within that

25   three-minute time frame, you don't have -- do you have any

```
 1    video or audio evidence of Officer Millard's statements?

 2            MR. BOYLAN:  Not of him when he is in proximity to

 3    Mr. Vo.

 4            THE COURT:  Well, that's -- that's a subject to --

 5    going to be subject to a difference of opinion.  What I'm

 6    saying is do you have any audio or videotape of Officer Millard

 7    saying these words or words to this effect at any time when

 8    Mr. Vo would have been in the vicinity?

 9            MR. BOYLAN:  No, Your Honor.  Finally, no.  I

10    hesitate to say what we have about Lieutenant Millard --

11            THE COURT:  Lieutenant.

12            MR. BOYLAN:  -- generally, because I haven't looked

13    for that, and I don't know what we have for a fulsome analysis

14    of what -- of what Lieutenant Millard has from the beginning of

15    his day to the end of his day.  But in the proximity when he's

16    near Mr. Vo in the upper west terrace door, they have it.

17            THE COURT:  All right.  Now, are you going to be

18    eliciting in your case in chief the opinions of any of the

19    officers -- any of the five officers from the OPR report, such

20    as why things happened the way they did, whether, you know,

21    maybe another door had -- could have been secured or whether

22    there was a failure to take appropriate police action.  Are

23    you seeking to elicit any opinion evidence?

24            MR. BOYLAN:  Not to that effect, Your Honor.  I mean,

25    we are going to ask him, you know, why did you stand there
```

1    while people were streaming?  And we expect him to say because

2    we felt bullied and got pushed back.

3            THE COURT:  That's different.  That's what they were

4    doing and what -- their state of mind at the time.  What I'm

5    asking for is any opinion as -- after the fact as to, you know,

6    sort of -- what's the word or phrase?  It's bothering me now.

7            MR. BOYLAN:  Post hoc?

8            THE COURT:  Not post hoc rationalizations.  You know

9    when you have an analysis of an event.  Anyway.  It will come

10   to me.

11           MR. BOYLAN:  Like an after action review?

12           THE COURT:  Something like that.  But in other

13   words --

14           MR. BOYLAN:  Something like that?  No, Your Honor.

15           THE COURT:  -- you know, looking back

16   retrospectively, what could we have done differently?  Why did

17   things not happen --

18           MR. BOYLAN:  Right, right, right.  No, Your Honor.  I

19   don't think that we will, no.

20           THE COURT:  I can't see it being admissible anyway,

21   but I'm just asking the intent to elicit.

22           MR. BOYLAN:  Sure.

23           THE COURT:  Okay.  And then, finally, the motion

24   under seal with regard to the personnel reports.  And let's

25   just deal with the one officer since Mr. Ohm says he doesn't

```
 1    intend to --

 2              MR. BOYLAN:  Sure.

 3              THE COURT:  With regard to the source data, not just

 4    the table, are you going to give that to them?

 5              MR. BOYLAN:  We don't intend to, Your Honor, because

 6    there's nothing that's relevant there.

 7              THE COURT:  But that's your opinion.  Why can't --

 8    the subject of protective order, why can't he get it, look at

 9    it.  If he thinks there's something relevant, he can make a

10    motion to me to say I think this goes to -- you know, officers

11    taking the stand, their credibility is at issue.  If it goes to

12    their credibility, their motive to curry favor --

13              MR. BOYLAN:  I think the way that we would prefer to

14    handle that, Your Honor, is to provide an ex parte to the

15    Court, and if there's an instance of Mr. Vo -- I'm sorry,

16    Mr. Ohm -- if there's a table -- one of the instances on the

17    table that Mr. Ohm says this instance is relevant, the Court

18    can assess those -- the supporting documents.

19              THE COURT:  But it's -- there's a protective order.

20    This is -- it's a motion under seal that personal information

21    is subject to a protective order.  Why is -- why can't he see

22    it?  What's the problem?

23              MR. BOYLAN:  We just don't believe that it's

24    relevant, Your Honor, and based on the table, which provides a

25    pretty good description of what's in the supporting documents,
```

1   if -- if defense isn't able to articulate a relevance for those

2   particular supporting documents, we don't believe that we have

3   an obligation --

4            THE COURT:  They don't know what are.  They can't

5   articulate a relevance if they haven't seen it.

6            MR. BOYLAN:  Well, respectfully, Your Honor, I think

7   they do have -- they do know what they are.  The table provides

8   a pretty good description of what's contained.

9            THE COURT:  Okay.  With regard to that one witness,

10  one potential witness in the file, Mr. Ohm is an officer of the

11  court.  He knows what his obligations are, and he has never

12  given me any reason to believe that he would not act

13  appropriately.  I want you to allow him to see the source

14  material, subject to a protective order, obviously.  Having --

15  once he reviews it, he can then -- he has to ask permission of

16  the Court to use any of it and tell me why it's relevant.

17           And I'll make a decision from there, but I don't want --

18  I don't think an in-camera review is necessary.  Mr. Ohm can

19  make the determination as to relevancy, and I'll tell him

20  whether he's right or not; whether I agree with him or not and

21  how he would intend to use it, because I take the personal

22  information very seriously.

23           And, again, this is a case that turns on what the

24  witnesses are seeing and hearing and what they're doing at the

25  time.  This is not, you know, an ongoing conspiracy drug

1    investigation where -- you know, it has to go directly to

2    credibility.  Mr. Ohm knows the rules of evidence about, you

3    know, whether -- you know, when the opportunity to curry favor,

4    you know, at the -- he knows what the rules of evidence and

5    relevancy are for this kind of information, and I'm -- there's

6    a bar.

7            MR. BOYLAN:  Understood, Your Honor.

8            THE COURT:  But I believe he should be able to look

9    at it.

10           MR. BOYLAN:  Understood.

11           THE COURT:  So I guess --

12           MR. BOYLAN:  I think I'm done, Your Honor, unless you

13    have any questions.

14           THE COURT:  Mr. Ohm, are you asking for a

15    continuance?  Because I have to tell you what the government is

16    saying is that what you're saying you would be looking for

17    doesn't exist.  And the material that I'm ordering them to show

18    you out of the personnel file of that one witness, I don't

19    think is enough -- I don't think that requires a delay in this

20    trial.  So --

21           MR. OHM:  I do want to show a picture to the Court.

22           THE COURT:  And I'm not hiding the ball here.  I

23    don't see that there's a reason for a continuance, but you can

24    convince me otherwise.

25           Let's see.

1          MR. OHM:  I'm not asking for a continuance,

2    Your Honor.

3          THE COURT:  Okay.

4          MR. OHM:  What we want the Court to do is preclude

5    Sergeant Millard from, I guess, buttressing his -- the

6    government's theory because we don't have -- well, number one,

7    if -- I don't know -- can the Court see this?  Is there a way

8    to turn this on?

9          THE COURT:  I don't see anything.

10         MR. OHM:  Okay.  So on the right hand, you can see

11   Mr. Vo as he enters.  On the left, you can see an individual.

12         THE COURT:  Wait, wait.  On the right is Mr. Vo?

13   Is -- his hair is much longer?

14         MR. OHM:  Yeah.

15         THE COURT:  Oh, okay.

16         MR. OHM:  On the left is an individual who's holding

17   a cell phone.  So I don't know who that person is, but if that

18   person has been arrested, his cell phone has been recovered,

19   then that's video that we want to know about.

20         Secondly --

21         THE COURT:  Hang on.

22         MR. OHM:  Sure.

23         THE COURT:  Mr. Vo is holding a cell phone.

24         MR. OHM:  Sure.

25         THE COURT:  Don't you have that?

```
1              MR. OHM:  We do, but it was their photos.  They're
2     not -- we don't have video.
3              THE COURT:  Okay.  But -- and you don't know what
4     this is.  He could be talking -- you don't what he's doing with
5     that phone?
6              MR. OHM:  Correct.
7              THE COURT:  Okay.
8              MR. OHM:  Yeah, for all of the above.
9         We also have other individuals there that we haven't
10    been able to identify, and we could talk to them.  I mean, as
11    the Court said, to establish relevance, it's somebody -- it's
12    either Mr. Vo could testify or somebody next to him could
13    testify, but we're entitled to the identities of other
14    individuals who -- and what their perceptions are and what they
15    could hear because then we could present that evidence to the
16    jury as well.
17             THE COURT:  Well, those individuals have a Fifth
18    Amendment problem.
19             MR. OHM:  If they haven't been sentenced yet.
20             THE COURT:  Right.  Or -- but -- I don't know if
21    they've been charged.  I don't know.  You know, but if they
22    haven't been charged --
23             MR. OHM:  Sure.  But, again, these are all things
24    that we're supposed to deal with, but we can't deal with since
25    that first step didn't happen where we knew about this
```

 1    information.

 2         And, Your Honor, just because --

 3         THE COURT:  Wait a second.  Hold on.  And where is

 4    the officer?  What time is this?

 5         MR. OHM:  So this is 40 -- hold on.  Right around

 6    2:38:18.  The officers are out of view.  So this is one of the

 7    problems that we had and why we couldn't identify -- so this is

 8    why the government, you know, jumping up and down about this

 9    report, it's meaningless to us because we didn't know who the

10    officers were.

11         THE COURT:  That doesn't matter.  I actually don't

12    think it's meaningless.  In other words, if you got in your

13    global discovery a report that says Officer Blank said:  I

14    don't -- I don't agree with you, but I respect you.  And

15    Officer Blank said:  Respect the building; it's just as much

16    *Brady* as it ever was, you just don't have the name.  And now

17    you have the name.  So you had a chance to investigate it way

18    back when it was first provided.  Mr. Boylan's point is a good

19    one.

20         MR. OHM:  Your Honor, there's global discovery and

21    there's case-specific discovery.  So global discovery is what

22    is part of every case in all of the land.  So the case law, I

23    think, is very well established on this.  We're talking about a

24    situation where the government has said over and over again,

25    this is the most amount of discovery they've ever had to

1      provide and the most amount of --

2                  THE COURT:  Slow down.

3                  MR. OHM:  -- information that exists in any sort of

4      case, the largest case in the world.  If there's a case where

5      the government should identify potentially exculpatory material

6      because they know the name, they know the time, and they know

7      the entrance, the case is when you have 20 terabytes of

8      information.

9                  THE COURT:  Except the government's proffer is we did

10     not think this was exculpatory information.  They're not

11     unreasonable in thinking that.  Like I said, if this was

12     something that they hid, we'd be in a whole different -- we'd

13     be in sanctions category, but it's -- their statement that they

14     don't believe this is *Brady* information is not unreasonable,

15     because I don't think it is either.  But say -- and I don't

16     think it's really impeaching either because the officer could

17     well say, yeah, I said it.  I made that statement as -- as he's

18     going by.  I don't think it's -- you know -- the government is

19     not hiding the ball there.  They've given you that statement.

20     They gave you the statement in global discovery when the --

21     when Mr. Vo was first charged.

22                 All that's changed between then and what you got on the

23     11th is the name of the officer and maybe the time.  Is that

24     right?  Was the time given to you before?

25                 MR. OHM:  The time existed in global discovery, but,

1    Your Honor, if I'm held to everything that's in global

2    discovery, I may as well just turn in my bar card now.  I

3    mean --

4             THE COURT:  Okay.  Tell me --

5             MR. OHM:  -- there's no way.

6             THE COURT:  You say you want the government precluded

7    from buttressing -- what do you mean by that?  Okay.  Let's say

8    the officer is going to be taking the stand and he's going to

9    say this is what I saw.  This is where I was.  These people are

10   coming in.  Let's assume he says, the alarms were going, there

11   was -- you know, there were all these chaotic things happening.

12   And, yes, I said -- I said those words.  How are they

13   buttressing -- what do you mean by buttressing?

14            MR. OHM:  Well, if he says, for example, the only

15   time I said those words is the time on video, I don't think he

16   should be permitted to say that, because I don't know that

17   that's true, and I haven't had the opportunity to test that

18   information.

19        Again, there's the video that the Court inquired about,

20   but there's also statements that the -- the government has in

21   their possession of all of the individuals who walked through,

22   and if other people heard different sorts of statements like

23   that, then I would be -- I would otherwise be able to impeach

24   this sergeant if he --

25            THE COURT:  No.  If other people -- no.  The

1     difference is if he says I said it one time as they were

2     walking in and the government knows it from -- from the

3     information in their possession that that's not true, then

4     that's *Brady*, and they need to turn it over to you.  But if

5     they simply don't know because they've never -- they've never

6     listened to those phones or talked to -- those people who

7     walked by, then it's not in their possession, they don't have a

8     duty to go out and investigate for you.  They have a duty to

9     turn over everything they have.

10          MR. OHM:  Right.

11          THE COURT:  And so you could have always -- you had

12    that picture.  You could have always tried to find out who

13    those people were and talked to them.

14          I mean, let me ask you, Mr. Boylan, one question.  Do

15    you have any video or audio evidence or interview evidence from

16    any of those people in that picture that they heard -- or

17    anybody -- that they heard Officer Millard say on another

18    occasion words to the effect of:  I don't agree with it.  I

19    respect it.  Respect the building?

20          MR. BOYLAN:  Not those exact words, Your Honor.

21          THE COURT:  What do you have?

22          MS. WAGNER:  I think --

23          THE COURT:  Come on up.

24          MS. WAGNER:  My understanding from the reports, that

25    he was -- Officer Millard was trying to de-escalate the

1   situation, and he may have used the words:  Respect this place.

2   I respect your opinion.  You know, he may have said that when

3   he was trying to keep the rioters from --

4          THE COURT:  So he may have said those words or --

5          MS. WAGNER:  Something.

6          THE COURT:  Okay.  But those same words?

7          MS. WAGNER:  Yeah.

8          THE COURT:  Why can't you cross-examine him on that,

9   Mr. Ohm?

10         MR. OHM:  I didn't even know that -- I mean, I really

11  didn't even know that until now.  What if he denies it?  Then

12  what am I left with?

13         THE COURT:  Well, you --

14         MR. OHM:  I shouldn't be in this situation where I'm

15  asking questions that I can't prove up.

16         THE COURT:  But the only thing you're entitled to is

17  information in the government's possession, custody, or

18  control, and they just gave it to you.  What else are you

19  entitled to that they have?

20         MR. OHM:  Well, that representation isn't worth much

21  for me in terms -- unless I get a transcript and there's a

22  party admission.  But if they have that, there's a source of

23  that information, whether it be a 302 of a statement that

24  defendant -- another defendant made to the FBI about their

25  interaction, whether it be video, whether it be social media

1     posts where people talked about it.  There are different ways

2     that it could be proven up.  There are sources of that.  And

3     whether they know about it or not, they only don't know it

4     because they haven't really looked.  We know that there's --

5     the gargantuan amount of information is a problem for defense,

6     but it also means that we can't assume that the prosecution

7     here knows everything that's in the possession of the

8     government.

9          THE COURT:  The gargantuan amount of information is

10    not a problem for the defense because you're talking about one

11    defendant at one particular time who went into the Capitol at a

12    time that is known by you and left the Capitol at a time that

13    is known by you.  So all this other stuff that is going on

14    hours before and hours after that they've been turning over

15    because they have an obligation to turn it over is not

16    relevant.

17         What's relevant is what's going on at the time your

18    client goes into that building and the time he leaves.  And

19    they've said -- now, I'll -- we'll ask the government to

20    disclose the time and the source and further information about

21    the same words that Officer Millard is probably using

22    repeatedly to keep the peace or whatever.  But it seems to be

23    the same thing he's saying over and over.  Look, I respect you

24    guys, your opinions, but respect the building.  Okay?  I

25    disagree with you, but I respect your right to have this

1    opinion.  Please don't trash the building.  That seems to be

2    what he's saying repeatedly.

3        So it's -- you're going to get that in.  All I'm saying

4    is what else are you entitled to that the government has?  I'm

5    sure you can ask them and they can tell you, you know, in the

6    next break, you know, whatever information they have about the

7    circumstances of those statements, but beyond that -- assume

8    you're going to get that -- what else is it that you think they

9    have -- they don't have an obligation to do your investigation.

10   They don't have an obligation to call in all those guys -- find

11   out who they are, call them in, look at their phones, talk to

12   them about what your client might have heard.

13        MR. OHM:  I agree.

14        THE COURT:  That's not the obligation.

15        MR. OHM:  And if this was, like, a mall video camera,

16   then I don't think there's anything that I could say.  It's

17   only by virtue of the fact that we know that many, many of the

18   people that entered the Capitol Building have been arrested,

19   have provided statements to law enforcement, have been

20   investigated by the FBI, had their statements on social media

21   pulled by the FBI, and so, therefore, it's in the government's

22   possession.

23        THE COURT:  I'm assuming -- and Mr. Boylan will tell

24   me if I'm wrong -- that the government has no statements made

25   by any of those people there who were -- if they were charged

1    or statements or audio from any of those individuals.  Is that

2    correct, Mr. Boylan?

3              MR. BOYLAN:  I don't know that we do or we don't,

4    Your Honor.  I mean --

5              THE COURT:  Do you know if you charged any of those

6    people?

7              MR. BOYLAN:  I don't know if we did or we didn't,

8    Your Honor.  And, you know, those people --

9              THE COURT:  You have to talk into the microphone.

10             MR. BOYLAN:  Your Honor, I think -- you said it best;

11   it's not our job to do the defense's investigation for them.

12   If we had -- had a request to look into a particular rioter

13   weeks ago, we could have said, okay, this person, we can figure

14   out if that person has been charged or hasn't been charged.

15        Whether we recovered their cell phone or didn't recover

16   their cell phone.

17             THE COURT:  What we're talking about is the

18   statements of that officer, and so what you're -- what you're

19   telling me you have is all the times that officer said words to

20   the effect of:  I disagree with you, but I respect you.

21   Respect the building.  You were going to -- either turned it

22   over to Mr. Ohm or you're going to turn it over to Mr. Ohm; is

23   that right?

24             MR. BOYLAN:  Understood, Your Honor, yes.

25             THE COURT:  Okay.  Then I don't see what the problem

1    is.  And I will say that I am not finding there's been a *Brady*

2    violation because I'm not finding the three factors necessary

3    for a *Brady* violation.

4         I am, however, ordering the government to make -- to

5    disclose to Mr. Ohm all the information about Officer Millard's

6    statements at -- around the time that Mr. Vo would have been in

7    that building or coming into the building, and I am ordering

8    the government to disclose to Mr. Ohm the source data for the

9    complaint against the officer and the timing and so on.

10        Other than that -- this whole thing about buttressing,

11   Mr. Ohm, I don't really understand your point because I think

12   the government's probably -- one of y'all is going to elicit

13   those statements from Officer Millard when he's on the stand,

14   and you have to -- before you can argue that your client heard

15   it, you've got to close it out.  You've got to make the

16   connection, somehow.

17        MR. OHM:  Understood, Your Honor.  And I think that

18   we -- I just want to clarify the Court's order.

19        The statements made to Mr. Boylan [sic] -- that also

20   would include the source materials:  whether it be a defendant

21   statement to the FBI, whether it be a statement to -- like on

22   video.  Like, we would get the video.  We wouldn't just get,

23   like, the letter of being, like, this person heard this.

24   Because I just don't want to --

25        THE COURT:  You're speaking too fast.  Even I cannot

1    understand what you're saying.

2         MR. OHM:  Okay.  I just want to make sure that we're

3    getting the source information for the information that they

4    would be providing, because if, for example --

5         THE COURT:  You're talking about the officer?

6         MR. OHM:  Yeah.  The statements to the officer.  And

7    I also would like that to include the other four officers who

8    are there -- I mean, it's equally relevant to them.  We just

9    didn't have a thread to pull.

10        THE COURT:  Okay.  No, no, we're confusing each

11   other.  I thought you were talking about the disciplinary

12   report.  You're talking about the OPR report?

13        MR. OHM:  No, Your Honor.  The statements made to

14   Sergeant Millard by -- or statements by Sergeant Millard to

15   protesters, I would like that to also include statements any of

16   those five officers made to protesters walking by at this

17   general relevant time and their source materials.

18        THE COURT:  As far as I can tell, what we have is

19   that Millard told OPR that another officer told them.  That's

20   not admissible.  That's him telling OPR that some officer told

21   me he said that.

22        MR. OHM:  No, Your Honor.  The video -- the video

23   that's in question that we didn't know the time about, that is

24   Officer Millard talking.

25        THE COURT:  Right.

1          MR. OHM:  And I think there's another officer who

2     says something similar -- I don't want to guess his name.  I

3     can't remember it off the top of my head.  But there's another

4     officer that says something similar, also referenced in the

5     motion.  So it appears that there's a possibility that multiple

6     officers are making these sorts of statements.  So we'd like

7     the statements of all five of them to this effect from about,

8     let's say, 2:35 to 2:40 so we can narrow it down for them.  I

9     don't want to make it too difficult.

10          THE COURT:  Do we need any of this before we pick a

11    jury?  Because can't you-all do that after we pick a jury?

12          MR. OHM:  I don't know how long it would take.  I was

13    about to say, maybe -- maybe a one-day continuance would be

14    appropriate, but if the Court doesn't want to do that --

15          THE COURT:  I don't think that -- I think we can pick

16    a jury and -- and I'm -- we're getting three strikes each as

17    per the rules for misdemeanors.  I'm not going to do it just

18    because you asked me to do it.  The rules provide --

19          MR. OHM:  The venue point was a pretty good one,

20    though, Your Honor.

21          THE COURT:  The rules provide three strikes a side.

22    That's what y'all are getting.  Three strikes a side.  Just

23    because somebody pulled the wool over my eyes in *Alford* and I

24    inadvertently gave them more, we're going by the rules.

25          So I don't see why we can't start picking a jury.

1    Finish maybe by 3:00.  Send them home to come in tomorrow for

2    opening statements and instructions, and y'all hash out this,

3    because you won't have to open, so it's not like you're being

4    prejudiced by not being able to -- I don't want to lose a day

5    for this.

6              MR. OHM:  That's fine, Your Honor.

7              THE COURT:  Okay.

8              MR. ROMANO:  Your Honor, may I come up?

9              THE COURT:  Come on up.

10             MR. ROMANO:  Thank you, Your Honor.

11             THE COURT:  State your name for the record.

12             MR. ROMANO:  Michael Romano, Your Honor.

13             THE COURT:  Hi, Mr. Romano.

14             MR. ROMANO:  Hi.  Good to see you again.  I'm

15   supervising the --

16             THE COURT:  I gathered.

17             MR. ROMANO:  -- team of AUSAs, and I want to make

18   sure that I understand the Court's order on video evidence or

19   statements by Officer Millard so that we can make sure to

20   comply with it.

21             THE COURT:  So what I want you to do is meet with

22   Mr. Ohm and give him as much -- all the information you have

23   about the circumstances of Officer Millard's statements

24   regarding I don't respect -- I respect, I don't agree.  If you

25   have video of it, if you have audio of it, to turn it over.

1    The timing, all of that.

2              MR. ROMANO:  Certainly.

3              THE COURT:  If you don't have audio, you don't have

4    audio.

5         Now, with regard to his -- his statements to OPR, what

6    he's asking for is that source data.

7         I mean, I think you can -- I think you should tell him

8    the circumstances under which his statements to OPR were made

9    and what he said exactly, but I do not believe you're

10   obligated -- if there's a video of him talking to OPR, I

11   don't -- is there?

12             MR. ROMANO:  I --

13             THE COURT:  There is not?

14             MR. ROMANO:  There is, apparently, audio of his

15   interview with OPR which is in the global discovery

16   productions.

17             THE COURT:  So they already have it?

18             MR. ROMANO:  That's my understanding.

19             THE COURT:  Okay.

20             MR. ROMANO:  Your Honor, but I think that there's --

21   actually might be some confusion about the first part of your

22   order on statements at the Capitol, and I -- I want to make

23   sure we're on the same page because I could see us coming back

24   and having further argument about that.

25         I heard Mr. Boylan say that he has not necessarily tried

1    to do a deep dive on where Officer Millard was and where he's

2    featured on cameras as opposed to the information that he

3    sought and then provided for Mr. Vo.

4         And when I heard Mr. Ohm a few minutes ago asking about

5    that window of time and Officer Millard and also the other

6    officers and what they might have said, it sounds like the

7    defense is asking us -- for us to search our video holdings and

8    do an investigation to try to find every place that

9    Officer Millard and those other four officers appeared on video

10   during that five-minute increment.  That's not going to happen

11   tonight, and it's, I think, asking us to do the defense's

12   investigation.

13            THE COURT:  No, I'm not asking you to do that.

14            MR. ROMANO:  Right.  I don't think that's what you're

15   asking.

16            THE COURT:  What I'm asking you to do is -- the OPR

17   report indicates five other officers.  So I guess -- I guess

18   Mr. Ohm is asking for the -- what are you asking for?  Because

19   these -- these statements to OPR and the interview are all

20   opinions after the -- after the fact.

21            MR. OHM:  Sure.

22            THE COURT:  And I think Mr. -- remind me of your last

23   name.

24            MR. ROMANO:  Romano.

25            THE COURT:  Mr. Romano is correct, that they're not

1    required to go through and examine -- I mean, they can give

2    you -- they can give you the material, but they're not required

3    to go through and do your investigation for you.  And it seems

4    like that would have been information you would have gotten in

5    global discovery anyway.

6              MR. OHM:  Just to make sure -- okay.  So setting

7    aside the OPR report entirely, there are five officers who are

8    standing in the same location.  They don't have to go to

9    different locations.  In that location, that's when Mr. Vo is

10   going -- it's the upper west terrace doors.  That's when Mr. Vo

11   is going in and that's the timing at question.

12             So in that period of time, any evidence of anything that

13   any of those five officers said to any of the passersby in the

14   narrow window of time --

15             THE COURT:  If they have it.

16             MR. OHM:  Right, but what they're saying is they

17   don't want to look -- and what I'm saying is that they need to

18   look to know that they have it.

19             THE COURT:  Don't you have it?

20             MR. OHM:  I don't know what we -- I don't know.  We

21   have -- I'm sure we don't have 302s for, like, individual

22   defendant statements for people --

23             THE COURT:  No, no.  If they had 302s for those

24   officers, you would have gotten that; right?

25             MR. OHM:  Not for the officers.  For the defendants,

1    though, who reported that the officers said blah, blah, blah.

2         THE COURT:  But you're assuming that material exists.

3    They said we don't have any information those officers said

4    anything.

5         MR. OHM:  Well, they said -- I thought Ms. Wagner

6    said that she did have information.

7         THE COURT:  Well, she's going to give you the source

8    of that information.  Okay?  But to the effect -- if there are

9    people who may have heard who weren't arrested -- that's just

10   speculation.  If they have statements from individuals that

11   those five officers during the relevant time period said

12   things, they have to turn that over.  But I think what they're

13   saying is we don't have that, and everything we have is what

14   we're telling you here in open court.

15        Is that right, Mr. Romano?

16        MR. ROMANO:  I think that's right, Your Honor.

17        THE COURT:  Come on up to the microphone, please.

18        MR. ROMANO:  I think that's right, Your Honor.  It is

19   certainly possible that there have been people who have been

20   arrested and that there might have been materials obtained from

21   those people and their stuff hasn't made it into global

22   discovery yet.  I don't want to, you know -- just because this

23   is such an ongoing process with the volume of defendants we

24   have, I certainly can't guarantee that everything is ingested

25   into our global discovery productions at the moment we receive

1      it, but --

2              THE COURT:  But here's why I'm not even sure that's

3      relevant.  You already are going to have an admission.  You're

4      going to have evidence that the officers said these things;

5      right?  There's not going to be any dispute that at least

6      Officer Millard said I don't respect -- I don't agree, but I

7      respect -- whatever.  So what does it matter if somebody else

8      who was standing there or if another person who was coming in

9      heard the same thing that you're already getting.  It still

10     doesn't go to Mr. Vo's state of mind.  It's -- it's -- it's

11     less relevant, more cumulative, and less likely.  I don't think

12     it -- it's material.  So -- so what?

13         So another guy who was standing in the vicinity hears

14     the officers say the same thing he's already said he's heard.

15     Again, how is that materially advancing your defense?

16             MR. OHM:  Your Honor, and, again, like -- and I

17     know -- there's the "relevance established hat" and there's the

18     "identifying potentially exculpatory material hat" that the

19     government must wear --

20             THE COURT:  I don't think it's exculpatory.

21             MR. OHM:  If there are officers telling everybody

22     coming in:  Respect the building.  Respect the building.  Just

23     respect the building.  I don't agree with it.  Just respect the

24     building, then that makes it more likely that Mr. Vo would have

25     heard it.

1        If Mr. Vo sees individuals who are filing in in front of

2   him and they're having conversations with the officers and even

3   though he doesn't hear what the content is and that's what

4   they're saying to everybody, that also makes it --

5        THE COURT:  If he doesn't hear the content, then he

6   doesn't know what they're saying to everybody.  They all could

7   be saying I told you not to come in here.  I told you not to

8   come in here.  I mean, it doesn't matter.  And what you're

9   doing is you're taking a small issue with regard to potential

10  impeachment and trying to make it up into a big *Brady* hole that

11  isn't there.  You've gotten -- you will get an officer

12  statement that he's saying respect the building.  I don't agree

13  with you.  I don't agree with you.  You may want it a number of

14  times.  Still doesn't go to what your client heard.

15       If he sees -- if he's in the back of the line and he

16  sees people talking to officers and walking through, that

17  doesn't go to his -- it may go to his state of mind that, well,

18  they're not getting stopped, so I can come in.  Sure.  But he

19  doesn't need the officer's statement for that.  He can say this

20  is what I saw, and based on what I saw -- but what you're

21  asking the government to do is to confirm to you the

22  nonexistence of material they don't know about.

23       MR. OHM:  Your Honor, they only don't know about it

24  because they haven't looked.

25       THE COURT:  They don't know who those people are.

1    You're talking about the government -- the government doesn't

2    have an obligation to conduct an investigation.

3            MR. OHM:  They don't know what the government -- and

4    these two individuals don't.  The government as a whole

5    certainly does.  And Your Honor just heard the government say

6    they didn't even realize that it's potentially useful, this

7    video, up until we said it was.  So --

8            THE COURT:  I don't agree it's potentially useful

9    either.  I don't agree it's potentially -- I've told you my

10   view on those statements, and I don't -- I think you can make

11   your argument.  That argument has not succeeded before.  It

12   might succeed this time.  You're a good lawyer.  Who knows.

13   But I don't agree it's exculpatory.

14           I'm taking a very, very -- relevancy, yes.  I'll give

15   you that.  But you're getting it in.  And so the fact that you

16   want to get it in five times as opposed to one time does not

17   obligate the government to do the search you're asking them to

18   do.

19           MR. OHM:  That's what -- that gets us back to what

20   our ask is; is that the reason it would matter is if

21   Sergeant Millard said something to the effect of I said it

22   once, there's no way your client could have heard it, and we're

23   left in a position where --

24           THE COURT:  First of all --

25           MR. OHM:  -- we can't impeach.

1          THE COURT:  -- he can't say that.  You know as well

2     as I know -- no, I'm not going allow any witness to sit here

3     and say he couldn't have heard.  All right?  That's

4     impermissible.

5          MR. OHM:  Sure.  But even --

6          THE COURT:  You know, Mr. Romano, Mr. Boylan --

7     they're not going to do that.  That's not -- you know, that's

8     not going to happen.  The jury is not going to be allowed to

9     hear that.

10         All -- I assume that they're going to ask the officers

11    what happened, what did you see, what did you do, what -- and

12    he'll say, yeah, at some point I told them this.  I may have

13    said it a few times as people walked by because -- and why did

14    you say that?  I said it because of this reason.  You can

15    cross-examine it and say, well, as you said this, you're not

16    stopping them; right?  You're not -- you know, you're just

17    saying as they're walking by.  All right?  You can elicit all

18    of that.

19         MR. OHM:  Sure, but that's assuming --

20         THE COURT:  Hold on.  So -- so let's say -- let's

21    spin this out.  Let's say you got the names of the people

22    around him.  Let's say you got their -- their cell phone

23    material.  Let's say you got them all to come in here and they

24    all said, yes, I heard the officers say the same thing.  So

25    what?  It's the same thing the officers already said he said.

1    It still doesn't go to your client's state of mind.  And the

2    jury could -- even if you could say, well, Mr. Vo was standing

3    right next to this guy, so yes -- if they're inferences that he

4    heard, the jury could still reject it.

5        The point is you're not getting anything more.  You're

6    not getting the reasonableness of his belief.  You're not

7    getting anything more than what you're already getting at

8    trial.

9        MR. OHM:  I -- I think the operative word,

10   Your Honor, is could.  They could reject it.  They could

11   embrace it.  Or they could --

12       THE COURT:  They could reject it.  They could embrace

13   it based on what we already know is coming in.  All -- all that

14   you're asking for is -- is basically cumulative of what you're

15   going to get.  Like I said -- now, sure if Officer Millard

16   said, I said it, nobody else said anything, I said it once, and

17   the government has good reason to believe he said it more than

18   once, then you can impeach him with that, but you're already --

19   they're already going to tell you the circumstances of how many

20   times he said it that's in their possession or control.

21       That's -- that's all -- I mean, you're -- what it seems

22   to me is -- you're saying is they're -- they're required to

23   confirm that he didn't say it to these people or that -- he

24   didn't say it -- what they've done is they've interviewed the

25   officers.  They're going to get all the times that he believes

1    he said it.  They're not required to then check the audio for

2    every single person walking by to see if he said it again.

3              MR. OHM:  Your Honor, I guess, respectfully, whether

4    it be *Brady* or whether it be Rule 16 and just material to the

5    preparation of our defense, if these officers are saying it

6    multiple times and the Court agrees that it's relevant, then we

7    get that information.

8              And -- and they have to identify --

9              THE COURT:  Multiple times that your client would

10   have heard.

11             MR. OHM:  Potentially.

12             THE COURT:  Right.  Well, you're going to -- they're

13   going to tell you, but we're talking about a very small time

14   frame.  And if the -- Officer Millard says I said it a couple

15   times, yeah, that's me, I'm saying it at that time, and I

16   probably said it a couple more times.  That's it.

17             MR. OHM:  If the government has video evidence in

18   their possession, then they have to be responsible for knowing

19   that information.  So if --

20             THE COURT:  They've given you all the video evidence

21   they have in their possession during the time your client was

22   coming in and coming out.

