**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **vs.** | * | **Case No. 21-cr-00509-1 (TSC)** |
| | * | |
| **ANTONY VO**, | * | |
| **Defendant** | * | |
| | * | |

**ooOoo**

**MEMORANDUM IN AID OF SENTENCING**

Antony Vo, by his undersigned counsel, hereby respectfully requests that the Court impose a sentence of probation, and if the Court deems it necessary a period of home detention and community service. That sentence is consistent with the recommendation of the Probation Officer, who prepared his Presentence Report ("PSR"). It is the appropriate sentence under the properly calculated guideline range, takes into account the mitigating circumstances in the case, and avoids unwarranted disparity.

Mr. Vo stands convicted of misdemeanor offenses arising out his conduct on January 6, 2021, when he came to Washington, D.C., with his mother to attend a political rally, activity that is at the core of the First Amendment. While others may disagree, Mr. Vo came to DC as an expression of his patriotic love for this nation, which took in his family when they fled the communist regime in Viet Nam decades ago. He did not come to DC prepared to enter the Capitol or to stop the certification of the electoral college votes. That is clear from the facts – prior to January 6, he did not mention the Capitol; on January 6, he listened to the speeches on the Mall and then walked peacefully with his mother toward the Capitol. He did not wear protective gear, did not bring or use any weapons, did not bring or use chemical irritants. He came to DC with his elderly mother. Surely, he had not

expectation of getting caught up in the chaos that ensued.  Before entering the Capitol he did not observe any violent clashes. While in the Capitol, he uttered no threats; did not destroy property or engage in acts of vandalism; and committed no acts of violence or otherwise engage in any confrontations with law enforcement.  He remained in the public areas of the Capitol for less than 30 minutes and left when asked to do so by a law enforcement officer.  After he left, he did not delete or otherwise seek to destroy evidence of his presence in DC, as many others have done.

Fairly early in the case, he sought to plead guilty to one count. While Mr. Vo went to trial, he did so because he believed that all of the charges the government brought against him did not reach his conduct. He was willing to enter a plea to what he believed he did but was not willing to admit to conduct or intentions that he did not have.  The sentence requested by the government is more than that which is necessary to meet the statutory purposes of sentencing, especially in light of sentences imposed on other individuals who engaged in similar and often more egregious conduct in connection with January 6 and in other contexts.

He has never been affiliated with any extremist group.  Prior to January 6, he had not posted copiously on social media nor even mentioned the Capitol.  While he sent a few messages about the actions at the Capitol in the immediate aftermath, they were not reflective of his intent earlier that day; more than anything they were commentary on the media coverage as noted by the fact that he put quotation marks around some comments and posted LOL to signify sarcasm

As the letters submitted on his behalf reflect, Antony Vo is a young man, full of compassion, and love for friends and family.  He is a gentle, non-violent soul, who is always there for friends and family.  Indeed, even though his father had been somewhat absent after his parentes divorced when he was only six years old, years later when his father was diagnosed with cancer Antony took a leave

of absence from school to care for him.

A sentence of probation for Mr. Vo is "sufficient, but not greater than necessary" as mandated by 18 U.S.C. § 3553(a), renders just punishment, comports with all the purposes of sentencing, and avoids unwarranted disparity.

Undersigned counsel will not comment extensively on the facts for two reasons. First, the Court and everyone else involved in the sentencing hearing was there, while Counsel was not. Even more importantly, Mr. Vo, having been convicted at trial, has a right to appeal that conviction and thus is someone constrained in what he can and should say at this point.

I.    **Objections to the Presentence Report Calculations and Grounds for Variance related to the Sentencing Guidelines**

A.    **Factual Disputes**

Set out below are Mr. Vo's specific factual disputes for the Court to resolve. Because the Court did not accept Mr. Vo's guilty plea and he thereafter proceeded to trial, there is no agreement as to the factual allegations. As set out in the PSR, the Offense Conduct in the PSR is a recitation of the government's factual allegations.[1] The PSR includes Mr. Vo's objections in the Addendum to the PSR but not in the Offense Conduct narrative. While the final PSR adopted each of the government's objections, it notes as to each of Mr. Vo's objections that "the Court is best positioned to determine factual matters concerning the representations made at trial."

Mr. Vo objects to the use of statements that were not presented at trial and are inconsistent with trial testimony or that otherwise lack sufficient indicia of reliability, including out-of-court statements of unknown persons. He objects to the reference to "rioters" throughout the PSR. As

---

[1] As noted in the PSR at ¶ 18, those paragraphs are a "summarization of the Complaint (CM-ECF Doc. 1) and a written submission provided by the Government."