23             Am I right, Mr. Romano?

24             MR. ROMANO:  I'll refer to --

25             THE COURT:  Mr. Boylan.

```
 1                    MR. BOYLAN:  Yes.

 2                    THE COURT:  Okay.

 3                    MR. OHM:  That's CCTV video.  But I didn't know --

 4                    THE COURT:  All the video in their possession.  In

 5       other words, if they had video -- I've had cases where they've

 6       had video from other people's cameras of the defendant.  They

 7       have turned it over.  As far as I'm aware --

 8            Mr. Boylan, is the government saying they don't have any

 9       video from any source of Mr. Vo going in or out other than

10       what's already been disclosed?

11                    MR. BOYLAN:  Correct.

12                    THE COURT:  Then there we have it.

13                    MR. OHM:  And then the other aspect is reports of

14       statements that those potential individuals have said

15       essentially the same request, except the source not being the

16       video, but the statements that the defendants have said to law

17       enforcement about this.

18                    THE COURT:  You're saying the defendants.  We don't

19       know if any of those people have been arrested.

20                    MR. OHM:  I know that I don't know, but I don't --

21                    THE COURT:  But, again, that's cumulative.  In other

22       words, if those individuals -- let's assume they were arrested

23       and they said I heard Officer Millard say I respect -- I

24       respect your opinion, I don't agree -- respect the building.

25       It's the same thing that Officer Millard has already said.
```

1          MR. OHM:  If they're saying that -- if they're

2     talking about that statement that I have on video, I agree it's

3     cumulative, but if there are additional statements, then it's

4     not cumulative.  And we have a good faith basis to think that

5     the officers were making these sorts of statements as people

6     came in, and we don't have any reason to think that it was only

7     said those two times that we have on video.

8          THE COURT:  But you don't have any reason to think it

9     wasn't.  You don't -- what you're asking for is -- is a --

10     you're asking the government to disprove a negative or

11     something like that.  I mean, that's not their *Brady*

12     obligation.

13          MR. OHM:  I'm asking for -- between *Brady* and

14     Rule 16, what I'm asking for is all the information from that

15     period of time.

16          THE COURT:  And they've said they've given it to you.

17          MR. OHM:  The video, but -- I'm including the

18     information, the accounts of other individuals, potentially

19     witnesses --

20          THE COURT:  If known to the government.

21          MR. OHM:  It's -- that's -- I just want them to

22     confirm that it's in there.  They're confident that there's no

23     video.  Great.  I'm not asking for the video anymore because

24     that's their representation.

25          They're not confident about other individuals'

1     statements about what officers said to them as they walked in.

2     That's what we're asking for.

3          THE COURT:  Okay.  We're going to pick a jury.  When

4     we're finished picking a jury, you-all can confer.  I want you

5     to confirm to Mr. Ohm that you've given him everything you have

6     about every witness statement -- about all the statements and

7     audio and video of that time period where Mr. Vo is going into

8     the building.  I don't care what's happening when he's leaving,

9     because it's about his entry.  Okay?

10         MR. OHM:  And, Your Honor, in terms of the -- the

11    officer's audio statement to OPR, I believe that's *Jencks*.  I

12    don't -- the global discovery --

13         THE COURT:  He says you have it.

14         MR. OHM:  He says that it was produced in global

15    discovery, which isn't really meaningful.  And if it wasn't

16    produced in case-specific discovery and it wasn't discovered

17    as -- disclosed as *Jencks*.

18         THE COURT:  So what you're saying is that when they

19    give you global discovery, you get to ignore it?  I mean --

20         MR. OHM:  It's like finding -- if they don't identify

21    it by an identifier, like, finding it is like --

22         THE COURT:  Tell him where it is.

23         MR. OHM:  Or send a copy.

24         THE COURT:  Tell him where it is.

25         Ms. Lavigne, how soon can we get a panel?

1        Five minutes.  Thank you.

2              (Recess taken.)

3              MR. BOYLAN:  Your Honor?

4              THE COURT:  Yes.

5              MR. BOYLAN:  May I ask a question?

6              THE COURT:  Yes.

7              MR. BOYLAN:  I would just like to -- I'd like to

8    clarify what the Court's ruling is on what we're obligated to

9    provide to the defense.

10        I think what I understand is that the Court would like

11   us to provide 302s or written statements for every rioter that

12   came in the building near Mr. Vo's time period, which is like

13   2:35 to 2:40.  I think that's the time period that defense

14   said -- that's -- frankly, Your Honor, that would be impossible

15   for us to do between now and tomorrow.

16              THE COURT:  I'm not asking for that.

17              MR. BOYLAN:  Okay.  Can I ask what is -- what is the

18   Court's ruling?

19              THE COURT:  What are you asking for?  Because I

20   assume you're not asking for that.  That's not --

21              MR. OHM:  Any statements in the government's

22   possession made by any individual who heard any of those five

23   officers make statements to the effect of -- that could

24   reasonably be interpreted as permitting or allowing

25   individuals --

```
 1            THE COURT:  Within what time frame?

 2            MR. OHM:  The five-minute time frame.

 3            THE COURT:  Of those five officers?

 4            MR. OHM:  Yes.  From those five officers.  The

 5    statements from those five officers.

 6            THE COURT:  From those five officers.

 7            MR. OHM:  And the source material.

 8            MR. BOYLAN:  It would be nearly impossible for us to

 9    do that in -- especially in an overnight time period,

10    Your Honor.

11            THE COURT:  Do you have the statements of those five

12    officers?

13            MR. BOYLAN:  We have what they -- the statements that

14    they gave to the OPR report.  I mean, we have some -- the

15    instances of video.  We can certainly look for the video of

16    what the officer said.

17            THE COURT:  For that five minutes.

18            MR. BOYLAN:  For that five minutes?

19            THE COURT:  Yes.

20            MR. BOYLAN:  Your Honor, this goes back to my

21    argument about the investigation and, you know -- when this

22    request could have been made to us.

23            Nothing that's been given to the defense in the last

24    two days has prompted this.  They have known since day one when

25    Mr. Vo came in the building, where he came in the building.  If
```

1      they wanted information about what people said in his vicinity

2      at that time, they could have easily requested it weeks or

3      months ago.

4          Making the request literally on the morning of trial is

5      very difficult.  There are a lot of people.  I don't know what

6      their arrest statuses are.  It's -- it's --

7          THE COURT:  No, no.  Well, I guess what I'm -- I

8      don't think you have an obligation to go through everybody who

9      was arrested during that time period and see what they said,

10     no.  You're not obligated to do that.  What you're obligated to

11     do -- what I'm asking you to do is if you have audio of those

12     officers saying this during that time period or any statements

13     in your possession that the officers said that during that time

14     period from the officers, then, yes, that -- but, Mr. Ohm, he

15     does have a point.  Why didn't you ask for that before?  You

16     had the redacted statements.

17         MR. OHM:  Your Honor, again, the redacted -- I didn't

18     read the redacted statement until last Monday.

19         THE COURT:  But that's not the government's fault.

20     That's your fault.

21         MR. OHM:  Your Honor, if you're saying that I'm

22     responsible for everything in Relativity, then it is my fault,

23     but I can't --

24         THE COURT:  No, no, no.  No.  I'm saying that you're

25     coming in here on the morning of trial and jumping up and down

1    about these statements from the officer when you had the

2    statements a long time ago and could have asked for this very

3    material.  That is -- that is the government's point, and it is

4    a good one.

5          MR. OHM:  I asked for it on Friday, which is when

6    I --

7          THE COURT:  No, but you -- no.  Friday -- the trial

8    is Monday and you're asking for it on Friday.  You could have

9    asked for it two months ago when you first came into the case.

10          MR. OHM:  Your Honor, two months ago -- what I'm

11    saying is because I did know that those statements were made --

12    that video was not provided to us until just this week.

13          THE COURT:  You didn't need the video.  You had the

14    statements.  You had the redacted statements.  You could have

15    said:  Hey, this statement -- this officer says I -- I don't

16    agree with you, but I respect you, respect the building.  You

17    knew -- you had that statement.

18          MR. OHM:  I had it in the global production, but I

19    did not -- I'm just telling you, Your Honor, I did not know

20    about those statements until --

21          THE COURT:  But that's not the government's fault.

22    They gave it to you, and the government's obligation is to turn

23    it over, and they turned it over.

24          MR. OHM:  It is the definition of needle in the

25    haystack, Your Honor, when you're talking about literally 20

1      terabytes of information and you're saying --

2           THE COURT:  Mr. Ohm, you know every single case that

3      has been brought.  There's -- the government has turned over a

4      lot of discovery, and then they turn over case-specific

5      discovery, but you cannot sit on that until the Friday before

6      trial when you have had the statement.  I don't care about

7      what -- what the time stamp says.  You had the statement.  If

8      it's as important as you say -- and I disagree about the

9      importance of it -- you should have said, hey, this is

10     exculpatory.  I want more.  Tell me more about this.  Tell me

11     more of the circumstances.  You can't do that on the Friday

12     before.

13           MR. OHM:  It was not case-specific discovery provided

14     to us.  That's what I'm saying.

15           THE COURT:  It was given to you.

16           MR. OHM:  It was given to the office in the

17     Relativity database.

18           THE COURT:  And, certainly, you knew what time your

19     client -- you knew the officer.  In other words, it may have

20     been given to you with a large amount, but there's no --

21     there's been no argument that it was deliberately buried.  You

22     had it.  You had the -- the officers' statements, and so you --

23     and even if you -- you got the case-specific discovery -- you

24     didn't get it last week.  You got the case-specific discovery.

25           MR. OHM:  It wasn't in the case-specific discovery.

1    That's my point.

2              THE COURT:  Because you already had it.

3              MR. OHM:  But, Your Honor, if it's case specific,

4    then it has to be in the case-specific discovery.  I mean,

5    I -- I will tell Your Honor right now, I can say as an officer

6    of the court that I did not put eyes on that and 99 percent of

7    the discovery on Relativity until -- generally, and on that

8    particular document until Monday.  So that's why we're here.

9    And if the Court is asking for me to ask for a continuance to

10   get this done right, then I'll do that, but I'm definitely

11   not --

12             THE COURT:  You're asking for a continuance -- you're

13   admitting that you -- the statements at issue you didn't see

14   until last week, and now you're asking for the government to,

15   basically, undertake an investigation into the circumstances.

16   That's how I'm seeing it, and I'm -- I'm -- what you have at

17   the moment -- okay.  Let's just go over for the record what you

18   have.

19        You have the officer's statement.  The officer is not

20   denying making the statement.  You have reasonable time frame,

21   and you're going to get -- they're going to inquire about the

22   circumstances from the officer of how many times he believes he

23   made that statement and when; right?

24             MR. BOYLAN:  Yes.

25             THE COURT:  Yes.  You'll have that.

1          Now, what you're asking for now is 302s of any

2    particular person who was arrested during that time who may

3    have heard that?  Because that you're not getting.

4          MR. OHM:  Not any particular person, Your Honor.

5    Just anybody who reported statements to -- made by those five

6    officers.

7          THE COURT:  During that time?

8          MR. OHM:  Yes.

9          THE COURT:  I don't think that's reasonable either

10   because, again, it's not -- you can't -- so what?  My -- and I

11   don't want to be flip or, you know -- but so what?  So four

12   minutes before somebody heard an officer say the same thing

13   he's going to say he said; right?  So you're getting it in.

14   You're getting the evidence in.  Repetition does not guarantee

15   veracity.  And, anyway, nobody's attacking the veracity.

16   You're getting the evidence in that the officer said this.

17   Whether you get it that he said it three times or four times,

18   it's a very small window we're talking about.  The government

19   is not going to fight you that the officer said this.  What

20   they're going to dispute is that it meant anything other than

21   don't trash our building.  There are too many of you and not

22   enough of us, so I don't agree with you, but, you know, I

23   respect your right to protest.  That -- you know, you're going

24   to argue that that means something more than -- you know,

25   they're going to argue that means something different, but the

1   fact that it was said again -- we're talking about diminishing

2   returns here and diminishing relevance.

3          MR. OHM:  Your Honor, the reasonableness of the

4   individuals who hear these words turn on the words themselves,

5   and they also turn on repetition of those words.  So if there

6   is a particular --

7          THE COURT:  Only if your client can hear it.  Only if

8   he can hear it.

9          MR. OHM:  Your Honor, in -- when I'm talking about

10  the line of individuals, I don't think that we are restricted

11  based upon the conduct.  The conduct -- his state of mind, his

12  intent, and what he perceives is also relevant.  I mean, that's

13  what the government is arguing.

14         THE COURT:  He can testify to what he heard.  He can

15  testify to what he saw.  And he can testify to what he believed

16  based on what he heard and what he saw.

17      Say you find a person who three minutes earlier,

18  four minutes earlier -- that Officer Millard said the same

19  thing.  So -- that -- how would that -- office- -- unless you

20  can show that Mr. Vo heard that -- what that guy heard, that

21  witness's testimony wouldn't be relevant.  He's not on trial.

22  He's not on trial.

23      Mr. Vo can say I saw a whole bunch of people in front of

24  me.  The officers were saying things.  They were going in.  I

25  thought, okay, this is fine, I can go in too.  You can make all

1   that argument.  The government is not obligated to turn over a

2   whole bunch of statements your client may or may not have heard

3   when you're already getting in the statement that -- and,

4   again, with no testimony that he heard it.

5          MR. OHM:  And, again, the Court doesn't know that,

6   number one.  Number two, we're entitled to the information in

7   the government's possession that would corroborate that, and

8   we're entitled to help advise Mr. Vo about his right to

9   testify.  As to whether what corroborating information might be

10  out there, this is just about the narrow Rule 16/*Brady* issue.

11         THE COURT:  Corroborate what?

12         MR. OHM:  His perception and what he might -- may or

13  may not have heard.

14      Your Honor, this is my job as a defense lawyer.

15         THE COURT:  Mr. Ohm -- and you're doing it very well.

16  I got -- you're doing your job, but this is my job as a judge

17  to rule on issues of relevancy and admissibility and also

18  determine if the government's made its Rule 16 obligations.

19  And so far based on what they've told me and prepared to go and

20  turn over, I think they have.

21      What they're saying is we are going to tell you how many

22  times this officer said to us I said these words.  You know,

23  we're going to tell you the circumstances under which he said

24  these words.

25      I do not believe the government has an obligation to go

1    and find every single witness who -- every single person who

2    came into the building who said I heard the officer said these

3    words.  They're not required to do that.  I'm not going to make

4    them do that.

5              MR. OHM:  Your Honor, if that's the case, then I'm

6    just stuck with the officer's account of these interactions.

7    And what the government has not said is --

8              THE COURT:  Stop.  Wait.  You said you're stuck with.

9    So the point is if a witness -- if they found a witness who

10   said, yeah, I heard the officers say these words too.  A, you

11   haven't accomplished anything more than you already have

12   because, as I said -- the government -- the evidence is going

13   to come in that the officer said these words.

14        And, B, what you'd have is another witness who would

15   say, yeah, the officer said it.  So what?  It still doesn't

16   mean your client heard it.  And that's the issue; what he heard

17   and what he saw.  Not what other people around him heard and

18   saw.

19             MR. OHM:  But it would make the -- it would make him

20   more likely to have heard it and, therefore, would be relevant.

21        So if there was --

22             THE COURT:  No.  I disagree.

23             MR. OHM:  If there was --

24             THE COURT:  I disagree.  It would not make it more --

25   in and of itself, would not make it more likely and relevant

1    that he heard it, because the testimony is going to be that

2    there's -- there's noise.  There's people.  There's sirens

3    going off.  There's all kinds of chaos.  And so that inference

4    has to be from your client's perspective.  We don't know

5    where -- I mean, I disagree.

6            MR. OHM:  But he testified, Your Honor, and I wanted

7    to corroborate that testimony with somebody saying ten seconds

8    earlier I walked in, you could see him on the camera a foot and

9    a half away.  And he heard the same thing and the guy kept on

10   repeating it, it would certainly corroborate his testimony.  It

11   would --

12           THE COURT:  If he testifies, you can corroborate it

13   with Officer Millard's statement that I said it.

14           MR. OHM:  But, Your Honor, they don't get to pick and

15   choose -- they don't know.  This is what my problem is -- is

16   that there might be a 302 of somebody who was standing right

17   next to Mr. Vo who said this is what I heard and this is what

18   the officer said.

19           THE COURT:  And again --

20           MR. OHM:  And they don't even know that it exists.

21   And I don't have access because that's in --

22           THE COURT:  Okay.  You're talking about what might

23   exist and what might not.  The government -- *Brady*/Rule 16

24   doesn't mean that the government has to go do your

25   investigation for you.  Your client knows who was around him.

1    You know, you can do your own investigation.  As a defense

2    lawyer, you can do your own investigation.  The government has

3    an obligation to produce what they have.

4              MR. OHM:  Sure.

5              THE COURT:  And they've given you the statement.

6    They gave you the statement months ago.  They gave you the --

7    you know, and -- and you've -- you've had all this evidence for

8    some time.

9         Now, when you decided to focus on it and look at it is

10   up to you.  But I'm telling you on the day of trial I'm not

11   going to obligate them to go and do a two-day investigation

12   into every possible person during that time frame who talked to

13   prosecutors and said:  This is what I heard and saw.  That's

14   not what I'm going to require them to do.

15             MR. OHM:  If they have that information in their

16   possession -- because we know that they do talk to people;

17   right?  So we know that they have a database of information

18   that includes 302s that I don't have access to with my

19   investigation as -- if they knew -- if they came up here and

20   said we know it's in those 302s -- if this was a small case

21   where it would be reasonable for the government to do -- know

22   that without looking, it would be a different situation.

23             THE COURT:  You can't come ask for that on the day of

24   trial, and I'm not going to require them to do it on the day of

25   trial.

1          MR. OHM:  I am, frankly, hurt that I'm expected to

2     know what's in all of Relativity.  I did not have that as an

3     expectation of me, and I am going to tell the Court that if we

4     go forward to trial -- we're going to have to do this

5     production at some point anyway.  Because if there's a

6     conviction and there's post-conviction litigation, then

7     somebody's got to look to see if what I did mattered or what I

8     didn't do mattered.

9          But I'm not falling on my sword here.  I am telling

10    the Court I had no idea that any judge would ever expect me to

11    know the 9 terabytes of information inside that Relativity

12    database.

13         THE COURT:  I don't expect you to know the

14    9 terabytes.  But I expect you to know what your defense is,

15    which you've always known what your defense is.  And I expect

16    you to look for materials relevant to that offense.  And if you

17    didn't get around to noticing that statement until this week,

18    that's not the prosecutors' fault.

19         MR. OHM:  Your Honor, that's not how the database is

20    set up, though.  I mean, you can't just be like, you know,

21    Antony Vo's case and then stuff comes out.

22         THE COURT:  So what should they have done

23    differently?  They gave you the material.  What -- you had --

24    you had it.  You're saying that they had an obligation to give

25    it to you and put red tabs and say this is --

1          MR. OHM:  No, Your Honor.

2          THE COURT:  Wait.  Let me finish.

3      And say, here, these are the -- these are the important

4  things you need to look at that pertain to your client.  They

5  gave you the statements.  They gave you case-specific

6  discovery.  You've had it.

7      Now, did you ever ask them, having received the first --

8  the global discovery, did you ever make more specific requests

9  of them?

10          MR. OHM:  Your Honor, the global discovery has all of

11  the CCTV video.  The global discovery has every single

12  individual --

13          THE COURT:  I know.

14          MR. OHM:  -- body-worn camera.  So what they should

15  have done, in my view, is put it in the case-specific

16  discovery.  They knew that -- they gave it to me as *Jencks*

17  because they knew it was part of the case.  So it should have

18  been in the case-specific discovery.

19          THE COURT:  Did you ask this them to -- when you got

20  the case-specific discovery, did you say:  Does this include

21  this?  I need to know this.  I want to know more about this.

22  Did you make specific requests?

23          MR. OHM:  I didn't even know there was an OPR report

24  involving the officers that Mr. Vo passed --

25          THE COURT:  And you got that report when?

1          MR. OHM:  Monday.

2          THE COURT:  A week ago?

3          MR. OHM:  Yeah.

4          THE COURT:  Did you then ask them for what you're

5    asking me today?

6          MR. OHM:  I asked them on Friday after I --

7    because -- I mean, I'm busy, Your Honor.

8          THE COURT:  Had you -- I know, but had you --

9          MR. OHM:  It's not like I was sitting on it until

10   Friday.  I guarantee that.

11         THE COURT:  But you had a trial on Monday.  You had a

12   trial on Monday.  And whether you were at the jail -- I've been

13   where you are.  Then you send an email.  You say, I've just

14   gotten this.  I want to know X, Y, and Z.  That would have at

15   least given them five days.

16         You're asking me on the day of trial to do this and for

17   information that I've already told you I don't think is

18   particularly relevant and I think is cumulative.

19         So you've made your record --

20         MR. OHM:  When I was doing my crosses on Friday,

21   that's when I was going through the *Jencks, which* is my

22   practice.  And it was in the *Jencks*.  So that's the first time

23   I saw it.  And, again, Your Honor, if I'm wrong, I'm wrong.  I

24   mean, I honestly -- it's -- I don't -- I don't -- I feel like I

25   work pretty hard.

1          THE COURT:  You do work very hard.

2          You've articulated your prejudice.  I've told you what

3     I'm going to require the government to do.  If you want to

4     renew your motion for that information over the course of the

5     trial if you believe it becomes relevant -- you're going to

6     hear the government's testimony.  You're going to hear the

7     witness's testimony.  We're going to pick a jury right now.

8          Did you-all pick your alternate seats?

9          MR. OHM:  I just want to make sure.  I -- I

10    separately move to continue and provide my basis on the record.

11    My understanding is that the government has statements made by

12    these officers potentially at the time that they -- and they

13    don't know whether their statements exist.  They haven't looked

14    for those statements, and they believe that there's a volume of

15    information that they have to turn over with that request.

16         I have not made that request in a timely manner

17    according to the Court, but that should not prejudice my

18    client.  We don't know what information is in there.  This is a

19    misdemeanor trial that could be done in the future.  And so I

20    would ask Your Honor, respectfully, to allow us to continue

21    this trial so the government can produce that material, we

22    could review it, and if there is additional investigation, that

23    we can do it.  But right now, that's where we are.

24         THE COURT:  Mr. Boylan.

25         MR. BOYLAN:  Your Honor, the government would object

1    to a continuance of trial.  It's our perspective that the

2    defense has had adequate time to investigate the case, to make

3    requests.  The government -- based on that investigation, what

4    defense counsel is asking for now is for the government to

5    conduct the entirety of their investigation overnight on the

6    first night of trial.  It's unwarranted.  And a continuance

7    wouldn't be appropriate here.

8              THE COURT:  All right.  The request for a continuance

9    is denied.

10             I will ask the government to inquire into the -- into

11   the source of those five officers' statements to OPR to get

12   every bit of information about what those officers'

13   statements -- to the effect of what Officer Millard said and

14   give the defense all the information about whatever the officer

15   said they said on that day.

16             And to the extent you -- that you know of any

17   individuals who were arrested within those few minutes around

18   the time Mr. Vo was going in and you have those statements

19   regarding what the officers said, that if you -- that you turn

20   those over on an ongoing basis as you become aware of that.

21             But beyond that, I am finding that the defense had this

22   information.  They had it months ago when the discovery -- you

23   know, I don't know.  A year ago, whenever the global discovery

24   was turned over.  They had it specifically referred to in the

25   Jencks Act information that was turned over Monday.

1          And I have already said that given Officer -- Officer

2     Millard's expected testimony, this evidence -- any information

3     that other officer -- this officer or other officers said

4     similar things would be cumulative, in particular without any

5     evidence that this defendant heard those statements.

6          I'll hear again, you know, if the defense wants to

7     further articulate its prejudice.  But right now, I would like

8     the government and the defense to pick an alternate seat.

9               MR. BOYLAN:  Thank you, Your Honor.

10              THE COURT:  Any number, 1 to 14.

11          Mr. Ohm.

12              MR. BOYLAN:  Have we numbered the seats yet?

13              THE COURT:  One starting closest to the door.  2, 3,

14     4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14.

15          Did we discuss -- we're doing this so -- in such a

16     rushed way.

17          You get three strikes, peremptories, each.  Alternate

18     strike last.  During your peremptories, if you inadvertently --

19     I'll remind you if you inadvertently strike an alternate seat.

20     But, normally, that's just viewed as a pass.  If you pass, you

21     pass.  You don't get that back later on.  You are permitted to

22     strike into the panel.  If both of you strike into the panel,

23     we're done.  Two passes in a row, we're done.

24              MR. BOYLAN:  Can you explain what you mean by

25     striking into the panel, Your Honor.

1          THE COURT:  In other words, you can exercise a

2    peremptory -- because when we start the selection, I'm going to

3    have the first 14 in the box.  So when you start your strikes,

4    you can strike into the box or you can strike into the panel.

5          And we're going to excuse them per rounds.  So we'll

6    have three rounds and then a round of alternates.  Every round,

7    we'll excuse the two, have a replacement come up and sit in the

8    box.

9          MR. BOYLAN:  Okay.

10         THE COURT:  Ms. Lavigne, you got that?

11         THE COURTROOM DEPUTY:  Yes.

12         THE COURT:  When they first come in for the

13   *voir dire*, put them all in there.  And then once I've read the

14   questions to them, they'll write their number on the card.

15   They go back outside.

16         And they come up one at a time.  They sit here.  I'll

17   ask them what questions they had answers to.  If they didn't,

18   I'll still ask them, you know, what do you do for a living.

19   I'll ask them something just to make sure so they can hear and

20   understand.  I'll allow limited follow-up from both sides, very

21   limited.  And then if you have a motion to strike, you should

22   make it as they're leaving.

23         And I think, based on my calculations with four

24   strikes -- so three peremptories and an alternate strike, four

25   per side; that's eight.  So we need about 26, 27 qualified.

1     I'd like to get 30.

2            And because of the time, I'm going to let them go at

3     1:00 because -- let them take lunch at 1:00.  Because,

4     otherwise, they won't eat because the cafeteria closes at 2:00.

5            MR. OHM:  Your Honor, I just want to -- we're going

6     to pick 12, number one.

7            THE COURT:  Well, for the defense.

8            MR. OHM:  Also --

9            THE COURT:  You already picked yours, Mr. Boylan?

10    What number?

11           MR. BOYLAN:  How about 3, Your Honor.

12           THE COURT:  Okay.

13           MR. OHM:  Your Honor, I also, I think -- I wanted to

14    add, for record purposes, that 9 terabytes, apparently, is

15    about 60 million pages of documents.  So we viewed the

16    Relativity as a dump, not as something we could reasonably --

17           THE COURT:  So what's the purpose of getting it then?

18    I mean, you're getting it.  Are you telling me that every time

19    you get this global discovery it's useless until you get the

20    case-specific discovery?  I mean --

21           MR. OHM:  Yeah.  Seriously.

22           THE COURT:  Do you -- when you --

23           MR. OHM:  I think the purpose is so the government

24    can make this argument, frankly.

25           THE COURT:  Okay.

```
1              MR. OHM:  Secondly, Your Honor, I also would ask

2     that as -- you know, I know the -- the prosecutors present here

3     are going to be busy, but as the trial proceeds, I would ask

4     the Court to order them to do -- to have other staff -- I think

5     they have a whole task force that's three times bigger than our

6     office -- that could look for that information while trial is

7     occurring; so that if there is such information --

8              Because what's mostly disconcerting to me is not that

9     the government identified information and says it's not

10    exculpatory.  It's that the government doesn't know that

11    information exists, even though it seems like there -- I mean,

12    there are, obviously, individuals who are walking through.  So

13    I would ask the Court to ask --

14              THE COURT:  See, there's where you think.  You're

15    saying the government doesn't know whether it exists.  And,

16    really, their obligation is for information that they have.  So

17    what you're asking them to do, again, is to investigate.  And

18    they're not obligated to investigate.  I mean, technically, you

19    know --

20              MR. OHM:  We don't have 302s, Your Honor.  We don't

21    have the information.

22              THE COURT:  I will ask them as the trial is ongoing

23    to look at the 302s for people who are arrested -- who were

24    arrested and interviewed during those three minutes at that

25    entry.
```

1          MR. OHM:  Okay.

2          THE COURT:  So that should narrow it down.

3          MR. BOYLAN:  Thank you, Your Honor.

4          THE COURT:  And the statements they're looking for

5    only go to the statements of that nature, of -- you know, I

6    respect, I agree with you, come on in.

7          All right.  Let's have the panel.

8          So after we do Round 1, we'll excuse those to the back

9    of the room; that way if we need to reseat because of a

10   challenge.  If you have a *Batson* challenge, you need to make it

11   as soon as possible.  Three rounds and then alternates.

12         Okay.  We only refer to the jurors by juror number.

13              (REPORTER'S NOTE:  A sotto voce conference was held

14   between the judge and the court reporter concerning redaction

15   of a name.)

16              (Proceedings held in the presence of the jury

17   venire.)

18              THE COURTROOM DEPUTY:  Your Honor, this is Criminal

19   Case 21-509, the United States of America v. Antony Vo.  And

20   this matter is set for jury selection and trial.

21         Parties, please introduce yourselves for the record,

22   starting with the government.

23              MS. WAGNER:  Good morning, Your Honor.  My name is

24   Lynnett Wagner.  I'm an Assistant U.S. Attorney.  And with me

25   is my co-counsel, Eric Boylan; my case agent, Joe --

1          THE COURT:  We can actually introduce everybody

2    sitting at counsel table during the identification of the

3    parties.  Just calling the case, yes.

4          MS. WAGNER:  Okay.  Thank you.

5          THE COURT:  Mr. Ohm.

6          MR. OHM:  Good morning, Your Honor.  Eugene Ohm,

7    joined by Katelyn Adams, on behalf of Antony Vo.

8          THE COURT:  All right.  Good morning, everyone.

9          Let me first begin by apologizing to you for having you

10   cooling your heels this morning.  We had to deal with a lot of

11   preliminary legal matters.  It couldn't be helped.  Nobody's

12   fault.  And I apologize for your time waiting for this.  But,

13   unfortunately, jury service does involve some amount of waiting

14   while the lawyers wrangle with legal issues.  So thank you for

15   your patience.

16         And it's a little chilly in here, but I've asked to see

17   if we can have the temperature turned up a little bit.

18         I'm Judge Chutkan, and I will be the presiding judge in

19   this case.

20         You have been called to this courtroom, as you heard,

21   for possible selection as a juror in a case titled United

22   States v. Antony Vo.

23         First, I want to introduce you to the court employees

24   and tell you how we will proceed.  Assisting me are my

25   courtroom deputy -- Ms. Lavigne-Rhodes, the courtroom deputy

1   clerk, who you've met.  We have a court reporter with us, we'll

2   have more than one at various times, and their job is to take

3   down everything you may -- you will hear that's stated in open

4   court and keep a record of the proceedings for the people

5   involved in this trial.  Also at the bench with me is

6   Mr. Jahvonta Mason.  He's one of my law clerks.

7        And I will introduce the lawyers and the parties in the

8   case in a moment.

9        You're here because we must select 12 of you and two

10   alternates to serve as jurors in this case.  The purpose of

11   jury selection is to select jurors who have no prior knowledge

12   of the case and no bias towards either side in a case.  To help

13   the parties learn more about you, I'll be asking you some

14   questions during a process we call *voir dire*.  Some people call

15   it *voir dire*, I think if you're from Texas.  There are no right

16   or wrong answers, only truthful ones.

17        So you should all have a card, an index card, and pencil

18   or pen.  Please write the last four digits of your juror number

19   in the upper right-hand corner of the index card.  We will

20   never refer to you by name during this process.  We will only

21   refer you to by juror number.  So it's going to be important

22   that you memorize that number.  And write it at the top

23   right-hand corner of your card.

24        The other thing is take a look and see who's sitting to

25   your right and to your left because it's noon almost.  The

1    cafeteria closes at 2:00.  I want you-all to have lunch.  So

2    we're going to break no later than 1:00 for lunch.  When you

3    come back, you're going to be required to reassemble in the

4    order that you are in.  So take a look and see who's sitting

5    next to you so you can help remember.

6        All right.  Now, I'm going to ask you a series of

7    questions, a lot of questions, but for a good purpose.  If you

8    have a yes answer to any of -- any question, write down the

9    number of the question on your card.  And this is so when you

10   come up for the *voir dire*, I can ask you what questions you had

11   answers to.  So just write the number.  If you have a yes

12   answer, just write the number of the question.  You don't have

13   to put down why.  I'll hear that in -- in private when you come

14   up to answer the questions.

15       Once I finish with the questions, then you will all

16   leave the room and then come up one by one so we can ask you

17   some follow-up questions.

18       If you have a phone, please turn it off.  Put it on

19   silent.  Thank you.  Yes.

20       And we will try and respect your privacy, but you

21   understand that the lawyers are entitled to know something

22   about you and -- so that we can try and select 12 unbiased,

23   impartial jurors for this case.

24       When the follow-up questioning is over, I will decide

25   whether any prospective juror should be excused for cause, and

1   then the lawyers will have a chance to make their selections,

2   and once that is completed, we will impanel and swear the jury

3   to hear the case.

4        The jurors who are selected will receive more

5   instructions after that, and those who are not selected will

6   return to the jury lounge.

7        So before we begin our questioning, I'm going to ask my

8   courtroom deputy to administer the oath.

9            THE COURTROOM DEPUTY:  Prospective jurors, please

10  stand and raise your right hand.

11           (Oath administered to the jury venire.)

12           THE JURY VENIRE:   (Collective affirmation.)

13           THE COURTROOM DEPUTY:  Thank you.  You may be seated.

14           THE COURT:  Now that you're sworn, we're going to

15  begin the *voir dire*; and the term *voir dire* is a legal term

16  that means to speak the truth.  To speak truthfully.  And

17  that's what I want you to do here.  Remember that you're bound

18  by the oath that you've just taken to speak truthfully to

19  respond to my questions.

20        Some of the questions that I ask may seem to address

21  matters that are personal to you.  Please understand it's not

22  my intention or my desire or the desire or intention of the

23  parties before me to invade your privacy or to embarrass you.

24  Our only wish is to select the fairest, most impartial jury

25  possible.  Each of the parties has a vital interest in this

1   matter and wants to be assured that jurors will have no -- the

2   jurors will have no biases or prejudices about this case and

3   that the verdict which is returned will be based only on the

4   law and the evidence.