Officer Henry testified, there were no images or videos of Mr. Vo observing violent or riotous conduct by others.  He also objects to the use of statements made by him that were expressions of political opinion protected by the First Amendment.[2]  Indeed, at no time before January 6 does Mr. Vo make reference to the Capitol or to storming it.  *See* Testimony of Case Agent, Henry

### 1.      Paragraph 24.

Mr. Vo denies that he "acknowledged" that he and his mother had "helped stop the vote count for a bit."  What he actually wrote was:

> "Wow *apparently* we stopped the count for a bit."

Gov Trial Ex 461A (emphasis added).    That message was sent at 8:06 p.m., after Mr. Vo had become aware of media reports.  The fact that he used the word "apparently" shows that he was repeating what the media were saying.  He was not admitting that he had actually stopped the count, as the Congress had suspended proceedings long before he entered the Capitol.  Nor was that statement an admission that it had been his intent to stop the count.

### 2.      Paragraph 26.

The PSR does not identify which messages are referenced here.  Statements made after the fact, hours after Mr. Vo had left the Capitol do not reflect Mr. Vo's intent at the time he was in the Capitol.  They are just descriptive of what was being reported by the media.  For example, a message

---

[2]  *See United States v.  Mitchell,* 508 U.S. 476, 489-90 (1993), which held that while the First Amendment does not prohibit the use of a defendant's previous statements to prove motive, subject to evidentiary rules, such evidence must "be scrutinized with care to be certain the statements are not expressions of mere lawful and permissible difference of opinion" which are protected by the First Amendment, *citing Haupt v. United States*, 330 U.S. 631, 642 (1947); *see also Brandenburg v. Ohio,* 395 U.S. 444 (1969) (First Amendment prohibits government from proscribing and punishing "mere advocacy" and from "forbid[ing], on pain of criminal punishment, assembly with others merely to advocate the described type of actions" unless the speech is "directed at inciting or producing imminent lawless action" and it is "likely to incite or produce such action.")

sent late on the afternoon of January 6, included quotation marks around the word "stormed" and included the acronym, "LOL." Both the quotation marks and the "LOL" reflect that Mr. Vo was repeating what was being reported in the media, which did not accurately depict his actions or intent. As to him at least, the reporting was hyperbolic. In fact, he did not "storm" the Capitol with his 67-year old mother. He walked in through an open door while law enforcement officers stood around and let him enter.

### B.  Objections to the PSR's Offense Level Calculation

#### 1.  Offense Guideline - U.S.S.G. § 2B2.3

Mr. Vo objects to the use of U.S.S.G. § 2A2.4 to calculate the guideline range. The proper guideline to be used for a violation of 18 U.S.C. § 1752(a)(1) and (a)(2), where the defendant did not engage physically with law enforcement officers is U.S.S.G. § 2B2.3. Notably, the preliminary PSR applied § 2B3.2 (ECF 132, ¶42). The final PSR applies § 2A2.4 apparently because the government objected to the use of § 2B2.3 but cites no cases or other explanation for the change.

#### 2.  Acceptance of Responsibility

Mr. Vo also submits that he should receive a 2-level reduction for acceptance of responsibility because he sought to plead guilty and went to trial only "to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." U.S.S.G. § 3E1.1 (n.2).[3]

---

[3] *See, e.g.,* Motion to Dismiss (ECF 26, filed 6/29/22); Second Motion to Dismiss (ECF 27, 6/29/22) (asserting facial challenge).

The proper calculation should therefore be:

| | |
|---|---|
| Base Offense Level, § 2B3.2(a) | 4 |
| Specific Offense characteristic, § 2B3.2(b)(1)(A)(vii) (If the trespass occurred "at any restricted building or grounds) | 2 |
| Acceptance of responsibility, § 3E1.1 (n. 2) | -2 |
| Zero-point Offender, § 4C1.1(a) | -2 |
| Total Offense Level | 2 |

Even if the zero-point offender adjustment does not apply, the total offense level places him in Zone A, where "a sentence of imprisonment is not required." U.S.S.G. § 5C1.1(b).

### 3.      The Appropriate Guideline is § 2B3.2

Appendix A of the United States Sentencing Guidelines ("the Statutory Index") lists two potential applicable guidelines, U.S.S.G. §§ 2A2.4 and 2B2.3, for violations of 18 U.S.C. § 1752, without reference to the statute's subdivisions. Section 1B1.2 (n. 2) provides that

> In the case of a particular statute that proscribes a variety of conduct that might constitute the subject of different offense guidelines, the Statutory Index may specify more than one offense guideline for that particular statute, and the court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted.