5           Therefore, it's important that you be entirely

6   straightforward with us in your responses so that we may more

7   easily select the jury for this case.  And, again, you may have

8   opinions about a lot of things, and we all do.  The question is

9   not whether you have opinions.  It's whether you can put those

10  opinions aside and be fair and impartial regardless of those

11  opinions.

12          So I haven't told you anything about the case, but do

13  any of you think you have any -- you may know anything about

14  the facts or circumstances of this case other than what I've

15  told you?  If you do, answer -- write down Question No. 1.

16          Wait a second.  I guess I haven't told you about the

17  nature of the charges.  I'm sorry.  Give me one minute.

18          Mr. Vo is charged with the following counts:  Count 1,

19  on or about January 6th, 2021, that he knowingly entered and

20  remained in a restricted building and grounds; that is, any

21  posted, cordoned off, and otherwise restricted area within the

22  United States Capitol and its grounds, where the Vice President

23  was and would be temporarily visiting, without lawful authority

24  to do so.  So Count 1 is entering and remaining in a restricted

25  building in violation of Title 18, United States Code

1    § 1752(a)(1).

2         Count 2, on or about January 6, 2021, that Mr. Vo

3    knowingly and with intent to impede and disrupt the orderly

4    conduct of government business and official functions engaged

5    in disorderly and disruptive conduct in and within such

6    proximity to a restricted building and grounds; that is, any

7    posted, cordoned off, and otherwise restricted area within the

8    United States Capitol and its grounds, where the Vice President

9    was and would be temporarily visiting, when and so that such

10   conduct did, in fact, impede and disrupt the orderly conduct of

11   government business and official functions.  This is disorderly

12   and disruptive conduct in a restricted building in violation of

13   Title 18, U.S. Code § 1752(a)(2).

14        Count 3, that on or about January 6, 2021, in the

15   District of Columbia, Mr. Vo willfully and knowingly engaged in

16   disorderly and disruptive conduct within the United States

17   Capitol Grounds and in any of the Capitol Buildings with the

18   intent to impede, disrupt, and disturb the orderly conduct of a

19   session of Congress, in either House of Congress, and the

20   orderly conduct in that building of a hearing before or any

21   deliberation of a committee of Congress or House of Congress.

22   That's violent entry and disorderly conduct in a

23   Capitol Building in violation of Title 40, United States Code

24   § 5104(e)(2)(D).

25        And Count 4, that on or about January 6, 2021, in the

1    District of Columbia, Antony Vo willfully and knowingly

2    paraded, demonstrated, and picketed in any United States

3    Capitol Building; that is, parading, demonstrating, or

4    picketing in a Capitol Building in violation of Title 40,

5    United States Code § 5104(e)(2)(G).

6            All right.  So let me ask again.  Count 1 --

7    Question 1 -- not Count 1.  Question 1:  Do you believe you may

8    know anything about the facts and circumstances of this case

9    other than what I've told you today?  That's Question 1.

10           Question 2:  Is there anything about the nature of the

11   charges that would make it difficult for you to render a fair

12   and impartial verdict in this case?  That's Question No. 2.

13           Question No. 3:  Do you live or work near the

14   United States Capitol in Washington, D.C., or do you have any

15   special familiarity with that area?  That's Question 3.

16           Question 4:  The United States is represented today --

17   now, if you could stand, all of you -- by Assistant

18   United States Attorney Eric Boylan.  Mr. Boylan -- actually,

19   why -- Ms. Wagner, introduce everybody on your team now.  You

20   can do that.

21           MS. WAGNER:  I'm Lynnett Wagner.  I'm joined by

22   Assistant U.S. Attorney Eric Boylan; Joseph Henry, who is an

23   FBI task force officer; and Taylor Wilbert is a paralegal at

24   the U.S. Attorney's Office.

25           THE COURT:  Thank you.

1       If any of you think you may know any member of the

2   prosecution team, write down 4 on your card.

3       The defendant in this case, as I've said, is Mr. Antony

4   Vo who lives in Bloomington, Indiana.  Do any of you think --

5   recognize or think that you might know Mr. Vo?  If you do,

6   write down 5.  That's Question No. 5.

7       Question No. 6:  Mr. Vo is represented in this case by

8   Eugene Ohm.

9       Mr. Ohm, if you can stand and introduce the members of

10  your team.

11          MR. OHM:  Thank you.

12      My name is Eugene Ohm.  I'm an assistant federal public

13  defender here in the District of Columbia.  I'm joined by Kate

14  Adams --

15          MS. ADAMS:  Good afternoon.

16          MR. OHM:  -- and Adam Moran, our paralegal.  And

17  Mr. Vo, if you want to stand up.

18          THE COURT:  All right.  If any of you think you might

19  know any member of the defense team, please write Question 6 on

20  your card.

21      Question 7:  The government will call a number of

22  witnesses to testify during this trial.  The defense may do so

23  but is not required to do so.  I will ask each party to

24  introduce or read any names of witnesses that you may hear from

25  or hear about during trial.  Not all of these witnesses will

1    necessarily testify, but they're being introduced to determine

2    whether any of you recognize or think that you may know any of

3    the potential witnesses in this case.

4        When the parties are finished, if you recognize or know

5    any of those individuals, write down No. 7.

6        So, Ms. Wagner or Mr. Boylan.  Yes, just turn on -- I'm

7    going to allow -- rather than have them run up to the podium,

8    you-all can stay at counsel table, just turn the microphone on,

9    and make sure you speak into it.

10       Thank you.

11       MS. WAGNER:  Good morning [sic].  The United States

12   will be calling six witnesses at trial:  U.S. Capitol Police

13   Captain Jessica Baboulis; U.S. Secret Service Agent Elizabeth

14   Glavey; Metropolitan Police Department Lieutenant Christopher

15   Dove; U.S. Capitol Police Lieutenant David Millard;

16   Metropolitan Police Department Officer Randy Done; and Federal

17   Bureau of Investigation Task Force Officer Joe Henry.

18       THE COURT:  Thank you.

19       And, again, if you recognize any of those names, please

20   write down the number -- that will be 7-A.

21       Mr. Ohm.

22       MR. OHM:  Thank you.

23       You may hear from or about the following people:  Alex

24   Gibson; Maria Nieves, N-i-e-v-e-s; Angeles, A-n-g-e-l-e-s,

25   Nozaleda, N-o-z-a-l-e-d-a; Tryees Smith.  Tryees is spelled

1    T-y-r-e-e-s.  And Ronald Sanders.

2              THE COURT:  All right.  Thank you.

3         Again, if you think you know or know any of those

4    individuals, please write down 7-B on your card.

5         Do you -- this is Question 8.  Do you recognize or think

6    you might know any other member of the jury panel or any other

7    person in the courtroom, including me or my courtroom staff?

8         Question 9:  The law provides that the defendant is

9    presumed innocent, and you must presume him innocent.  The

10   burden is on the government to prove him guilty of each element

11   of the offense beyond a reasonable doubt.  The defense does not

12   have to produce any evidence at trial because he is not

13   required to prove his innocence, nor is the defendant required

14   to prove any fact in dispute in this case.

15        This instruction is based on the law.  The presumption

16   continues through the trial unless and until the government

17   proves the defendant guilty beyond a reasonable doubt.  Would

18   any of you have any difficulty following this principle?

19        If you would have trouble following the principle, you

20   should write down Question 9 on your card.

21        Question 10:  A defendant -- this defendant, like every

22   defendant in a criminal case, has an absolute right not to

23   testify.  Our Constitution provides that no defendant may be

24   compelled to testify.  If the defendant chooses or elects not

25   to testify in this case, you must not draw any inference as to

1    his guilt from that decision.

2          Would any of you have any difficulty following this

3    principle?  If so, write Question 10.

4          Question 11:  The law requires that jurors weigh the

5    evidence in a case and reach a verdict based solely upon the

6    admitted evidence and instructions of law without any regard

7    whatsoever for what potential punishment might be.

8          Would any of you have any difficulty following this

9    principle?  That's Question 11.

10         Question 12:  Have you or any of your family, close

11   friends, or household members ever studied law or had any legal

12   training, including paralegal training?  That's Question 12.

13         Question 13:  Have you or any of your close friends or

14   family or household members ever worked for or within an office

15   that handles prosecution or law enforcement?  By prosecution, I

16   mean government agencies such as the United States Attorney's

17   Office, a district attorney's office, or an attorney general's

18   office.  By law enforcement, I mean government agencies like

19   state and local police departments; the Metropolitan Police

20   Department; the Federal Bureau of Investigation, also known as

21   the FBI; the Department of Justice; the U.S. Marshals Service;

22   the Bureau of Alcohol, Tobacco, Firearms and Explosives; the

23   IRS; the U.S. Secret Service; the CIA; and the Department of

24   Homeland Security.  That's Question 13.

25         Question 14:  Have you or any of your family, close

1    friends, or household members ever done any work for or with

2    any person or organization that does criminal defense work,

3    such as the federal defender's office, the public defender's

4    office, defense attorneys, or a private law firm?  This

5    question also includes work as a private investigator.  That's

6    Question 14.

7        Question 15:  Have you or any of your family, close

8    friends, or household members ever worked at a courthouse or

9    for a court system, including as a probation or parole officer?

10       Question 16:  Do you or any of your family, close

11   friends, or household members have a pending application for

12   employment with the United States Attorney's Office or any

13   prosecutor's office, a public defender's office, a law firm

14   that does criminal defense work, or with any local, state, or

15   federal law enforcement agencies?  That's Question 16, for a

16   pending application for employment.

17       Question 17:  Do any of you now or have you within the

18   past five years belonged to or participated in any crime

19   prevention groups, such as Neighborhood Watch -- such as a

20   Neighborhood Watch organization, Orange Hat groups, or any

21   other crime prevention or victim rights groups?  That's

22   Question 17.

23       Question 18:  Have you ever served on a grand jury?

24       Question 19:  Have you ever served on a trial jury

25   either in a civil or criminal case?  That's Question 19.

1          We're more than halfway through.

2          Question 20:  Have you or any of your family, close

3    friends, or household members had any unpleasant experiences

4    with the police or a prosecutor or other law enforcement,

5    whether they're in D.C. or elsewhere, or unpleasant experience

6    with a defense attorney or a defense investigator, whether here

7    in D.C. or elsewhere?  That's Question 20.

8          Question 21:  Do you have any feelings about people of

9    different races, gender, nationality, or religion that could

10   affect your ability to be a fair and impartial juror?  That's

11   Question 21.

12         Question 22:  You will hear testimony from police

13   officers and other law enforcement agencies -- agents in this

14   case.  Would the fact that the witness is a police officer or

15   law enforcement agent have any effect at all on whether or not

16   you believe that person's testimony?

17         In other words, would the fact that a witness is a

18   police officer or law enforcement agent make you more or less

19   likely to believe his or her testimony?  And you'll get an

20   instruction that you are -- excuse me -- evaluate law

21   enforcement testimony as you would any other.

22         Excuse me.  Lot of talking today.

23         Question 23:  Have you or any of your family, close

24   friends, or household members ever been the victim of or a

25   witness to a crime?  By crime here, I mean something other than

1  parking or speeding tickets.  It's 23.

2  Question 24:  Have you or any of your family, close

3  friends, or household members ever been arrested for, charged

4  with, found guilty of, or gone to jail for a crime?  That's 24.

5  Question 25:  Have you had an experience with law

6  enforcement or any person associated with or employed by the

7  U.S. Attorney's Office or the court or the criminal justice

8  system which would make it difficult for you to be a fair and

9  impartial juror in this case?

10  Question 26:  Do you have -- 26-A.  Do you have strong

11  feelings about persons who do not accept the results of the

12  2020 presidential election?  That's 26-A.

13  26-B:  Would those feelings affect your ability to be a

14  fair and impartial juror?  That's 26-B.

15  27:  Does any member of the panel suffer from any

16  illness that would make it difficult for you to sit as a juror,

17  or are any of you presently taking any medications that cause

18  drowsiness, confusion, or discomfort?  That's Question 27.

19  Question 28:  Does any member of the panel believe that

20  they would be unable to deliberate and reach a verdict if they

21  were selected as a juror?  That includes any moral, social,

22  political, philosophical, spiritual, religious, or any other

23  creed or belief that would prevent you from doing so?  That is,

24  preventing you from deliberating and reaching a verdict.

25  That's Question 28.

1          Question 29:  Do any of you have travel plans or some

2     other engagement this week that would make it impossible for

3     you to sit as a juror?

4          And I'll tell you here that we expect this case to get

5     to the jury for deliberation this week.  We will never start

6     before 9:30.  We'll start at 9:30 in the morning.  We'll never

7     go past 5 o'clock.  And we do not sit on weekends.  And even if

8     you're deliberating, you're not going to go past 5 o'clock.  So

9     that's the limits of when you will be here.

10          Question 30:  Do you or someone close to you have a

11     connection to the events that occurred on the U.S. Capitol on

12     January 6th, 2021?

13          Question 31:  Have you or a close friend or family

14     member ever worked at the U.S. Capitol Building?

15          Question 32:  Were you or anyone close to you so

16     affected or inconvenienced by the events that transpired at the

17     U.S. Capitol on January 6th, 2021, or have you so closely

18     followed the media's coverage of the prosecution of the

19     January 6th cases that you could not be a fair and impartial

20     juror in this case?

21          Again, everybody has opinions, but you'll be instructed

22     that -- you'll be asked if you can put those opinions aside and

23     be fair and impartial and -- and assess the case based on the

24     evidence.

25          That question asks if you are so affected or so

1   inconvenienced or have been following so closely that you could

2   not be fair and impartial.  That's Question No. 32.

3          Question No. 33:  If you or your spouse or partner have

4   strong political views, do you think that you will be able to

5   put aside your political views or those of your spouse or

6   partner and be a fair and impartial juror in this case?  So

7   that's a related question.  Can you be fair despite whatever

8   political views you may have?

9          Question 34:  Do you have any difficulty speaking,

10  reading, writing, or understanding the English language?  34.

11         And my final question, 35, is a catchall question.  Are

12  there any other reasons that I haven't asked about that might

13  make it difficult for you to sit fairly, impartially, and

14  attentively as a juror in this case?

15         So if I've missed something but you still believe --

16  you're sitting there saying, the judge hasn't asked me, but I

17  don't think I could be fair, write 35 down, and we can ask you

18  about it.  All right?

19         Thank you.  Now, if you -- Ms. Lavigne will take you all

20  outside, and we'll have you come in one at a time.

21         We will stop at 1 o'clock, and we'll resume after lunch

22  at 2 o'clock.

23         Please keep your cards.  And when you come in for the

24  questioning, bring them up with you.

25              (Proceedings held out of the presence of the jury

```
 1      venire.)

 2                 (Off the record.)

 3                 (REPORTER'S NOTE:  Juror 0198 enters.)

 4                 THE COURT:  Come on up.  Good afternoon.

 5                 THE PROSPECTIVE JUROR:  Good afternoon.

 6                 THE COURT:  Are you Juror No. 0198?

 7                 THE PROSPECTIVE JUROR:  Yes, ma'am.

 8                 THE COURT:  Now, which questions did you have answers

 9      for?

10                 THE PROSPECTIVE JUROR:  14, 19, 20, 22, 23, 26-A

11      and -B, 29, and 32.

12                 THE COURT:  All right.  Thank you.

13            I think -- let's start with 32.

14                 THE PROSPECTIVE JUROR:  Yes, ma'am.

15                 THE COURT:  Because that kind of gets to the whole

16      ball of wax.

17            So Question 32 is were you or anyone close to you so

18      affected or inconvenienced by the events of January 6th that

19      you could not be a fair and impartial juror.  Can you tell us

20      about that.

21                 THE PROSPECTIVE JUROR:  Devastating.

22                 THE COURT:  I'm sorry?

23                 THE PROSPECTIVE JUROR:  I was devastated.  It was

24      very difficult to witness, to watch.

25                 THE COURT:  Can you pull the microphone a little
```

1    closer.

2              THE PROSPECTIVE JUROR:  I'm sorry.  I felt like I was

3    witnessing an act of insurrection, treason.  I still haven't

4    recovered.  It's very difficult to watch.

5              THE COURT:  All right.  And I understand that.  But

6    Mr. Vo is (a) presumed to be innocent and hasn't been proven

7    guilty.  Are you -- are you saying that just because he's

8    charged with or may have been there that you -- because of your

9    feelings you couldn't be fair and impartial in this case?

10             THE PROSPECTIVE JUROR:  No, Your Honor.

11             THE COURT:  All right.  Thank you, sir.

12          Any objections?

13             MR. OHM:  No, Your Honor.

14             THE COURT:  Thank you, sir.

15             (REPORTER'S NOTE:  Juror 0198 left.)

16             THE COURT:  As soon as one steps out, we can bring

17   the next one in.

18             (REPORTER'S NOTE:  Juror 0742 enters.)

19             THE COURT:  Good afternoon.  You may have a seat

20   right there.  Pull the microphone up close to you.

21          Can you tell me your juror number, sir.

22             THE PROSPECTIVE JUROR:  0742.

23             THE COURT:  All right.  Juror 0742.  Thank you.  Can

24   you -- let me let you get situated.

25             Okay.  What questions did you have answers to?

```
 1              THE PROSPECTIVE JUROR:  18, 19, and 26.

 2              THE COURT:  All right.  Thank you.

 3          Let's start with 26.  Do you have -- so was that A and

 4     B?  Both -- in other words, do you have strong feelings about

 5     people who don't accept the results of the election, and would

 6     those feelings affect your ability to be fair or impartial?

 7     That's 26.

 8              THE PROSPECTIVE JUROR:  Strong feelings, certainly.

 9     But, no, I believe I could be fair and impartial for

10     individuals.

11              THE COURT:  All right.  Any follow-up?

12          Oh, I'm sorry.  Wait.  Let's get to the other ones.

13          19:  Have you ever served on a trial jury before?

14              THE PROSPECTIVE JUROR:  Yes.

15              THE COURT:  And how long ago?

16              THE PROSPECTIVE JUROR:  It's been several years.

17              THE COURT:  Do you remember -- was it in D.C.?

18              THE PROSPECTIVE JUROR:  It was D.C.

19              THE COURT:  Do you remember if it was federal court

20     or Superior Court?

21              THE PROSPECTIVE JUROR:  I want to say Superior.

22              THE COURT:  Was it a criminal case or a civil case?

23              THE PROSPECTIVE JUROR:  Civil.

24              THE COURT:  I don't want to know what the verdict

25     was, but were you able to reach a verdict in the case?
```

```
 1                THE PROSPECTIVE JUROR:  Yes.
 2                THE COURT:  Okay.  Anything about that experience
 3       cause you to be so affected that you couldn't be fair and
 4       impartial in this case?
 5                THE PROSPECTIVE JUROR:  No.
 6                THE COURT:  All right.  And 18, you have served on a
 7       grand jury?
 8                MR. BOYLAN:  I have.
 9                THE COURT:  You've really done your service to the
10       District.  How long ago?
11                THE PROSPECTIVE JUROR:  It was maybe four years --
12       four or five years ago.
13                THE COURT:  Do you remember if it was in federal
14       court or -- was it in this building or over at the
15       U.S. Attorney's Office building?  Do you remember?
16                THE PROSPECTIVE JUROR:  The other building, I
17       believe.
18                THE COURT:  Okay.  Anything -- now, you realize,
19       obviously, having been on a civil jury -- in a criminal jury
20       you have to find guilt beyond a reasonable doubt; whereas in a
21       grand jury, it's simply probable cause.  You understand the
22       difference?
23                THE PROSPECTIVE JUROR:  Yes.
24                THE COURT:  Okay.  Any follow-up, Mr. Ohm?  You can
25       sit there.  Just pull the microphone close to you.
```

```
 1              MR. OHM:  Good afternoon, sir.  Do you mind delving a
 2       little bit into your strong feelings?
 3              THE PROSPECTIVE JUROR:  Sure.  I mean, I was -- I
 4       live here in Washington.  I happened to be working from home.
 5       I had the television on.  I was taking care of an elderly
 6       relative, and I saw these events transpire.  And it was just
 7       like, wow, you know.  It was pretty shocking.  And -- so I've
 8       been following it since.
 9              MR. OHM:  I noticed that you didn't -- you didn't
10       mark down the question relating to January 6th in particular,
11       but you did mark down the question relating to people who don't
12       accept the results of the election.
13          Is there -- do you mind sort of explaining to us what
14       the distinction is in your mind?
15              THE PROSPECTIVE JUROR:  I might have made an error on
16       that card.
17              MR. OHM:  Got it.
18              THE COURT:  So by that, do you mean you -- do you
19       also have strong feelings about the events of January 6th?
20       But are you able to put those feelings aside and be fair and
21       impartial in this case?
22              THE PROSPECTIVE JUROR:  I believe so.
23              MR. OHM:  Do you -- do you have any sort of
24       preconceived notions that everybody who was inside the Capitol
25       is guilty of some crime?
```

1          THE PROSPECTIVE JUROR:  If you were inside the

2     Capitol, then perhaps you shouldn't have been there.

3          MR. OHM:  Do you mind -- so you do have a

4     preconceived notion?  Is it fair to say that you have a

5     preconceived notion that everybody who was inside the Capitol

6     is guilty of a crime?

7          THE PROSPECTIVE JUROR:  It's not preconceived.

8          THE COURT:  Let me ask you this:  It's fair to say

9     you have opinions about people inside the building; is that

10    right?

11         THE PROSPECTIVE JUROR:  Yes, ma'am.

12         THE COURT:  Can you put aside those opinions and

13    decide whether they're guilty or not guilty of the particular

14    crimes that they're charged with?

15         THE PROSPECTIVE JUROR:  I believe so.

16         MR. OHM:  When you say it's not preconceived, what do

17    you mean by that?

18         THE PROSPECTIVE JUROR:  It states that -- well, it's

19    against the law, apparently, to be -- there is a law that says

20    you cannot be inside this building beyond certain parameters

21    that is permissible.

22         THE COURT:  You said if there's a law.  And so I'm

23    going to be instructing you on what the law is and the law that

24    you're to apply.  You're going to find facts, and I'm going to

25    tell you what the law is and -- if you're selected for the

 1    jury.  Can you follow the law as I tell you?  I mean, I

 2    understand you say here -- you know, your understanding is it's

 3    against the law.  But I'll actually tell you what the law is

 4    and isn't.

 5         Can you follow my instructions of what the law is as I

 6    tell them to you at the close of the case?

 7              THE PROSPECTIVE JUROR:  Yes, ma'am.

 8              THE COURT:  All right.  Mr. Boylan.

 9              MR. OHM:  I'm sorry, may I continue?  This is,

10    obviously --

11              THE COURT:  Pick up the phone, please.  Just a

12    minute.

13         I'm going to -- occasionally I have to talk to the

14    lawyers, and I'm going to put that on so you can't hear.

15              (Bench conference on the record.)

16              THE COURT:  Mr. Ohm, I think you're getting kind of

17    close to arguing with this juror.

18         I can't hear you.  Are you pressing the button?  I'm not

19    hearing you.  Try the other one.

20              MR. OHM:  Can you hear me?

21              THE COURT:  Yes.  Yes.

22         You're getting dangerously close to arguing with this

23    witness.

24              MR. OHM:  Your Honor, I think -- he, essentially,

25    came out and said that he thought that all the individuals

1    inside were guilty.  In fact, he did say that.

2            THE COURT:  He said --

3            MR. OHM:  I know the Court is going to instruct him

4    on the law --

5            THE COURT:  No.

6            MR. OHM:  -- but he's -- I'm entitled to talk to him

7    about that --

8            THE COURT:  You are.  What he said --

9            MR. OHM:  -- if he can view this case factually only

10   based upon the evidence that he has heard in trial.

11           THE COURT:  He said if there's a law that says they

12   weren't supposed to be in there -- use the other one.  He --

13   can you hear now?

14           MR. OHM:  Yes.

15           THE COURT:  He said if there's a law that they're not

16   supposed to be in there, and he's also said that he can follow

17   the law as I instruct them to.  And he said before that they

18   weren't supposed to be in there.

19       Now, that's -- yeah, that's his presupposition.  But

20   he's also said that he can apply the law as I tell him to.  And

21   I think that's enough.  I don't think -- you know, pressing him

22   on whether he -- you know, his personal beliefs, he said he can

23   put those aside and follow the instructions and the law as I

24   give them to him.

25           MR. OHM:  Your Honor, I just want to say for the

1   record, in denying our venue motion, we understood that these

2   kinds of questions would be something that we could delve into

3   in a little bit more depth because *voir dire* is the fallback

4   for not changing venue.

5           THE COURT:  All right.  I'm going to let the

6   government ask him questions, and I'll allow you some limited

7   follow-up after that.

8           MR. OHM:  Thank you.

9           (Proceedings held in open court.)

10          MR. BOYLAN:  Sir, I understand that you told us that

11  you have some preconceptions about what the law is.  If you

12  were to be selected for this jury, could you put those

13  preconceptions aside and listen to the law as the Court

14  instructs and base your findings in this case entirely on what

15  the judge asks you and not what your preconceptions are?

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  So here's what I'm trying to get at;

18  right?  Every defendant who's charged with a crime is entitled

19  to an impartial juror, not a juror who doesn't have opinions,

20  but whether -- the question is whether you can put the opinions

21  and your feelings, personal feelings, aside and confine your

22  decision to the evidence that's presented in the courtroom.

23          And so what we're trying to get at is if you feel so

24  strongly about the events of the 6th that you can't be fair, we

25  want to know.

1        So my question is regardless of how you feel personally,

2    can you put those personal feelings aside and decide the

3    defendant's guilt or innocence based on the evidence you hear

4    in the courtroom?  Or are you going to think to yourself, he

5    shouldn't have been in there, he's guilty of something?  That's

6    what I'm -- we're trying to find out.

7            THE PROSPECTIVE JUROR:  I understand.

8            THE COURT:  And can you do that?

9            THE PROSPECTIVE JUROR:  I believe so.

10           THE COURT:  All right.  Mr. Ohm.

11           MR. OHM:  Just one final question.  So if you were in

12   my shoes or Mr. Vo's shoes, would you find -- would you think

13   that you would be -- because, obviously, we don't really know

14   you.  Do you think that you would be a good and fair juror for

15   this particular case as opposed to something else?

16           THE PROSPECTIVE JUROR:  Yes.

17           THE COURT:  All right.  Thank you.

18      We're ready for 0446 now.

19           (REPORTER'S NOTE:  Juror 0742 left.)

20           (REPORTER'S NOTE:  Juror 0446 enters.)

21           THE COURT:  Good afternoon, sir.  Come on up.  Are

22   you Juror No. 0446?

23           THE PROSPECTIVE JUROR:  Yes, I am.

24           THE COURT:  Okay.  And what questions did you have

25   answers to?

1      THE PROSPECTIVE JUROR:  11, 20, 23, and 24.

2      THE COURT:  Okay.  Let's start with 11.

3      THE PROSPECTIVE JUROR:  I'm not -- I don't remember

4  all the questions so can you repeat the ones.

5      THE COURT:  Sure.  11 is the law requires that jurors

6  weigh the evidence in a case and reach a verdict solely based

7  on the evidence and the instructions of law without any regard

8  whatsoever for what the potential punishment might be.

9      Would you have any difficulty following this principle?

10      THE PROSPECTIVE JUROR:  Yeah.  I don't believe that

11  everything is, you know, by law system how, you know -- what I

12  say?  The sentencing is right.

13      THE COURT:  So you -- what is it?  What do you feel?

14  You feel like sentences are too light?  Too harsh?  What is it?

15      THE PROSPECTIVE JUROR:  Both, you know.  And it

16  depends on the case.

17      THE COURT:  All right.  Well, you don't know a whole

18  lot about this case yet; right?

19      THE PROSPECTIVE JUROR:  No.

20      THE COURT:  You, obviously, know it concerns

21  January 6th.

22      THE PROSPECTIVE JUROR:  Yes.

23      THE COURT:  And if there were to be a conviction --

24  and I guess -- first of all, you have to hear the evidence.

25      THE PROSPECTIVE JUROR:  Yeah.

1          THE COURT:  You have to decide the defendant's guilty

2     or not.  And if there were to be a conviction, it wouldn't be

3     the jury that would impose a sentence.  It would be me, the

4     Court.  Does that cause you any concern?

5          THE PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Why?

7          THE PROSPECTIVE JUROR:  How -- I don't know if it's

8     going to be right or not.

9          THE COURT:  And would that affect your ability to be

10    a fair and impartial juror?  Would you be worried about what

11    sentence I would give should you find the defendant guilty?

12         THE PROSPECTIVE JUROR:  It can affect it, yes.

13         THE COURT:  Okay.  That's -- so No. 20:  Have you or

14    any of your family, close friends, or household members had any

15    unpleasant experiences with the -- with police or prosecutor,

16    law enforcement?

17         THE PROSPECTIVE JUROR:  So my -- my cousin's husband,

18    he was selling drugs, and I didn't know about it.  And I was in

19    the home, and the police officers came in with guns and stuff

20    while I was sleeping.  So it was, you know, unpleasant, you

21    know.

22         THE COURT:  And did you feel that they treated you

23    unfairly and --

24         THE PROSPECTIVE JUROR:  I mean, no.  But I was -- I

25    mean, I was --

1          THE COURT:  No.  I understand.

2          THE PROSPECTIVE JUROR:  It was just traumatizing

3     because it was like -- I was asleep.  I was in my shirt and

4     underwear.  And they just came in there, and they had these

5     big-old guns, and I'm like, what's going on, you know, scared.

6          THE COURT:  That must have been very frightening.

7          Do you think that that experience would make you less

8     fair?  Do you think that because of that experience you

9     couldn't be fair to the government or that you would view the

10    testimony of a police officer with suspicion?

11         THE PROSPECTIVE JUROR:  I don't think so.  I just

12    was -- I was traumatized.  So I noted it on the card.

13         THE COURT:  No, no.  I want you to answer the

14    questions.

15         THE PROSPECTIVE JUROR:  I don't -- I don't think so.

16         THE COURT:  So you think you could be fair to both

17    sides?

18         THE PROSPECTIVE JUROR:  Yeah.

19         THE COURT:  Okay.  3:  Have you or any of your

20    family, close friends, or household members ever been the

21    victim of or witness to a crime?

22         THE PROSPECTIVE JUROR:  My cousin, the one I'm

23    talking about, he was doing the crime.

24         THE COURT:  Okay.  Same thing?

25         THE PROSPECTIVE JUROR:  Yeah.

1          THE COURT:  All right.  And 24:  Have you or any of

2     your family, close friends, or household members ever been

3     arrested for, charged with, found guilty of a crime?  Is that

4     the same cousin?

5          THE PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Okay.  It had a big effect.

7      All right.  Any follow-up, Mr. Boylan?

8          MR. BOYLAN:  Yes, Your Honor.

9      Sir, the instance that you're describing when you were

10    traumatized by police officers -- I'm very sorry that happened

11    to you -- can you tell us when that was?  How long ago?

12         THE PROSPECTIVE JUROR:  All I can remember is it was

13    before COVID.  Probably like -- so five years ago.  Because I

14    think he was supposed to go in for like four years.  So he been

15    out for like a year now.  So five years ago, maybe six.

16         MR. BOYLAN:  Four, five years ago.  Have the feelings

17    of trauma that you felt that day stayed with you since then?

18         THE PROSPECTIVE JUROR:  Yeah.

19         MR. BOYLAN:  Would you say that that's a feeling that

20    you feel very deeply?

21         THE PROSPECTIVE JUROR:  Not -- not as much as I did.

22    I mean, you know, I get a little anxious sometimes if I see a

23    lot of police officers maybe.  But, you know, I know they got

24    to do their job, you know.

25         MR. BOYLAN:  Have you had any instances of

1    interactions with police officers in that time period?

2              THE PROSPECTIVE JUROR:  No.

3              MR. BOYLAN:  Would you say that that's led you to

4    mistrust police officers?

5              THE PROSPECTIVE JUROR:  No.  My cousin, he was

6    guilty.  I mean, he was doing the crime.

7              MR. BOYLAN:  Do you think that hearing the testimony

8    of a police officer, that you would view it more or less

9    favorably because of your experience?

10             THE PROSPECTIVE JUROR:  No.

11             MR. BOYLAN:  Nothing else.

12             THE COURT:  Mr. Ohm.

13             MR. OHM:  It says here you work for Amazon.  How long

14   have you been working with them?

15             THE PROSPECTIVE JUROR:  Three years almost.

16             MR. OHM:  Okay.  That's all I have.  Thank you.

17             THE COURT:  I do have a question with regard to the

18   question -- you answered the question about punishment.

19   Because as I've told you, if there's a conviction of guilt --

20   and that will be the jury's decision.  But the punishment, the

21   sentence, would be mine.  Do you -- you said that you feel like

22   the sentences aren't always fair.

23             THE PROSPECTIVE JUROR:  Fair.  That's what I --

24             THE COURT:  And do you think you would -- that your

25   feelings about the fact that sentences aren't always fair would

1    cause you to favor one side or the other, or could you just --

2    could you --

3            THE PROSPECTIVE JUROR:  Maybe.  It could -- it could

4    sway me one way or another.  It could, yes.

5            THE COURT:  So even if you thought that the

6    government had proved their case beyond a reasonable doubt, are

7    you -- do you have any concern that your feelings about

8    sentencing would make you unable to return that verdict or vote

9    for that verdict?

10           THE PROSPECTIVE JUROR:  I want to say I should be

11   able to still be fair, but I can't say for sure.

12           THE COURT:  Okay.  All right.  Thank you, sir.

13           THE PROSPECTIVE JUROR:  All right.  Do I leave my

14   card here or --

15           THE COURT:  I think you can give it to Ms. Lavigne.

16           (REPORTER'S NOTE:  Juror 0446 left.)

17           THE COURT:  Sir, can you wait one moment.  We have a

18   motion here.

19           MR. BOYLAN:  And, Your Honor, we would move to strike

20   that juror for cause.  He's explained that he would base his

21   findings on something other than the law and the facts in this

22   case.

23           THE COURT:  I was surprised you asked about the law

24   enforcement and not on that, because that's what caused me to

25   be concerned.  Mr. Ohm wisely didn't touch that with a 10-foot

1    pole.

2         But I have concern about that.  I gave him a chance to

3    rehabilitate himself, and he expressed uncertainty that he

4    could -- that he could vote for guilt because of his concern

5    about punishment.