That is exactly the situation here. Section 1752 proscribes a variety of conduct. For example, § 1752 (a)(4) prohibits "physical violence against a person," which would trigger application of § 2A2.4. All the enhancements in§ 2A2.4 address assaultive conduct against a person, *e.g.,* "physical contact," possession of a "dangerous weapon," "bodily injury" suffered by a victim. U.S.S.G. § 2A2.4(b). It even includes a cross-reference if the conduct constituted "aggravated assault." § 2A2.4(c). No such conduct is charged in Count Two against Mr. Vo.

On the other hand, the conduct prohibited by § 1752(a)(2) is impeding a government function in or near a restricted building.  Section 1752(a)(2) makes it unlawful for any person to:

> knowingly, and with intent to impede or disrupt the orderly conduct of *Government business or official functions*, engages in disorderly or disruptive conduct *in, or within such proximity to, any restricted building or grounds* when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of *Government business or official functions*;

18 U.S.C. § 1752(a)(2) (emphasis added).  The offense level is enhanced if the offense involved as in the instant case, a "restricted building." § 2B2.3(b)(1).

As Judge Friedman explained in *United States v. Brodnax*, No. 21-cr-350-PLF (ECF 61), the first judge in the district to be confronted with the issue, the appropriate guideline is § 2B2.3 because a violation of 18 U.S.C. § 1752(a)(2) does not turn on any activity directed towards individuals. Relying on cases from other circuits in an analogous situation, Judge Friedman also noted that all the statutory provisions to which § 2A2.4 applied "the conduct was explicitly affirmatively by the language of the statute directed at a person . . . law enforcement officials performing official duties." *Id.* at 95.  Judge Friedman further noted that the Information charging the § 1752(a)(2) offense did not include a reference to a "law enforcement official. *Id.* at 96.  Here, the Information also does not make reference to any law enforcement or other official.  Judge Friedman also distinguished those cases where the January 6 defendants were alleged to have assaulted officers, thrown things at them or pushing them.  *Id.* at 97-98.  As with Mr. Vo, the defendant in *Brodnax* "made no physical contact" with any officer and did not even yell at an officer.  *Id.*  Judge Friedman also noted the specific offense characteristic found in 2B3.2 applies where the trespass occurred in a restricted building.  *Id.*  He lastly noted that in contrast to § 1752(a)(4), § 1752(a)(2) "does not assume that

a person is the victim.  It assumes that the government, the governmental function is at issue." *Id.*
at 99.   More recently, Judge Reyes relied on *Brodnax* to apply 2B3.2, in a case where she had
acquitted the defendants of a violation of 18  U.S.C. § 231.  *See United States v. Mylnarek*, 23-cr-
114-ACR.[4]

### C.        Objections to the PSR's Criminal History Calculation

All of Mr. Vo's convictions involve the type of petty offenses for which he should not receive
any criminal history points pursuant to U.S.S.G. § 4A1.2(c) and application note 12, which apply to
petty offenses.  In determining whether a particular conviction should receive criminal history points,
note 12 directs the Court to use a "common sense approach" which compares the offense to the listed
petty offenses as well as considers the punishment imposed.  Clearly, using such an approach, none
of Mr. Vo's prior offenses should count as criminal history points.  Each of the three prior offenses
involves simple possession of marijuana, which were pled down to possession of paraphernalia or a
misdemeanor accessory after the fact.  No jail time was imposed in any of them because of the minor
nature of the conduct.[5]

Additionally, the  2023  guidelines  amendments  provide  that  a  downward  departure  is

---

[4]  The transcript of the hearing where the guideline application is considered may be found
in *Mylnarek* (ECF 89, filed 4/5/24); *Broadnax* (ECF 76, filed 6/21/23).

[5]   Application Note 12 to § 4A1.2 provides:
Application of Subsection (c).—
(A) In General.—In determining whether an unlisted offense is similar to an offense
listed in subsection (c)(1) or (c)(2), the court should use a common sense approach
that includes consideration of relevant factors such as (i) a comparison of punishments
imposed  for  the  listed  and  unlisted  offenses;  (ii)  the  perceived  seriousness  of  the
offense as indicated by the level of punishment; (iii) the elements of the offense; (iv)
the level of culpability involved; and (v) the degree to which the commission of the
offense indicates a likelihood of recurring criminal conduct.

warranted where a prior conviction involves simple possession of marijuana. *See* U.S.S.G. § 4A1.3(b) and application note 3(A)(ii) (downward departure warranted where "defendant received criminal history points from a sentence for possession of marihuana for personal use, without an intent to sell or distribute it to another person."). If the Court were to depart downward based on this recent amendment, Mr. Vo would also be eligible for a 2-level downward adjustment applicable to zero-point offenders pursuant to 4C1.1(a).

In any event, the government's argument that Mr. Vo's criminal history which consists of these three petty offenses shows "his lack of respect for the rule of law" is a baffling argument. To the contrary, the minor offense that the Probation Officer has used to place him in Criminal History Category II overstates his culpability.