6         Mr. Ohm.

7         MR. OHM:  Your Honor, we would object.  I thought he

8    did rehabilitate himself.  He said that he couldn't be a

9    hundred percent, but that's how every rational person can feel

10   when -- but he said that he believes --

11        THE COURT:  Actually, let's look at exactly what he

12   said.  He said he doesn't feel like sentences are always fair.

13   I said, "And do you think you would -- that your feelings about

14   the fact that sentences aren't always fair would cause you to

15   favor one side or the other, or could you just -- could you --"

16        And he said, "Maybe."

17        And then I said could you -- I can't tell what that

18   is -- but be swayed one way or the other -- okay.  Wait.  It's

19   the next question.

20        I said, "So even if you thought the government had

21   proved their case beyond a reasonable doubt, are you -- do you

22   have any concern that your feelings about sentencing would make

23   you unable to return that verdict or vote for that verdict?"

24        And the juror said, "I want to say I should be able to

25   still be fair, but I can't say for sure."

1        So I think that -- that really highlights his struggle,

2   is that he's -- he'd like to be, but the fact that he can't say

3   for sure and he's already expressed fairly unequivocally early,

4   I'm going to grant the government motion.

5             MR. OHM:  Your Honor, I would just point out that

6   that initial juror who said -- he also didn't express

7   certainty.  I think most venire people cannot express

8   certainty.  They can express hope and expectation, but they

9   can't say for a hundred percent.

10            THE COURT:  I agree with you that -- you know, they

11  can't say a hundred percent, but they're pretty sure.  For

12  example, he said I'm pretty sure I could be fair, it would be

13  different.  But he had already said earlier he -- he couldn't.

14  And then he said, "I want to say I should . . ."  If he had

15  said I should, maybe.  But I want to say I should but I still

16  can't say for sure, I think that he's -- it's too much

17  hesitation, especially based on his earlier statements.

18            So I'll grant it over objection.

19            Next one.  Thank you.

20            Ms. Lavigne, you can probably tell everybody after the

21  next two people that they can go off to lunch, and they should

22  be back by 2:00.

23            (REPORTER'S NOTE:  Juror 0539 enters.)

24            THE COURT:  Are you Juror No. 0539?

25            THE PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Okay.  Good afternoon.  And what

2     questions did you have answers to?

3          THE PROSPECTIVE JUROR:  1, 8, 12, 13, 14, 17, 20.  I

4     wasn't sure if it was 21 or 22.  23, 26-A, and 31.

5          THE COURT:  Okay.  Let's start with No. 1.  Hold on.

6     Do you believe you may know anything about the facts and

7     circumstances of the case?

8          THE PROSPECTIVE JUROR:  About January 6th, so yeah.

9          THE COURT:  Anything beyond that?

10          THE PROSPECTIVE JUROR:  Not about the specifics of

11     the defendant.

12          THE COURT:  Okay.  In retrospect, that's not a

13     particularly artful question given that I said January 6th in

14     the opening.

15          Okay.  No. 8:  Do you recognize or think you might know

16     any members of the jury panel or any other person in the:

17     Courtroom, including me or my courtroom staff?

18          THE PROSPECTIVE JUROR:  Yeah, I ran into somebody I

19     know from around town.

20          THE COURT:  In the panel?

21          THE PROSPECTIVE JUROR:  I've met him recently.  Like,

22     a friend of a friend.

23          THE COURT:  Okay.  If you were both on the --

24          THE PROSPECTIVE JUROR:  But technically, yes.

25          THE COURT:  If you were both selected to be on the

1    jury, do you think the fact that you know this person might

2    make you hesitate to disagree with them?

3              THE PROSPECTIVE JUROR:  No.  I don't know his last

4    name.

5              THE COURT:  Okay.  12:  Have you or your family,

6    close friends, or household members ever had any legal

7    training?

8              THE PROSPECTIVE JUROR:  Yes, Your Honor.  I'm an

9    attorney and my spouse is as well.

10             THE COURT:  What kind of law do you practice?

11             THE PROSPECTIVE JUROR:  I practice in the area of tax

12   and employment law for corporations.

13             THE COURT:  What area does your spouse practice in?

14             THE PROSPECTIVE JUROR:  Criminal law.

15             THE COURT:  All right.  Well, for -- do you think you

16   can put aside what you might have heard about criminal law or

17   your spouse's practice and follow the instructions of the law

18   as I give them to you?

19             THE PROSPECTIVE JUROR:  Yes.

20             THE COURT:  And do you think you can put aside

21   whatever you might have learned in law school or in your career

22   about the rules of evidence and criminal law and --

23             THE PROSPECTIVE JUROR:  I didn't take evidence,

24   Your Honor.  I guess I studied it for the bar, but I don't

25   remember.

1           THE COURT:  Okay.  Do you think you can put that

2     aside?

3           THE PROSPECTIVE JUROR:  Yes, Your Honor.

4           THE COURT:  Okay.  Question 13:  Any family, close

5     friends, or household members work in a prosecutor's office or

6     law enforcement office?

7           THE PROSPECTIVE JUROR:  My spouse works for the

8     Department of Justice.

9           THE COURT:  All right.  What division?

10          THE PROSPECTIVE JUROR:  Criminal.

11          THE COURT:  All right.  Well, the prosecutors here

12    are employees of the Department of Justice.  Do you think that

13    would cause you to, you know, worry about, like, if I don't

14    find -- you know, if I find the defendant not guilty, am I

15    going to have trouble at home?  I mean, would you -- the fact

16    that your spouse and the prosecutors are DOJ employees, would

17    that --

18          THE PROSPECTIVE JUROR:  No, I don't think so.

19          THE COURT:  Okay.  And 14:  You or family members,

20    close friends ever worked for a criminal defense organization?

21          THE PROSPECTIVE JUROR:  My spouse.

22          THE COURT:  As well?

23          THE PROSPECTIVE JUROR:  Yes.

24          THE COURT:  And same question.  Would that affect

25    your ability to be fair here?

```
 1              THE PROSPECTIVE JUROR:  No.

 2              THE COURT:  17:  Have you participated in any kind of

 3    criminal prevention groups, Neighborhood Watch, that kind of

 4    thing?

 5              THE PROSPECTIVE JUROR:  I must have mischecked that

 6    one.  I don't think I remember.

 7              THE COURT:  20:  Have you or any of your family

 8    members, close friends ever had any unpleasant experiences with

 9    the police or a prosecutor?

10              THE PROSPECTIVE JUROR:  Yeah, I -- I guess without --

11    without specifics, I can think of a few offhand negative

12    personal interactions, and certainly my hearing a lot of

13    negative interactions my spouse has had with prosecutors from

14    her prior roles.

15              THE COURT:  Okay.  Was she a defense lawyer before?

16              THE PROSPECTIVE JUROR:  Yeah.

17              THE COURT:  Okay.  Or he.

18         All right.  Well, so can you -- would you -- would you

19    be able to put those feelings and experiences aside and assess

20    the testimony of a law enforcement agent the way we would any

21    other witness?

22              THE PROSPECTIVE JUROR:  Yeah, I would certainly try.

23              THE COURT:  Do you have any doubts or concerns about

24    your ability?

25              THE PROSPECTIVE JUROR:  Specifically about a law -- I
```

1    guess I'm not sure I understand the question.

2           THE COURT:  So you're going to hear testimony from,

3    as you heard, Capitol Police officers, FBI agent, maybe

4    Metropolitan Police Department officers.

5           I will instruct the jury that the testimony of a law

6    enforcement agent is to be assessed as you would any other

7    witness and you shouldn't give it -- give them greater or

8    lesser weight simply because they're law enforcement officers.

9           Could you do that?

10          THE PROSPECTIVE JUROR:  Yeah, I think I can do that.

11          THE COURT:  All right.  Any follow-up?  Mr. Ohm.

12          MR. OHM:  Could you tell us your -- I mean,

13   obviously, most people in D.C. know something about

14   January 6th.  Do you have any concerns --

15          THE COURT:  Why don't you sit down and you'll be

16   closer -- there you go.

17          MR. OHM:  Do you have any concerns as to whether you

18   could be fair to Mr. Vo based upon what you already know about

19   January 6th?

20          THE PROSPECTIVE JUROR:  Yeah, I think I could be

21   fair.  I guess the question is what the facts would be

22   presented to us.

23          MR. OHM:  Do you have any sort of, like, preconceived

24   opinion that everybody who went inside the Capitol is guilty of

25   some crime?

```
1              THE PROSPECTIVE JUROR:  If you weren't supposed to be
2      there, then they may be guilty.
3              MR. OHM:  But do you feel that you're open-minded
4      enough to determine -- well, apply what Her Honor is going to
5      instruct you is the law and not, sort of what you might think
6      either as a lawyer or even as a citizen or somebody who watches
7      the news?
8              THE PROSPECTIVE JUROR:  Yeah, I think so.
9              MR. OHM:  Nothing further.
10             THE COURT:  Thank you.
11         Ms. Wagner or Mr. Boylan.
12             MS. WAGNER:  Sorry.  Juror 0539, did you also have a
13     response or a question on No. 31?  I might have written them
14     down wrong.
15             THE PROSPECTIVE JUROR:  Yes, I have.
16             THE COURT:  I forgot to write that down.  Sorry.
17             MS. WAGNER:  If I may, Your Honor.
18             THE COURT:  Yes.
19             MS. WAGNER:  The question is have you or a close
20     friend or family member ever worked at the U.S.
21     Capitol Building.
22             THE PROSPECTIVE JUROR:  I worked at the
23     Capitol Building briefly.
24             MS. WAGNER:  When did you work at the
25     Capitol Building?
```

1          THE PROSPECTIVE JUROR:  During the summer of law

2     school.

3          MS. WAGNER:  So without questioning when you went to

4     law school, was that more than ten years ago?

5          THE PROSPECTIVE JUROR:  Yes.

6          MS. WAGNER:  And are you familiar with the building

7     from that experience?

8          THE PROSPECTIVE JUROR:  I think it's been renovated

9     since then.  So I think I'm -- I would not find my way around.

10    But I think maybe there was construction going on at the time.

11         THE COURT:  I think there's construction going on all

12    the time.

13         MS. WAGNER:  But as far as the fact that this

14    involves testimony about the Capitol, would your prior

15    experience working at the Capitol, even though it was a while

16    ago, affect your ability to listen to the evidence and listen

17    to the judge's instruction?

18         THE PROSPECTIVE JUROR:  I don't think so.

19         MS. WAGNER:  You don't think it would affect your

20    ability?

21         THE PROSPECTIVE JUROR:  I can't imagine what I would

22    remember about that that would be relevant, I guess.

23         MS. WAGNER:  Very briefly.

24         Just -- is your spouse -- without getting a lot -- is

25    she currently working for the Department of Justice?

```
1              THE PROSPECTIVE JUROR:  Yes.

2              MS. WAGNER:  Thank you, Your Honor.

3              MR. OHM:  Your Honor?

4              THE COURT:  Yes.

5              MR. OHM:  Can I get a couple of follow-ups?

6         Did you ever deal with Capitol Police officers in your

7    job?

8              THE PROSPECTIVE JUROR:  Going through security.

9              MR. OHM:  That's it?

10             THE PROSPECTIVE JUROR:  Yeah.

11             THE COURT:  You have to say yes.

12             THE PROSPECTIVE JUROR:  Yes, just when going through

13   security.

14             MR. OHM:  Okay.  And I also -- I think we've forgot

15   about 26-A, which is a question about strong feelings about

16   persons who did not --

17             THE COURT:  Did you answer 26-A?

18             THE PROSPECTIVE JUROR:  Yeah.

19             THE COURT:  Oh, you did.  Okay.

20             MR. OHM:  If Your Honor wants to conduct that.

21             THE COURT:  So you said -- you answered 26-A but not

22   B; is that right?  So you have strong feelings about people who

23   don't accept the results of the election, but B was whether

24   those feelings would affect your ability to be fair and

25   impartial?  Is that --
```

1          THE PROSPECTIVE JUROR:  Yeah.  I strongly believe

2  they're wrong.

3          THE COURT:  But could you be fair to somebody who

4  disagrees with you?

5          THE PROSPECTIVE JUROR:  Yeah.  I mean, I

6  specifically -- on the case at hand, whether somebody is in a

7  place where they're not supposed to be or what the charges seem

8  to be.

9          THE COURT:  Okay.

10         MR. OHM:  So would it be fair to say you don't have

11  strong feelings about their opinions about the election, but

12  not necessarily strong feelings about the people themselves?

13  Or do you think you have strong feelings about the people

14  themselves as well?

15         THE PROSPECTIVE JUROR:  The former is how I would

16  frame it.

17         MR. OHM:  Thank you.  Nothing further.

18         THE COURT:  All right.  Thank you, sir.

19     Let's break for lunch now and ask the jurors to be back

20  at 2 o'clock.

21         (REPORTER'S NOTE:  Juror 0539 left.)

22         THE COURT:  I'm told one of the panel members just

23  found out her sister just died.  So I'm excusing her.  We're

24  going to get the number in a minute.

25     All right.  Everyone, I will see you at 2 o'clock.

1     Hopefully, it will be warmer in here.

2                  (Recess taken.)

3                  (REPORTER'S NOTE:  The p.m. portion of the trial was

4     reported by Tamara Sefranek, who prepared said transcript.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 18th day of September, 2023.

10

11               /s/ Nancy J. Meyer
                 Nancy J. Meyer
12               Official Court Reporter
                 Registered Diplomate Reporter
13               Certified Realtime Reporter
                 333 Constitution Avenue Northwest
14               Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## 0

**0198** [3] - 117:3, 117:6, 118:15
**02** [1] - 4:8
**0446** [4] - 126:18, 126:20, 126:22, 132:16
**0539** [4] - 134:23, 134:24, 140:12, 143:21
**0742** [4] - 118:18, 118:22, 118:23, 126:19

## 1

**1** [17] - 38:11, 38:13, 39:23, 43:20, 96:10, 100:8, 105:15, 105:18, 105:24, 107:6, 107:7, 107:9, 116:21, 135:3, 135:5
**10** [5] - 7:8, 46:2, 96:14, 110:21, 111:3
**10-foot** [1] - 132:25
**11** [6] - 96:14, 111:4, 111:9, 127:1, 127:2, 127:5
**11th** [10] - 4:3, 5:6, 5:9, 5:16, 18:9, 18:11, 23:24, 39:11, 41:3, 55:23
**12** [8] - 96:14, 98:6, 102:9, 103:22, 111:10, 111:12, 135:3, 136:5
**12th** [1] - 5:16
**13** [5] - 96:14, 111:13, 111:24, 135:3, 137:4
**13th** [1] - 5:17
**14** [8] - 96:10, 96:14, 97:3, 111:25, 112:6, 117:10, 135:3, 137:19
**14th** [2] - 5:17, 18:17
**15** [2] - 46:2, 112:7
**15th** [5] - 5:18, 18:19, 40:6, 40:25, 42:17
**16** [6] - 75:4, 77:14, 87:18, 89:23, 112:10, 112:15
**16/Brady** [1] - 87:10
**17** [4] - 112:17, 112:22, 135:3, 138:2
**1752(a)(1)** [1] - 106:1
**1752(a)(2)** [1] - 106:13
**18** [5] - 105:25, 106:13, 112:23, 119:1, 120:6

**18th** [1] - 41:4
**19** [5] - 112:24, 112:25, 117:10, 119:1, 119:13
**1:00** [3] - 98:3, 103:2

## 2

**2** [7] - 96:13, 106:2, 107:10, 107:12, 116:22, 143:20, 143:25
**2-minute** [1] - 27:21
**20** [11] - 4:9, 25:11, 55:7, 82:25, 113:2, 113:7, 117:10, 127:1, 128:13, 135:3, 138:7
**20-minute** [1] - 46:2
**2020** [1] - 114:12
**2021** [10] - 39:18, 41:4, 42:24, 105:19, 106:2, 106:14, 106:25, 115:12, 115:17
**21** [3] - 113:8, 113:11, 135:4
**21-509** [1] - 100:19
**22** [4] - 4:10, 113:12, 117:10, 135:4
**23** [5] - 113:23, 114:1, 117:10, 127:1, 135:4
**24** [4] - 114:2, 114:4, 127:1, 130:1
**25** [1] - 114:5
**26** [5] - 97:25, 114:10, 119:1, 119:3, 119:7
**26-A** [7] - 114:10, 114:12, 117:10, 135:4, 142:15, 142:17, 142:21
**26-B** [2] - 114:13, 114:14
**27** [3] - 97:25, 114:15, 114:18
**28** [2] - 114:19, 114:25
**29** [2] - 115:1, 117:11
**2:00** [3] - 98:4, 103:1, 134:22
**2:35** [2] - 64:8, 79:13
**2:38:18** [1] - 54:6
**2:40** [2] - 64:8, 79:13

## 3

**3** [6] - 96:13, 98:11, 106:14, 107:13, 107:15, 129:19
**30** [3] - 14:22, 98:1, 115:10

**302** [2] - 58:23, 89:16
**302s** [8] - 68:21, 68:23, 79:11, 85:1, 90:18, 90:20, 99:20, 99:23
**31** [3] - 115:13, 135:4, 140:13
**32** [5] - 115:15, 116:2, 117:11, 117:13, 117:17
**33** [1] - 116:3
**34** [2] - 116:9, 116:10
**35** [2] - 116:11, 116:17
**3:00** [1] - 65:1

## 4

**4** [5] - 38:12, 96:14, 106:25, 107:16, 108:2
**40** [4] - 7:8, 54:5, 106:23, 107:4
**45** [1] - 7:7

## 5

**5** [5] - 96:14, 108:6, 115:7, 115:8
**5104(e)(2)(D)** [1] - 106:24
**5104(e)(2)(G)** [1] - 107:5

## 6

**6** [6] - 96:14, 106:2, 106:14, 106:25, 108:7, 108:19
**60** [1] - 98:15
**6th** [16] - 21:9, 21:16, 28:7, 105:19, 115:12, 115:17, 115:19, 117:18, 121:10, 121:19, 125:24, 127:21, 135:8, 135:13, 139:14, 139:19

## 7

**7** [3] - 96:14, 108:21, 109:5
**7-A** [1] - 109:20
**7-B** [1] - 110:4

## 8

**8** [4] - 96:14, 110:5, 135:3, 135:15

## 9

**9** [8] - 24:11, 39:8, 91:11, 91:14, 96:14, 98:14, 110:8, 110:20
**99** [1] - 84:6
**9:00** [1] - 3:12
**9:30** [4] - 3:7, 3:12, 115:6

## A

**ability** [9] - 113:10, 114:13, 119:6, 128:9, 137:25, 138:24, 141:16, 141:20, 142:24
**able** [21] - 12:3, 16:14, 19:3, 24:13, 25:7, 26:3, 34:1, 34:8, 34:14, 35:3, 50:1, 51:8, 53:10, 56:23, 65:4, 116:4, 119:25, 121:20, 132:11, 133:24, 138:19
**absence** [1] - 28:24
**absolute** [1] - 142:23
**accept** [4] - 114:11, 119:5, 121:12, 142:23
**access** [3] - 36:6, 89:21, 90:18
**accomplished** [1] - 88:11
**according** [2] - 24:22, 94:17
**account** [1] - 88:6
**accounts** [1] - 77:18
**accused** [1] - 30:10
**Act** [1] - 95:25
**act** [3] - 15:7, 50:12, 118:3
**action** [3] - 19:20, 47:22, 48:11
**actions** [2] - 16:12, 21:4
**Adam** [1] - 108:16
**Adams** [2] - 101:7, 108:14
**ADAMS** [1] - 108:15
**add** [1] - 98:14
**additional** [4] - 19:1, 29:22, 77:3, 94:22
**address** [2] - 27:8, 104:20
**adequate** [1] - 95:2
**administer** [1] - 104:8
**administered** [1] - 104:11
**admissibility** [2] -

28:15, 87:17
**admissible** [2] - 48:20, 63:20
**admission** [2] - 58:22, 70:3
**admitted** [1] - 111:6
**admitting** [1] - 84:13
**advancing** [1] - 70:15
**advantage** [1] - 33:4
**advise** [1] - 87:8
**affect** [10] - 26:19, 113:10, 114:13, 119:6, 128:9, 128:12, 137:24, 141:16, 141:19, 142:24
**affected** [4] - 115:16, 115:25, 117:18, 120:3
**affecting** [1] - 26:10
**affirmation** [1] - 104:12
**after-the-fact** [1] - 22:9
**afternoon** [7] - 108:15, 117:4, 117:5, 118:19, 121:1, 126:21, 135:1
**agencies** [4] - 111:16, 111:18, 112:15, 113:13
**agent** [6] - 100:25, 113:15, 113:18, 138:20, 139:3, 139:6
**Agent** [1] - 109:13
**agents** [1] - 113:13
**ago** [20] - 4:3, 61:13, 67:4, 81:3, 82:2, 82:9, 82:10, 90:6, 93:2, 95:22, 95:23, 119:15, 120:10, 120:12, 130:11, 130:13, 130:15, 130:16, 141:4, 141:16
**agree** [35] - 4:24, 6:13, 6:19, 6:23, 7:5, 8:19, 12:3, 15:1, 17:2, 21:19, 24:24, 25:1, 26:7, 36:17, 41:24, 42:6, 42:12, 50:20, 54:14, 57:18, 60:13, 65:24, 70:6, 70:23, 71:12, 71:13, 72:8, 72:9, 72:13, 76:24, 77:2, 82:16, 85:22, 100:6, 134:10
**agrees** [1] - 75:6
**ahead** [1] - 43:14
**alarms** [1] - 56:10

**Alcohol** [1] - 111:22
**Alex** [1] - 109:23
**Alford** [1] - 64:23
**alleged** [3] - 4:2, 26:21, 39:8
**alleviate** [1] - 33:12
**allow** [7] - 42:2, 50:13, 73:2, 94:20, 97:20, 109:7, 125:6
**allowed** [7] - 12:6, 12:7, 14:2, 21:6, 21:20, 38:16, 73:8
**allowing** [2] - 32:15, 79:24
**almost** [2] - 102:25, 131:15
**alternate** [5] - 94:8, 96:8, 96:17, 96:19, 97:24
**alternates** [3] - 97:6, 100:11, 102:10
**alternative** [1] - 3:20
**Amazon** [1] - 131:13
**Amendment** [1] - 53:18
**America** [1] - 100:19
**amount** [6] - 54:25, 55:1, 59:5, 59:9, 83:20, 101:13
**analysis** [2] - 47:13, 48:9
**Angeles** [1] - 109:24
**ANGELES** [1] - 109:24
**angry** [1] - 15:9
**answer** [8] - 29:18, 34:18, 103:8, 103:12, 103:14, 105:15, 129:13, 142:17
**answered** [2] - 131:18, 142:21
**answering** [1] - 30:3
**answers** [7] - 97:17, 102:16, 103:11, 117:8, 118:25, 126:25, 135:2
**Antony** [7] - 45:15, 91:21, 100:19, 101:7, 101:22, 107:1, 108:3
**anxious** [1] - 130:22
**anyway** [7] - 16:21, 38:17, 48:9, 48:20, 68:5, 85:15, 91:5
**apologize** [2] - 43:17, 101:12
**apologizing** [1] - 101:9
**appeared** [1] - 67:9
**application** [2] -

112:11, 112:16
**apply** [3] - 122:24, 124:20, 140:4
**appreciate** [3] - 7:3, 14:25, 36:21
**approach** [1] - 24:4
**appropriate** [4] - 19:20, 47:22, 64:14, 95:7
**appropriately** [1] - 50:13
**area** [5] - 105:21, 106:7, 107:15, 136:11, 136:13
**arguable** [1] - 14:19
**argue** [17] - 3:21, 4:15, 6:21, 8:20, 8:22, 9:15, 12:3, 12:7, 25:2, 25:13, 28:9, 33:9, 37:22, 43:3, 62:14, 85:24, 85:25
**argues** [4] - 3:16, 3:18, 4:11, 45:8
**arguing** [6] - 8:3, 16:2, 24:14, 86:13, 123:17, 123:22
**argument** [23] - 8:19, 8:21, 11:18, 12:14, 16:20, 17:19, 18:1, 18:6, 26:10, 27:3, 31:5, 34:4, 36:25, 41:10, 41:17, 42:16, 66:24, 72:11, 80:21, 83:21, 87:1, 98:24
**arguments** [1] - 14:6
**armed** [1] - 7:19
**arrest** [2] - 35:14, 81:6
**arrested** [18] - 29:25, 35:21, 35:22, 36:1, 52:18, 60:18, 69:9, 69:20, 76:19, 76:22, 81:9, 85:2, 95:17, 99:23, 99:24, 114:3, 130:3
**artful** [1] - 135:13
**articulate** [6] - 13:8, 29:4, 32:6, 50:1, 50:5, 96:7
**articulated** [1] - 94:2
**aside** [16] - 14:21, 27:22, 68:7, 105:10, 115:22, 116:5, 121:20, 122:12, 124:23, 125:13, 125:21, 126:2, 136:16, 136:20, 137:2, 138:19
**asleep** [1] - 129:3
**aspect** [1] - 76:13
**assess** [6] - 25:22,

25:24, 34:3, 49:18, 115:23, 138:19
**assessed** [1] - 139:6
**assistant** [1] - 108:12
**Assistant** [3] - 100:24, 107:17, 107:22
**assisting** [1] - 101:24
**associated** [1] - 114:6
**assume** [10] - 8:21, 11:23, 22:10, 30:12, 56:10, 59:6, 60:7, 73:10, 76:22, 79:20
**assuming** [9] - 6:1, 6:13, 28:20, 34:20, 35:20, 41:19, 60:23, 69:2, 73:19
**assumption** [2] - 18:1, 29:15
**assumptions** [1] - 35:23
**assured** [1] - 105:1
**attack** [1] - 38:10
**attacking** [1] - 85:15
**attempted** [2] - 24:18, 24:19
**attentively** [1] - 116:14
**attorney** [3] - 111:17, 113:6, 136:9
**Attorney** [3] - 100:24, 107:18, 107:22
**Attorney's** [5] - 107:24, 111:16, 112:12, 114:7, 120:15
**attorney's** [1] - 111:17
**attorneys** [1] - 112:4
**audible** [2] - 17:8, 26:9
**audio** [25] - 15:13, 15:14, 26:5, 27:12, 27:14, 27:15, 27:18, 29:23, 34:9, 35:13, 35:16, 46:15, 47:1, 47:6, 57:15, 61:1, 65:25, 66:3, 66:4, 66:14, 75:1, 78:7, 78:11, 81:11
**audiotape** [1] - 46:9
**AUSAs** [1] - 65:17
**authority** [1] - 105:23
**authorized** [1] - 6:17
**available** [3] - 33:12, 33:19, 41:8
**aware** [3] - 6:3, 76:7, 95:20

## B

**Baboulis** [1] - 109:13

**bad** [2] - 12:11, 13:5
**ball** [4] - 13:4, 51:22, 55:19, 117:16
**bar** [3] - 51:6, 56:2, 136:24
**Barclay** [5] - 35:24, 36:10, 38:8, 38:23, 39:3
**base** [2] - 125:14, 132:20
**based** [23] - 18:1, 19:23, 36:15, 37:24, 39:8, 49:24, 71:20, 74:13, 86:11, 86:16, 87:19, 95:3, 97:23, 105:3, 110:15, 111:5, 115:23, 124:10, 126:3, 127:6, 134:17, 139:18
**basis** [10] - 29:8, 29:22, 30:14, 31:20, 33:6, 41:18, 42:9, 77:4, 94:10, 95:20
**Batson** [1] - 100:10
**battle** [1] - 7:18
**became** [1] - 18:19
**become** [1] - 95:20
**becomes** [1] - 94:5
**begin** [4] - 14:13, 101:9, 104:7, 104:15
**beginning** [2] - 24:22, 47:14
**behalf** [1] - 101:7
**behaving** [1] - 15:7
**behind** [5] - 9:8, 9:9, 10:16, 11:1, 20:8
**belief** [3] - 21:6, 74:6, 114:23
**beliefs** [1] - 124:22
**believes** [3] - 74:25, 84:22, 133:10
**bellowing** [1] - 26:6
**belonged** [1] - 112:18
**bench** [1] - 102:5
**Bench** [1] - 123:15
**best** [2] - 16:14, 61:10
**between** [6] - 14:9, 43:7, 55:22, 77:13, 79:15, 100:14
**beyond** [9] - 60:7, 95:21, 110:11, 110:17, 120:20, 122:20, 132:6, 133:21, 135:9
**bias** [1] - 102:12
**biases** [1] - 105:2
**big** [7] - 7:18, 30:25, 31:1, 31:5, 71:10, 129:5, 130:6

**big-old** [1] - 129:5
**bigger** [1] - 99:5
**bit** [7] - 13:19, 15:24, 20:9, 95:12, 101:17, 121:2, 125:3
**blah** [3] - 69:1
**Blank** [2] - 54:13, 54:15
**blind** [1] - 35:10
**Bloomington** [1] - 108:4
**body** [1] - 92:14
**body-worn** [1] - 92:14
**boom** [1] - 24:16
**bother** [1] - 18:7
**bothering** [1] - 48:6
**bound** [1] - 104:17
**box** [3] - 97:3, 97:4, 97:8
**BOYLAN** [73] - 22:6, 22:11, 38:24, 39:1, 39:4, 39:12, 39:17, 40:4, 40:10, 40:13, 40:15, 40:19, 40:21, 41:1, 41:6, 41:12, 42:4, 42:8, 42:21, 43:14, 45:13, 45:23, 46:17, 47:2, 47:9, 47:12, 47:24, 48:7, 48:11, 48:14, 48:18, 48:22, 49:2, 49:5, 49:13, 49:23, 50:6, 51:7, 51:10, 51:12, 57:20, 61:3, 61:7, 61:10, 61:24, 76:1, 76:11, 79:3, 79:5, 79:7, 79:17, 80:8, 80:13, 80:18, 80:20, 84:24, 94:25, 96:9, 96:12, 96:24, 97:9, 98:11, 100:3, 120:8, 125:10, 130:8, 130:16, 130:19, 130:25, 131:3, 131:7, 131:11, 132:19
**Boylan** [21] - 38:25, 39:1, 57:14, 60:23, 61:2, 62:19, 66:25, 73:6, 75:25, 76:8, 94:24, 98:9, 100:25, 107:18, 107:22, 109:6, 123:8, 130:7, 140:11
**Boylan's** [1] - 54:18
**Brady** [36] - 3:2, 3:16, 4:2, 4:6, 4:16, 4:22, 10:7, 11:13, 12:12, 12:14, 12:25, 13:5, 16:25, 18:2, 21:22,

29:16, 30:8, 30:20, 30:25, 31:6, 33:13, 39:7, 41:11, 41:12, 41:13, 41:18, 42:18, 54:16, 55:14, 57:4, 62:1, 62:3, 71:10, 75:4, 77:11, 77:13

**Brady/Rule** [1] - 89:23

**break** [3] - 60:6, 103:2, 143:19

**briefly** [2] - 140:23, 141:23

**bring** [2] - 116:24, 118:16

**broken** [1] - 11:25

**brought** [1] - 83:3

**building** [53] - 4:8, 4:13, 4:20, 5:2, 6:18, 7:6, 7:10, 7:14, 7:22, 9:24, 10:2, 10:23, 11:10, 11:16, 14:1, 15:2, 21:18, 26:23, 41:25, 42:1, 42:3, 54:15, 57:19, 59:18, 59:24, 60:1, 61:21, 62:7, 70:22, 70:23, 70:24, 71:12, 76:24, 78:8, 79:12, 80:25, 82:16, 85:21, 88:2, 105:20, 105:25, 106:6, 106:12, 106:20, 120:14, 120:15, 120:16, 122:9, 122:20, 141:6

**Building** [9] - 41:22, 60:18, 106:23, 107:3, 107:4, 115:14, 140:21, 140:23, 140:25

**Buildings** [1] - 106:17

**bullied** [2] - 41:13, 48:2

**bunch** [3] - 26:11, 86:23, 87:2

**burden** [1] - 110:10

**Bureau** [3] - 109:17, 111:20, 111:22

**buried** [1] - 83:21

**business** [2] - 106:4, 106:11

**busy** [3] - 18:10, 93:7, 99:3

**button** [1] - 123:18

**buttressing** [5] - 52:5, 56:7, 56:13, 62:10

## C

**cafeteria** [2] - 98:4, 103:1

**calculations** [1] - 97:23

**camera** [5] - 46:7, 50:18, 60:15, 89:8, 92:14

**cameras** [3] - 35:6, 67:2, 76:6

**cannot** [4] - 62:25, 83:5, 122:20, 134:7

**capacity** [1] - 37:16

**capital** [1] - 30:25

**Capitol** [37] - 4:4, 4:19, 6:11, 19:24, 20:4, 20:6, 27:11, 41:22, 46:11, 59:11, 59:12, 60:18, 66:22, 105:22, 106:8, 106:17, 106:23, 107:3, 107:4, 107:14, 109:12, 109:15, 115:11, 115:14, 115:17, 121:24, 122:2, 122:5, 139:3, 139:24, 140:21, 140:23, 140:25, 141:14, 141:15, 142:6

**Captain** [1] - 109:13

**card** [14] - 56:2, 97:14, 102:17, 102:19, 102:23, 103:9, 108:2, 108:20, 110:4, 110:20, 121:16, 129:12, 132:14

**cards** [1] - 116:23

**care** [4] - 37:9, 78:8, 83:6, 121:5

**career** [1] - 136:21

**Case** [1] - 100:19

**case** [88] - 9:2, 13:6, 13:15, 31:8, 31:13, 33:11, 39:20, 43:3, 43:4, 43:9, 47:18, 50:23, 54:21, 54:22, 55:4, 55:7, 78:16, 82:9, 83:2, 83:4, 83:13, 83:23, 83:24, 83:25, 84:3, 84:4, 88:5, 90:20, 91:21, 92:5, 92:15, 92:17, 92:18, 92:20, 95:2, 98:20, 100:25, 101:3, 101:19, 101:21, 102:8, 102:10, 102:12, 103:23, 104:3, 105:2, 105:7, 105:12, 105:14,

107:8, 107:12, 108:3, 108:7, 109:3, 110:14, 110:22, 110:25, 111:5, 112:25, 113:14, 114:9, 115:4, 115:20, 115:23, 116:6, 116:14, 118:9, 119:22, 119:25, 120:4, 121:21, 123:6, 124:9, 125:14, 126:15, 127:6, 127:16, 127:18, 132:6, 132:22, 133:21, 135:7, 143:6