### 1.    Paragraph 52.

As noted above, the offense for simple possession of marijuana should not count under § 4A1.2. Applying a common-sense approach, and in light of the near universal view that simple possession of marijuana should be no more than a civil offense, this offense should not count for criminal history points. *See, e.g.,* President Biden's Proclamation on Granting Pardon for the Offense of Simple Possession of Marijuana, Attempted Simple Possession of Marijuana, or Use of Marijuana, 12/23/23 (pardoning all persons convicted of simple possession of marijuana under federal or DC code statutes). Alternatively, to the extent that the PSR notes that the downward departure is not warranted because of the allegation that there were firearms in the car, Mr. Vo objects to reliance on such unsworn non-court information. *See Shepard v. United States*, 544 U.S. 13, 26 (2005) (holding that in determining whether a defendant qualified as an Armed Career Criminal, district court was limited to reviewing "the terms of the charging document, the terms of a plea agreement or transcript

of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information").  Moreover, neither § 4A1.2 nor 4A1.3 refer to uncharged conduct.  Notwithstanding the allegations in ¶52, the fact remains that Mr. Vo was not charged with any firearm offenses.  The PSR's explanation for rejecting Mr.  Vo's arguments for not counting the petty offenses under § 4A1.2(c) (see below) and departing downward under §4A1.3(b) ignores the plain language of the guideline, which refers to a "prior sentence" and says nothing about alleged non-charged conduct.[6]

### 2.      Paragraph 53.

This offense for possession of paraphernalia  for which Mr. Vo was fined $300 should not receive any criminal history points under U.S.S.G. § 4A1.2(c) and n. (12), which applies to petty offenses.  As noted above, in determining whether this offense should receive criminal history points, the Court should use a "common sense approach" which compares the offense to the listed petty offenses as well as consider the punishment imposed.  Clearly, using such an approach, a conviction for possessing paraphernalia for which a fine of $300 was imposed, is similar or less serious than the offenses listed in § 4A1.2(c).[7]

---

[6]  U.S.S.G. § 4A1.3, Application Note 3(A)(ii) provides (emphasis added):

(A) Examples.  A downward departure from the defendant's criminal history category may be warranted based on any of the following circumstances:
. . .
(ii) The defendant received *criminal history points from a sentence for possession of marihuana* for personal use, without an intent to sell or distribute it to another person.

[7]  Offenses such as "careless or reckless driving, contempt of court, disorderly conduct or disturbing the peace, driving without a license or with a revoked or suspended license, false information to a police officer, gambling, hindering or failure to obey a police officer, insufficient funds check, leaving the scene of an accident, non-support, prostitution, resisting arrest, trespassing"

3.      **Paragraph 54.**

The "accessory after the fact" offense listed in this paragraph is a misdemeanor under Virginia law.  VA Code § 18.2-19 ("In the case of every felony, every accessory after the fact shall be guilty of a Class 1 misdemeanor").  He received a suspended sentence in this case and a $500 fine. As with the paraphernalia offense in Paragraph 53, he should not receive any criminal history points for this offense under § 4A1.2(c).

## II.   Application of the Sentencing Factors

### A.   Mr.  Vo's History and Characteristics Demonstrate That a Sentence That Does Not  Include Imprisonment Is Appropriate

Antony Vo is the son of Vietnamese immigrants.  His father, who had attended Viet Nam's version of West Point, fought the Viet Cong alongside American troops.  After American troops left Viet Nam, his father was imprisoned.  His mother and sisters tried to leave on a boat and when caught were also imprisoned.  Eventually, because of his service, the United States admitted his family to the United States.  Shortly thereafter, Antony was born in the United States.  His parents and sisters opened nail salons and while they worked long hours, they were able to make a decent life for themselves.  His parents divorced when he was only six years old and his father moved to another state, where he remarried.  As a young man, Antony worked in his family's businesses.  He has lived most of his life in Indiana.  He attended Indiana University.  When his father was diagnosed with cancer, Antony took a leave of absence from school to help care for him. After his father died in 2015, Antony returned to finish his college degree.  He is self-employed as an investor and providing advise investment advise to his family.

---

are only counted where "(A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense."

Multiple letters from friends, young and old, all describe Antony is similar terms.  They all describe Antony as a peaceful and compassionate young man.  A 67-year old veteran, Sonny Knowles writes that Antony is a "very nice young man, who loves our Country."  He's gotten to know Antony from playing tennis and joining him for breakfast.