**case-specific** [13] - 54:21, 78:16, 83:4, 83:13, 83:23, 83:24, 83:25, 84:4, 92:5, 92:15, 92:18, 92:20, 98:20

**cases** [6] - 28:7, 32:18, 39:21, 76:5, 115:19

**catchall** [1] - 116:11

**category** [1] - 55:13

**caught** [3] - 14:5, 16:16, 16:18

**caused** [1] - 132:24

**CCTV** [5] - 35:8, 45:18, 45:25, 76:3, 92:11

**cell** [9] - 27:14, 27:15, 29:24, 52:17, 52:18, 52:23, 61:15, 61:16, 73:22

**certain** [1] - 122:20

**certainly** [21] - 6:21, 8:20, 12:3, 12:6, 12:7, 16:9, 25:2, 28:11, 33:14, 34:4, 66:2, 69:19, 69:24, 72:5, 80:15, 83:18, 89:10, 119:8, 138:12, 138:22

**certainty** [2] - 134:7, 134:8

**challenge** [7] - 20:25, 24:1, 34:8, 34:13, 34:14, 100:10

**chance** [3] - 54:17, 104:1, 133:2

**changed** [1] - 55:22

**changing** [1] - 125:4

**chant** [3] - 8:12, 9:7, 14:10

**chants** [1] - 14:13

**chaos** [1] - 89:3

**chaotic** [1] - 56:11

**charged** [13] - 53:21, 53:22, 55:21, 60:25, 61:5, 61:14, 105:18, 114:3, 118:8, 122:14, 125:18, 130:3

**charges** [1] - 105:17, 107:11, 143:7

**charts** [1] - 39:22

**check** [1] - 75:1

**chief** [1] - 47:18

**chilly** [1] - 101:16

**choose** [1] - 89:15

**chooses** [1] - 110:24

**Christopher** [1] - 109:14

**Chutkan** [1] - 101:18

**CIA** [1] - 111:23

**circle** [1] - 42:13

**circumstances** [12] - 32:8, 60:7, 65:23, 66:8, 74:19, 83:11, 84:15, 84:22, 87:23, 105:14, 107:8, 135:7

**citizen** [1] - 140:6

**civil** [4] - 112:25, 119:22, 119:23, 120:19

**clarify** [3] - 44:8, 62:18, 79:8

**clarifying** [1] - 40:19

**clear** [4] - 17:9, 18:19, 33:11, 38:18

**clearly** [2] - 17:20, 32:17

**clerk** [1] - 102:1

**clerks** [1] - 102:6

**client** [26] - 7:13, 15:19, 16:13, 16:14, 16:15, 16:16, 16:21, 17:8, 17:18, 25:6, 25:10, 28:4, 59:18, 60:12, 62:14, 71:14, 72:22, 75:9, 75:21, 83:19, 86:7, 87:2, 88:16, 89:25, 92:4, 94:18

**client's** [8] - 16:22, 21:5, 26:2, 27:4, 28:5, 28:9, 74:1, 89:4

**clips** [2] - 27:14, 27:15

**clock** [2] - 33:24, 46:4

**close** [27] - 42:13, 62:15, 111:10, 111:13, 111:25, 112:7, 112:10, 113:2, 113:23, 114:2, 115:10, 115:13, 115:15,

117:17, 118:20, 120:25, 123:6, 123:17, 123:22, 128:14, 129:20, 130:2, 136:6, 137:4, 137:20, 138:8, 140:19

**closely** [2] - 115:17, 116:1

**closer** [2] - 118:1, 139:16

**closes** [2] - 98:4, 103:1

**closest** [1] - 96:13

**closing** [1] - 34:6

**cloud** [1] - 34:10

**co** [2] - 44:8, 100:25

**co-counsel** [2] - 44:8, 100:25

**Code** [4] - 105:25, 106:13, 106:23, 107:5

**colleague** [1] - 6:14

**Collective** [1] - 104:12

**Columbia** [3] - 106:15, 107:1, 108:13

**combination** [1] - 33:18

**coming** [12] - 7:17, 46:12, 46:21, 56:10, 62:7, 66:23, 70:8, 70:22, 74:13, 75:22, 81:25

**commit** [1] - 13:25

**committed** [1] - 8:3

**committee** [1] - 106:21

**communication** [1] - 16:18

**compelled** [1] - 110:24

**complaint** [2] - 37:25, 62:9

**completed** [1] - 104:2

**completely** [3] - 5:2, 11:7, 16:15

**complicated** [1] - 37:15

**compliment** [1] - 12:20

**comply** [1] - 65:20

**components** [1] - 30:9

**concept** [1] - 38:2

**concern** [5] - 128:4, 132:7, 133:2, 133:4, 133:22

**concerned** [2] - 37:8, 132:25

**concerning** [1] - 100:14

**concerns** [4] - 127:20, 138:23, 139:14, 139:17
**conduct** [14] - 72:2, 86:11, 95:5, 106:4, 106:5, 106:10, 106:12, 106:16, 106:18, 106:20, 106:22, 142:20
**confer** [2] - 40:20, 78:4
**conference** [3] - 3:11, 100:13, 123:15
**confident** [2] - 77:22, 77:25
**confine** [1] - 125:21
**confirm** [4] - 71:21, 74:23, 77:22, 78:5
**conflict** [1] - 11:5
**confrontation** [1] - 10:14
**confusing** [1] - 63:10
**confusion** [2] - 66:21, 114:18
**Congress** [4] - 106:19, 106:21
**connection** [2] - 62:16, 115:11
**consider** [1] - 24:1
**consistent** [1] - 7:21
**conspiracy** [1] - 50:25
**constitute** [2] - 6:15, 6:16
**Constitution** [1] - 110:23
**construction** [2] - 141:10, 141:11
**contained** [1] - 50:8
**content** [2] - 71:3, 71:5
**context** [3] - 8:8, 15:17, 17:22
**continuance** [9] - 51:15, 51:23, 52:1, 64:13, 84:9, 84:12, 95:1, 95:6, 95:8
**continue** [3] - 94:10, 94:20, 123:9
**continues** [1] - 110:16
**contribute** [1] - 4:25
**contributes** [1] - 6:21
**control** [5] - 14:15, 32:23, 46:9, 58:18, 74:20
**controversial** [1] - 6:20
**conundrum** [1] - 29:16
**conversations** [1] - 71:2

**conveyed** [1] - 16:10
**conveying** [1] - 21:17
**conviction** [5] - 91:6, 127:23, 128:2, 131:19
**convince** [1] - 51:24
**convoluted** [1] - 37:14
**cooling** [1] - 101:10
**copies** [3] - 40:7, 45:24, 45:25
**copy** [2] - 44:25, 78:23
**cordoned** [2] - 105:21, 106:7
**corner** [2] - 102:19, 102:23
**corporations** [1] - 136:12
**correct** [5] - 40:4, 53:6, 61:2, 67:25, 76:11
**corroborate** [5] - 87:7, 87:11, 89:7, 89:10, 89:12
**corroborated** [1] - 16:21
**corroborating** [1] - 87:9
**could've** [1] - 20:18
**counsel** [5] - 44:8, 95:4, 100:25, 101:2, 109:8
**Count** [7] - 105:18, 105:24, 106:2, 106:14, 106:25, 107:6, 107:7
**counts** [1] - 105:18
**couple** [5] - 8:17, 44:7, 75:14, 75:16, 142:5
**course** [4] - 12:15, 36:19, 37:19, 94:4
**COURT** [390] - 5:4, 5:9, 6:1, 6:10, 7:10, 8:17, 9:4, 9:10, 9:15, 10:9, 10:19, 11:12, 13:10, 13:20, 14:18, 15:22, 15:24, 16:11, 16:13, 17:2, 17:11, 17:19, 17:25, 18:8, 18:22, 20:16, 20:23, 21:3, 21:13, 21:23, 22:8, 22:17, 22:25, 23:2, 23:19, 23:22, 24:20, 25:21, 26:5, 26:16, 26:19, 27:10, 28:2, 28:20, 29:2, 29:12, 29:20, 30:8, 30:19, 30:23, 31:1, 31:2, 31:3, 31:5, 31:12, 31:16, 32:23,

33:14, 33:21, 34:20, 35:4, 35:16, 36:5, 36:9, 36:19, 36:21, 37:2, 37:12, 38:4, 38:8, 38:23, 38:25, 39:2, 39:10, 39:16, 40:2, 40:5, 40:17, 40:20, 40:24, 41:2, 41:10, 41:16, 42:5, 42:11, 43:7, 43:16, 43:22, 43:25, 44:5, 44:12, 44:16, 45:6, 45:20, 46:8, 46:24, 47:4, 47:11, 47:17, 48:3, 48:8, 48:12, 48:15, 48:20, 48:23, 49:3, 49:7, 49:19, 50:4, 50:9, 51:8, 51:11, 51:14, 51:22, 52:3, 52:9, 52:12, 52:15, 52:21, 52:23, 52:25, 53:3, 53:7, 53:17, 53:20, 54:3, 54:11, 55:2, 55:9, 56:4, 56:6, 56:25, 57:11, 57:21, 57:23, 58:4, 58:6, 58:8, 58:13, 58:16, 59:9, 60:14, 60:23, 61:5, 61:9, 61:17, 61:25, 62:25, 63:5, 63:10, 63:18, 63:25, 64:10, 64:15, 64:21, 65:7, 65:9, 65:11, 65:13, 65:16, 65:21, 66:3, 66:13, 66:17, 66:19, 67:13, 67:16, 67:22, 67:25, 68:15, 68:19, 68:23, 69:2, 69:7, 69:17, 70:2, 70:20, 71:5, 71:25, 72:8, 72:24, 73:1, 73:6, 73:20, 74:12, 75:9, 75:12, 75:20, 75:25, 76:2, 76:4, 76:12, 76:18, 76:21, 77:8, 77:16, 77:20, 78:3, 78:13, 78:18, 78:22, 78:24, 79:4, 79:6, 79:16, 79:19, 80:1, 80:3, 80:6, 80:11, 80:17, 80:19, 81:7, 81:19, 81:24, 82:7, 82:13, 82:21, 83:2, 83:15, 83:18, 84:2, 84:12, 84:25, 85:7, 85:9, 86:7, 86:14, 87:11, 87:15, 88:8, 88:22, 88:24, 89:12, 89:19, 89:22, 90:5, 90:23, 91:13, 91:22,

92:2, 92:13, 92:19, 92:25, 93:2, 93:4, 93:8, 93:11, 94:1, 94:24, 95:8, 96:10, 96:13, 97:1, 97:10, 97:12, 98:7, 98:9, 98:12, 98:17, 98:22, 98:25, 99:14, 99:22, 100:2, 100:4, 101:1, 101:5, 101:8, 104:14, 107:25, 108:18, 109:18, 110:2, 117:4, 117:6, 117:8, 117:12, 117:15, 117:22, 117:25, 118:5, 118:11, 118:14, 118:16, 118:19, 118:23, 119:2, 119:11, 119:15, 119:17, 119:19, 119:22, 119:24, 120:2, 120:6, 120:9, 120:13, 120:18, 120:24, 121:18, 122:8, 122:12, 122:22, 123:8, 123:11, 123:16, 123:21, 124:2, 124:5, 124:8, 124:11, 124:15, 125:5, 125:17, 126:8, 126:10, 126:17, 126:21, 126:24, 127:2, 127:5, 127:13, 127:17, 127:20, 127:23, 128:1, 128:6, 128:9, 128:13, 128:22, 129:1, 129:6, 129:13, 129:16, 129:19, 129:24, 130:1, 130:6, 131:12, 131:17, 131:24, 132:5, 132:12, 132:15, 132:17, 132:23, 133:11, 134:10, 134:24, 135:1, 135:5, 135:9, 135:12, 135:20, 135:23, 135:25, 136:5, 136:10, 136:13, 136:15, 136:20, 137:1, 137:4, 137:9, 137:11, 137:19, 137:22, 137:24, 138:2, 138:7, 138:15, 138:17,

138:23, 139:2, 139:11, 139:15, 140:10, 140:16, 140:18, 141:11, 142:4, 142:11, 142:17, 142:19, 142:21, 143:3, 143:9, 143:18, 143:22
**court** [14] - 5:15, 31:21, 50:11, 69:14, 84:6, 100:14, 101:23, 102:1, 102:4, 112:9, 114:7, 119:19, 120:14, 125:9
**Court** [28] - 5:21, 14:6, 14:7, 16:5, 18:15, 33:10, 49:15, 49:17, 50:16, 51:21, 52:4, 52:7, 53:11, 56:19, 64:14, 75:6, 79:10, 84:9, 87:5, 91:3, 91:10, 94:17, 99:4, 99:13, 119:20, 124:3, 125:13, 128:4
**Court's** [5] - 29:18, 62:18, 65:18, 79:8, 79:18
**courthouse** [2] - 37:20, 112:8
**courtroom** [10] - 101:20, 101:25, 104:8, 110:7, 125:22, 126:4, 135:17
**COURTROOM** [4] - 97:11, 100:18, 104:9, 104:13
**cousin** [3] - 129:22, 130:4, 131:5
**cousin's** [1] - 128:17
**coverage** [1] - 115:18
**COVID** [1] - 130:13
**crazy** [1] - 32:20
**credibility** [4] - 38:11, 49:11, 49:12, 51:2
**credible** [1] - 24:2
**creed** [1] - 114:23
**crime** [14] - 14:1, 112:18, 112:21, 113:25, 114:4, 121:25, 122:6, 125:18, 129:21, 129:23, 130:3, 131:6, 139:25
**crimes** [1] - 122:14
**Criminal** [1] - 100:18
**criminal** [13] - 110:22, 112:2, 112:14,

112:25, 114:7,
119:22, 120:19,
136:14, 136:16,
136:22, 137:10,
137:20, 138:3
**cross** [15] - 9:5, 12:21,
12:24, 13:24, 18:4,
18:12, 18:13, 25:2,
29:16, 34:23, 36:17,
38:21, 42:6, 58:8,
73:15
**cross-examination** [8]
- 9:5, 12:24, 18:4,
18:12, 18:13, 29:16,
36:17, 38:21
**cross-examine** [7] -
12:21, 13:24, 25:2,
34:23, 42:6, 58:8,
73:15
**crosses** [1] - 93:20
**crowd** [2] - 25:23,
26:3
**cumulative** [7] -
70:11, 74:14, 76:21,
77:3, 77:4, 93:18,
96:4
**curry** [3] - 38:5, 49:12,
51:3
**custody** [1] - 58:17

# D

**D.C** [6] - 107:14,
113:5, 113:7,
119:17, 119:18,
139:13
**dancing** [2] - 27:7
**dangerously** [1] -
123:22
**darn** [1] - 39:20
**data** [5] - 27:16, 39:19,
49:3, 62:8, 66:6
**database** [4] - 83:17,
90:17, 91:12, 91:19
**dated** [1] - 41:4
**David** [1] - 109:15
**days** [4] - 4:3, 44:7,
80:24, 93:15
**de** [1] - 57:25
**de-escalate** [1] - 57:25
**deal** [7] - 3:13, 4:13,
48:25, 53:24,
101:10, 142:6
**debriefed** [1] - 22:21
**decide** [9] - 10:15,
31:10, 31:11, 34:25,
43:2, 103:24,
122:13, 126:2, 128:1
**decided** [2] - 10:10,
90:9

**decision** [6] - 19:23,
31:17, 50:17, 111:1,
125:22, 131:20
**deduce** [1] - 46:3
**deep** [1] - 67:1
**deeply** [1] - 130:20
**defendant** [22] - 41:8,
41:15, 58:24, 59:11,
62:20, 68:22, 76:6,
96:5, 108:3, 110:8,
110:13, 110:17,
110:21, 110:22,
110:23, 110:24,
125:18, 128:11,
135:11, 137:14
**defendant's** [2] -
126:3, 128:1
**defendants** [4] -
68:25, 69:23, 76:16,
76:18
**defender** [1] - 108:13
**defender's** [3] - 112:3,
112:13
**defenders** [1] - 24:12
**defense** [50] - 4:7, 5:1,
11:20, 31:9, 31:10,
31:18, 32:11, 32:17,
32:24, 33:6, 39:7,
39:21, 42:18, 43:9,
43:10, 44:1, 44:22,
45:8, 45:13, 45:24,
50:1, 59:5, 59:10,
67:7, 70:15, 75:5,
79:9, 79:13, 80:23,
87:14, 90:1, 91:14,
91:15, 95:2, 95:4,
95:14, 95:21, 96:6,
96:8, 98:7, 108:19,
108:22, 110:11,
112:2, 112:4,
112:14, 113:6,
137:20, 138:15
**defense's** [2] - 61:11,
67:11
**defenses** [1] - 32:20
**definitely** [2] - 12:18,
84:10
**definition** [1] - 82:24
**delay** [1] - 51:19
**delayed** [1] - 29:7
**deliberate** [1] - 114:20
**deliberately** [1] -
83:21
**deliberating** [2] -
114:24, 115:8
**deliberation** [2] -
106:21, 115:5
**delve** [1] - 125:2
**delving** [1] - 121:1
**demonstrate** [1] -

13:25
**demonstrated** [1] -
107:2
**demonstrating** [1] -
107:3
**denied** [1] - 95:9
**denies** [1] - 58:11
**deny** [1] - 13:7
**denying** [2] - 84:20,
125:1
**Department** [9] -
109:14, 109:16,
111:20, 111:21,
111:23, 137:8,
137:12, 139:4,
141:25
**department's** [1] -
21:11
**departments** [1] -
111:19
**depicted** [1] - 4:7
**depth** [1] - 125:3
**deputy** [3] - 101:25,
104:8
**DEPUTY** [4] - 97:11,
100:18, 104:9,
104:13
**describing** [1] - 130:9
**description** [3] -
37:14, 49:25, 50:8
**desire** [2] - 104:22
**despite** [1] - 116:7
**determination** [1] -
50:19
**determine** [3] - 87:18,
109:1, 140:4
**devastated** [1] -
117:23
**devastating** [1] -
117:21
**died** [1] - 143:23
**difference** [9] - 25:21,
30:15, 30:16, 31:6,
43:7, 43:12, 47:5,
57:1, 120:22
**different** [21] - 5:2,
6:10, 11:7, 14:7,
14:8, 15:5, 15:10,
20:9, 21:12, 21:13,
24:2, 26:3, 48:3,
55:12, 56:22, 59:1,
68:9, 85:25, 90:22,
113:9, 134:13
**differently** [5] - 13:11,
13:16, 28:9, 48:16,
91:23
**difficult** [8] - 64:9,
81:5, 107:11, 114:8,
114:16, 116:13,
117:24, 118:4

**difficulty** [5] - 110:18,
111:2, 111:8, 116:9,
127:9
**digits** [1] - 102:18
**diminishing** [2] - 86:1,
86:2
**dire** [7] - 97:13,
102:14, 102:15,
103:10, 104:15,
125:3
**directly** [3] - 6:25, 7:7,
51:1
**disagree** [19] - 4:5,
4:15, 13:1, 15:5,
25:16, 26:22, 30:11,
36:17, 36:18, 36:23,
41:24, 46:13, 59:25,
61:20, 83:8, 88:22,
88:24, 89:5, 136:2
**disagreeing** [1] -
29:13
**disagrees** [1] - 143:4
**disciplinary** [1] -
63:11
**disclose** [5] - 34:5,
44:22, 59:20, 62:5,
62:8
**disclosed** [5] - 18:8,
41:11, 43:11, 76:10,
78:17
**disclosure** [2] - 18:11,
34:12
**discomfort** [1] -
114:18
**disconcerting** [1] -
99:8
**discovered** [1] - 78:16
**discovery** [43] - 18:17,
24:5, 24:8, 39:17,
39:20, 39:24, 41:8,
45:1, 54:13, 54:20,
54:21, 54:25, 55:20,
55:25, 56:2, 66:15,
68:5, 69:22, 69:25,
78:12, 78:15, 78:16,
78:19, 83:4, 83:5,
83:13, 83:23, 83:24,
83:25, 84:4, 84:7,
92:6, 92:8, 92:10,
92:11, 92:16, 92:18,
92:20, 95:22, 95:23,
98:19, 98:20
**Discovery** [1] - 39:23
**discuss** [2] - 18:23,
96:15
**discussed** [1] - 12:17
**dismiss** [9] - 3:1, 3:14,
3:15, 5:7, 5:10, 13:3,
13:7, 29:12
**dismissal** [3] - 3:18,

13:6, 39:7
**disorderly** [4] - 106:5,
106:11, 106:16,
106:22
**dispatch** [1] - 45:5
**disprove** [1] - 77:10
**dispute** [3] - 70:5,
85:20, 110:14
**disrupt** [3] - 106:3,
106:10, 106:18
**disruptive** [3] - 106:5,
106:12, 106:16
**distinction** [1] -
121:14
**district** [1] - 111:17
**District** [4] - 106:15,
107:1, 108:13,
120:10
**disturb** [1] - 106:18
**dive** [1] - 67:1
**division** [1] - 137:9
**docket** [1] - 18:18
**document** [2] - 44:23,
84:8
**documents** [5] -
39:22, 49:18, 49:25,
50:2, 98:15
**DOJ** [1] - 137:16
**done** [13] - 13:10,
43:4, 48:16, 51:12,
74:24, 84:10, 91:22,
92:15, 94:19, 96:23,
112:1, 120:9
**Done** [1] - 109:16
**door** [18] - 10:13,
10:20, 14:15, 17:15,
19:3, 19:7, 19:8,
19:14, 19:21, 20:12,
20:14, 20:15, 20:18,
23:23, 47:16, 47:21,
96:13
**doors** [2] - 46:22,
68:10
**doorway** [1] - 9:9
**double** [1] - 9:22
**doubt** [8] - 16:16,
31:14, 42:23,
110:11, 110:17,
120:20, 132:6,
133:21
**doubts** [1] - 138:23
**Dove** [1] - 109:15
**down** [25] - 9:9, 15:22,
15:24, 30:3, 54:8,
55:2, 64:8, 81:25,
100:2, 102:3, 103:8,
103:13, 105:15,
108:2, 108:6, 109:5,
109:20, 110:4,
110:20, 116:17,

121:10, 121:11, 139:15, 140:14, 140:16
**drafting** [1] - 18:21
**draw** [6] - 3:25, 9:16, 11:12, 11:14, 25:2, 110:25
**drawn** [1] - 17:21
**drowsiness** [1] - 114:18
**drug** [1] - 50:25
**drugs** [1] - 128:18
**due** [1] - 28:17
**dump** [1] - 98:16
**during** [19] - 3:23, 19:20, 67:10, 69:11, 75:21, 81:9, 81:12, 81:13, 85:2, 85:7, 90:12, 96:18, 99:24, 101:2, 102:14, 102:20, 108:22, 108:25, 141:1
**duty** [3] - 5:15, 57:8

## E

**early** [2] - 43:10, 134:3
**earshot** [3] - 8:12, 8:24, 16:20
**easily** [3] - 12:21, 81:2, 105:7
**eat** [1] - 98:4
**effect** [14] - 4:21, 19:19, 34:16, 47:7, 47:24, 57:18, 61:20, 64:7, 69:8, 72:21, 79:23, 95:13, 113:15, 130:6
**effective** [1] - 42:18
**eight** [1] - 97:25
**either** [12] - 30:10, 46:5, 53:12, 55:15, 55:16, 61:21, 72:9, 85:9, 102:12, 106:19, 112:25, 140:6
**elderly** [1] - 121:5
**election** [5] - 114:12, 119:5, 121:12, 142:23, 143:11
**elects** [1] - 110:24
**element** [1] - 110:10
**elicit** [11] - 11:6, 12:6, 22:3, 22:5, 25:6, 27:2, 42:15, 47:23, 48:21, 62:12, 73:17
**eliciting** [1] - 47:18
**Elizabeth** [1] - 109:13
**elsewhere** [3] - 4:19, 113:5, 113:7

**email** [1] - 93:13
**embarrass** [1] - 104:23
**embrace** [2] - 74:11, 74:12
**employed** [1] - 114:6
**employees** [3] - 101:23, 137:12, 137:16
**employment** [3] - 112:12, 112:16, 136:12
**encouragement** [1] - 6:16
**end** [1] - 47:15
**enforcement** [18] - 36:2, 60:19, 76:17, 111:15, 111:18, 112:15, 113:4, 113:13, 113:15, 113:18, 113:21, 114:6, 128:16, 132:24, 137:6, 138:20, 139:6, 139:8
**engaged** [2] - 106:4, 106:15
**engagement** [1] - 115:2
**English** [1] - 116:10
**ensued** [1] - 32:5
**enter** [6] - 4:8, 4:13, 4:20, 5:2, 41:22, 42:3
**entered** [2] - 60:18, 105:19
**entering** [1] - 105:24
**enters** [5] - 52:11, 117:3, 118:18, 126:20, 134:23
**entirely** [3] - 68:7, 105:5, 125:14
**entirety** [1] - 95:5
**entitled** [12] - 27:23, 38:15, 42:6, 53:13, 58:16, 58:19, 60:4, 87:6, 87:8, 103:21, 124:6, 125:18
**entrance** [1] - 55:7
**entry** [3] - 78:9, 99:25, 106:22
**equal** [1] - 36:6
**equally** [1] - 63:8
**equating** [1] - 22:13
**equipment** [2] - 23:6, 23:8
**Eric** [3] - 100:25, 107:18, 107:22
**error** [1] - 121:15
**escalate** [1] - 57:25
**especially** [2] - 80:9,

134:17
**essentially** [4] - 20:15, 32:13, 76:15, 123:24
**establish** [3] - 9:4, 33:25, 53:11
**established** [3] - 17:20, 54:23, 70:17
**establishing** [1] - 28:10
**Eugene** [3] - 101:6, 108:8, 108:12
**evaluate** [1] - 113:20
**event** [1] - 48:9
**events** [7] - 18:16, 115:11, 115:16, 117:18, 121:6, 121:19, 125:24
**evidence** [55] - 3:16, 3:18, 3:20, 5:24, 9:11, 10:7, 11:20, 11:23, 16:15, 17:22, 24:15, 24:17, 25:17, 26:1, 26:19, 27:23, 28:5, 30:13, 31:25, 34:9, 46:19, 46:21, 47:1, 47:23, 51:2, 51:4, 53:15, 57:15, 65:18, 68:12, 70:4, 75:17, 75:20, 85:14, 85:16, 88:12, 90:7, 96:2, 96:5, 105:4, 110:12, 111:5, 111:6, 115:24, 124:10, 125:22, 126:3, 127:6, 127:7, 127:24, 136:22, 136:23, 141:16
**evidence.com** [1] - 45:25
**ex** [1] - 49:14
**exact** [1] - 57:20
**exactly** [3] - 46:4, 66:9, 133:11
**examination** [8] - 9:5, 12:24, 18:14, 18:12, 18:13, 29:16, 36:17, 38:21
**examine** [8] - 12:21, 13:24, 25:2, 34:23, 42:6, 58:8, 68:1, 73:15
**example** [4] - 21:10, 56:14, 63:4, 134:12
**Excel** [1] - 39:22
**excellent** [1] - 5:5
**except** [3] - 15:13, 55:9, 76:15
**exchange** [1] - 6:25
**exchanges** [1] - 7:2
**exculpatory** [37] -

3:17, 5:1, 6:2, 6:5, 6:23, 7:11, 7:23, 8:4, 8:5, 8:19, 8:22, 10:6, 12:12, 12:18, 13:1, 13:23, 17:3, 17:4, 18:4, 18:5, 19:16, 20:3, 20:7, 25:1, 29:14, 30:11, 30:16, 31:20, 32:2, 32:25, 55:5, 55:10, 70:18, 70:20, 72:13, 83:10, 99:10
**excuse** [6] - 3:16, 97:5, 97:7, 100:8, 113:20, 113:22
**excused** [1] - 103:25
**excusing** [1] - 143:23
**exercise** [1] - 97:1
**exist** [5] - 34:22, 45:12, 51:17, 89:23, 94:13
**existed** [2] - 33:8, 55:25
**exists** [11] - 28:20, 34:20, 34:22, 35:1, 35:4, 35:5, 55:3, 69:2, 89:20, 99:11, 99:15
**expand** [1] - 23:10
**expect** [6] - 48:1, 91:10, 91:13, 91:14, 91:15, 115:4
**expectation** [2] - 91:3, 134:8
**expected** [2] - 91:1, 96:2
**experience** [8] - 113:5, 114:5, 120:2, 129:7, 129:8, 131:9, 141:7, 141:15
**experiences** [4] - 113:3, 128:15, 138:8, 138:19
**explain** [1] - 96:24
**explained** [1] - 132:20
**explaining** [1] - 121:13
**Explosives** [1] - 111:22
**express** [3] - 134:6, 134:7, 134:8
**expressed** [2] - 133:3, 134:3
**extent** [1] - 95:16
**eyes** [2] - 64:23, 84:6

## F

**fact** [25] - 6:8, 14:9, 17:17, 21:14, 22:9,

23:3, 26:13, 33:4, 38:18, 48:5, 60:17, 67:20, 72:15, 86:1, 106:10, 110:14, 113:14, 113:17, 124:1, 131:25, 133:14, 134:2, 136:1, 137:15, 141:13
**factors** [1] - 62:2
**facts** [8] - 11:19, 15:20, 105:14, 107:8, 122:24, 132:21, 135:6, 139:21
**factual** [2] - 3:25, 35:25
**factually** [1] - 124:9
**failure** [4] - 3:15, 19:20, 22:2, 47:22
**failures** [2] - 4:2, 21:11
**fair** [40] - 12:8, 105:10, 107:11, 113:10, 114:8, 114:14, 115:19, 115:23, 116:2, 116:6, 116:7, 116:17, 117:19, 118:9, 119:6, 119:9, 120:3, 121:20, 122:4, 122:8, 125:24, 126:14, 128:10, 129:8, 129:9, 129:16, 131:22, 131:23, 131:25, 132:11, 133:12, 133:14, 133:25, 134:12, 137:25, 139:18, 139:21, 142:24, 143:3, 143:10
**fairest** [1] - 104:24
**fairly** [2] - 116:13, 134:3
**faith** [6] - 12:11, 13:5, 29:8, 29:22, 30:16, 77:4
**fall** [1] - 39:18
**fallback** [2] - 24:11, 125:3
**falling** [1] - 91:9
**familiar** [1] - 141:6
**familiarity** [1] - 107:15
**family** [17] - 111:10, 111:14, 111:25, 112:7, 112:10, 113:2, 113:23, 114:2, 115:13, 128:14, 129:20, 130:2, 136:5, 137:4,

137:19, 138:7,
140:20
**far** [5] - 12:17, 63:18,
76:7, 87:19, 141:13
**fast** [1] - 62:25
**fault** [6] - 81:19,
81:20, 81:22, 82:21,
91:18, 101:12
**favor** [6] - 4:1, 38:6,
49:12, 51:3, 132:1,
133:15
**favorable** [1] - 30:10
**favorably** [1] - 131:9
**FBI** [7] - 58:24, 60:20,
60:21, 62:21,
107:23, 111:21,
139:3
**featured** [1] - 67:2
**federal** [5] - 108:12,
112:3, 112:15,
119:19, 120:13
**Federal** [2] - 109:16,
111:20
**feelings** [25] - 113:8,
114:11, 114:13,
118:9, 119:4, 119:6,
119:8, 121:2,
121:19, 121:20,
125:21, 126:2,
130:16, 131:25,
132:7, 133:13,
133:22, 138:19,
142:15, 142:22,
142:24, 143:11,
143:12, 143:13
**felt** [4] - 32:22, 48:2,
118:2, 130:17
**few** [4] - 67:4, 73:13,
95:17, 138:11
**Fifth** [1] - 53:17
**fight** [3] - 19:12,
19:17, 85:19
**figure** [1] - 61:13
**file** [6] - 39:7, 41:2,
41:6, 46:2, 50:10,
51:18
**filed** [7] - 3:1, 3:4,
13:3, 18:9, 33:3,
36:12
**files** [1] - 46:2
**filing** [4] - 5:6, 5:10,
8:15, 71:1
**final** [2] - 116:11,
126:11
**finally** [2] - 47:9, 48:23
**findings** [4] - 3:25,
37:6, 125:14, 132:21
**fine** [2] - 65:6, 86:25
**Finish** [1] - 32:9
**finish** [3] - 65:1, 92:2,

103:15
**finished** [2] - 78:4,
109:4
**Firearms** [1] - 111:22
**firm** [2] - 112:4,
112:13
**first** [31] - 3:14, 4:3,
4:14, 8:7, 12:8,
15:17, 15:19, 24:16,
24:17, 24:25, 36:23,
37:21, 39:6, 39:14,
39:15, 39:23, 40:21,
53:25, 54:18, 55:21,
66:21, 72:24, 82:9,
92:7, 93:22, 95:6,
97:3, 97:12, 101:9,
101:23, 127:24
**five** [38] - 4:4, 6:11,
14:14, 18:25, 23:21,
23:23, 35:9, 40:8,
44:10, 45:3, 47:19,
63:16, 64:7, 67:10,
67:17, 68:7, 68:13,
69:11, 72:16, 79:1,
79:22, 80:2, 80:3,
80:4, 80:5, 80:6,
80:11, 80:17, 80:18,
85:5, 93:15, 95:11,
112:18, 120:12,
130:13, 130:15,
130:16
**five-minute** [2] -
67:10, 80:2
**flatfooted** [1] - 16:19
**flip** [1] - 85:11
**focus** [1] - 90:9
**fodder** [4] - 38:20,
41:19, 41:20
**folks** [2] - 10:11, 10:15
**follow** [14] - 97:20,
103:17, 103:24,
119:11, 120:24,
123:1, 123:5,
124:16, 124:23,
125:7, 130:7,
136:17, 139:11,
142:5
**follow-up** [8] - 97:20,
103:17, 103:24,
119:11, 120:24,
125:7, 130:7, 139:11
**follow-ups** [1] - 142:5
**followed** [1] - 115:18
**following** [11] - 19:1,
33:20, 105:18,
109:23, 110:18,
110:19, 111:2,
111:8, 116:1, 121:8,
127:9
**foot** [1] - 89:8