Another friend writes

> As a registered democrat with a deeply liberal upbringing and owning an entertainment business in Los Angeles, I have chosen to keep my identity hidden but could not silently watch as one of my dear friends and one of the most peaceful kind humans I've met in my life is unjustly treated as a criminal. I first met Anthony Vo when we were students at Indiana University together.  He was a little older and as an out of state kid who knew nobody, he was instantly a dear friend. Our mutual love for music brought us together but our similar disposition on how to treat people with respect and live life with a sense of joy and wonder kept us close well beyond our college years.
>
> In the 10 or so years that I have known Antony, I have always viewed him as a man with pure intentions of being kind and loving to everyone he encounters. He truly is a light in my life and everyone who I've introduced him to.
>
> Anthony and I rarely discussed politics, but when we did it was always very calm and open minded. Although we don't always agree, we always listen to each other and respect the differences. When I was made aware of his presence on January 6th, I was confused as I knew that he would never participate in something so violent and horrible as the event I saw unfolding from afar through my liberal news intake. After some time, we got back in touch and I just wanted to make sure that he was okay.
>
> When we were physically together next, Antony was able to explain his story to me. It opened my eyes to the reality of the situation and proved that he is the Antony I know who is incredibly peaceful, respectful, insightful and joyful to be around. From the bottom of my heart, I believe Antony when he says that he thought he was allowed to be there that day and knows that if he didn't - there is no way that he would've shown up, brought his mother, photographed it and shared it on the internet.

It has been difficult to watch someone of such pure moral character who brings such a light to this world be torn down as part of a political nuance. Antony is a proud first generation American who loves his country, respects each and every person he ever comes into contact with and would never do anything to cause any harm or damage.

Antony is someone that contributes such positivity to this world and the people he encounters. It's hard to put into words just how fantastic of a human he truly is and how positive I am that he would never knowingly do any wrong.

Another long-time friend writes:

I have known Antony Vo for 14 years. I would like to share the experience & man I have gotten to know over this time. Fourteen years is a long time to hide shady character from someone especially since we have traveled so much and so closely together. We have been to California, Seattle, New York City, Key West, Mexico & the Bahamas together.  The distance traveled and time spent together makes me as or more informed than anyone to educate you on the man I know.

Antony Vo is the kind of man that would never hurt anyone & takes it as his responsibility to leave everyone better than he found them. When we attended college together Antony would always look after everyone closely and always offered rides to anyone who had too much to drink. Antony is the friend who is always there to talk if a friend has a problem or needs a listening ear.  In college Antony would constantly solve his moms' problems from hours away and at all hours of the night. He would always take his younger nieces and nephews for fun play days at putt put or the movies.  Looking after people is natural to Mr. Vo. His presence to his friends and family as a caregiver is essential.

I have traveled much of the country going to music festivals with Mr. Vo and have always been amazed by his kindness towards strangers. Antony Vo always made sure people around him had the food & water they needed to thrive even if it meant giving people his.  Having known Mr. Vo and watching how he is with people I have always been amazed how he would make time to stop and talk with the homeless beggars in New Orleans and give them a $20 bill to make sure they had a hot meal.  Antony and I have been attending New

Orleans Jazz & Heritage festival for ten years now. It is heartbreaking to know he might not be able to attend this year. His presence & energy will be sorely missed in New Orleans. I know that he would take care of a lot of people.

Having attended high school, college and numerous concerts & festivals with Antony I can confidently say this is all one giant mistake. Antony is not a criminal. Like always. Antony Vo does not pose a threat to anyone. I believe in my heart that Mr. Vo's intense curiosity lead him to investigate what was happening and was swept up into a deeply unfortunate situation. Surely we have all walked into the wrong building or class room in college. Anything criminal or malicious about Mr. Vo's behavior is completely and totally in the strongest terms against the man I have gotten to know the past fourteen years. This is undoubtedly all one giant mistake.

Antony Vo is a leader. Antony is always the friend who introduces new technologies, suggesting new ideas and talking about ways to improve all while providing a fun light hearted environment. It is hard to imagine a world where Antony Vo isn't there to lead his family and friends.

I want to thank you for taking the time to see the man I have gotten to know over the past fourteen years. Antony Vo is a man of strength, integrity and character. Wishing you all the best and thank you for understanding that is all one big mistake.

## B.   Nature and Circumstances of the Offense Do Not Warrant the 11-Month Sentence of Imprisonment the Government Requests

While Antony Vo entered the Capitol on January 6, the most salient aspects of his conduct as testified to by the Officer Henry, the case agent, is that at no time on January 6 was Mr. Vo violent, nor did he destroy property, nor did he encourage others to do any of those things. Officer Henry, who reviewed an extensive number of videos and images, including those taken by Mr. Vo himself, captured by CCTV and BWC, and from third parties testified that no incidents of violence or destruction of property by others in Mr. Vo's presence were captured in those materials.