**footage** [1] - 45:8
**Force** [1] - 109:17
**force** [2] - 99:5,
107:23
**forceful** [1] - 15:9
**forgot** [2] - 140:16,
142:14
**form** [1] - 42:9
**former** [1] - 143:15
**forward** [2] - 17:15,
91:4
**foundation** [1] - 42:13
**four** [13] - 45:3, 63:7,
67:9, 85:11, 85:17,
86:18, 97:23, 97:24,
102:18, 120:11,
120:12, 130:14,
130:16
**fourth** [1] - 21:10
**frame** [8] - 46:23,
46:25, 75:14, 80:1,
80:2, 84:20, 90:12,
143:16
**frankly** [5] - 5:13,
33:17, 79:14, 91:1,
98:24
**free** [1] - 8:20
**Friday** [12] - 23:15,
24:16, 26:16, 44:25,
82:5, 82:7, 82:8,
83:5, 83:11, 93:6,
93:10, 93:20
**friend** [4] - 115:13,
135:22, 140:20
**friends** [15] - 111:11,
111:13, 112:1,
112:8, 112:11,
113:3, 113:24,
114:3, 128:14,
129:20, 130:2,
136:6, 137:5,
137:20, 138:8
**frightening** [1] - 129:6
**front** [7] - 11:5, 13:12,
13:14, 28:23, 39:3,
71:1, 86:23
**frustrated** [1] - 20:1
**fulsome** [3] - 36:25,
37:1, 47:13
**functions** [2] - 106:4,
106:11
**furthermore** [1] -
41:14
**future** [1] - 94:19

---

# G

**gargantuan** [2] - 59:5,
59:9
**gas** [1] - 12:1

**gathered** [1] - 65:16
**gender** [1] - 113:9
**general** [3] - 24:4,
38:1, 63:17
**general's** [1] - 111:17
**generally** [4] - 24:12,
37:20, 47:12, 84:7
**Gibson** [1] - 109:24
**Giglio** [2] - 44:12,
44:14
**given** [18] - 5:1, 21:5,
22:1, 40:9, 50:12,
55:19, 55:24, 75:20,
77:16, 78:5, 80:23,
83:15, 83:16, 83:20,
90:5, 93:15, 96:1,
135:13
**glass** [1] - 11:25
**Glavey** [1] - 109:14
**global** [25] - 39:17,
39:23, 40:11, 40:14,
41:7, 45:1, 54:13,
54:20, 54:21, 55:20,
55:25, 56:1, 66:15,
68:5, 69:21, 69:25,
78:12, 78:14, 78:19,
82:18, 92:8, 92:10,
92:11, 95:23, 98:19
**Global** [2] - 39:23,
43:19
**government** [105] -
3:4, 3:17, 4:1, 4:3,
5:14, 8:3, 11:6,
11:24, 12:10, 12:13,
16:2, 20:4, 21:24,
22:3, 22:5, 25:16,
27:23, 28:16, 28:24,
29:22, 29:24, 30:2,
30:14, 31:23, 32:1,
32:7, 33:3, 33:13,
34:3, 34:5, 34:7,
34:21, 36:15, 36:24,
37:1, 37:20, 40:7,
43:2, 43:25, 46:8,
46:23, 51:15, 54:8,
54:24, 55:5, 55:18,
56:6, 56:20, 57:2,
59:8, 59:19, 60:4,
60:24, 62:4, 62:8,
70:19, 71:21, 72:1,
72:3, 72:4, 72:5,
72:17, 74:17, 75:17,
76:8, 77:10, 77:20,
83:3, 84:14, 85:18,
86:13, 87:1, 87:25,
88:7, 88:12, 89:23,
89:24, 90:2, 90:21,
94:3, 94:11, 94:21,
94:25, 95:3, 95:4,
95:10, 96:8, 98:23,

99:9, 99:10, 99:15,
100:22, 106:4,
106:11, 108:21,
110:10, 110:16,
111:16, 111:18,
125:6, 129:9, 132:6,
133:20, 134:4
**government's** [15] -
24:4, 36:11, 52:6,
55:9, 58:17, 60:21,
62:12, 79:21, 81:19,
82:3, 82:21, 82:22,
87:7, 87:18, 94:6
**graduating** [1] - 37:24
**grand** [3] - 112:23,
120:7, 120:21
**grant** [3] - 13:7, 134:4,
134:18
**granted** [1] - 16:5
**great** [1] - 77:23
**greater** [1] - 139:7
**grounds** [4] - 105:20,
105:22, 106:6, 106:8
**Grounds** [1] - 106:17
**group** [4] - 10:13,
11:4, 28:8, 33:20
**groups** [4] - 112:19,
112:20, 112:21,
138:3
**guarantee** [3] - 69:24,
85:14, 93:10
**guard** [1] - 14:5
**guess** [19] - 16:25,
20:11, 22:12, 25:15,
35:14, 51:11, 52:5,
64:2, 67:17, 75:3,
81:7, 105:16,
127:24, 136:24,
138:10, 139:1,
139:21, 141:22
**guides** [1] - 33:1
**guilt** [5] - 111:1,
120:20, 126:3,
131:19, 133:4
**guilty** [17] - 110:10,
110:17, 114:4,
118:7, 121:25,
122:6, 122:13,
124:1, 126:5, 128:1,
128:11, 130:3,
131:6, 137:14,
139:24, 140:2
**guns** [2] - 128:19,
129:5
**guy** [4] - 70:13, 74:3,
86:20, 89:9
**guys** [2] - 59:24, 60:10

# H

**hair** [1] - 52:13
**half** [3] - 8:11, 28:1, 89:9
**halfway** [1] - 113:1
**hand** [5] - 52:10, 102:19, 102:23, 104:10, 143:6
**handle** [1] - 49:14
**handles** [1] - 111:15
**hang** [1] - 52:21
**hanging** [1] - 6:7
**hard** [2] - 93:25, 94:1
**harsh** [1] - 127:14
**hash** [1] - 65:2
**Hat** [1] - 112:20
**hat** [2] - 70:17, 70:18
**hate** [1] - 3:8
**haystack** [1] - 82:25
**head** [1] - 64:3
**hear** [59] - 6:2, 6:22, 9:11, 9:12, 9:18, 10:3, 12:4, 12:9, 12:16, 14:21, 16:14, 16:24, 23:5, 23:7, 25:7, 25:23, 25:24, 26:3, 26:25, 28:4, 28:8, 31:23, 31:25, 32:7, 34:1, 34:21, 34:24, 35:24, 38:8, 41:15, 42:10, 42:15, 53:15, 71:3, 71:5, 73:9, 86:4, 86:7, 86:8, 94:6, 96:6, 97:19, 102:3, 103:13, 104:3, 108:24, 108:25, 109:23, 113:12, 123:14, 123:18, 123:20, 124:13, 126:3, 127:24, 139:2
**heard** [71] - 9:1, 13:15, 14:6, 25:6, 25:8, 25:11, 25:13, 25:18, 25:20, 26:15, 26:24, 27:5, 27:13, 28:6, 28:10, 28:12, 28:13, 28:23, 32:6, 42:9, 42:10, 42:12, 42:14, 45:11, 46:18, 56:22, 57:16, 57:17, 60:12, 62:14, 62:23, 66:25, 67:4, 69:9, 70:9, 70:14, 70:25, 71:14, 72:5, 72:22, 73:3, 73:24, 74:4, 75:10, 76:23, 79:22, 85:3, 85:12, 86:14, 86:16, 86:20, 87:2, 87:4,

87:13, 88:2, 88:10, 88:16, 88:17, 88:20, 89:1, 89:9, 89:17, 90:13, 96:5, 101:20, 124:10, 136:16, 139:3
**hearing** [5] - 50:24, 106:20, 123:19, 131:7, 138:12
**hearings** [2] - 5:16, 5:17
**hears** [3] - 10:3, 26:12, 70:13
**hearsay** [1] - 9:22
**heels** [1] - 101:10
**held** [6] - 19:15, 56:1, 100:13, 100:16, 116:25, 125:9
**help** [4] - 6:3, 87:8, 102:12, 103:5
**helped** [2] - 19:2, 101:11
**helpful** [2] - 31:24, 32:3
**Henry** [2] - 107:22, 109:17
**hesitate** [2] - 47:10, 136:2
**hesitation** [1] - 134:17
**Hi** [1] - 65:13
**hi** [1] - 65:14
**hid** [1] - 55:12
**hide** [1] - 13:4
**hiding** [2] - 51:22, 55:19
**highlights** [1] - 134:1
**highly** [1] - 44:23
**himself** [3] - 32:15, 133:3, 133:8
**hoc** [2] - 48:7, 48:8
**hold** [6] - 19:11, 31:2, 54:3, 54:5, 73:20, 135:5
**holding** [3] - 29:24, 52:16, 52:23
**holdings** [1] - 67:7
**hole** [1] - 71:10
**home** [4] - 65:1, 121:4, 128:19, 137:15
**Homeland** [1] - 111:24
**honestly** [1] - 93:24
**Honor** [141] - 5:3, 5:12, 5:20, 6:5, 6:24, 7:24, 8:8, 9:3, 9:6, 9:13, 10:8, 10:24, 10:25, 13:18, 13:22, 15:12, 16:24, 18:6, 20:8, 20:21, 21:19, 22:12, 23:10, 25:15,

26:4, 27:6, 28:14, 30:17, 33:11, 34:2, 34:6, 36:18, 37:19, 37:23, 38:22, 38:24, 39:1, 39:5, 39:6, 39:19, 40:19, 40:22, 41:1, 41:6, 41:12, 42:8, 42:21, 42:23, 43:17, 45:13, 45:24, 46:18, 47:9, 47:24, 48:14, 48:18, 49:5, 49:14, 49:24, 50:6, 51:7, 51:12, 52:2, 54:2, 54:20, 56:1, 57:20, 61:4, 61:8, 61:10, 61:24, 62:17, 63:13, 63:22, 64:20, 65:6, 65:8, 65:10, 65:12, 66:20, 69:16, 69:18, 70:16, 71:23, 72:5, 74:10, 75:3, 78:10, 79:3, 79:14, 80:10, 80:20, 81:17, 81:21, 82:10, 82:19, 82:25, 84:3, 84:5, 85:4, 86:3, 86:9, 87:14, 88:5, 89:6, 89:14, 91:19, 92:1, 92:10, 93:7, 93:23, 94:20, 94:25, 96:9, 96:25, 98:5, 98:11, 98:13, 99:1, 99:20, 100:3, 100:18, 100:23, 101:6, 118:10, 118:13, 123:24, 124:25, 130:8, 132:19, 133:7, 134:5, 136:8, 136:24, 137:3, 140:4, 140:17, 142:2, 142:3, 142:20
**hope** [1] - 134:8
**hopefully** [1] - 144:1
**hour** [1] - 23:24
**hours** [2] - 59:14
**House** [2] - 106:19, 106:21
**household** [13] - 111:11, 111:14, 112:1, 112:8, 112:11, 113:3, 113:24, 114:3, 128:14, 129:20, 130:2, 136:6, 137:5
**hundred** [3] - 133:9, 134:9, 134:11
**hurt** [2] - 19:25, 91:1
**husband** [1] - 128:17

# I

**idea** [7] - 5:25, 39:6, 39:25, 45:13, 45:16, 46:19, 91:10
**identification** [1] - 101:2
**identified** [5] - 4:4, 4:6, 34:10, 45:3, 99:9
**identifier** [1] - 78:21
**identify** [5] - 53:10, 54:7, 55:5, 75:8, 78:20
**identifying** [1] - 70:18
**identities** [2] - 13:11, 53:13
**ignore** [1] - 78:19
**illness** [1] - 114:16
**image** [1] - 35:2
**images** [6] - 35:13, 35:16, 35:17, 35:19, 35:20
**imagine** [1] - 141:21
**immediate** [1] - 4:11
**immediately** [1] - 5:15
**impanel** [1] - 104:2
**impartial** [20] - 103:23, 104:24, 105:10, 107:12, 113:10, 114:9, 114:14, 115:19, 115:23, 116:2, 116:6, 117:19, 118:9, 119:6, 119:9, 120:4, 121:21, 125:19, 128:10, 142:25
**impartially** [1] - 116:13
**impeach** [5] - 20:20, 38:5, 56:23, 72:25, 74:18
**impeaching** [3] - 30:11, 30:12, 55:16
**impeachment** [8] - 20:10, 34:19, 41:19, 41:20, 41:21, 42:7, 42:19, 71:10
**impede** [3] - 106:3, 106:10, 106:18
**impeded** [1] - 42:17
**impermissible** [1] - 73:4
**importance** [1] - 83:9
**important** [5] - 35:7, 83:8, 92:3, 102:21, 105:5
**importantly** [1] - 32:4
**impose** [1] - 128:3
**impossible** [3] -

79:14, 80:8, 115:2
**in-camera** [1] - 50:18
**inadvertently** [3] - 64:24, 96:18, 96:19
**incident** [1] - 19:21
**include** [4] - 62:20, 63:7, 63:15, 92:20
**includes** [4] - 44:15, 90:18, 112:5, 114:21
**including** [6] - 11:14, 77:17, 110:7, 111:12, 112:9, 135:17
**inconvenienced** [3] - 115:16, 116:1, 117:18
**incorporate** [1] - 18:12
**incorrect** [2] - 40:1, 45:23
**increment** [1] - 67:10
**inculpatory** [2] - 9:25, 15:10
**index** [2] - 102:17, 102:19
**Indiana** [1] - 108:4
**indicated** [1] - 19:8
**indicates** [1] - 67:17
**indication** [1] - 19:3
**indicia** [1] - 12:1
**individual** [7] - 7:7, 14:24, 52:11, 52:16, 68:21, 79:22, 92:12
**individuals** [40] - 8:12, 10:13, 10:25, 11:4, 11:11, 14:1, 15:6, 17:8, 17:12, 23:12, 23:16, 23:18, 23:19, 27:13, 27:16, 27:22, 27:25, 28:4, 29:23, 53:9, 53:14, 53:17, 56:21, 61:1, 69:10, 71:1, 72:4, 76:14, 76:22, 77:18, 79:25, 86:4, 86:10, 95:17, 99:12, 109:5, 110:4, 119:10, 123:25
**individuals'** [1] - 77:25
**inference** [9] - 9:16, 10:1, 11:12, 12:8, 17:20, 25:3, 25:19, 89:3, 110:25
**inferences** [4] - 3:25, 11:14, 17:21, 74:3
**information** [71] - 3:18, 4:16, 4:22, 5:6, 5:9, 5:20, 12:12, 13:5, 13:17, 24:11, 25:6, 28:18, 33:4,

33:5, 37:17, 43:21,
45:9, 45:12, 45:14,
45:15, 49:20, 50:22,
51:5, 54:1, 55:3,
55:8, 55:10, 55:14,
56:18, 57:3, 58:17,
58:23, 59:5, 59:9,
59:20, 60:6, 62:5,
63:3, 65:22, 67:2,
68:4, 69:3, 69:6,
69:8, 75:7, 75:19,
77:14, 77:18, 81:1,
83:1, 87:6, 87:9,
90:15, 90:17, 91:11,
93:17, 94:4, 94:15,
94:18, 95:12, 95:14,
95:22, 95:25, 96:2,
99:6, 99:7, 99:9,
99:11, 99:16, 99:21
**informed** [3] - 17:8,
25:14, 27:4
**informs** [5] - 10:12,
10:20, 10:21, 17:11,
26:14
**infraction** [1] - 37:25
**ingested** [1] - 69:24
**initial** [1] - 134:6
**innocence** [2] -
110:13, 126:3
**innocent** [3] - 110:9,
118:6
**inquire** [2] - 84:21,
95:10
**inquired** [1] - 56:19
**inside** [11] - 8:6, 8:7,
14:12, 91:11,
121:24, 122:1,
122:5, 122:9,
122:20, 124:1,
139:24
**instance** [5] - 40:22,
46:17, 49:15, 49:17,
130:9
**instances** [3] - 49:16,
80:15, 130:25
**instruct** [4] - 124:3,
124:17, 139:5, 140:5
**instructed** [1] - 115:21
**instructing** [1] -
122:23
**instruction** [5] - 3:21,
3:24, 110:15,
113:20, 141:17
**instructions** [7] -
65:2, 104:5, 111:6,
123:5, 124:23,
127:7, 136:17
**instructs** [1] - 125:14
**insurrection** [1] -
118:3

**intend** [4] - 22:5, 49:1,
49:5, 50:21
**intends** [1] - 22:3
**intent** [10] - 7:25,
13:15, 25:14, 32:21,
41:22, 42:10, 48:21,
86:12, 106:3, 106:18
**intention** [3] - 8:6,
104:22
**intentionally** [1] - 3:17
**interaction** [3] - 14:25,
16:8, 58:25
**interactions** [4] - 88:6,
131:1, 138:12,
138:13
**interest** [1] - 104:25
**interpreted** [3] - 4:13,
16:10, 79:24
**interview** [6] - 21:15,
22:8, 24:18, 57:15,
66:15, 67:19
**interviewed** [2] -
74:24, 99:24
**introduce** [7] - 100:21,
101:1, 101:23,
102:7, 107:19,
108:9, 108:24
**introduced** [1] - 109:1
**invade** [1] - 104:23
**investigate** [5] -
54:17, 57:8, 95:2,
99:17, 99:18
**investigated** [1] -
60:20
**investigation** [19] -
3:21, 32:16, 51:1,
60:9, 61:11, 67:8,
67:12, 68:3, 72:2,
80:21, 84:15, 89:25,
90:1, 90:2, 90:11,
90:19, 94:22, 95:3,
95:5
**Investigation** [2] -
109:17, 111:20
**investigator** [2] -
112:5, 113:6
**involve** [1] - 101:13
**involved** [1] - 102:5
**involves** [1] - 141:14
**involving** [1] - 92:24
**IRS** [1] - 111:23
**issue** [8] - 38:6, 45:12,
46:10, 49:11, 71:9,
84:13, 87:10, 88:16
**issues** [3] - 39:13,
87:17, 101:14
**itself** [3] - 33:18,
33:25, 88:25

**J**

**Jahvonta** [1] - 102:6
**jail** [3] - 5:17, 93:12,
114:4
**January** [18] - 21:9,
21:16, 28:7, 105:19,
106:2, 106:14,
106:25, 115:12,
115:17, 115:19,
117:18, 121:10,
121:19, 127:21,
135:8, 135:13,
139:14, 139:19
**Jencks** [10] - 41:3,
41:9, 43:11, 44:14,
78:11, 78:17, 92:16,
93:21, 93:22, 95:25
**Jessica** [1] - 109:13
**job** [9] - 36:21, 39:21,
61:11, 87:14, 87:16,
102:2, 130:24, 142:7
**jobs** [1] - 31:9
**Joe** [2] - 100:25,
109:17
**joined** [3] - 101:7,
107:21, 108:13
**Joseph** [1] - 107:22
**Judge** [2] - 22:11,
101:18
**judge** [6] - 87:16,
91:10, 100:14,
101:18, 116:16,
125:15
**judge's** [1] - 141:17
**jumping** [3] - 43:17,
54:8, 81:25
**Juror** [13] - 117:3,
117:6, 118:15,
118:18, 118:23,
126:19, 126:20,
126:22, 132:16,
134:23, 134:24,
140:12, 143:21
**juror** [25] - 3:9,
100:12, 101:21,
102:18, 102:21,
103:25, 113:10,
114:9, 114:14,
114:16, 114:21,
115:3, 115:20,
116:6, 116:14,
117:19, 118:21,
123:17, 125:19,
126:14, 128:10,
132:20, 133:24,
134:6
**JUROR** [109] - 117:5,
117:7, 117:10,
117:14, 117:21,

117:23, 118:2,
118:10, 118:22,
119:1, 119:8,
119:14, 119:16,
119:18, 119:21,
119:23, 120:1,
120:5, 120:11,
120:16, 120:23,
121:3, 121:15,
121:22, 122:1,
122:7, 122:11,
122:15, 122:18,
123:7, 125:16,
126:7, 126:9,
126:16, 126:23,
127:1, 127:3,
127:10, 127:15,
127:19, 127:22,
127:25, 128:5,
128:7, 128:12,
128:17, 128:24,
129:2, 129:11,
129:15, 129:18,
129:22, 129:25,
130:5, 130:12,
130:18, 130:21,
131:2, 131:5,
131:10, 131:15,
131:23, 132:3,
132:10, 132:13,
134:25, 135:3,
135:8, 135:10,
135:18, 135:21,
135:24, 136:3,
136:8, 136:11,
136:14, 136:19,
136:23, 137:3,
137:7, 137:10,
137:18, 137:21,
137:23, 138:1,
138:5, 138:10,
138:16, 138:22,
138:25, 139:10,
139:20, 140:1,
140:8, 140:15,
140:22, 141:1,
141:5, 141:8,
141:18, 141:21,
142:1, 142:8,
142:10, 142:12,
142:18, 143:1,
143:5, 143:15
**jurors** [11] - 100:12,
102:10, 102:11,
103:23, 104:4,
104:9, 105:1, 105:2,
111:4, 127:5, 143:19
**JURY** [1] - 104:12
**jury** [52] - 3:9, 3:24,
6:21, 9:15, 23:5,
25:5, 25:8, 25:22,

117:23, 118:2,
118:10, 118:22,
119:1, 119:8,
119:14, 119:16,
119:18, 119:21,
119:23, 120:1,
120:5, 120:11,
120:16, 120:23,
121:3, 121:15,
121:22, 122:1,
122:7, 122:11,
122:15, 122:18,
123:7, 125:16,
126:7, 126:9,
126:16, 126:23,
127:1, 127:3,
127:10, 127:15,
127:19, 127:22,
127:25, 128:5,
128:7, 128:12,
128:17, 128:24,
129:2, 129:11,
129:15, 129:18,
129:22, 129:25,
130:5, 130:12,
130:18, 130:21,
131:2, 131:5,
131:10, 131:15,
131:23, 132:3,
132:10, 132:13,
134:25, 135:3,
135:8, 135:10,
135:18, 135:21,
135:24, 136:3,
136:8, 136:11,
136:14, 136:19,
136:23, 137:3,
137:7, 137:10,
137:18, 137:21,
137:23, 138:1,
138:5, 138:10,
138:16, 138:22,
138:25, 139:10,
139:20, 140:1,
140:8, 140:15,
140:22, 141:1,
141:5, 141:8,
141:18, 141:21,
142:1, 142:8,
142:10, 142:12,
142:18, 143:1,
143:5, 143:15
**jurors** [11] - 100:12,
102:10, 102:11,
103:23, 104:4,
104:9, 105:1, 105:2,
111:4, 127:5, 143:19
**JURY** [1] - 104:12
**jury** [52] - 3:9, 3:24,
6:21, 9:15, 23:5,
25:5, 25:8, 25:22,

25:23, 26:25, 29:5,
34:2, 35:10, 42:5,
53:16, 64:11, 64:16,
64:25, 73:8, 74:2,
74:4, 78:3, 78:4,
94:7, 100:16,
100:20, 101:13,
102:11, 104:2,
104:6, 104:11,
104:24, 105:7,
110:6, 112:23,
112:24, 115:5,
116:25, 119:13,
120:7, 120:19,
120:21, 123:1,
125:12, 128:3,
135:16, 136:1, 139:5
**jury's** [1] - 131:20
**justice** [1] - 114:7
**Justice** [4] - 111:21,
137:8, 137:12,
141:25

**K**

**Kate** [1] - 108:13
**Katelyn** [1] - 101:7
**keep** [5] - 3:9, 58:3,
59:22, 102:4, 116:23
**kept** [1] - 89:9
**key** [1] - 45:4
**killed** [3] - 10:1, 10:22,
11:15
**kind** [16] - 7:18, 13:5,
15:19, 22:23, 32:1,
35:10, 37:11, 37:14,
38:15, 44:6, 51:5,
117:15, 123:16,
136:10, 138:2, 138:3
**kinds** [4] - 12:17, 28:7,
89:3, 125:2
**knowing** [2] - 32:21,
75:18
**knowingly** [4] -
105:19, 106:3,
106:15, 107:1
**knowledge** [2] -
33:10, 102:11
**known** [8] - 16:6, 33:5,
59:12, 59:13, 77:20,
80:24, 91:15, 111:20
**knows** [10] - 18:15,
19:25, 37:23, 50:11,
51:2, 51:4, 57:2,
59:7, 72:12, 89:25

**L**

**labeled** [1] - 41:2
**laid** [1] - 42:13
**land** [1] - 54:22

**language** [1] - 116:10
**large** [1] - 83:20
**largest** [1] - 55:4
**last** [13] - 22:6, 23:13, 29:18, 36:11, 45:16, 67:22, 80:23, 81:18, 83:24, 84:14, 96:18, 102:18, 136:3
**last-minute** [1] - 36:11
**late** [2] - 30:7, 34:12
**Lavigne** [6] - 78:25, 97:10, 101:25, 116:19, 132:15, 134:20
**Lavigne-Rhodes** [1] - 101:25
**law** [64] - 31:8, 31:13, 33:11, 36:2, 54:22, 60:19, 76:16, 102:6, 105:4, 110:8, 110:15, 111:4, 111:6, 111:11, 111:15, 111:18, 112:4, 112:13, 112:15, 113:4, 113:13, 113:15, 113:18, 113:20, 114:5, 122:19, 122:22, 122:23, 122:25, 123:1, 123:3, 123:5, 124:4, 124:11, 124:15, 124:17, 124:20, 124:23, 125:11, 125:13, 127:5, 127:7, 127:11, 128:16, 132:21, 132:23, 136:10, 136:12, 136:14, 136:16, 136:17, 136:21, 136:22, 137:6, 138:20, 138:25, 139:5, 139:8, 140:5, 141:1, 141:4
**lawful** [1] - 105:23
**lawyer** [11] - 5:5, 12:21, 31:18, 33:22, 39:2, 43:9, 72:12, 87:14, 90:2, 138:15, 140:6
**lawyers** [7] - 31:9, 31:11, 101:14, 102:7, 103:21, 104:1, 123:14
**leaps** [2] - 24:20, 24:21
**learn** [2] - 7:3, 102:13
**learned** [1] - 136:21
**least** [7] - 19:12, 20:1,

20:18, 44:7, 44:23, 70:5, 93:15
**leave** [4] - 3:21, 19:2, 103:16, 132:13
**leaves** [1] - 59:18
**leaving** [5] - 19:2, 19:6, 19:7, 78:8, 97:22
**led** [1] - 131:3
**left** [16] - 19:6, 23:24, 33:9, 35:10, 35:11, 52:11, 52:16, 58:12, 59:12, 72:23, 102:25, 118:15, 126:19, 132:16, 143:21
**legal** [5] - 101:11, 101:14, 104:15, 111:11, 136:6
**less** [6] - 14:9, 70:11, 113:18, 129:7, 131:8
**lesser** [2] - 139:8
**letter** [2] - 18:18, 62:23
**letters** [1] - 39:22
**letting** [1] - 20:5
**levels** [1] - 21:11
**lieutenant** [1] - 47:11
**Lieutenant** [2] - 20:11, 21:8, 47:10, 47:14, 109:14, 109:15
**light** [1] - 127:14
**likely** [6] - 38:1, 70:11, 70:24, 88:20, 88:25, 113:19
**limine** [5] - 3:4, 16:2, 24:14, 33:3, 36:12
**limited** [3] - 97:20, 97:21, 125:6
**limits** [1] - 115:9
**line** [12] - 4:8, 6:6, 6:9, 10:25, 11:3, 15:8, 17:16, 19:12, 71:15, 86:10
**lined** [1] - 14:14
**lining** [1] - 32:13
**link** [2] - 8:22, 9:1
**listen** [3] - 125:13, 141:16
**listened** [1] - 57:6
**literally** [2] - 81:4, 82:25
**litigation** [1] - 91:6
**live** [2] - 107:13, 121:4
**lives** [1] - 108:4
**living** [1] - 97:18
**local** [2] - 111:19, 112:14
**location** [2] - 68:8, 68:9

**locations** [2] - 19:24, 68:9
**log** [1] - 45:2
**look** [25] - 10:22, 22:19, 23:18, 24:2, 33:23, 33:24, 34:16, 45:15, 49:8, 51:8, 59:23, 60:11, 61:12, 68:17, 68:18, 80:15, 90:9, 91:7, 91:16, 92:4, 99:6, 99:23, 102:24, 103:4, 133:11
**looked** [6] - 5:19, 11:8, 47:12, 59:4, 71:24, 94:13
**looking** [9] - 15:17, 17:9, 17:12, 45:4, 46:20, 48:15, 51:16, 90:22, 100:4
**looks** [1] - 4:9
**lose** [1] - 65:4
**losing** [1] - 32:24
**loud** [2] - 25:25, 26:8
**loudspeaker** [1] - 26:6
**lounge** [1] - 104:6
**lunch** [6] - 98:3, 103:1, 103:2, 116:21, 134:21, 143:19
**Lynnett** [2] - 100:24, 107:21

---

# M

**ma'am** [4] - 117:7, 117:14, 122:11, 123:7
**magistrate** [1] - 5:15
**mall** [1] - 60:15
**manner** [4] - 23:14, 28:19, 38:2, 94:16
**March** [1] - 41:4
**Maria** [1] - 109:24
**mark** [2] - 121:10, 121:11
**Marshals** [1] - 111:21
**Mason** [1] - 102:6
**material** [24] - 3:25, 4:6, 20:10, 29:15, 34:19, 36:16, 39:11, 41:11, 41:18, 44:13, 50:14, 51:17, 55:5, 68:2, 69:2, 70:12, 70:18, 71:22, 73:23, 75:4, 80:7, 82:3, 91:23, 94:21
**materially** [1] - 70:15
**materials** [11] - 30:20, 36:25, 37:2, 37:10,

37:19, 38:20, 62:20, 63:17, 69:20, 91:16
**matter** [12] - 13:14, 17:4, 28:3, 33:23, 35:25, 37:19, 54:11, 70:7, 71:8, 72:20, 100:20, 105:1
**mattered** [2] - 91:7, 91:8
**matters** [7] - 3:6, 3:11, 13:14, 16:1, 16:3, 101:11, 104:21
**mean** [80] - 4:15, 5:12, 5:15, 6:20, 9:10, 9:13, 9:15, 10:21, 10:25, 11:17, 12:23, 12:24, 13:21, 13:23, 14:12, 14:20, 16:13, 16:16, 18:2, 19:11, 21:8, 23:2, 23:19, 23:24, 26:5, 26:16, 28:11, 28:12, 28:20, 30:18, 32:14, 33:22, 34:15, 37:2, 38:11, 38:16, 38:19, 47:24, 53:10, 56:3, 56:7, 56:13, 57:14, 58:10, 61:4, 63:8, 66:7, 68:1, 71:8, 74:21, 77:11, 78:19, 80:14, 84:4, 86:12, 88:16, 89:5, 89:24, 91:20, 93:7, 93:24, 96:24, 98:18, 98:20, 99:11, 99:18, 111:16, 111:18, 113:25, 121:3, 121:18, 122:17, 123:1, 128:24, 128:25, 130:22, 131:6, 137:15, 139:12, 143:5
**meaningful** [1] - 78:15
**meaningless** [2] - 54:9, 54:12
**means** [5] - 3:7, 59:6, 85:24, 85:25, 104:16
**meant** [2] - 9:1, 85:20
**media** [5] - 4:19, 14:3, 36:2, 58:25, 60:20
**media's** [1] - 115:18
**medications** [1] - 114:17
**meet** [1] - 65:21
**meeting** [1] - 37:8
**member** [7] - 108:1, 108:19, 110:6, 114:15, 114:19, 115:14, 140:20
**members** [19] - 19:13,

108:9, 111:11, 111:14, 112:1, 112:8, 112:11, 113:3, 113:24, 114:3, 128:14, 129:20, 130:2, 135:16, 136:6, 137:5, 137:19, 138:8, 143:22
**memorize** [1] - 102:22
**mens** [3] - 13:25, 32:19, 32:21
**merit** [1] - 41:17
**met** [2] - 102:1, 135:21
**Metropolitan** [4] - 109:14, 109:16, 111:19, 139:4
**Michael** [1] - 65:12
**microphone** [7] - 40:18, 61:9, 69:17, 109:8, 117:25, 118:20, 120:25
**middle** [1] - 17:16
**might** [32] - 3:13, 8:2, 11:6, 18:23, 21:5, 28:14, 35:3, 36:2, 38:12, 60:12, 66:21, 67:6, 69:20, 72:12, 87:9, 87:12, 89:16, 89:22, 89:23, 108:5, 108:18, 110:6, 111:7, 116:12, 121:15, 127:8, 135:15, 136:1, 136:16, 136:21, 140:5, 140:13
**Millard** [43] - 9:22, 10:4, 15:3, 20:11, 20:20, 21:9, 27:19, 27:24, 34:7, 35:8, 35:11, 40:3, 41:5, 41:9, 45:10, 45:11, 46:10, 47:6, 47:10, 47:14, 52:5, 57:17, 57:25, 59:21, 62:13, 63:14, 63:19, 63:24, 65:19, 67:1, 67:5, 67:9, 70:6, 72:21, 74:15, 75:14, 76:23, 76:25, 86:18, 95:13, 109:15
**Millard's** [9] - 9:20, 44:15, 44:17, 44:21, 47:1, 62:5, 65:23, 89:13, 96:2
**million** [1] - 98:15
**mind** [18] - 6:17, 6:22, 7:25, 16:9, 17:13, 26:2, 27:4, 28:5, 28:10, 48:4, 70:10,

71:17, 74:1, 86:11, 121:1, 121:13, 121:14, 122:3

**minded** [1] - 140:3

**mine** [1] - 131:21

**minimizes** [1] - 33:14

**minute** [16] - 8:7, 8:11, 14:10, 14:22, 14:24, 28:1, 32:12, 32:16, 33:2, 36:11, 46:25, 67:10, 80:2, 105:17, 123:12, 143:24

**minutes** [17] - 4:9, 14:13, 15:21, 20:13, 33:21, 33:22, 33:23, 33:24, 67:4, 79:1, 80:17, 80:18, 85:12, 86:17, 86:18, 95:17, 99:24