Mr. Vo entered the Capitol through a door that was open, while law enforcement officers

looked on.  While an alarm was ringing, no evidence was presented that Mr. Vo understood the alarm to mean that he was not authorized to enter the Capitol building particularly in light of the open door and law enforcement officers who did not signal that entry was not allowed. Mr. Vo and his mother were seen smiling throughout the day; they were not seen angrily shouting at officers.  Before entering the Capitol, Mr. Vo did not knock over or set aside any barricades. At all times, Mr. Vo remained in the public areas of the Capitol; he did not enter the House floor or any private offices. When approached by an Officer and asked to leave, he promptly did so.

Those facts alone negate the justification for a sentence of imprisonment.

Nonetheless, it is also significant that Antony Vo did not wear any protective gear such as a gas mask or protective vest (as others did on January 6) and did not bring any pepper spray or any other weapons when he came to DC.  He came to DC to attend a political rally.  He did not come to take part in an insurrection or to impede the orderly process of government.  Officer Henry testified that prior to January 6, there was no mention of the Capitol in any of Mr.  Vo's messages or social media posts.  He came to DC to exercise his First Amendment rights, with the purest intents to participate as an American citizen.  After listening to the speeches that morning, along with tens of thousands of other Americans, he marched toward the Capitol.  It is significant, that in telling his followers to go to the Capitol, then-President Trump said:

> I know that everyone here will soon be marching over to the Capitol building *to peacefully and patriotically make your voices heard*.

Trump, Jan 6 speech (emphasis added).[8]  Throughout the day, Mr. Vo was peaceful; he never hurt anyone, or destroyed any property.

---

[8] As reported by NPR:  https://tinyurl.com/3rvd67yn

After January 6, unlike a number of others, Mr. Vo did not destroy the contents of his phone or delete his social media posts. He did not destroy the clothes he wore. He did not seek to hide his participation. All of his post-January 6 conduct shows that he lacked any consciousness of guilt.

Moreover, a sentence of probation with a condition of home detention and/or community service constitutes punishment. *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass").

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[9] *See, e.g.,* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased.") In short, there is little empirical

---

[9]   Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect.");; Zvi D. Gabbay*, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

support for the prospect that a period of confinement will be any more effective at deterring Mr. Vo or others from committing this offense.

### C.   A Sentence Below What the Government Is Seeking Would Avoid Unwarranted Disparities.

#### 1.   Sentences Imposed in Petty Offense Violations

As a starting point, had Mr. Vo been allowed to enter a plea of guilty to parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four), he would have faced a much less severe sentence. Not only is the maximum penalty for that offense 6-months imprisonment but in 94% of cases where there was a conviction on that charge, the government recommended a sentence of probation. *See* US DOJ, Sentences Imposed in Cases Arising out of the Events of January 6, 2021 at pp 1-9.[10] With the exception of three cases, in each of those instances the district court imposed a sentence at or below the government recommendation. The only three exceptions involved cases where this Court presided.[11] Count Four, 40 U.S.C. § the Court's decision to decline to accept Mr. Vo's guilty plea to the petty offense charged in Count IV, has had the effect of imposing a "trial penalty" on Mr. Vo.

---

[10] Chart dated 3/26/204 at https://www.justice.gov/usao-dc/media/1331746/dl?inline

[11]   *See, e.g., United States v. Bissey,* 21-cr-165-TSC (Gov recommended 36 months' probation, Court imposed 14 days' incarceration); *United States v. Miller,B.,* 21-cr-0266-TSC (Gov recommended 36 months probation/90 days home detention; Court imposed 20 days' incarceration); *United States v. Miller, S.,* 21-cr-0266-TSC (Gov recommended 60 days home detention/36 months probation; Court imposed 14 days' incarceration).

2.      **Sentences Imposed in Cases with the Same Four Misdemeanor Convictions**

•   *United States v. Rhine*, 21-687 (RC). Rhine went to trial and was convicted on the same four charges as Mr. Vo. The Court imposed a sentence of 4-months' imprisonment.

•   *United States v. David Blair*, 21-cr-186 (PLF). Blair, who carried a large confederate flag and a backpack containing a knife and duct tape, and pushed a large lacrosse stick against a police officer's chest while yelling that he would not submit to commands, pleaded guilty to civil disorder, 18 U.S.C. § 231) and was sentenced to five months imprisonment (ECF 55).