**mischecked** [1] - 138:5

**misconduct** [2] - 8:4, 10:11

**misdemeanor** [1] - 94:19

**misdemeanors** [1] - 64:17

**missed** [2] - 37:8, 116:15

**missing** [1] - 3:20

**mistrust** [1] - 131:4

**moment** [4] - 69:25, 84:17, 102:8, 132:17

**Monday** [10] - 23:13, 37:18, 44:9, 81:18, 82:8, 84:8, 93:1, 93:11, 93:12, 95:25

**months** [5] - 81:3, 82:9, 82:10, 90:6, 95:22

**moral** [1] - 114:21

**Moran** [1] - 108:16

**morning** [9] - 3:6, 81:4, 81:25, 100:23, 101:6, 101:8, 101:10, 109:11, 115:6

**most** [8] - 5:17, 10:23, 27:14, 54:25, 55:1, 104:24, 134:7, 139:13

**mostly** [1] - 99:8

**motion** [29] - 3:1, 3:4, 3:14, 3:15, 5:6, 5:10, 13:2, 13:3, 13:7, 16:2, 18:9, 18:21, 21:22, 24:14, 36:11, 36:16, 39:7, 48:23, 49:10, 49:20, 64:5, 94:4, 97:21, 125:1,

132:18, 134:4

**motions** [2] - 3:13, 33:3

**motive** [3] - 38:5, 38:6, 49:12

**move** [2] - 94:10, 132:19

**moved** [1] - 3:15

**moving** [1] - 14:12

**MPD** [1] - 37:23

**multiple** [6] - 5:16, 28:22, 64:5, 75:6, 75:9

**must** [11] - 3:24, 30:10, 30:13, 30:15, 32:24, 70:19, 102:9, 110:9, 110:25, 129:6, 138:5

## N

**name** [13] - 46:2, 54:16, 54:17, 55:6, 55:23, 64:2, 65:11, 67:23, 100:15, 100:23, 102:20, 108:12, 136:4

**names** [18] - 23:12, 36:13, 37:12, 40:14, 40:15, 40:22, 43:12, 43:20, 44:2, 44:19, 44:21, 44:24, 45:1, 45:3, 45:8, 73:21, 108:24, 109:19

**narrow** [4] - 64:8, 68:14, 87:10, 100:2

**nationality** [1] - 113:9

**nature** [5] - 8:5, 30:16, 100:5, 105:17, 107:10

**near** [3] - 47:16, 79:12, 107:13

**nearby** [1] - 24:25

**nearly** [1] - 80:8

**necessarily** [5] - 11:2, 16:8, 66:25, 109:1, 143:12

**necessary** [2] - 50:18, 62:2

**need** [19] - 3:11, 13:16, 19:13, 27:9, 29:9, 32:7, 34:17, 38:10, 45:8, 57:4, 64:10, 68:17, 71:19, 82:13, 92:4, 92:21, 97:25, 100:9, 100:10

**needed** [1] - 19:13

**needle** [1] - 82:24

**negative** [3] - 77:10, 138:11, 138:13

**Neighborhood** [3] - 112:19, 112:20, 138:3

**never** [6] - 50:11, 57:5, 102:20, 115:5, 115:6

**new** [1] - 26:19

**news** [1] - 140:7

**next** [11] - 8:25, 9:17, 53:12, 60:6, 74:3, 89:17, 103:5, 118:17, 133:19, 134:19, 134:21

**Nieves** [1] - 109:24

**NIEVES** [1] - 109:24

**night** [7] - 3:3, 5:7, 5:11, 18:10, 23:15, 39:8, 95:6

**nobody** [3] - 20:14, 20:17, 74:16

**nobody's** [2] - 85:15, 101:11

**noise** [1] - 89:2

**nonexistence** [1] - 71:22

**noon** [1] - 102:25

**normal** [1] - 12:15

**normally** [2] - 38:12, 96:20

**NOTE** [10] - 100:13, 117:3, 118:15, 118:18, 126:19, 126:20, 132:16, 134:23, 143:21, 144:3

**noted** [1] - 129:12

**notes** [1] - 37:4

**nothing** [9] - 21:16, 34:18, 38:12, 41:13, 49:6, 80:23, 131:11, 140:9, 143:17

**notice** [3] - 3:3, 3:5, 10:16

**noticed** [1] - 121:9

**noticing** [1] - 91:17

**notion** [3] - 24:13, 122:4, 122:5

**notions** [1] - 121:24

**Nozaleda** [1] - 109:25

**NOZALEDA** [1] - 109:25

**number** [22] - 6:24, 16:25, 29:21, 52:6, 71:13, 87:6, 96:10, 97:14, 98:6, 98:10, 100:12, 102:18, 102:21, 102:22, 103:9, 103:11, 103:12, 108:21, 109:20, 118:21, 143:24

**numbered** [1] - 96:12

## O

**o'clock** [7] - 39:8, 115:7, 115:8, 116:21, 116:22, 143:20, 143:25

**oath** [2] - 104:8, 104:18

**Oath** [1] - 104:11

**object** [2] - 94:25, 133:7

**objection** [1] - 134:18

**objections** [1] - 118:12

**obligate** [2] - 72:17, 90:11

**obligated** [6] - 66:10, 79:8, 81:10, 87:1, 99:18

**obligation** [13] - 50:3, 59:15, 60:9, 60:10, 60:14, 72:2, 77:12, 81:8, 82:22, 87:25, 90:3, 91:24, 99:16

**obligations** [4] - 16:25, 33:13, 50:11, 87:18

**obtained** [1] - 69:20

**obvious** [1] - 32:11

**obviously** [10] - 16:1, 16:17, 18:3, 50:14, 99:12, 120:19, 123:10, 126:13, 127:20, 139:13

**occasion** [1] - 57:18

**occasionally** [1] - 123:13

**occurred** [3] - 15:11, 33:18, 115:11

**occurring** [1] - 99:7

**occurs** [1] - 4:9

**October** [1] - 39:18

**offense** [2] - 91:16, 110:11

**offered** [1] - 7:15

**offhand** [1] - 138:11

**office** [12] - 83:16, 86:19, 99:6, 111:14, 111:17, 111:18, 112:3, 112:4, 112:13, 137:5, 137:6

**Office** [5] - 107:24, 111:17, 112:12, 114:7, 120:15

**officer** [63] - 4:12, 4:23, 9:21, 9:23, 10:5, 10:21, 15:1, 19:5, 19:9, 19:10,

19:16, 21:12, 21:13, 24:23, 26:6, 26:21, 26:25, 27:1, 27:3, 28:22, 42:16, 44:19, 48:25, 50:10, 54:4, 55:16, 55:23, 56:8, 61:18, 61:19, 62:9, 63:5, 63:6, 63:19, 63:20, 64:1, 64:4, 71:11, 80:16, 82:1, 82:15, 83:19, 84:5, 84:19, 84:22, 85:12, 85:16, 85:19, 87:22, 88:2, 88:13, 88:15, 89:18, 95:14, 96:3, 107:23, 112:9, 113:14, 113:18, 129:10, 131:8

**Officer** [37] - 9:20, 9:22, 10:4, 21:8, 40:3, 44:15, 44:17, 45:10, 45:11, 46:10, 47:1, 47:6, 54:13, 54:15, 57:17, 57:25, 59:21, 62:5, 62:13, 63:24, 65:19, 65:23, 67:1, 67:5, 67:9, 70:6, 74:15, 75:14, 76:23, 76:25, 86:18, 89:13, 95:13, 96:1, 109:16, 109:17

**officer's** [8] - 4:9, 6:18, 23:5, 41:23, 71:19, 78:11, 84:19, 88:6

**officers** [98] - 3:22, 4:4, 4:19, 6:8, 8:2, 8:14, 10:12, 11:2, 11:3, 11:8, 11:21, 12:5, 13:12, 13:14, 14:14, 14:21, 16:8, 18:25, 20:5, 20:22, 21:16, 21:20, 21:23, 23:7, 23:8, 23:20, 23:21, 23:23, 23:25, 27:18, 27:25, 28:3, 34:1, 35:9, 37:6, 40:8, 41:13, 43:12, 44:2, 44:10, 44:22, 45:3, 47:19, 49:10, 54:6, 54:10, 63:7, 63:16, 64:6, 67:6, 67:9, 67:17, 68:7, 68:13, 68:24, 68:25, 69:1, 69:3, 69:11, 70:4, 70:14, 70:21, 71:2, 71:16, 73:10, 73:24, 73:25, 74:25, 75:5, 77:5, 78:1, 79:23, 80:3, 80:4, 80:5, 80:6, 80:12,

81:12, 81:13, 81:14, 85:6, 86:24, 88:10, 92:24, 94:12, 95:19, 96:3, 113:13, 128:19, 130:10, 130:23, 131:1, 131:4, 139:3, 139:4, 139:8, 142:6

**officers'** [4] - 22:8, 83:22, 95:11, 95:12

**official** [3] - 19:22, 106:4, 106:11

**OHM** [216] - 5:3, 5:8, 5:12, 6:5, 6:24, 7:24, 9:3, 9:6, 9:13, 10:8, 10:10, 10:24, 13:9, 13:18, 13:21, 14:20, 15:23, 15:25, 16:12, 16:24, 17:3, 17:14, 17:24, 18:5, 18:15, 20:8, 20:17, 20:24, 21:12, 21:19, 22:12, 22:24, 23:1, 23:10, 23:21, 23:23, 25:15, 26:4, 26:8, 26:18, 27:6, 27:11, 28:14, 29:1, 29:11, 29:18, 29:21, 30:17, 30:21, 30:24, 31:4, 31:7, 31:15, 32:10, 32:25, 33:16, 34:2, 34:25, 35:5, 35:25, 36:7, 36:18, 36:20, 36:23, 37:3, 37:13, 38:7, 38:9, 51:21, 52:1, 52:4, 52:10, 52:14, 52:16, 52:22, 52:24, 53:1, 53:6, 53:8, 53:19, 53:23, 54:5, 54:20, 55:3, 55:25, 56:5, 56:14, 57:10, 58:10, 58:14, 58:20, 60:13, 60:15, 62:17, 63:2, 63:6, 63:13, 63:22, 64:1, 64:12, 64:19, 65:6, 67:21, 68:6, 68:16, 68:20, 68:25, 69:5, 70:16, 70:21, 71:23, 72:3, 72:19, 72:25, 73:5, 73:19, 74:9, 75:3, 75:11, 75:17, 76:3, 76:13, 76:20, 77:1, 77:13, 77:17, 77:21, 78:10, 78:14, 78:20, 78:23, 79:21, 80:2, 80:4, 80:7, 81:17, 81:21, 82:5, 82:10, 82:18, 82:24, 83:13, 83:16, 83:25, 84:3, 85:4, 85:8, 86:3,

86:9, 87:5, 87:12, 88:5, 88:19, 88:23, 89:6, 89:14, 89:20, 90:4, 90:15, 91:1, 91:19, 92:1, 92:10, 92:14, 92:23, 93:1, 93:3, 93:6, 93:9, 93:20, 94:9, 98:5, 98:8, 98:13, 98:21, 98:23, 99:1, 99:20, 100:1, 101:6, 108:11, 108:16, 109:22, 118:13, 121:1, 121:9, 121:17, 121:23, 122:3, 122:16, 123:9, 123:20, 123:24, 124:3, 124:6, 124:9, 124:14, 124:25, 125:8, 126:11, 131:13, 131:16, 133:7, 134:5, 139:12, 139:17, 139:23, 140:3, 140:9, 142:3, 142:5, 142:9, 142:14, 142:20, 143:10, 143:17

**Ohm** [50] - 3:1, 3:7, 3:15, 5:4, 12:20, 15:22, 28:2, 30:19, 36:19, 39:18, 40:6, 40:24, 42:22, 42:25, 43:9, 45:21, 48:25, 49:16, 49:17, 50:10, 50:18, 51:2, 51:14, 58:9, 61:22, 62:5, 62:8, 62:11, 65:22, 67:4, 67:18, 78:5, 81:14, 83:2, 87:15, 96:11, 101:5, 101:6, 108:8, 108:9, 108:12, 109:21, 120:24, 123:16, 126:10, 131:12, 132:25, 133:6, 139:11

**Ohm's** [3] - 41:10, 41:16, 42:16

**old** [1] - 129:5

**once** [10] - 27:19, 34:13, 43:6, 50:15, 72:22, 74:16, 74:18, 97:13, 103:15, 104:2

**one** [66] - 3:8, 4:2, 4:4, 4:14, 6:11, 6:18, 6:24, 8:17, 14:15, 16:25, 17:15, 19:1, 19:11, 24:11, 29:21,

31:23, 33:7, 37:7, 37:14, 37:24, 44:8, 45:6, 46:6, 48:25, 49:16, 50:9, 50:10, 51:18, 52:6, 54:6, 54:19, 57:1, 57:14, 59:10, 59:11, 62:12, 64:13, 64:19, 72:16, 80:24, 82:4, 87:6, 96:13, 97:16, 98:6, 102:2, 102:6, 103:16, 105:17, 116:20, 118:16, 118:17, 123:19, 124:12, 126:11, 129:22, 132:1, 132:4, 132:17, 133:15, 133:18, 134:19, 138:6, 143:22

**one-day** [1] - 64:13

**ones** [8] - 19:6, 24:7, 45:12, 46:1, 102:16, 119:12, 127:4

**ongoing** [4] - 50:25, 69:23, 95:20, 99:22

**open** [9] - 15:13, 15:14, 19:3, 19:7, 65:3, 69:14, 102:3, 125:9, 140:3

**open-minded** [1] - 140:3

**open-source** [2] - 15:13, 15:14

**opening** [2] - 65:2, 135:14

**operating** [1] - 35:23

**operative** [1] - 74:9

**opinion** [17] - 8:24, 19:9, 20:24, 20:25, 21:14, 22:13, 22:14, 22:19, 30:16, 47:5, 47:23, 48:5, 49:7, 58:2, 60:1, 76:24, 139:24

**opinions** [23] - 4:24, 6:19, 21:1, 21:3, 21:6, 21:20, 22:1, 22:9, 23:5, 47:18, 59:24, 67:20, 105:8, 105:9, 105:10, 105:11, 115:21, 115:22, 122:9, 122:12, 125:19, 125:20, 143:11

**opportunity** [4] - 23:18, 24:1, 51:3, 56:17

**opposed** [3] - 67:2, 72:16, 126:15

**OPR** [32] - 9:21, 9:23, 10:5, 18:25, 21:9, 22:1, 32:16, 39:13, 39:14, 39:23, 40:2, 40:5, 40:8, 41:4, 44:9, 44:18, 46:15, 47:19, 63:12, 63:19, 63:20, 66:5, 66:8, 66:10, 66:15, 67:16, 67:19, 68:7, 78:11, 80:14, 92:23, 95:11

**Orange** [1] - 112:20

**order** [11] - 28:16, 38:16, 49:8, 49:19, 49:21, 50:14, 62:18, 65:18, 66:22, 99:4, 103:4

**ordering** [3] - 51:17, 62:4, 62:7

**orderly** [4] - 106:3, 106:10, 106:18, 106:20

**orders** [1] - 38:1

**organization** [3] - 112:2, 112:20, 137:20

**original** [1] - 43:19

**otherwise** [6] - 18:6, 34:14, 51:24, 56:23, 98:4, 105:21, 106:7

**outnumbered** [3] - 7:17, 19:24, 20:6

**outside** [3] - 17:14, 97:15, 116:20

**overinclusive** [2] - 31:16, 31:21

**overnight** [2] - 80:9, 95:5

**own** [2] - 90:1, 90:2

**P**

**p.m** [1] - 144:3

**page** [1] - 66:23

**pages** [1] - 98:15

**panel** [14] - 3:8, 29:5, 78:25, 96:22, 96:25, 97:4, 100:7, 110:6, 114:15, 114:19, 135:16, 135:20, 143:22

**paraded** [1] - 107:2

**parading** [1] - 107:3

**paralegal** [3] - 107:23, 108:16, 111:12

**parameters** [1] - 122:20

**pardon** [1] - 15:23

**parking** [1] - 114:1

**parole** [1] - 112:9

**part** [7] - 10:12, 21:21, 33:20, 44:24, 54:22, 66:21, 92:17

**parte** [1] - 49:14

**participated** [2] - 112:18, 138:2

**particular** [11] - 50:2, 59:11, 61:12, 84:8, 85:2, 85:4, 86:6, 96:4, 121:10, 122:13, 126:15

**particularly** [3] - 32:3, 93:18, 135:13

**parties** [7] - 100:21, 101:3, 102:7, 102:13, 104:23, 104:25, 109:4

**partner** [2] - 116:3, 116:6

**parts** [1] - 44:10

**party** [2] - 58:22, 108:23

**pass** [3] - 96:20, 96:21

**passed** [2] - 13:12, 92:24

**passersby** [1] - 68:13

**passes** [1] - 96:23

**passing** [5] - 4:5, 6:11, 13:14, 27:13, 45:9

**past** [5] - 13:22, 38:13, 112:18, 115:7, 115:8

**patently** [1] - 39:9

**patience** [1] - 101:15

**peace** [1] - 59:22

**peacefully** [1] - 26:13

**pen** [1] - 102:18

**pencil** [1] - 102:17

**pending** [2] - 112:11, 112:16

**people** [79] - 4:20, 6:6, 6:8, 6:14, 7:19, 8:7, 8:15, 10:16, 10:20, 11:10, 13:12, 14:12, 14:16, 14:21, 17:17, 19:8, 19:15, 20:15, 20:13, 22:23, 24:3, 26:11, 27:14, 28:1, 28:6, 28:8, 28:12, 28:22, 32:15, 33:23, 35:6, 35:15, 35:20, 35:25, 45:9, 45:17, 48:1, 56:9, 56:22, 56:25, 57:6, 57:13, 57:16, 59:1, 60:18, 60:25, 61:6, 61:8, 68:22, 69:9, 69:19, 69:21, 71:16, 71:25, 73:13, 73:21, 74:23, 76:19, 77:5, 81:1,

81:5, 86:23, 88:17, 89:2, 90:16, 99:23, 102:4, 102:14, 109:23, 113:8, 119:5, 121:11, 122:9, 134:7, 134:21, 139:13, 142:22, 143:12, 143:13
**people's** [3] - 6:19, 21:2, 76:6
**per** [3] - 64:17, 97:5, 97:25
**perceive** [4] - 5:25, 11:9, 15:8, 28:8
**perceives** [1] - 86:12
**percent** [4] - 84:6, 133:9, 134:9, 134:11
**perception** [1] - 87:12
**perceptions** [1] - 53:14
**peremptories** [3] - 96:17, 96:18, 97:24
**peremptory** [1] - 97:2
**perhaps** [2] - 8:18, 122:2
**period** [16] - 3:24, 14:10, 27:21, 32:12, 33:2, 68:12, 69:11, 77:15, 78:7, 79:12, 79:13, 80:9, 81:9, 81:12, 81:14, 131:1
**permissible** [1] - 122:21
**permission** [10] - 4:13, 5:2, 6:15, 7:14, 10:23, 12:2, 16:10, 41:23, 42:3, 50:15
**permitted** [3] - 32:22, 56:16, 96:21
**permitting** [1] - 79:24
**person** [21] - 14:15, 37:8, 45:7, 52:17, 52:18, 61:13, 61:14, 62:23, 70:8, 75:2, 85:2, 85:4, 86:17, 88:1, 90:12, 110:7, 112:2, 114:6, 133:9, 135:16, 136:1
**person's** [1] - 113:16
**personal** [8] - 36:14, 49:20, 50:21, 104:21, 124:22, 125:21, 126:2, 138:12
**personally** [7] - 19:11, 19:19, 20:1, 21:14, 22:18, 46:23, 126:1
**personnel** [2] - 48:24, 51:18

**persons** [2] - 114:11, 142:16
**perspective** [3] - 10:18, 89:4, 95:1
**pertain** [1] - 92:4
**philosophical** [1] - 114:22
**phone** [10] - 35:19, 52:17, 52:18, 52:23, 53:5, 61:15, 61:16, 73:22, 103:18, 123:11
**phones** [6] - 27:14, 27:15, 29:24, 35:20, 57:6, 60:11
**photographs** [1] - 26:20
**photos** [1] - 53:1
**phrase** [2] - 22:22, 48:6
**pick** [10] - 64:10, 64:11, 64:15, 78:3, 89:14, 94:7, 94:8, 96:8, 98:6, 123:11
**picked** [1] - 98:9
**picketed** [1] - 107:2
**picketing** [1] - 107:4
**picking** [2] - 64:25, 78:4
**picture** [3] - 51:21, 57:12, 57:16
**PII** [1] - 43:21
**place** [5] - 7:12, 7:22, 58:1, 67:8, 143:7
**places** [1] - 4:11
**plans** [1] - 115:1
**plausible** [1] - 41:18
**podium** [1] - 109:7
**point** [19] - 5:21, 9:19, 10:17, 23:11, 25:16, 30:2, 32:9, 44:8, 54:18, 62:11, 64:19, 73:12, 74:5, 81:15, 82:3, 84:1, 88:9, 91:5, 134:5
**pole** [1] - 133:1
**police** [16] - 19:20, 47:22, 111:19, 113:4, 113:12, 113:14, 113:18, 128:15, 128:19, 129:10, 130:10, 130:23, 131:1, 131:4, 131:8, 138:9
**Police** [12] - 4:4, 4:19, 6:11, 20:4, 109:12, 109:14, 109:15, 109:16, 111:19, 139:3, 139:4, 142:6
**political** [4] - 114:22,

116:4, 116:5, 116:8
**portion** [1] - 144:3
**position** [3] - 6:12, 6:22, 72:23
**possession** [20] - 29:23, 30:6, 35:14, 35:17, 36:2, 46:9, 56:21, 57:3, 57:7, 58:17, 59:7, 60:22, 74:20, 75:18, 75:21, 76:4, 79:22, 81:13, 87:7, 90:16
**possibility** [1] - 64:5
**possible** [5] - 69:19, 90:12, 100:11, 101:21, 104:25
**possibly** [1] - 20:3
**post** [4] - 22:2, 48:7, 48:8, 91:6
**post-conviction** [1] - 91:6
**post-talk** [1] - 22:2
**posted** [2] - 105:21, 106:7
**postmortem** [2] - 22:24, 22:25
**posts** [1] - 59:1
**potential** [6] - 50:10, 71:9, 76:14, 109:3, 111:7, 127:8
**potentially** [18] - 6:5, 13:23, 17:3, 17:4, 18:5, 31:20, 32:25, 33:1, 38:20, 44:14, 55:5, 70:18, 72:6, 72:8, 72:9, 75:11, 77:18, 94:12
**pour** [1] - 20:5
**practical** [1] - 19:18
**practice** [5] - 93:22, 136:10, 136:11, 136:13, 136:17
**preclude** [1] - 52:4
**precluded** [1] - 56:6
**preconceived** [6] - 121:24, 122:4, 122:5, 122:7, 122:16, 139:23
**preconceptions** [3] - 125:11, 125:13, 125:15
**prefer** [1] - 49:13
**prejudice** [12] - 13:8, 23:17, 27:8, 29:4, 32:5, 32:6, 33:15, 34:6, 34:23, 94:2, 94:17, 96:7
**prejudiced** [4] - 9:18, 18:14, 45:14, 65:4
**prejudices** [1] - 105:2

**preliminary** [3] - 3:6, 3:11, 101:11
**prep** [1] - 5:18
**preparation** [1] - 75:5
**prepare** [1] - 28:18
**prepared** [2] - 87:19, 144:4
**preposterous** [1] - 24:13
**presence** [2] - 100:16, 116:25
**present** [3] - 40:23, 53:15, 99:2
**presented** [2] - 125:22, 139:22
**presently** [1] - 114:17
**preserve** [1] - 3:16
**President** [2] - 105:22, 106:8
**presidential** [1] - 114:12
**presiding** [1] - 101:18
**pressing** [2] - 123:18, 124:21
**presume** [1] - 110:9
**presumed** [2] - 110:9, 118:6
**presumption** [1] - 110:15
**presupposition** [1] - 124:19
**pretrial** [1] - 3:10
**pretty** [8] - 39:20, 49:25, 50:8, 64:19, 93:25, 121:7, 134:11, 134:12
**prevent** [1] - 114:23
**preventing** [1] - 114:24
**prevention** [3] - 112:19, 112:21, 138:3
**principle** [5] - 110:18, 110:19, 111:3, 111:9, 127:9
**privacy** [2] - 103:20, 104:23
**private** [3] - 103:13, 112:4, 112:5
**privileged** [1] - 16:18
**probable** [1] - 120:21
**probation** [1] - 112:9
**problem** [9] - 24:4, 28:2, 31:7, 49:22, 53:18, 59:5, 59:10, 61:25, 89:15
**problems** [1] - 54:7
**proceed** [2] - 29:14, 101:24
**Proceedings** [3] -

100:16, 116:25, 125:9
**proceedings** [1] - 102:4
**proceeds** [1] - 99:3
**process** [5] - 28:17, 38:12, 69:23, 102:14, 102:20
**produce** [4] - 3:16, 90:3, 94:21, 110:12
**produced** [16] - 11:23, 34:11, 40:7, 40:11, 40:21, 41:6, 41:7, 41:8, 43:5, 43:24, 44:1, 45:16, 78:14, 78:16
**producing** [1] - 11:24
**Production** [1] - 43:20
**production** [2] - 82:18, 91:5
**productions** [2] - 66:16, 69:25
**proffer** [4] - 10:3, 33:6, 33:7, 55:9
**proffers** [1] - 4:7
**prompted** [2] - 45:16, 80:24
**properly** [1] - 28:18
**propped** [1] - 20:17
**prosecution** [5] - 59:6, 108:2, 111:15, 115:18
**prosecutor** [4] - 31:18, 113:4, 128:15, 138:9
**prosecutor's** [2] - 112:13, 137:5
**prosecutors** [6] - 31:8, 90:13, 99:2, 137:11, 137:16, 138:13
**prosecutors'** [1] - 91:18
**prospective** [2] - 103:25, 104:9
**PROSPECTIVE** [109] - 117:5, 117:7, 117:10, 117:14, 117:21, 117:23, 118:2, 118:10, 118:22, 119:1, 119:8, 119:14, 119:16, 119:18, 119:21, 119:23, 120:1, 120:5, 120:11, 120:16, 120:23, 121:3, 121:15, 121:22, 122:1, 122:7, 122:11, 122:15,

122:18, 123:7, 125:16, 126:7, 126:9, 126:16, 126:23, 127:1, 127:3, 127:10, 127:15, 127:19, 127:22, 127:25, 128:5, 128:7, 128:12, 128:17, 128:24, 129:2, 129:11, 129:15, 129:18, 129:22, 129:25, 130:5, 130:12, 130:18, 130:21, 131:2, 131:5, 131:10, 131:15, 131:23, 132:3, 132:10, 132:13, 134:25, 135:3, 135:8, 135:10, 135:18, 135:21, 135:24, 136:3, 136:8, 136:11, 136:14, 136:19, 136:23, 137:3, 137:7, 137:10, 137:18, 137:21, 137:23, 138:1, 138:5, 138:10, 138:16, 138:22, 138:25, 139:10, 139:20, 140:1, 140:8, 140:15, 140:22, 141:1, 141:5, 141:8, 141:18, 141:21, 142:1, 142:8, 142:10, 142:12, 142:18, 143:1, 143:5, 143:15

**protected** [1] - 28:17
**protective** [5] - 38:16, 49:8, 49:19, 49:21, 50:14
**protest** [1] - 85:23
**protester** [2] - 7:3, 32:20
**protesters** [5] - 3:23, 4:5, 6:11, 63:15, 63:16
**prove** [5] - 28:24, 58:15, 110:10, 110:13, 110:14
**proved** [2] - 132:6, 133:21
**proven** [2] - 59:2, 118:6
**proves** [1] - 110:17
**provide** [9] - 28:18, 36:24, 49:14, 55:1,

64:18, 64:21, 79:9, 79:11, 94:10
**provided** [9] - 27:1, 37:1, 45:1, 45:2, 54:18, 60:19, 67:3, 82:12, 83:13
**provides** [6] - 5:14, 37:20, 49:24, 50:7, 110:8, 110:23
**providing** [1] - 63:4
**proximity** [3] - 47:2, 47:15, 106:6
**public** [4] - 33:10, 108:12, 112:3, 112:13
**publicly** [2] - 33:12, 33:19
**pull** [4] - 63:9, 117:25, 118:20, 120:25
**pulled** [2] - 60:21, 64:23
**punished** [1] - 38:1
**punishment** [5] - 111:7, 127:8, 131:18, 131:20, 133:5
**punitive** [1] - 37:23
**purpose** [5] - 8:18, 98:17, 98:23, 102:10, 103:7
**purposes** [4] - 8:21, 30:12, 46:6, 98:14
**pushback** [1] - 37:21
**pushed** [1] - 48:2
**pushing** [2] - 15:9, 17:15
**putting** [1] - 42:18

## Q

**qualified** [1] - 97:25
**questioning** [4] - 103:24, 104:7, 116:24, 141:3
**questions** [22] - 30:4, 51:13, 58:15, 97:14, 97:17, 102:14, 103:7, 103:10, 103:14, 103:15, 103:17, 104:19, 104:20, 117:8, 118:25, 125:2, 125:6, 126:24, 127:4, 129:14, 135:2

## R

**races** [1] - 113:9
**raise** [1] - 104:10
**ran** [1] - 135:18
**Randy** [1] - 109:16

**rather** [1] - 109:7
**rational** [1] - 133:9
**rationalizations** [2] - 22:2, 48:8
**rea** [3] - 13:25, 32:19, 32:21
**reach** [4] - 111:5, 114:20, 119:25, 127:6
**reaching** [1] - 114:24
**read** [3] - 81:18, 97:13, 108:24
**reading** [1] - 116:10
**ready** [1] - 126:18
**reality** [1] - 20:21
**realize** [3] - 12:4, 72:6, 120:18
**really** [17] - 13:13, 25:25, 27:9, 34:17, 36:25, 37:7, 38:14, 55:16, 58:10, 59:4, 62:11, 78:15, 99:16, 120:9, 126:13, 134:1
**reason** [11] - 13:23, 14:5, 20:4, 27:16, 50:12, 51:23, 72:20, 73:14, 74:17, 77:6, 77:8
**reasonable** [11] - 12:9, 12:13, 25:19, 84:20, 85:9, 90:21, 110:11, 110:17, 120:20, 132:6, 133:21
**reasonableness** [2] - 74:6, 86:3
**reasonably** [4] - 4:12, 16:9, 79:24, 98:16
**reasons** [4] - 33:7, 116:12
**reassemble** [1] - 103:3
**receive** [4] - 44:1, 44:5, 69:25, 104:4
**received** [1] - 92:7
**recently** [1] - 135:21
**Recess** [2] - 79:2, 144:2
**recognize** [6] - 108:5, 109:2, 109:4, 109:19, 110:5, 135:15
**record** [10] - 65:11, 84:17, 93:19, 94:10, 98:14, 100:21, 102:4, 117:2, 123:15, 125:1
**records** [1] - 36:14
**recover** [1] - 61:15
**recovered** [3] - 52:18, 61:15, 118:4

**red** [1] - 91:25
**redacted** [14] - 40:12, 40:13, 40:15, 40:22, 41:4, 43:12, 43:20, 44:2, 44:20, 45:1, 81:16, 81:17, 81:18, 82:14
**redaction** [2] - 44:20, 100:14
**refer** [4] - 75:24, 100:12, 102:20, 102:21
**referenced** [1] - 64:4
**referred** [1] - 95:24
**regard** [9] - 45:6, 48:24, 49:3, 50:9, 66:5, 71:9, 111:6, 127:7, 131:17
**regarding** [3] - 36:14, 65:24, 95:19
**regardless** [2] - 105:10, 126:1
**rehabilitate** [2] - 133:3, 133:8
**reject** [3] - 74:4, 74:10, 74:12
**related** [1] - 116:7
**relates** [1] - 37:15
**relating** [2] - 121:10, 121:11
**relative** [1] - 121:6
**Relativity** [6] - 81:22, 83:17, 84:7, 91:2, 91:11, 98:16
**relevance** [6] - 16:4, 50:1, 50:5, 53:11, 70:17, 86:2
**relevancy** [4] - 50:19, 51:5, 72:14, 87:17
**relevant** [34] - 3:24, 13:13, 21:4, 21:7, 23:5, 23:9, 25:13, 26:14, 33:6, 36:16, 37:22, 38:2, 38:4, 49:6, 49:9, 49:17, 49:24, 50:16, 59:16, 59:17, 63:8, 63:17, 69:11, 70:3, 70:11, 75:6, 86:12, 86:21, 88:20, 88:25, 91:16, 93:18, 94:5, 141:22
**religion** [1] - 113:9
**religious** [1] - 114:22
**remained** [1] - 105:20
**remaining** [1] - 105:24
**remember** [15] - 15:12, 20:16, 30:8, 64:3, 103:5, 104:17, 119:17, 119:19, 120:13, 120:15,

127:3, 130:12, 136:25, 138:6, 141:22
**remembers** [1] - 17:5
**remind** [2] - 67:22, 96:19
**render** [1] - 107:11
**renew** [1] - 94:4
**renovated** [1] - 141:8
**repeat** [2] - 22:6, 127:4
**repeatedly** [3] - 7:16, 59:22, 60:2
**repeating** [2] - 3:22, 89:10
**repetition** [2] - 85:14, 86:5
**replacement** [1] - 97:7
**report** [30] - 7:1, 10:15, 18:25, 19:1, 23:14, 23:16, 39:13, 39:14, 39:23, 40:2, 40:5, 40:8, 41:4, 43:5, 43:7, 44:9, 44:10, 44:11, 44:18, 44:19, 47:19, 54:9, 54:13, 63:12, 67:17, 68:7, 80:14, 92:23, 92:25
**reported** [6] - 4:17, 4:18, 32:15, 69:1, 85:5, 144:4
**REPORTER** [1] - 31:2
**reporter** [2] - 100:14, 102:1
**REPORTER'S** [10] - 100:13, 117:3, 118:15, 118:18, 126:19, 126:20, 132:16, 134:23, 143:21, 144:3
**reports** [5] - 17:5, 43:19, 48:24, 57:24, 76:13
**representation** [2] - 58:20, 77:24
**represented** [2] - 107:16, 108:7
**request** [12] - 36:4, 40:24, 44:1, 44:5, 46:5, 61:12, 76:15, 80:22, 81:4, 94:15, 94:16, 95:8
**requested** [3] - 37:18, 40:7, 81:6
**requests** [3] - 92:8, 92:22, 95:3
**require** [3] - 90:14, 90:24, 94:3
**required** [13] - 28:16,