•   *United States v. Dropkin,* 21-cr-00734-JEB (JEB). Dropkin entered the Capitol Building a mere four minutes after the initial breach at the Senate Wing Door, where there clear signs of violent entry as the window adjacent to the door through which Dropkin passed had just been smashed out and Dropkin would have walked directly by a pile of shattered glass. Dropkin was then part of a large crowd that surged past a police line in the Crypt causing officers to fall back from their positions. After MPD officers in riot gear entered the Rotunda to contain the mob, Dropkin stayed in the Rotunda, positioned himself close to those officers, and rather than exit the building, he instead recorded several altercations with his cell phone. Dropkin was inside the Capitol Building for approximately one hour (ECF 22). While his priors were stale, he had several prior convictions. The court imposed a sentence of 30 days' imprisonment.

•   *United States v. Wood,* 21-cr-00223-APM. Wood incited others to violence, calling rioters forward, waving a blue Trump flag he found on the ground, and inspiring the crowds to continue their siege of the Capitol. Wood was the tenth rioter to breach the Capitol specifically through the broken-out window north of the Senate Wing Door. He joined others in pursuing police officers through the Brumidi corridors (1st floor), past the Senate Carriage Door (1st floor), up a staircase, and to the Ohio Clock corridor (2nd floor). Wood then left that group and backtracked to the first floor, back past the Senate Carriage Door, through the Brumidi corridors, and past the Senate Wing Door to the Capitol Crypt (1st floor). Wood then went through the Small House Rotunda (1st floor), up to the second floor Small House Rotunda, and once on the 2nd floor for the second time, Wood went through the House Speaker's suite of offices (entering at least three offices and the Speaker's conference room). Wood then entered the Capitol's Grand Rotunda, went towards the Senate Chamber, back to the Rotunda, and towards the House Chamber. At the House Chamber, Wood was close enough to the front of the group to be able to tell others that he and other rioters "just broke through Capitol police" and that they were "going to bust into the house chambers." He was also close enough to know that U.S. Capitol Police drew their firearms to protect the House Chamber, telling a group chat that "Alarms are

blaring," and "We are trying to take the house but they are pulling guns!" After being "hit with a tear gas bomb," Wood returned to the Rotunda. There, Wood very nearly left the Capitol through the East Rotunda Doors. Instead, he turned back and on separate occasions, directly pushed against MPD officers attempting to clear the Rotunda. Eventually, Wood was finally forced into the foyer between the Rotunda and the East Rotunda Doors and then out of the Capitol building. Wood spent a total of approximately eighty minutes in the Capitol, from 2:13 p.m. to 3:33 p.m. (ECF 55). In addition to the four misdemeanors, Wood was also convicted of felony obstruction. Wood was sentenced to 36 months' probation, with the first 12 months' on home detention.

### 3.       Sentences Imposed on Other January 6 Defendants

• *United States v. Finley*, 21-cr-526 (TSC). While Finley pleaded guilty to 18 U.S.C. § 1752(a)(1), he was a a chapter president of the Proud Boys, marched with them for several hours, saw violent confrontations and destruction of property before entering the Capitol and deleted social media posts, and videos and photos from his phone and advised others to do the same (ECF 38). This Court sentenced him to 75 days' imprisonment.

### 4.       Sentences in Non-January 6 Cases

• *United States v. Bronstein*, 15-cr-0048 (CRC). Five defendants stood up, one by one, shouting, interrupting a Supreme Court argument in protest over a prior decision of the Court. Only after litigating the constitutionality of the statute, did they plead guilty. When the DC Circuit reversed the district court, holding the statutes constitutional, the defendants pleaded guilty to two misdemeanor offenses. Each was sentenced to 12 months probation.

• *United States v. Dane Powell*, 2017-CF2-00145. Sentenced to 4 months' imprisonment after pleading guilty to charges of felony rioting and felony assault on a police officer. Powell was among 234 people arrested in the aftermath of various incidents on January 20, 2017, protesting the inauguration of President Trump. 15 others have pled guilty to misdemeanor rioting offenses, and charges against 20 other defendants have been dismissed. "Powell joined together with more than 200 other people in and around Logan Circle in Washington, D.C. The group formed a "black bloc" in which individual defendants wore black or dark colored clothing, gloves, scarves, sunglasses, ski masks, gas masks, goggles, helmets, hoodies, and other face-concealing and face-protecting items to conceal their identities in an effort to prevent law enforcement from being able to identify the individual perpetrators of violence or property damage. Some of the members of the black bloc were armed with hammers, crowbars, wooden sticks, and other weapons. Powell was among those dressed in black, and had in his possession a gas mask. Powell also attempted

to conceal his face with a mask. In addition, *Powell was in possession of a hammer, and a heavy wooden stick* with a flag attached to it; he admitted that he participated in breaking windows at two businesses and throwing a brick, large rock, or piece of concrete at uniformed law enforcement officers during the riot." Press Release Number: 17-144, USAO-DC