28:24, 28:25, 41:22,
68:1, 68:2, 74:22,
75:1, 88:3, 103:3,
108:23, 110:13
**requirement** [1] - 32:4
**requires** [3] - 51:19,
111:4, 127:5
**reseat** [1] - 100:9
**resistance** [1] - 17:18
**respect** [52] - 4:5,
4:24, 6:12, 6:19, 7:5,
7:10, 7:14, 7:21,
15:2, 15:5, 17:7,
24:24, 26:7, 26:22,
41:24, 41:25, 45:20,
46:13, 54:14, 54:15,
57:19, 58:1, 58:2,
59:23, 59:24, 59:25,
61:20, 61:21, 65:24,
70:6, 70:7, 70:22,
70:23, 71:12, 76:23,
76:24, 82:16, 85:23,
100:6, 103:20
**respectfully** [4] -
25:15, 50:6, 75:3,
94:20
**respond** [3] - 36:4,
36:11, 104:19
**response** [6] - 7:4,
18:18, 18:20, 22:14,
22:16, 140:13
**responses** [1] - 105:6
**responsible** [3] -
24:13, 75:18, 81:22
**rest** [2] - 13:3, 44:18
**restricted** [9] - 32:17,
32:21, 86:10,
105:20, 105:21,
105:24, 106:6,
106:7, 106:12
**result** [1] - 21:11
**results** [4] - 114:11,
119:5, 121:12,
142:23
**resume** [1] - 116:21
**retrospect** [1] - 135:12
**retrospectively** [1] -
48:16
**return** [3] - 104:6,
132:8, 133:23
**returned** [1] - 105:3
**returns** [1] - 86:2
**reveal** [1] - 44:21
**revealed** [2] - 3:22,
19:1
**review** [3] - 48:11,
50:18, 94:22
**reviewed** [2] - 18:16
**reviews** [1] - 50:15
**Rhodes** [1] - 101:25

**ridiculous** [2] - 39:9,
45:18
**right-hand** [2] -
102:19, 102:23
**rights** [2] - 28:17,
112:21
**rioter** [3] - 7:3, 61:12,
79:11
**rioters** [4] - 21:17,
23:22, 46:12, 58:3
**rise** [1] - 21:5
**rises** [1] - 11:13
**roles** [1] - 138:14
**ROMANO** [15] - 65:8,
65:10, 65:12, 65:14,
65:17, 66:2, 66:12,
66:14, 66:18, 66:20,
67:14, 67:24, 69:16,
69:18, 75:24
**Romano** [7] - 65:12,
65:13, 67:24, 67:25,
69:15, 73:6, 75:23
**Ronald** [1] - 110:1
**room** [2] - 100:9,
103:16
**round** [1] - 97:6
**Round** [1] - 100:8
**rounds** [3] - 97:5,
97:6, 100:11
**row** [1] - 96:23
**rule** [1] - 87:17
**Rule** [4] - 75:4, 77:14,
87:10, 87:18
**rules** [7] - 51:2, 51:4,
64:17, 64:18, 64:21,
64:24, 136:22
**ruling** [2] - 79:8, 79:18
**run** [1] - 109:7
**running** [1] - 44:6
**rushed** [1] - 96:16

**S**

**sanction** [1] - 3:19
**sanctions** [2] - 3:2,
55:13
**Sanders** [1] - 110:1
**sat** [1] - 12:13
**Saturday** [5] - 3:2, 5:7,
5:11, 18:10, 39:7
**saw** [14] - 21:25,
22:20, 25:18, 56:9,
71:20, 86:15, 86:16,
86:23, 88:17, 88:18,
90:13, 93:23, 121:6
**scale** [1] - 37:24
**scandal** [1] - 32:14
**scared** [1] - 129:5
**scenarios** [1] - 11:19
**school** [3] - 136:21,

141:2, 141:4
**scouring** [1] - 46:21
**seal** [7] - 3:4, 3:5,
36:12, 36:13, 38:17,
48:24, 49:20
**search** [2] - 67:7,
72:17
**seat** [3] - 96:8, 96:19,
118:19
**seated** [1] - 104:13
**seats** [2] - 94:8, 96:12
**second** [6] - 17:6,
19:11, 37:25, 43:9,
54:3, 105:16
**secondly** [2] - 52:20,
99:1
**seconds** [6] - 4:8,
4:10, 7:8, 14:22,
25:11, 89:7
**Secret** [2] - 109:13,
111:23
**secure** [1] - 20:18
**secured** [5] - 19:14,
20:12, 20:18, 47:21
**Security** [1] - 111:24
**security** [2] - 142:8,
142:13
**see** [42] - 4:22, 5:19,
5:25, 6:3, 8:16, 9:7,
10:2, 24:2, 26:11,
26:21, 27:23, 29:23,
31:25, 35:6, 35:8,
35:9, 44:23, 48:20,
49:21, 50:13, 51:23,
51:25, 52:7, 52:9,
52:10, 52:11, 61:25,
64:25, 65:14, 66:23,
73:11, 75:2, 81:9,
84:13, 89:8, 91:7,
99:14, 101:16,
102:24, 103:4,
130:22, 143:25
**seeing** [3] - 19:21,
50:24, 84:16
**seeking** [2] - 25:17,
47:23
**seeks** [1] - 3:20
**seem** [3] - 14:14,
104:20, 143:7
**sees** [5] - 26:11,
26:12, 71:1, 71:15,
71:16
**Sefranek** [1] - 144:4
**segment** [1] - 32:16
**select** [5] - 102:9,
102:11, 103:22,
104:24, 105:7
**selected** [6] - 104:4,
104:5, 114:21,
122:25, 125:12,

135:25
**selection** [4] - 97:2,
100:20, 101:21,
102:11
**selections** [1] - 104:1
**self** [1] - 32:15
**self-reported** [1] -
32:15
**selling** [1] - 128:18
**send** [3] - 65:1, 78:23,
93:13
**senior** [3] - 9:21, 9:23,
10:5
**sensitive** [1] - 44:23
**sentence** [3] - 128:3,
128:11, 131:21
**sentenced** [1] - 53:19
**sentences** [5] -
127:14, 131:22,
131:25, 133:12,
133:14
**sentencing** [3] -
127:12, 132:8,
133:22
**separately** [1] - 94:10
**September** [3] - 4:3,
5:10, 40:6
**sergeant** [4] - 7:4,
27:19, 32:14, 56:24
**Sergeant** [14] - 15:3,
20:11, 20:20, 27:24,
34:7, 35:8, 35:11,
41:5, 41:9, 44:21,
52:5, 63:14, 72:21
**series** [1] - 103:6
**seriously** [2] - 50:22,
98:21
**serve** [1] - 102:10
**served** [4] - 112:23,
112:24, 119:13,
120:6
**Service** [3] - 109:13,
111:21, 111:23
**service** [2] - 101:13,
120:9
**session** [1] - 106:19
**set** [2] - 91:20, 100:20
**setting** [1] - 68:6
**several** [1] - 119:16
**severe** [1] - 38:2
**shirt** [1] - 129:3
**shocked** [1] - 5:19
**shocking** [1] - 121:7
**shockingly** [1] - 36:20
**shoes** [2] - 126:12
**show** [6] - 25:10,
25:11, 25:12, 51:17,
51:21, 86:20
**shutting** [1] - 30:3
**sic** [2] - 8:12, 62:19

**sic]** [4] - 35:24, 36:10,
38:8, 109:11
**side** [6] - 64:21, 64:22,
97:25, 102:12,
132:1, 133:15
**sides** [2] - 97:20,
129:17
**silent** [1] - 103:19
**similar** [9] - 3:22,
11:19, 27:24, 45:11,
64:2, 64:4, 96:4
**simply** [7] - 6:18, 8:24,
22:21, 25:12, 57:5,
120:21, 139:8
**single** [7] - 32:24,
35:19, 75:2, 83:2,
88:1, 92:11
**sirens** [3] - 11:25,
25:23, 89:2
**sister** [1] - 143:23
**sit** [11] - 31:25, 73:2,
83:5, 97:7, 97:16,
114:16, 115:3,
115:7, 116:13,
120:25, 139:15
**sitting** [7] - 22:21,
31:22, 93:9, 101:2,
102:24, 103:4,
116:16
**situated** [1] - 118:24
**situation** [6] - 15:10,
28:8, 54:24, 58:1,
58:14, 90:22
**situations** [1] - 31:24
**six** [3] - 4:3, 109:12,
130:15
**sleeping** [1] - 128:20
**slips** [1] - 14:15
**slow** [3] - 15:22,
15:24, 55:2
**small** [4] - 71:9, 75:13,
85:18, 90:20
**Smith** [1] - 109:25
**social** [5] - 14:3, 36:1,
58:25, 60:20, 114:21
**solely** [2] - 111:5,
127:6
**someone** [2] - 8:25,
115:10
**sometimes** [1] -
130:22
**somewhere** [1] - 34:9
**soon** [3] - 78:25,
100:11, 118:16
**sorry** [20] - 10:24,
15:25, 22:6, 23:1,
31:3, 31:4, 36:10,
37:13, 39:2, 39:3,
40:19, 49:15,
105:17, 117:22,

118:2, 119:12, 123:9, 130:10, 140:12, 140:16

**sort** [9] - 12:12, 14:13, 22:22, 48:6, 55:3, 121:13, 121:23, 139:23, 140:5

**sorts** [6] - 12:1, 14:6, 21:21, 56:22, 64:6, 77:5

**sotto** [1] - 100:13

**sought** [1] - 67:3

**sound** [1] - 11:25

**sounds** [2] - 15:4, 67:6

**source** [22] - 15:13, 15:14, 36:24, 37:2, 37:10, 37:18, 38:20, 49:3, 50:13, 58:22, 59:20, 62:8, 62:20, 63:3, 63:17, 66:6, 69:7, 76:9, 76:15, 80:7, 95:11

**sources** [2] - 27:18, 59:2

**speaking** [2] - 62:25, 116:9

**special** [1] - 107:15

**specific** [16] - 54:21, 78:16, 83:4, 83:13, 83:23, 83:24, 83:25, 84:3, 84:4, 92:5, 92:8, 92:15, 92:18, 92:20, 92:22, 98:20

**specifically** [3] - 95:24, 138:25, 143:6

**specifics** [2] - 135:10, 138:11

**speculate** [1] - 25:8

**speculation** [1] - 69:10

**speeding** [1] - 114:1

**spelled** [1] - 109:25

**spent** [1] - 5:17

**spin** [1] - 73:21

**spiritual** [1] - 114:22

**spoliations** [1] - 3:2

**spouse** [9] - 116:3, 116:5, 136:9, 136:13, 137:7, 137:16, 137:21, 138:13, 141:24

**spouse's** [1] - 136:17

**staff** [3] - 99:4, 110:7, 135:17

**Stage** [3] - 38:11, 38:12, 38:13

**stairs** [1] - 9:9

**stamp** [5] - 24:23, 25:4, 45:22, 46:6,

83:7

**stamped** [2] - 24:7, 45:24

**stamps** [2] - 24:6, 24:8

**stand** [9] - 14:20, 47:25, 49:11, 56:8, 62:13, 104:10, 107:17, 108:9, 108:17

**standing** [18] - 8:5, 8:25, 10:13, 11:1, 14:14, 17:10, 17:14, 20:5, 23:13, 23:17, 26:11, 27:22, 42:22, 68:8, 70:8, 70:13, 74:2, 89:16

**standpoint** [1] - 19:22

**start** [11] - 7:18, 39:6, 64:25, 97:2, 97:3, 115:5, 115:6, 117:13, 119:3, 127:2, 135:5

**started** [5] - 5:18, 6:8, 17:17, 18:20, 33:10

**starting** [3] - 17:25, 96:13, 100:22

**starts** [2] - 22:17, 46:3

**state** [15] - 6:16, 6:22, 7:25, 26:2, 27:4, 28:5, 28:9, 48:4, 65:11, 70:10, 71:17, 74:1, 86:11, 111:19, 112:14

**statement** [47] - 4:9, 4:12, 6:2, 6:3, 6:10, 6:18, 8:10, 9:17, 9:21, 15:20, 16:22, 17:7, 21:10, 26:21, 27:1, 27:3, 32:1, 44:15, 44:18, 44:21, 46:14, 46:15, 55:13, 55:17, 55:19, 55:20, 58:23, 62:21, 71:12, 71:19, 77:2, 78:6, 78:11, 81:18, 82:15, 82:17, 83:6, 83:7, 84:19, 84:20, 84:23, 87:3, 89:13, 90:5, 90:6, 91:17

**statements** [107] - 3:22, 5:22, 5:23, 7:21, 8:15, 12:5, 12:16, 12:17, 12:19, 14:2, 14:3, 16:19, 16:20, 18:2, 18:13, 18:24, 19:1, 20:9, 20:19, 21:2, 22:8, 23:25, 27:17, 27:24, 28:1, 28:3, 28:11,

35:2, 40:3, 40:16, 40:22, 41:5, 41:23, 41:25, 42:2, 42:9, 42:15, 43:11, 43:13, 43:22, 43:23, 44:2, 44:19, 45:11, 47:1, 56:20, 56:22, 60:7, 60:19, 60:20, 60:24, 61:1, 61:18, 62:6, 62:13, 62:19, 63:6, 63:13, 63:14, 63:15, 64:6, 64:7, 65:2, 65:19, 65:23, 66:5, 66:8, 66:22, 67:19, 68:22, 69:10, 72:10, 76:14, 76:16, 77:3, 77:5, 78:1, 78:6, 79:11, 79:21, 79:23, 80:5, 80:11, 80:13, 81:12, 81:16, 82:1, 82:2, 82:11, 82:14, 82:20, 83:22, 84:13, 85:5, 87:2, 92:5, 94:11, 94:13, 94:14, 95:11, 95:13, 95:18, 96:5, 100:4, 100:5, 134:17

**States** [15] - 100:19, 101:22, 105:22, 105:25, 106:8, 106:16, 106:23, 107:2, 107:5, 107:14, 107:16, 107:18, 109:11, 111:16, 112:12

**states** [1] - 122:18

**statuses** [1] - 81:6

**stay** [1] - 109:8

**stayed** [1] - 130:17

**stem** [1] - 19:17

**step** [1] - 53:25

**steps** [1] - 118:16

**still** [21] - 8:22, 25:11, 26:23, 27:2, 28:12, 31:12, 31:13, 32:25, 34:4, 44:19, 70:9, 71:14, 74:1, 74:4, 88:15, 97:18, 116:15, 118:3, 132:11, 133:25, 134:15

**stood** [4] - 4:19, 7:20, 11:21, 12:22

**stop** [9] - 6:1, 10:19, 12:23, 19:17, 20:1, 21:3, 24:21, 88:8, 116:21

**stopped** [1] - 71:18

**stopping** [1] - 73:16

**story** [1] - 11:7

**straightforward** [1] - 105:6

**streaming** [1] - 48:1

**Strickler** [1] - 30:9

**strike** [9] - 96:18, 96:19, 96:22, 97:4, 97:21, 97:24, 132:19

**strikes** [6] - 64:16, 64:21, 64:22, 96:17, 97:3, 97:24

**striking** [1] - 96:25

**strong** [11] - 114:10, 116:4, 119:4, 119:8, 121:2, 121:19, 142:15, 142:22, 143:11, 143:12, 143:13

**strongly** [2] - 125:24, 143:1

**struggle** [1] - 134:1

**stuck** [4] - 20:21, 34:18, 88:6, 88:8

**studied** [2] - 111:11, 136:24

**stuff** [6] - 15:13, 25:22, 59:13, 69:21, 91:21, 128:19

**subject** [8] - 12:24, 18:3, 47:4, 47:5, 49:8, 49:21, 50:14

**subpoena** [1] - 36:5

**succeed** [1] - 72:12

**succeeded** [1] - 72:11

**successful** [1] - 41:20

**sudden** [4] - 8:7, 8:13, 10:11, 10:15

**suffer** [1] - 114:15

**summarizes** [1] - 37:5

**summer** [1] - 141:1

**Superior** [1] - 119:20, 119:21

**supervising** [1] - 65:15

**supervisory** [1] - 37:16

**supporting** [3] - 49:18, 49:25, 50:2

**supposed** [7] - 53:24, 124:12, 124:16, 124:18, 130:14, 140:1, 143:7

**supposes** [1] - 42:8

**suppressed** [2] - 30:13, 30:15, 42:20

**suppression** [1] - 30:20

**surprised** [1] - 132:23

**surrounding** [1] - 17:22

**suspicion** [1] - 129:10

**sustained** [2] - 37:6, 37:25

**sway** [1] - 132:4

**swayed** [1] - 133:18

**swear** [1] - 104:2

**sword** [1] - 91:9

**sworn** [1] - 104:14

**system** [5] - 37:23, 37:24, 112:9, 114:8, 127:11

## T

**T-y-r-e-e-s** [1] - 110:1

**table** [8] - 37:4, 49:4, 49:16, 49:17, 49:24, 50:7, 101:2, 109:8

**tabs** [1] - 91:25

**talented** [1] - 12:21

**Tamara** [1] - 144:4

**Task** [1] - 109:17

**task** [2] - 99:5, 107:23

**tax** [1] - 136:11

**Taylor** [1] - 107:23

**team** [5] - 65:17, 107:19, 108:2, 108:10, 108:19

**tear** [3] - 7:11, 7:22, 12:1

**technically** [2] - 99:18, 135:24

**television** [1] - 121:5

**temperature** [1] - 101:17

**temporarily** [2] - 105:23, 106:9

**ten** [2] - 89:7, 141:4

**terabytes** [7] - 24:11, 39:19, 55:7, 83:1, 91:11, 91:14, 98:14

**term** [2] - 104:15

**terms** [15] - 10:18, 10:25, 11:3, 13:21, 13:23, 15:6, 15:21, 23:17, 27:6, 27:18, 28:15, 33:17, 58:21, 78:10

**terrace** [1] - 3:23, 19:21, 46:22, 47:16, 68:10

**test** [1] - 56:17

**testified** [1] - 89:6

**testifies** [1] - 89:12

**testify** [19] - 9:11, 20:20, 21:20, 21:23, 34:7, 38:9, 41:9, 42:11, 53:12, 53:13, 86:14, 86:15, 87:9, 108:22, 109:1, 110:23, 110:24,

110:25
**testimony** [22] - 4:18, 7:15, 9:20, 11:21, 86:21, 87:4, 89:1, 89:7, 89:10, 94:6, 94:7, 96:2, 113:12, 113:16, 113:19, 113:21, 129:10, 131:7, 138:20, 139:2, 139:5, 141:14
**Texas** [1] - 102:15
**themselves** [3] - 86:4, 143:12, 143:14
**theoretical** [1] - 19:9
**theory** [3] - 20:8, 41:21, 52:6
**therefore** [5] - 3:3, 42:7, 60:21, 88:20, 105:5
**they've** [16] - 45:18, 53:21, 54:25, 55:19, 57:5, 59:14, 59:19, 74:24, 75:20, 76:5, 77:16, 87:19, 90:5
**thinking** [1] - 55:11
**thinks** [2] - 10:22, 49:9
**third** [3] - 19:19, 21:10, 32:4
**thread** [1] - 63:9
**three** [23] - 15:21, 20:13, 30:9, 32:12, 32:16, 33:2, 33:21, 33:22, 33:24, 46:25, 62:2, 64:16, 64:21, 64:22, 85:17, 86:17, 96:17, 97:6, 97:24, 99:5, 99:24, 100:11, 131:15
**three-minute** [4] - 32:12, 32:16, 33:2, 46:25
**throughout** [1] - 14:3
**Thursday** [1] - 18:17
**tickets** [1] - 114:1
**tide** [1] - 19:18
**tie** [1] - 26:23
**time-stamped** [2] - 24:7, 45:24
**timely** [2] - 28:19, 94:16
**timing** [15] - 8:9, 14:8, 14:23, 15:15, 15:18, 15:20, 16:1, 16:3, 18:16, 33:8, 33:17, 45:21, 62:9, 66:1, 68:11
**Title** [4] - 105:25, 106:13, 106:23, 107:4

**titled** [1] - 101:21
**Tobacco** [1] - 111:22
**today** [5] - 3:5, 93:5, 107:9, 107:16, 113:22
**together** [1] - 44:6
**tomorrow** [2] - 65:1, 79:15
**tonight** [1] - 67:11
**top** [3] - 33:2, 64:3, 102:22
**touch** [1] - 132:25
**towards** [1] - 102:12
**town** [1] - 135:19
**training** [3] - 111:12, 136:7
**transcript** [2] - 58:21, 144:4
**transpire** [1] - 121:6
**transpired** [1] - 115:16
**trash** [2] - 60:1, 85:21
**trauma** [1] - 130:17
**traumatized** [2] - 129:12, 130:10
**traumatizing** [1] - 129:2
**travel** [1] - 115:1
**treason** [1] - 118:3
**treated** [1] - 128:22
**trial** [44] - 5:18, 7:15, 21:2, 24:16, 28:16, 29:5, 29:6, 33:22, 39:8, 46:6, 51:20, 74:8, 81:4, 81:25, 82:7, 83:6, 86:21, 86:22, 90:10, 90:24, 90:25, 91:4, 93:11, 93:12, 93:16, 94:5, 94:19, 94:21, 95:1, 95:6, 99:3, 99:6, 99:22, 100:20, 102:5, 108:22, 108:25, 109:12, 110:12, 110:16, 112:24, 119:13, 124:10, 144:3
**trials** [2] - 4:18, 11:18
**tried** [4] - 19:25, 20:18, 57:12, 66:25
**triggered** [1] - 17:1
**trouble** [2] - 110:19, 137:15
**true** [9] - 27:20, 30:8, 30:21, 31:17, 31:19, 39:19, 56:17, 57:3
**trust** [2] - 31:8, 35:11
**truth** [1] - 104:16
**truthful** [1] - 102:16
**truthfully** [2] - 104:16, 104:18

**Try** [1] - 123:19
**try** [7] - 11:6, 19:17, 20:2, 67:8, 103:20, 103:22, 138:22
**Tryees** [2] - 109:25
**trying** [8] - 16:17, 29:3, 57:25, 58:3, 71:10, 125:17, 125:23, 126:6
**turn** [24] - 31:10, 31:14, 31:19, 42:23, 43:1, 52:8, 56:2, 57:4, 57:9, 59:15, 61:22, 65:25, 69:12, 82:22, 83:4, 86:4, 86:5, 87:1, 87:20, 94:15, 95:19, 103:18, 109:6, 109:8
**turned** [23] - 7:2, 12:14, 12:19, 23:13, 41:3, 42:23, 42:24, 43:8, 43:10, 44:7, 44:9, 44:12, 44:25, 46:20, 46:22, 61:21, 76:7, 82:23, 83:3, 95:24, 95:25, 101:17
**turning** [2] - 5:18, 59:14
**turns** [3] - 13:15, 16:5, 50:23
**twice** [1] - 43:5
**two** [16] - 14:10, 14:13, 28:1, 35:9, 39:12, 72:4, 77:7, 80:24, 82:9, 82:10, 87:6, 90:11, 96:23, 97:7, 102:9, 134:21
**two-day** [1] - 90:11
**two-minute** [1] - 14:10

# U

**U.S** [15] - 100:24, 106:13, 107:22, 107:24, 109:12, 109:13, 109:15, 111:21, 111:23, 114:7, 115:11, 115:14, 115:17, 120:15, 140:20
**ultimate** [1] - 28:15
**unable** [3] - 114:20, 132:8, 133:23
**unaware** [1] - 16:16
**unbiased** [1] - 103:22
**uncertainty** [1] - 133:3
**under** [10] - 3:4, 3:5, 30:9, 36:12, 36:13, 38:17, 48:24, 49:20, 66:8, 87:23

**understood** [5] - 51:7, 51:10, 61:24, 62:17, 125:1
**undertake** [1] - 84:15
**underwear** [1] - 129:4
**unequivocally** [1] - 134:3
**unfairly** [1] - 128:23
**unfortunately** [1] - 101:13
**United** [15] - 100:19, 101:21, 105:22, 105:25, 106:8, 106:16, 106:23, 107:2, 107:5, 107:14, 107:16, 107:18, 109:11, 111:16, 112:12
**unless** [10] - 5:23, 9:4, 11:16, 35:14, 36:5, 51:12, 58:21, 86:19, 110:16
**unpleasant** [5] - 113:3, 113:5, 128:15, 128:20, 138:8
**unreasonable** [3] - 20:25, 55:11, 55:14
**unredact** [1] - 44:17
**unredacted** [7] - 23:15, 40:7, 40:10, 40:11, 40:24, 42:17, 44:3
**unwarranted** [1] - 95:6
**up** [48] - 7:11, 7:22, 8:23, 9:1, 11:18, 14:14, 18:22, 26:23, 27:19, 32:13, 33:24, 36:9, 42:13, 45:7, 54:8, 57:23, 58:15, 59:2, 65:8, 65:9, 69:17, 71:10, 72:7, 81:25, 90:10, 90:19, 91:20, 97:7, 97:16, 97:20, 101:17, 103:10, 103:14, 103:16, 103:17, 103:24, 108:17, 109:7, 116:24, 117:4, 118:20, 119:11, 120:24, 123:11, 125:7, 126:21, 130:7, 139:11
**uploaded** [1] - 36:1
**upper** [6] - 3:23, 19:21, 46:21, 47:16, 68:10, 102:19
**ups** [1] - 142:5

**useful** [2] - 72:6, 72:8
**useless** [1] - 98:19

# V

**various** [1] - 102:2
**vastly** [2] - 19:24, 20:6
**VENIRE** [1] - 104:12
**venire** [4] - 100:17, 104:11, 117:1, 134:7
**venue** [4] - 64:19, 125:1, 125:4
**veracity** [2] - 85:15
**verdict** [12] - 105:3, 107:12, 111:5, 114:20, 114:24, 119:24, 119:25, 127:6, 132:8, 132:9, 133:23
**version** [3] - 23:16, 40:25, 44:3
**versions** [1] - 42:17
**Vice** [2] - 105:22, 106:8
**vicinity** [7] - 4:12, 16:3, 16:5, 24:15, 47:8, 70:13, 81:1
**victim** [6] - 4:4, 4:8, 9:6, 15:4, 15:14, 15:17, 15:19, 16:6, 17:20, 20:16, 26:20, 27:11, 33:18, 35:1, 35:8, 35:13, 35:16, 35:19, 35:20, 39:13, 46:2, 46:3, 46:9, 46:22, 47:1, 52:19, 53:2, 56:15, 56:19, 57:15, 58:25, 60:15, 62:22, 63:22, 65:18, 65:25, 66:10, 67:7, 67:9, 72:7, 75:17, 75:20, 76:3, 76:4, 76:5, 76:6, 76:9, 76:16, 77:2, 77:7, 77:17, 77:23, 78:7, 80:15, 82:12, 82:13, 92:11
**victim** [6] - 4:4, 4:8, ... [1] - 112:21, 113:24, 129:21
**video** [61] - 4:4, 4:8, 9:6, 15:4, 15:14, 15:17, 15:19, 16:6, 17:20, 20:16, 26:20, 27:11, 33:18, 35:1, 35:8, 35:13, 35:16, 35:19, 35:20, 39:13, 46:2, 46:3, 46:9, 46:22, 47:1, 52:19, 53:2, 56:15, 56:19, 57:15, 58:25, 60:15, 62:22, 63:22, 65:18, 65:25, 66:10, 67:7, 67:9, 72:7, 75:17, 75:20, 76:3, 76:4, 76:5, 76:6, 76:9, 76:16, 77:2, 77:7, 77:17, 77:23, 78:7, 80:15, 82:12, 82:13, 92:11
**videos** [4] - 15:14, 24:2, 24:7, 36:1
**videotape** [2] - 46:15, 47:6
**view** [10] - 31:21, 35:9, 35:12, 54:6, 72:10, 92:15, 124:9, 129:9, 131:8
**viewed** [2] - 96:20, 98:15
**views** [3] - 116:4,

116:5, 116:8
**violates** [1] - 42:18
**violation** [7] - 30:9,
62:2, 62:3, 105:25,
106:12, 106:23,
107:4
**violations** [1] - 3:2
**violent** [4] - 10:14,
11:5, 26:12, 106:22
**virtue** [1] - 60:17
**visiting** [2] - 105:23,
106:9
**vital** [1] - 104:25
**Vo** [73] - 4:1, 4:7, 4:11,
5:24, 7:8, 8:5, 8:12,
8:25, 9:7, 10:3,
12:22, 13:15, 13:25,
14:23, 15:8, 15:16,
15:17, 16:3, 16:5,
24:15, 28:23, 32:12,
33:5, 33:20, 33:25,
41:21, 42:2, 42:8,
42:14, 45:15, 46:4,
46:11, 46:18, 46:19,
46:21, 47:3, 47:8,
47:16, 49:15, 52:11,
52:12, 52:23, 53:12,
55:21, 62:6, 67:3,
68:9, 68:10, 70:24,
71:1, 74:2, 76:9,
78:7, 80:25, 86:20,
86:23, 87:8, 89:17,
92:24, 95:18,
100:19, 101:7,
101:22, 105:18,
106:2, 106:15,
107:1, 108:4, 108:5,
108:7, 108:17,
118:6, 139:18
**Vo's** [8] - 5:1, 6:16,
7:25, 28:17, 70:10,
79:12, 91:21, 126:12
**voce** [1] - 100:13
**voir** [7] - 97:13,
102:14, 102:15,
103:10, 104:15,
125:3
**volume** [3] - 11:9,
69:23, 94:14
**vote** [3] - 132:8, 133:4,
133:23

---

**W**

---

**WAGNER** [26] - 40:12,
40:14, 43:17, 43:23,
44:4, 44:6, 44:14,
44:17, 57:22, 57:24,
58:5, 58:7, 100:23,
101:4, 107:21,
109:11, 140:12,

140:17, 140:19,
140:24, 141:3,
141:6, 141:13,
141:19, 141:23,
142:2
**Wagner** [7] - 43:14,
69:5, 100:24,
107:19, 107:21,
109:6, 140:11
**wait** [16] - 23:19,
24:20, 39:10, 52:12,
54:3, 88:8, 92:2,
105:16, 119:12,
132:17, 133:18
**waiting** [5] - 3:8, 3:9,
5:13, 101:12, 101:13
**walk** [3] - 14:22,
17:17, 19:8
**walked** [6] - 11:21,
56:21, 57:7, 73:13,
78:1, 89:8
**walking** [12] - 3:23,
6:14, 26:13, 27:22,
32:13, 57:2, 63:16,
71:16, 73:17, 75:2,
99:12
**wants** [3] - 96:6,
105:1, 142:20
**warmer** [1] - 144:1
**warrant** [1] - 13:6
**warranted** [1] - 3:19
**Washington** [2] -
107:14, 121:4
**watch** [2] - 117:24,
118:4
**Watch** [3] - 112:19,
112:20, 138:3
**watches** [1] - 140:6
**wax** [1] - 117:16
**ways** [2] - 42:25, 59:1
**wear** [1] - 70:19
**week** [8] - 45:16,
82:12, 83:24, 84:14,
91:17, 93:2, 115:2,
115:5
**weekends** [1] - 115:7
**weeks** [2] - 61:13,
81:2
**weigh** [2] - 111:4,
127:6
**weight** [1] - 139:8
**west** [5] - 3:23, 19:21,
46:21, 47:16, 68:10
**whatsoever** [2] -
111:7, 127:8
**whereas** [1] - 120:20
**whole** [10] - 5:20,
11:13, 55:12, 62:10,
72:4, 86:23, 87:2,
99:5, 117:15, 127:17

**widely** [2] - 4:17, 4:18
**Wilbert** [1] - 107:23
**willful** [1] - 30:20
**willfully** [2] - 106:15,
107:1
**willfulness** [1] - 8:1
**window** [3] - 67:5,
68:14, 85:18
**wink** [2] - 34:15
**wisely** [1] - 132:25
**wish** [1] - 104:24
**withdraw** [1] - 21:22
**withheld** [1] - 3:17
**withholding** [1] - 13:5
**witness** [18] - 42:7,
50:9, 50:10, 51:18,
73:2, 78:6, 88:1,
88:9, 88:14, 113:14,
113:17, 113:25,
117:24, 123:23,
129:21, 138:21,
139:7
**witness's** [2] - 86:21,
94:7
**witnesses** [8] - 24:17,
50:24, 77:19,
108:22, 108:24,
108:25, 109:3,
109:12
**witnessing** [1] - 118:3
**wonder** [1] - 13:22
**wool** [1] - 64:23
**word** [3] - 22:13, 48:6,
74:9
**words** [40] - 4:20,
4:23, 8:23, 11:14,
11:17, 16:10, 16:12,
16:18, 19:19, 21:5,
25:22, 29:7, 31:13,
47:7, 48:13, 54:12,
56:12, 56:15, 57:18,
57:20, 58:1, 58:4,
58:6, 59:21, 61:19,
76:5, 76:22, 83:19,
86:4, 86:5, 87:22,
87:24, 88:3, 88:10,
88:13, 97:1, 113:17,
119:4
**works** [1] - 137:7
**world** [1] - 55:4
**worn** [1] - 92:14
**worried** [1] - 128:10
**worries** [1] - 39:4
**worry** [1] - 137:13
**worse** [1] - 19:25
**worth** [7] - 9:23, 10:1,
10:22, 11:10, 11:15,
42:1, 58:20
**wow** [1] - 121:7
**wrangle** [1] - 101:14

**write** [17] - 97:14,
102:18, 102:22,
103:8, 103:11,
103:12, 105:15,
108:2, 108:6,
108:19, 109:5,
109:20, 110:4,
110:20, 111:3,
116:17, 140:16
**writing** [1] - 116:10
**written** [2] - 79:11,
140:13
**wrote** [2] - 18:17, 37:4

---

**Y**

---

**y'all** [5] - 6:12, 19:10,
62:12, 64:22, 65:2
**yards** [1] - 7:8
**year** [2] - 95:23,
130:15
**years** [10] - 112:18,
119:16, 120:11,
120:12, 130:13,
130:14, 130:15,
130:16, 131:15,
141:4
**yelling** [1] - 9:13
**you-all** [5] - 64:11,
78:4, 94:8, 103:1,
109:8
**yourself** [2] - 12:21,
126:4
**yourselves** [2] - 31:9,
100:21

---

**§**

---

**§** [4] - 106:1, 106:13,
106:24, 107:5