- Senate Confirmation Hearings for Justice Kavanaugh.  Hundreds of demonstrators who entered the Capitol with the express purpose of disrupting the Confirmation hearings were charged with disorderly conduct, crowding or obstructing and paid fines of $35 or $50.  At least 227 demonstrators were arrested between the start of the nomination hearings on Tuesday and the end of the testimony on Friday, according to the U.S. Capitol Police.  "Disrupting the hearings was a way for us to go directly into the homes of the American people to say, 'We will not be silenced and you need to be as outraged as we are,'" said Linda Sarsour, a co-chair of the Women's March and one of the organizers of this week's protests.  Leaders from the Women's March were among a broad coalition of organizations, including abortion rights groups, labor unions and advocated for gun control, behind this week's activism.  The Women's March partnered with the Center for Popular Democracy to help coordinate interruptions during the hearing and will assist demonstrators who are fined or arrested with legal and financial support, said Sansour.  Sansour said she was the first person to shout out on Day 1 of the hearing.  She was one of 70 people arrested that day.[12]  The photo below shows one of the Kavanaugh protestors being ushered out of the Senate confirmation hearing; she was simply fined without being charged with any federal offenses.



---

[12] *The Resistance at the Kavanaugh Hearings: More than 200 Arrests*, National Public Radio ("NPR"), September 8, 2018 at https://tinyurl.com/4w4vzvv4 .

In contrast to Mr. Vo, the young woman depicted above came to the Capitol with the express purpose to interfere with the Congressional confirmation hearings of a Supreme Court Justice. And did so. Surely, the confirmation of federal judges deserves the same level of respect as the certification of electoral votes. It is difficult to reconcile the leniency the young woman received with the harshness of the Government's treatment of Mr. Vo and request that he be sent to prison for a lengthy period.

### 5.     Judiciary Sentencing Information (JSIN)

Mr. Vo objects to the use of the JSIN data set out in the PSR ¶134:

> During the last five fiscal years (FY2019-2023), there were 15 defendants whose primary guideline was §2A2.4, with a Final Offense Level of 10 and a Criminal History Category of II, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 14 defendants (93%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 9 month(s) and the median length of imprisonment imposed was 11 month(s).

In this instance, the JSIN information is neither reliable nor useful because the offenses covered by § 2A2.4 are so diverse.[13] The listed offenses range from misdemeanor offenses, to 5-year felonies, to offenses that carry a statutory maximum penalty of life. Without knowing which offenses were included in the 14 whose average length of imprisonment was 9 months, the data is just pure speculation.

These cases and the JSIN information demonstrate that a sentence of 11-months requested by the Government is greater than necessary under the unique circumstances of this case. Comparing

---

[13] U.S.S.G. § 2A2.4, Commentary:

Statutory Provisions:  18 U.S.C. §§ 40A, 111, 1501, 1502, 2237(a)(1), (a)(2)(A), 3056(d).  For additional statutory provision(s), see Appendix A (Statutory Index).

Mr. Vo's behavior to the panoply of January 6 defendants, Mr. Vo's conduct was less serious before, during and after January 6 than many or most who entered the Capitol.  It was far less serious than those who used weapons they brought or picked up common items they found to use as weapons and caused serious bodily injury to police officers.  It is far less serious than those who entered the House floor or private offices, whether or not they vandalized those offices or carried away documents.  His conduct is far more similar to those who have received sentences of probation with home detention.  Moreover, Mr. Vo's slight stature and gentle nature is likely to make him susceptible to abuse in prison.  Therefore, a sentence of 11-months imprisonment is "greater than necessary to" impose just punishment and protect the public.

## CONCLUSION

For all these reasons, and for any other reasons that are just and fair, Mr. Vo respectfully requests that this Honorable Court impose a sentence that does not include imprisonment.  If the Court deems necessary, it should impose a term home detention and community service.  Such a sentence would be just, conform with the properly calculated guideline range, avoid unwarranted disparity and the judgment of the Probation Officer and respect the First Amendment interests that inspired Mr. Vo's participation in the political rally.  As Judge Reyes recently noted in a January 6 case, she "is not going to put people in prison for basically getting caught up in what happened.  For persons, who as Mr. Vo did not come to the political rally at the Ellipse with the intent to go into the Capitol but went into the Capitol as "the second wave" and did not engage in confrontations with law enforcement officers, imprisonment is "greater than necessary" to impose just punishment, protect the public and deter.

Respectfully submitted,

/s/ Carmen D.  Hernandez

**Carmen D.  Hernandez**
Bar No.  MD03366
7166 Mink Hollow Rd
Highland, MD 20777
(240) 472-3391

## CERTIFICATE OF SERVICE

I hereby certify that the instant notice was served on all counsel of record this 8th day of April, 2024 on all counsel of record via ECF.

/s/

**Carmen D.  Hernandez**

23