```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


  UNITED STATES OF AMERICA,      .
                                 .
            Plaintiff,           .  CR No. 21-0509 (TSC)
                                 .
      v.                         .
                                 .
  ANTONY VO,                     .  Washington, D.C.
                                 .  Wednesday, April 10, 2024
            Defendant.           .  2:01 p.m.
  . . . . . . . . . . . . . . . . .


                 TRANSCRIPT OF SENTENCING HEARING
               BEFORE THE HONORABLE TANYA S. CHUTKAN
                  UNITED STATES DISTRICT JUDGE



  APPEARANCES:

For the Government:           ERIC BOYLAN, AUSA
                              U.S. Attorney's Office
                              601 D Street NW
                              Washington, DC 20530

For Defendant:                CARMEN D. HERNANDEZ, ESQ.
                              Federal Public Defender Office
                              7166 Mink Hollow Road
                              Highland, MD 20777

Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue NW
                              Washington, DC 20001




Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.
```

1                        P R O C E E D I N G S

2              THE COURT:  Criminal action 21-509, United States

3     of America versus Antonio Vo.  Counsel, please state your

4     appearances for the record, starting with the government.

5              MR. BOYLAN:  Good afternoon, Your Honor.  Eric Boylan

6     on behalf of the United States.

7              THE COURT:  Good afternoon, Mr. Boylan.

8              MS. HERNANDEZ:  Good afternoon, Your Honor.

9     Carmen Hernandez on behalf of Mr. Vo, who is sitting at counsel

10    table with me.

11             THE COURT:  Good afternoon, Ms. Hernandez.

12       Good afternoon Mr. Vo.

13             MS. HERNANDEZ:  There are also some of his family

14    members in the courtroom.

15             THE COURT:  Good afternoon.

16             MS. HERNANDEZ:  I can wait to identify them when it's

17    my time to talk.

18             THE COURT:  That's fine.

19       I'm sure Mr. Vo appreciates your being here today.

20             PROBATION OFFICER:  Good afternoon, Your Honor.

21    Haley Spicer on behalf of the United States Probation Office.

22             THE COURT:  Good afternoon.

23       All right.  We're here for the sentencing of Mr. Vo, who,

24    after a week-long jury trial, was found guilty of Entering and

25    Remaining in a Restricted Building or Grounds, in violation of

1    18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in

2    a Restricted Building or Grounds, in violation of 18 U.S.C.

3    § 1752(a)(2); Disorderly Conduct in a Capitol Building or

4    Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and

5    Parading, Demonstrating, or Picketing in a Capitol Building,

6    in violation of 40 U.S.C. § 5104(e)(2)(G).

7         All right.  Before I proceed to sentencing, there are two

8    outstanding motions I have to address first.  The first is the

9    defendant's motion to stay sentencing pending the resolution of

10   the elements of 18 U.S.C. § 1752 by the D.C. Circuit in *United*

11   *States v. Griffin*, and defendant's motion for the Court to accept

12   Mr. Vo's guilty plea to a violation of 40 U.S.C. § 5104(e)(2)(G),

13   motion to vacate the verdict of guilt on the remaining counts.

14        With regard to the motion to stay pending resolution of

15   *Griffin*, Mr. Vo requested that the Court stay sentencing until

16   the D.C. Circuit has ruled on the issues in *Griffin*, which was

17   argued on December 4, 2023, and as he states, "will resolve the

18   intra-district split regarding the *mens rea* element of the

19   § 1752(a) offenses."

20        Mr. Vo argues that, should the D.C. Circuit reverse the

21   conviction in *Griffin*, that would also require a reversal of

22   Mr. Vo's 1752(a) convictions, and furthermore, if we proceed

23   today with sentencing, Mr. Vo would be seeking to remain on

24   bail pending appeal until the *Griffin* opinion is decided.

25        The government opposes, arguing that the defense motion

should be denied because *Griffin*'s outcome should have no effect

on the sentencing in this case and, more specifically, that even

if *Griffin* were to be decided in a way that is favorable for

Mr. Vo, there will be no change in the nature or circumstances

of Mr. Vo's offense, his history and characteristics, or any of

the other 3553(a) factors.

Is there anything you want to add?  And then today I

received the government's filing of emails on that point.

After Mr. Vo's plea broke down, there was an exchange -- and

I'm referring to ECF No. 1 --

MR. BOYLAN:  Your Honor, I don't mean to interrupt,

but I think the email goes to the defense's motion to vacate.

THE COURT:  Oh, that's right.  Not to stay.  Okay.

I just want to put it on record.  Here we go.

It is ECF No. 151 filed today.  And it is a notice of

filing by the government, and it attaches an email from Mr. Vo's

lawyer at the time, Maria Jacob, to my courtroom deputy Tim

Bradley, and Mr. Michael Romano, who was the assistant U.S.

attorney who was in the office prosecuting January 6 cases.

This is from Ms. Jacob, Mr. Vo's counsel, after the breakdown

of the plea:

On April 22, 2022, two years ago, Ms. Jacob states:

"Good morning.  After much discussion with Mr. Vo, he has had

a change of heart and no longer wishes to enter a guilty plea.

Would it be possible to convert the plea hearing next week into

1    a status conference instead?  Thank you, and sorry for the

2    change."

3         That was an email sent by Ms. Jacob on behalf of Mr. Vo on

4    April 22, 2022, after the breakdown of the plea, and therefore

5    it goes, frankly, to thoroughly undermine Ms. Hernandez's

6    assertion that the Court should somehow be compelled to accept

7    a guilty plea, which is another argument in and of itself.

8              MS. HERNANDEZ:  May I respond to that?

9              THE COURT:  Yes, you may.

10             MS. HERNANDEZ:  Thank you, Your Honor.

11        I don't believe that under the D.C. Circuit case law, any

12   of the Supreme Court case law, that what happened weeks after

13   the plea is relevant.

14             THE COURT:  Do you have any case you might want to --

15             MS. HERNANDEZ:  Well, yes.

16             THE COURT:  -- cite in support of that?

17             MS. HERNANDEZ:  In the memo that I filed yesterday,

18   the issue was, at the time that he tried to enter the plea, the

19   government was asking the Court to have him affirm a fact that

20   the D.C. Circuit refers to as an external fact that's not an

21   element of the offense, as I understand that charge.

22             THE COURT:  But it was a fact that was contained in

23   the statement of offense that -- let me finish -- that Mr. Vo

24   had signed, and therefore I am not limited in my questioning of

25   Mr. Vo with regard to the veracity of the information contained

1    in the statement of offense.  I'm not limited to simply the

2    elements.  I'm questioning him regarding the facts that he

3    had signed and agreed to.

4            MS. HERNANDEZ:  Correct.  And he confirmed all the

5    facts.  He affirmed that he -- in fact, he said, "Let me triple

6    check."  He affirmed all the facts.  He affirmed that he was

7    admitting all of the elements of the offense, and then I guess

8    Mr. Romano, the prosecutor, said to the Court, "Is he admitting

9    to the other facts?"

10       But my understanding of the case law -- and of course I

11   know the Court ruled as it did -- the case law says, at that

12   point, you're not allowed -- it's an abuse of discretion.

13   The case I cited in my reply authored by Judge Edwards is that

14   the Court is -- it's an abuse of discretion for the Court to

15   preclude a plea to go forward when the defendant refuses to

16   admit a fact, which the D.C. Circuit refers to as an "external

17   fact," because it is not an element of the offense.  That's the

18   D.C. Circuit's language.

19           THE COURT:  But that's not what happened here.

20   I didn't prevent the plea going forward.  I have before me the

21   transcript of the plea, which I've looked at again just to

22   refresh my memory since it was so long ago.

23       When I started questioning Mr. Vo with regard to the facts

24   contained in the statement of offense and he said that he

25   believed he had permission to enter, I said, "Why don't you talk

to your lawyer.  I really don't want to rush through this when

I've had some red flags," because there were some other issues

that had caused me some concern.

    And I said Mr. Vo's "being very careful, and he's being

very candid, and I appreciate that.  I want him to be candid.

I want him to be honest, and I want him to ask any questions or

raise any concerns he has.  So Mr. Vo is doing what -- nothing

wrong."

    "What I'm going to do is let you talk briefly in

a breakout room, and then we will come back and see if we need

to reschedule this," because my concern was Mr. Vo had not had

sufficient opportunity to really understand what he was entering

into and he was agreeing to.

    His lawyer said, "Thank you.  I would appreciate that."

And Ms. Jacob then, after a break, said, "I think we need a

little bit more time to fully answer Mr. Vo's questions and go

through this in a little bit more detail."  That's page 25 of

the plea transcript.

    I said, "I absolutely agree.  This is not something I want

to rush into.  And Mr. Vo has some questions.  They should be

answered.  I don't want anybody twisting anybody's arm here.

And Mr. Vo has an absolute right to have all of his concerns

answered, his questions answered.  This is fine.  No problem.

Let's move this to another date."

1        MS. HERNANDEZ:  So, Your Honor, my argument is that

2   what happened after that time is not relevant to the Court's

3   decision that day.  My argument is that the record, based on

4   not just one case, but multiple D.C. Circuit cases, and the one

5   that's most on point is *United States v. Washington*, where the

6   D.C. Circuit said it was an abuse of discretion.

7        The court wanted the defendant to admit -- the court

8   rejected the plea because the defendant would not admit that his

9   coconspirator was involved in the offense.  The government said

10  he's not being charged with a conspiracy, he's being charged

11  with a distribution charge, and therefore, whether he admits

12  what his codefendant did or didn't do is an external fact and

13  it's an abuse of discretion to deny it.

14       THE COURT:  But there again, Ms. Hernandez, you're

15  assuming facts not in evidence.  I did not reject Mr. Vo's plea.

16  I simply said Mr. Vo can have additional time to discuss his

17  case and his concerns with his lawyer and that they could come

18  back, and it was only upon inquiry as to how he wished to then

19  proceed at the next date that his lawyer unequivocally rejected

20  the plea on behalf of her client.

21       MS. HERNANDEZ:  So my position is that the emails are

22  irrelevant to the decision based on my reading of the case law.

23  The transcript at page 23, you asked Mr. -- and this is cited in

24  page 3 of my motion, ECF 138:

25       The Court says, "Okay.  At the time -- and you don't have

1    to know the exact time.  That's why I said 'approximately.'

2    At the time you entered the Capitol building on January 6, 2021,

3    did you know that you did not have permission to enter the

4    building?"

5        And I must say, the Court asked that question at the

6    prompting of the prosecutor.  You can see the prosecutor wanted

7    you to ask that question.  I agree it was in the statement of

8    offense.  And then the defendant says -- tried to answer your

9    question fully:

10       "I think at first -- well, the thing is, like, I was

11   standing at the entrance for the longest time, and I guess

12   I wasn't given much indication, because police officers were

13   standing in front there, and they gave me no indication that

14   I couldn't enter in.  They never said that I couldn't enter in.

15   They gave a thumb's up to you, you know --"

16       And the Court interrupted at that point -- he was still

17   talking -- and said, "Ms. Jacob, hold on a minute" -- I think

18   Ms. Jacob said, "Your Honor --" and you said, "Ms. Jacob, hold

19   on one minute.  I just don't see how we can go any further."

20   I read that as the Court believed -- let me back up.

21       If in fact it is an element of that offense that he has

22   to -- that he was required to know that he was prohibited from

23   entering the Capitol -- and I haven't seen any cases.  It's out

24   there.  I know a lot of defendants admit to that, but I haven't

25   seen any cases.  And in fact the opinion from the circuit

1    yesterday evaluated -- it didn't take that issue head on.  That

2    wasn't an issue before it, but it described why Congress passed

3    that statute, and it described that the reason that Congress

4    passed that statute and the reason it was not unconstitutional

5    under the First Amendment is that the Capitol is a working

6    building where Congress does its business, so it can preclude

7    anything going on.

8        If I am correct that it's not an element, it is my

9    opinion -- and of course the court -- it is my opinion that the

10   court and the government wanted him to admit a fact that's not

11   an element of the offense, but he did admit every other fact.

12   He admitted every other fact on there without equivocation, and

13   therefore, if the reason that he was not allowed to plead is

14   because of that fact -- which he's explaining to you the truth.

15   And, Your Honor, let me say this: Pleas --

16       THE COURT:  You know, Ms. Hernandez, you should be

17   careful how you start throwing around terms like "the truth,"

18   because I sat here for this trial.

19       MS. HERNANDEZ:  This is what he was thinking.  He's

20   explaining to the Court what his mindset was.  Only he can tell

21   the Court what his mindset was.  He was trying to explain -- I

22   was just going to say, plea agreements are very difficult.  The

23   government often wants defendants to admit facts that are not

24   what the defendant believes are accurate.  I've got three cases

25   right now where I'm struggling with this issue.

1    And so what my understanding of the case law is, one, I

2    don't believe that email is relevant to the decision, but two,

3    what they're still asking him to do is admit a fact which he

4    believes is not accurate and which is not an element of the

5    offense.  It's that combination.  And therefore, when he says

6    I don't want to plead, he doesn't want to plead if pleading

7    requires him to say something that he doesn't believe is true

8    and that's not accurate.

9        THE COURT:  And therein lies your problem.  Because

10   what happened on the day that his plea broke down was that he --

11   I was questioning him and -- and, you know, we can talk about

12   whatever we had in mind.  The record is, I think, abundantly

13   clear that I was questioning him with regard to the statement

14   of offense.  And as I said before, he signs and attests to the

15   statement of offense.  He says it's all correct.

16       And I always ask defendants when they're pleading:  Did

17   you read the whole thing?  Is it all true?  Every word?  You

18   can't come back at sentencing and say, well, I did what it says

19   in paragraph 3 but not in paragraph 4.

20       So I ask defendants -- and it is my practice to ask

21   defendants about not just the elements, but the other information

22   and factual information that is included in the statement of

23   offense that they have signed and agreed to.  If there are facts

24   in a statement of offense that the defendant does not agree to,

25   the time to work that out is before there's a signed plea

1    agreement because that's when -- I don't have any part.  I don't

2    have any role to play in that.  But once a signed statement of

3    offense is presented to me as part of a plea agreement, I'm

4    going to probe -- let me finish -- whether the whole thing is

5    accurate.  And that's what I was doing.

6        Now, if there was a problem with some of the facts

7    contained in the statement of offense, the thing to do was, in

8    the drafting of this, was to say, well, he can't admit to that

9    because that's not true.  He didn't.  He signed it and it was

10   presented to me.  So when I'm questioning him -- and I did not

11   -- I don't believe I said this is not an element.  I said:  Do

12   you need more time?  Let's continue another day so you can have

13   your questions answered.

14       That was a second opportunity for Mr. Vo, through counsel,

15   to negotiate a revised statement of offense with which he could

16   agree, and that would have been just fine.  But that's not what

17   happened.  And I disagree with you.  That's why the email is

18   absolutely relevant, because when asked is this going to be a

19   plea, what is this going to be, Ms. Jacob said he doesn't want

20   to plead, we're going forward.

21           MS. HERNANDEZ:  So as the Court has just indicated,

22   the Court is absolutely --

23           THE COURT:  He's raising his hand.  You may want to --

24           MS. HERNANDEZ:  No.  He's not going to say anything.

25           THE COURT:  Okay.

1          MS. HERNANDEZ:  My advice is he's not going to say

2    anything.

3          THE COURT:  Well, that's between y'all.

4          MS. HERNANDEZ:  Okay.  Number one, Your Honor, what

5    the Court just indicated, what happened at the plea hearing,

6    is a matter of record.  The transcript is there.  And that's my

7    point.  What happened at the -- the email that was sent two

8    weeks later or three weeks later requires additional facts to

9    explain why it was sent.  That is -- that may be a 2255 issue.

10    That's not here.

11          THE COURT:  I think the email supplements the record

12    in terms of what the parties agreed to, but we can differ on that.

13          MS. HERNANDEZ:  So the Court just described what

14    happened.  In fact, what the transcript shows is what happened.

15    And the Court correctly started asking him about the facts that

16    he had signed to, and he said, Let me triple check, and then he

17    came back and said I admit paragraphs 8 through 11.

18          The government steps in -- and paragraph 12 is the one that

19    says I had no permission to enter.  The government then steps in

20    and says to the Court, is he admitting that he knew that entry

21    was not permissible?

22          The Court then turns to him and asks that question,

23    and then he tries to explain to you what he thought about it.

24    He did, as to paragraph 12, explicitly say, I admit all the

25    elements of the offense.  It's the next line that says he wants

1    to -- he has permission to --

2           THE COURT:  Ms. Hernandez, are you saying that having

3    disavowed -- with Mr. Vo having disavowed one paragraph of the

4    statement of offense that he had agreed to and signed, that I

5    should have somehow said, okay, well, I'm going to ignore that

6    section?  Or in my opinion, the appropriate course of action was

7    to say, let's just stop this, then, and you all can go and

8    discuss the concerns -- you know.

9        I can't force -- I mean, I have a duty.  If I have before

10   me a signed document saying I agree and accept all the facts and

11   I did everything in the statement of offense, and during the

12   plea inquiry the defendant says, no, actually I don't -- I

13   actually disagree, I didn't do paragraph 12, I believe I have a

14   duty to stop.

15          MS. HERNANDEZ:  Well, what I am telling the Court is,

16   as I read *United States v. Washington* --

17          THE COURT:  I've read it.

18          MS. HERNANDEZ:  -- it's a similar situation.  The

19   transcript was not in the appellate, but the issue there was the

20   Court rejected the plea because the government wanted the man to

21   admit to something which the D.C. Circuit terms was an "external

22   fact."  What the D.C. Circuit says is, as long as you have -- as

23   long as the defendant had admitted -- the Court's obligation is

24   to determine that there's a factual basis for the plea.  That's

25   under Rule 11, and that's what the Court was doing.

1    THE COURT:  But don't you agree, Ms. Hernandez, that

2    your argument rests on an assumption that I rejected the plea?

3    MS. HERNANDEZ:  But you did.  At the point that he

4    said -- at the point that he would not admit a fact which under

5    D.C. Circuit terminology is "external," it's not an element of

6    the offense, the Court said, "hold on a minute, I just don't

7    see how we can go any further," it was at that moment when

8    he rejected, when he would not admit that he knew he had no

9    permission.  Again, if that's an element of the offense, that's

10   the end of the inquiry.  I have not seen a case that says that's

11   an element.

12   THE COURT:  I think we're going to have to agree to

13   disagree on how that's characterized because, first of all, I

14   did not reject the plea because I wrongly believed that that was

15   an element.  I stopped the proceeding, continued the change of

16   plea hearing to give Mr. Vo and his lawyer a chance to work out

17   their understanding of paragraph 12 and if necessary straighten

18   it out with the government.  I continued it.  I didn't say,

19   okay, we're done here, let's schedule a trial date.

20   MS. HERNANDEZ:  Well, again, I agree with the Court,

21   what happened at the plea hearing is -- we have a transcript.

22   The Court believes that you did not.  I read it as you did.  And

23   I understand -- that's why I think -- it doesn't matter what

24   happens afterward.

25   And I cite the Supreme Court case, the *Frye* case, where the

1    Supreme Court says if a defense counsel does not communicate
2    a plea offer to his client, the fact that at some later time
3    a different plea offer is made or a less favorable plea offer
4    is made doesn't change the facts of that day.

5        I believe under the facts here -- and I understand.
6    I understand that the government wants January 6 defendants to
7    admit -- I know it because I represent a number of defendants.
8    They want the defendants to admit that they knew that they were
9    not allowed in the Capitol.  But I do not believe --

10       THE COURT:  Then they shouldn't sign statements of
11   offense saying that they --

12       MS. HERNANDEZ:  Well, that's an issue about his
13   representation.  And again, when you questioned him, he was very
14   clear about what he was disagreeing with.  And again, he wasn't
15   even rejecting it.  He was trying to explain to you what his
16   state of mind was.  So the point is, we have a record.  The
17   Court sees it one way; when I read the agreement, I read it a
18   different way.  You're the judge.  I understand that.

19       THE COURT:  Interestingly enough, I never got any
20   communication from Ms. Jacob, his lawyer at the time, saying,
21   Judge, we believe that Mr. Vo should be allowed to enter his
22   plea; that's not an element.  This argument comes after Mr. Vo's
23   been convicted after a jury trial.

24       MS. HERNANDEZ:  Again, that may have to be taken up
25   at a --

1          THE COURT:  I'm sure.

2          MS. HERNANDEZ:  -- evidentiary hearing.  But I will

3  represent to the Court, because I represent a number of January

4  6 defendants, that the government always wants that in there,

5  and I often fight it.  There are times when it's clear that the

6  defendant knew.  I mean there are times when the evidence is

7  clear that the defendant knew, there are times when they don't.

8          And I will say to the Court because I have non-January 6

9  cases and January 6 cases where the government stands there and

10  says this is the plea offer, take it or leave it.  So if the

11  government is insisting that that element be put in there and

12  the Court did a lot of -- I will say this:

13          The Court did a lot more than a lot of judges, because you

14  went through the paragraphs and said do you admit this, do you

15  admit this.  So, yes, Your Honor went through a lot more than

16  other judges at the plea hearing, but the only thing he did not

17  categorically admit was this fact.

18          And if that fact, as I understand the case law, is not an

19  element, then that inquiry and that termination and whatever his

20  lawyers were telling him and whatever the government wanted him

21  to admit should not have played a part.  That's my view.  It

22  will not be the first time I am wrong, but I'm sure -- the D.C.

23  Circuit has a lot of cases on this issue.  Frankly, I was

24  surprised that there were so many cases on this issue.

25          THE COURT:  Okay.

1          MS. HERNANDEZ:  Because, I mean, I do remember once --
2     this is how old I am.  I remember when Judge Green was ordered
3     -- was reversed by the D.C. Circuit.  That's a long time ago,
4     and that's why I went looking for the case when I heard that
5     he had tried to plead.  And it is very prejudicial to him, as
6     I said.
7          Let me say this:  I did not respond to the government's --
8     respond to the motion to stay because it's clear that the Court
9     doesn't want to stay the case, and it is clear that the Court
10    has a lot of discretion in that regard.  So I didn't want to
11    jam up the record more than I already have.  I will say the
12    government claims that it makes no difference how you sentence.
13    I don't see how factually that can be the case if you're
14    sentencing on two petty offenses versus --
15         THE COURT:  We'll get to that at your allocution.
16         MS. HERNANDEZ:  I disagree with the government's
17    position that they say it wouldn't matter because that issue
18    arose in the context of staying the sentencing, which the Court
19    has made clear you don't want to --
20         THE COURT:  I'm not staying the sentencing.
21         MS. HERNANDEZ:  That's why I didn't reply to that.
22         THE COURT:  All right.
23         MS. HERNANDEZ:  Anyway, that's I think the record --
24    I believe the record is the transcript of the guilty plea, and
25    whatever happened outside, none of us know exactly what the

1    conversations were between Ms. Jacob and the defendant,

2    Ms. Jacob and the prosecutors, and I don't believe that -- if

3    the Court were going to look at that, then we'd have to bring

4    in Ms. Jacob.  We'd have to bring --

5              THE COURT:  That's for another issue.

6              MS. HERNANDEZ:  Exactly.  That's my position.  That's

7    why I'm saying that it's not relevant.  It may become relevant

8    in a different context, but I don't think it's relevant at this

9    point.

10             THE COURT:  Thank you, Ms. Hernandez.

11             MS. HERNANDEZ:  Thank you, Your Honor.

12             THE COURT:  Yes, Mr. Boylan.

13             MR. BOYLAN:  Your Honor, first of all, I think the

14   proper way to read the transcript of the Rule 11 hearing is

15   exactly what Your Honor has already stated.  The plea was not

16   rejected on that day, it was just continued, and for that reason

17   the email becomes dispositive.  The defendant voluntarily

18   withdrew his plea and he chose not to move forward.

19             THE COURT:  And he chose not to renegotiate or engage

20   in any -- I don't know.  But all I know, at no point -- I said

21   you all need to talk about this, and nobody said, okay, well,

22   we're going to try to get a statement of offense without the

23   offending paragraph.

24             MR. BOYLAN:  I think that's correct, Your Honor.

25   I do want to add a couple other things.  To the extent that the

1    transcript is read or construed to be a rejection of the plea, I

2    think that the Court was still proper and correct in doing that,

3    and it's true for two reasons.  Number one Your Honor already

4    touched on.  The Court has an obligation to ensure that a plea

5    -- a guilty plea is knowing and voluntary.

6    There were certainly questions about whether Mr. Vo was

7    going to enter that plea knowingly, and the Court was correct to

8    question him about that, as happens at every Rule 11 conference,

9    and there were concerns there.  So rejecting it on that basis

10    was correct.  I think it was also correct for the Court to have

11    rejected that because there was no factual basis to establish

12    that count.  The Court has to find a factual basis for every

13    count that a defendant pleads guilty.

14    The defendant disputed that he entered the Capitol --

15    that he didn't know he wasn't allowed to enter the Capitol.

16    There just isn't a world where a defendant could act willfully

17    and knowingly in parading inside the Capitol where he didn't

18    know that he wasn't allowed to be inside.  That's a  -- one is

19    a factual predicate for the other.  So without that information,

20    there couldn't have been a factual basis for the plea, and for

21    that reason independently, the Court was right to reject it.

22    I think that's all that I have, Your Honor, unless you have

23    any questions for me.

24    THE COURT:  All right.  Thank you, Mr. Boylan.

25    MS. HERNANDEZ:  So, Your Honor, I don't think any

1    of us in here --

2              THE COURT:  Ms. Hernandez?

3              MS. HERNANDEZ:  If the burden's on me, then I should

4    be able to --

5              THE COURT:  All right.  But, you know, let's try and

6    stick with some decorum here.

7              MS. HERNANDEZ:  So the Court is interpreting the facts

8    to say that there was no additional plea negotiation.  We don't

9    know, and the Court would not have become privy to that, because

10   as the Court already noted, you're not a part of those

11   negotiations.  So as the record stands, the only way we could

12   know that is if we brought Ms. Jacob here and had her testify,

13   which is not appropriate, I don't think.

14        Second of all, I don't believe that the government's

15   statement that a defendant cannot act knowingly and willfully --

16   and again I point to the jury instructions.  The Court never

17   told the jury he never had to know he was not allowed in the

18   Capitol.  "Knowingly and willfully" modifies the terms "parading

19   inside the Capitol."

20        If you read the *Nassif* opinion that was issued yesterday,

21   the D.C. Circuit appears to say that the congress's intent in

22   passing the statute is not to have any parades or demonstrations

23   inside the Capitol.  It says nothing about whether people who

24   come in with permission or not permission -- and in fact that's

25   the case.

1          We've had a number of events at the Capitol where people,

2     during the Kavanaugh hearings, people sat during -- protesting

3     immigration law.  People come and sit in the lobby in the

4     Rotunda, and they're carted away.  They come in through metal

5     detectors and everything else, and they are told to leave.

6          So they entered the Capitol knowingly -- I mean they were

7     admitted into the Capitol after going through security, and

8     they're still arrested or, you know, directed out and they do

9     and I believe 5104, which is why it's a petty offense, 5104 the

10    knowingly and willfully only modifies the terms parading --

11    those three terms, and it modifies "in the Capitol."

12         It doesn't say anything about knowing that you weren't

13    admitted into the Capitol.  And again, my view is that even if I

14    go through security, even if I got a letter of invitation from a

15    member of Congress, I cannot parade in the Capitol because that

16    violates 5104.

17              THE COURT:  All right.  Thank you.

18         At Mr. Vo's March 2022 plea hearing, he was extended a plea

19    agreement as to Count 4, Parading, Demonstrating, or Picketing

20    in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

21    That statute states the following:  "An individual or group of

22    individuals may not willfully and knowingly parade, demonstrate,

23    or picket in any of the Capitol buildings."

24         As indicated in the hearing transcript, when I reiterated

25    the count that Mr. Vo intended to plead guilty to, he first

asked: "And what is defined by 'parading'?"  This was the first
indication to the Court that Mr. Vo, although he had claimed
otherwise prior, did not fully understand what he was about to
plead to.  I then allowed Mr. Vo a sidebar with his counsel,
Ms. Jacob.

When we returned, Mr. Vo indicated that he wanted to
proceed with the plea.  However, it was clear to the Court
that there were remaining concerns when I tried to establish
the "willful and knowing" element of the charge.

I asked Mr. Vo, in looking at the relevant paragraphs in
8 to 12 of the statement of offense, whether he knowingly and
voluntarily admitted to all the elements of the offense to which
he's pleading guilty to.  Mr. Vo answered:  "Yes, I do."
8 through 12.

But this broad response was in conflict when the Court
attempted to receive more direct responses from Mr. Vo with
its questions.  As soon as the Court began to directly question
Mr. Vo as to some of the information and factual admissions in
the statement of offense, Mr. Vo balked.

For instance, the Court first asked: "On January 5th
or 6th of 2021, did you travel with a family member from
Bloomington, Indiana, to Washington, D.C., for the purpose of
protesting Congress's certification of the Electoral College
results on January 6, 2021?"

Instead of answering in the affirmative, Mr. Vo rephrased

the question and answered:  "I was there to be a part of the
Trump rally and to -- my purpose of being there was to voice my
concern for the election irregularities."  After the question at
issue here was asked with regard to whether he knew he did not
have permission, Mr. Vo responded that the police gave him no
indication that he couldn't enter in.

I then told the parties that there were some red flags
here.  And again, those red flags arose because of Mr. Vo's
disagreement with the -- some of the elements, but also the
information contained in the statement of offense, to which he
had signed and stated, under oath, that he agreed.  And yet when
questioning him more closely, it was clear that he didn't agree.

And so I believed it was incumbent upon me to stop the
proceeding, allow Mr. Vo to discuss this further with his
lawyer, and I guess if necessary, the lawyer could enter into
negotiations with the government, but that my role had to be
halted because of the red flags that I saw as arising in that
hearing.

I did not reject Mr. Vo's plea; rather, after witnessing
confusion on his part, I allowed him more time to discuss with
Ms. Jacob before making a decision.  As I said in that hearing
to Mr. Vo: "I really don't want you to stifle any questions or
concerns you have.  This is important, and it's your life."

And then subsequently the plea hearing was continued, and
subsequently Ms. Jacob indicated that they did not want to go

1   forward with the plea hearing.  They wanted to reject the plea

2   offer and convert the plea hearing to a status date, as the

3   email indicates.  For all those reasons, the defendant's motion

4   to accept Mr. Vo's guilty plea and vacate the remaining counts

5   is denied.

6       With regard to the motion to stay, as I indicated before,

7   I'm going to deny that motion.  Mr. Vo's trial -- I heard you

8   partially on that issue, Ms. Hernandez.

9       Mr. Boylan, did you want to respond to that?

10          MR. BOYLAN:  Yes, Your Honor.  The issue of *Griffin*

11  doesn't affect the sentence that will be set down here today

12  because, under 3553(a), those factors won't change.

13          THE COURT:  Well, I have to decide that, don't I.

14          MR. BOYLAN:  That's true, Your Honor.

15          THE COURT:  All right.

16          MR. BOYLAN:  But the sentence that the government

17  requests here is 11 months.  It doesn't exceed the 12-month

18  statutory maximum for the two counts that wouldn't be affected

19  by the *Griffin* decision.  So in any event, the Court can issue

20  a ruling, and the government would request that the Court issue

21  a ruling that the sentence would be the same regardless of the

22  decision in *Griffin*.  For that reason, there's no reason to

23  stay the sentencing.

24          THE COURT:  All right.  Ms. Hernandez.

25      Ms. Hernandez, before you begin, I'll just tell you that

1    I believe that I would have to make that finding.

2              MS. HERNANDEZ:  Correct.  And, in fact, the whole

3    sentencing memo is about the guidelines, which would not

4    apply -- you know, the --

5              THE COURT:  Right.  But the statutory maximum would.

6              MS. HERNANDEZ:  Correct.  But again, the government

7    didn't cite any particular case for that proposition.  But as a

8    matter of fact and law, it makes no sense, in my opinion, that

9    the Court would sentence exactly the same if you had a defendant

10   with four criminal counts versus two counts.

11             THE COURT:  Well, if I'm sentencing -- I mean, in

12   the three other four-count misdemeanor trials that I've had,

13   my sentence has always been to run concurrently.

14             MS. HERNANDEZ:  Correct.  But again, even the

15   government's -- as I cited from the government's -- in another

16   context, the government has requested -- has sought straight

17   probation in the petty offense cases, in like seven cases.  I

18   don't believe they've ever asked for probation or recommended

19   probation in the one-year misdemeanors.  So I don't think that,

20   as a matter of fact, that's accurate.

21             THE COURT:  I think that goes to the disparity argument.

22             MS. HERNANDEZ:  Well, again, I disagree with the

23   government's analysis.  They didn't cite a case, so I couldn't

24   come back with a case.  And I think as a matter of fact, we all

25   understand that when judges decide -- every factor, the 3553

1  factors changes if you're sentencing somebody on four factors

2  rather than two, I believe.  And I believe the Court -- but

3  again, it's Your Honor's finding.

4        THE COURT:  I think I'd have to decide whether my

5  sentence would be any different without the 1752 counts.

6     All right.  So I'm going to deny that motion because the

7  sentence I intend to impose today, regardless of Mr. Vo's

8  convictions under 1752, in consideration of the evidence that

9  I heard at trial -- remember, this is not a case of a plea.

10  This is the case of the evidence I heard at trial.

11     My sentence would be the same had Mr. Vo been convicted

12  solely as to counts 3 and 4, even if he weren't convicted of

13  counts 1 and 2, based on the evidence I heard at trial as

14  well as all the factors I have to consider under § 3553(a).

15     All right.  Now, in preparation for the sentencing, I have

16  received and reviewed the presentence report and the sentencing

17  recommendation from the probation department, as well as the

18  following documents: the government's sentencing memorandum; the

19  defendant's sentencing memorandum and corresponding character

20  letters, which are ECF Nos. 146 to 148; and the latest pretrial

21  compliance report, which was filed on April 5, ECF No. 145; as

22  well as the government's filing this morning, which I believe

23  is ECF No. 151.

24     So let me begin first with the presentence report.  The

25  final presentence report and sentencing recommendation were

1  filed on April 3, 2024.

2      Mr. Boylan, does the government have any objection to any

3  of the factual determinations as set forth in the presentence

4  report?

5          MR. BOYLAN:  No, Your Honor.

6          THE COURT:  Are you expecting any evidence or any

7  witnesses for this hearing?

8          MR. BOYLAN:  No, Your Honor.

9          THE COURT:  All right.  Mr. Vo, are you fully

10  satisfied with the services of Ms. Hernandez?

11          THE DEFENDANT:  Yes, I am.

12          THE COURT:  Do you feel you've had enough time to talk

13  with her about the probation department's presentence report as

14  well as any of the papers that have been filed in connection

15  with this hearing?  Have you had enough time?

16          THE DEFENDANT:  I wish we had more time, Your Honor.

17          THE COURT:  Do you need more time?  I mean, we're

18  going to go forward with sentencing today, but I can break if

19  you need to talk with her.  This case has been pending since

20  2021.

21          THE DEFENDANT:  Yes.  Your Honor, like, we've just

22  been working, working, working the past few days just to like,

23  you know, put together everything that we want to say, and it's

24  been -- I don't know -- like even up to right before court we've

25  been trying to scramble and address --

1          THE COURT:  What are you saying, Mr. Vo?  Do you want

2     to talk to your lawyer some more today?

3          THE DEFENDANT:  Yes, I do.

4          THE COURT:  How much time do you need, Ms. Hernandez?

5          MS. HERNANDEZ:  Well, Your Honor, he was preparing a

6     statement of facts he wanted -- I'm sorry -- he was preparing a

7     letter for the Court, and we were editing as we --

8          THE COURT:  See, this case has been pending, as I

9     said, since 2021.  We have had -- I can't even begin to count

10    the motions for continuances we've had for statuses, for plea,

11    for a trial date, change of counsel, the motion to stay the

12    sentencing, to a point where I think it's not unfair for the

13    Court to perhaps suspect that there is some effort here to delay

14    the final disposition of this case.  And I hesitate to raise it,

15    but that's what it looks like to me.  And I'm not delaying the

16    sentencing another day.

17         MS. HERNANDEZ:  So, Your Honor, I guess it's not fair

18    to Mr. Vo.  The truth is, I came in -- all of you were here.

19    The Court heard the evidence.  The government heard the

20    evidence.  I didn't.

21         THE COURT:  That's not going to change.  You weren't

22    the lawyer for the trial.

23         MS. HERNANDEZ:  The government has been -- I have

24    asked for multiple items.  They have provided me with the trial

25    exhibits.  It's difficult in any case to come in after a trial

1    because there was evidence that came in, there were exhibits

2    that came in, there was testimony -- there were all sorts of

3    things that I was not privy to.

4         In essence, I've had to prepare for sentencing -- the

5    preparation that is required for a sentencing when there's been

6    a trial and counsel was not trial counsel is almost as extensive

7    as what is required to go to trial because, as I say, exhibits

8    were introduced.  The government refers to them in the memo.

9    The PSR refers to them.  So I then have to go -- I talk to the

10   defendant, and he says to me X, Y, and Z, so I then have to pull

11   transcripts.  I then have to pull --

12        THE COURT:  Let me stop you.  The thing is, the

13   facts have already been determined.  A jury heard evidence over

14   several days and found Mr. Vo guilty on all four counts after

15   hearing the evidence.

16        I've looked at your filings.  You take dispute with a

17   number of matters to which the jury already ruled.  We're not

18   relitigating the facts of this case.  Mr. Vo can disagree about

19   what happened in this case; but I sat here and heard the

20   evidence, and a jury sat there and heard the evidence.  They

21   made their findings, they rendered a verdict, and I was able

22   to determine the evidence as well.

23        So we're not going to relitigate -- Mr. Vo's dispute or

24   disagreement with what the jury found or how the government

25   argued evidence is really not relevant for purposes of

1    sentencing.

2          MS. HERNANDEZ:  That's just -- I don't believe that's

3    accurate.  The jury was not asked to find did he say this, did

4    he say that.  The jury was asked to find was he guilty of this,

5    was he guilty of that.  That's a completely different inquiry

6    than the government quotes certain items that he said -- and one

7    in particular, if they're quoting from a different text, I don't

8    know that; but in one in particular the government quotes that

9    he said something, and they left out -- they left out the word

10   -- as I read -- I had to go looking for the exhibit, and the

11   exhibit said "apparently" my mom and I did something or other,

12   and then "LOL."  As quoted in the presentence report, the

13   "apparently" is left out and the "LOL" is left out.  Obviously --

14         THE COURT:  But I saw the exhibit.  I mean, the

15   presentence report's recitation of the statement of the facts

16   is taken from documents the probation office got.  This is a

17   case that went to trial, and therefore, that's neither here nor

18   there.

19         MS. HERNANDEZ:  No, Your Honor.  The presentence

20   report requests that a defendant if he wants to challenge a

21   fact, and the fact of what he said was not something that the

22   jury decided.  And as I say, the government quotes it -- unless

23   they're --

24         THE COURT:  Slow down.  Please.

25         MS. HERNANDEZ:  Maybe they're looking at different

1    exhibits.

2         THE COURT:  I have before me your lengthy sentencing

3    memorandum.  I have your objections to the presentence report.

4    So I think I know what your objections are.  If you need some

5    more time to talk with your client about what he wants to say or

6    something, I'll give you till 3:30.

7         MS. HERNANDEZ:  I would like to talk to him about what

8    he wants to say to the Court.

9         THE COURT:  I'm actually going to give you to 3:15,

10   because it's a quarter to 3:00 now, and we've been here since

11   two o'clock.

12        MS. HERNANDEZ:  Paragraph 26 of the presentence

13   report says, in two different exchanges on Instagram, Defendant

14   Vo said that he and his mother stormed the Capitol.  I then went

15   and asked the government for the exhibits.  He sent them to me.

16   The exhibit that I believe refers to that includes what I just

17   told the Court that says "apparently."

18       Now, when somebody says apparently something happens, it

19   generally means that's not what I did; that's what people are

20   saying.  So I believe that's a statement of fact that needs to

21   be corrected because of the way the plea agreement -- you know,

22   the way the law on presentence reports, if I don't object, then

23   the Court can use anything --

24        THE COURT:  And what I'm saying to you is I'm using

25   the evidence that I heard at trial.  But frankly, Ms. Hernandez --

1    and I'm going to give you till 3:15 -- you might be better

2    served and your client might be better served talking about

3    some of the things he's said since his trial.

4        Mr. Boylan.

5            MR. BOYLAN:  Your Honor, I think there's been a

6    statement that the government's misrepresenting the evidence,

7    and I don't take that lightly.  And it's completely unfounded.

8    The defendant had two separate text messages.  The one that

9    Ms. Hernandez refers to is trial Exhibit 461A, where the

10   defendant said, "Wow, apparently we stopped the vote count for

11   a bit."  And the one that's referred to in the PSR is 501A:

12   "My mom and I helped stop the vote count for a bit," just to

13   clear that up.

14           THE COURT:  That's my recollection.

15       And again -- you know, Ms. Hernandez, far be it from me

16   to tell you how to do your job, but there are a lot far more

17   troubling things about this case that I'm troubled by than

18   whether you disagree with the specific wording of an exhibit

19   at trial.

20           MS. HERNANDEZ:  Again, the prosecutor (inaudible) --

21           THE COURT:  Okay.  Stop it.  No.  We're not going

22   back and forth here.

23           MS. HERNANDEZ:  I was talking about paragraph 26,

24   which is a different statement than what he's describing.  And

25   again -- and this is the problem with coming in at the end of

1    the case, Your Honor.  The presentence report makes an assertion,

2    but it doesn't refer to the particular exhibit.  And I admit I

3    wasn't at trial, so I have to go looking to see if there's an

4    exhibit that matches.

5        If the statement had said exhibit blank says Y and Z, I can

6    either say, yes, that's what it says, or no.  But because of the

7    case law, if I do not object to these factual -- as the Court

8    well knows, if I do not object, then the Court can accept

9    everything in this PSR --

10            THE COURT:  That may be, but again, Ms. Hernandez,

11    there are battles you have to fight.  Again, this is not a

12    case where we're proceeding to sentencing after a plea.  There

13    was a trial.  There was a full evidentiary hearing.  I heard the

14    evidence.  I am frankly not -- I don't need the factual

15    recitation set forth in the presentence report.

16        I heard the evidence in this case, and there are more

17    problems that Mr. Vo needs to deal with and address at this

18    hearing than discrepancies between the presentence report and

19    what you believe the evidence was at trial.  There will be the

20    problems that he has including some of the statements he has

21    made since his conviction in this matter.

22        So I'm giving you till 3:15.  You decide what you want to

23    talk about at sentencing; but we're doing the sentencing today,

24    and we're not going past 4:30.

25            MS. HERNANDEZ:  I understand that.  If the Court

1    has some questions that it wants to have Mr. Vo answer --

2            THE COURT:  No.  I mean, Mr. Vo has seen the

3    government's sentencing memoranda.  Mr. Vo is well aware of the

4    statements he's made and the conduct he's engaged in since his

5    conviction in this case.  I don't need to give you preset

6    questions now.

7            MS. HERNANDEZ:  Mr. Vo is not self-representing,

8    Your Honor.  It puts me in a very bad position to say Mr. Vo

9    knows.

10            THE COURT:  Well, I believe the government has

11    addressed Mr. -- I'm not talking about anything I haven't been

12    presented with by the government, so you know what's in the

13    government's sentencing memorandum.

14        (Recess from 2:51 p.m. to 3:19 p.m.)

15            MS. HERNANDEZ:  Your Honor, thank you for giving us

16    time.  I would like more time to spend with him.  This is the

17    first time I'm meeting him in person, and as I've explained, I

18    think I was appointed January 30th of this year, I can't tell

19    the Court what time I started getting the transcripts, and the

20    government also provided me with trial exhibits at my request,

21    but there's a lot of materials.  This is the first time we're

22    meeting.  We've had a number of conversations.  It's not delay.

23    As the Court knows, we're all very busy in this courthouse these

24    days.

25            THE COURT:  I think it is delay, Ms. Hernandez, and

1    I'll tell you why:  I suspected that this might be the issue

2    when I got back to resume the hearing, and I asked my law clerk

3    to pull out a list of all the continuances and delays that I've

4    been asked to agree to since this case has come in.  And again,

5    I'm not even -- this isn't even exhaustive:

6        I continued an October 2021 status conference to December

7    2021.  That was continued several times.

8        In March of 2022, we vacated a status conference date and

9    scheduled a plea hearing for March 18.

10       On March 18, after that plea hearing broke down, we

11   continued the plea hearing to April 27.

12       On April 22, I converted that plea hearing, at the request

13   of defense counsel, to a status date.

14       On May 31, I set a pretrial order for trial set to commence

15   on November 9, 2022.

16       On August 16, 2022, I continued the trial date to February

17   2023.

18       In November of 2022, I granted in part and denied in part a

19   motion to continue and modify conditions of release.

20       I permitted Mr. Vo to travel outside of the country for a

21   cruise in February of 2023.

22       Eventually, trial was rescheduled to June of 2023.

23       In April of 2023, I granted another motion to continue the

24   trial to September 2023.

25       There was an oral motion to continue trial on September 18

1    that I denied.

2         And then we had trial.  And then I scheduled -- after

3    the trial was concluded, I scheduled sentencing for December 18,

4    2023.

5         In November of 2023, I received a motion from the defense

6    to continue the sentencing for Mr. Vo to conduct his PSR

7    interview and for medical treatment.  I granted that motion, and

8    sentencing was rescheduled to February 20, 2024.

9         On January 3, 2024, Mr. Vo filed a motion requesting

10   modification of his pretrial conditions of release to allow him

11   to travel.  I denied that motion.

12        After Mr. Vo's trial counsel filed a motion to withdraw,

13   we then had to reschedule the sentencing till today.

14        So Mr. Vo was convicted last year, and we are now in April.

15   And I understand that you may not have had a chance to meet

16   personally.  That's between you and your client.

17        And I will say, Ms. Hernandez, your focus on the materials

18   at trial is one focus.  And you're a defense attorney, I'm not

19   going to tell you how to do your job, but again, this is not a

20   sentencing after a plea in which case you need to talk about --

21   this is a sentencing after a trial.

22        I saw the evidence.  I'm able to judge the evidence.

23   A jury returned a verdict on the evidence.  And so as I have

24   said, my concern lies with factors such as acceptance of

25   responsibility, remorse, statements that your client has made

1    since his conviction, statements he's made after this matter

2    after he was -- after January 6.  Those are all issues.

3         The fact that he committed this offense while he was

4    admonished to be on good behavior in a prior offense, those

5    are all the things that really factor into my determination of

6    the 3553(a) factors.  I'm not going to sit here and hear you

7    argue about how I should, you know, interpret the evidence

8    that the jury and I heard at trial.

9         MS. HERNANDEZ:  What the Court is saying makes it even

10   more important that I review the evidence that the Court is

11   considering and that the government is arguing --

12        THE COURT:  Well, you have had time to do it, and I'm

13   not going to give Mr. Vo additional time because, frankly, delay

14   seems to be the order of the day here.

15        MS. HERNANDEZ:  So, Your Honor, what I would say is

16   the following:  The motions to continue were filed by counsel,

17   federal defenders in this case whom I assume that the Court

18   respects.  So --

19        THE COURT:  I do.

20        MS. HERNANDEZ:  -- if they filed -- as I do.  I'm a

21   former federal defender.  If they filed a motion, it was for

22   good grounds.  Also, the attorney who originally represented

23   Mr. Vo was not the trial attorney.  I don't know what happened

24   there.  In other words, Maria Jacobs --

25        THE COURT:  Ms. Hernandez, if you're going to file a

1     motion for ineffective assistance of counsel, that's after the
2     sentencing hearing.

3          MS. HERNANDEZ:  If the Court would allow me, that's
4     not what I'm saying.  What I'm saying is some of those delays
5     may be because of change of counsel, and we don't know why they
6     changed counsel.  As I noted, everyone in this courthouse is
7     extremely busy.  Everyone.  From the clerks, to the Court, to
8     every lawyer.  I'm working -- I have a pretrial conference --

9          THE COURT:  Ms. Hernandez --

10         MS. HERNANDEZ:  I'm just saying, if the bottom line
11    is if it were a plea my work would be less problematic because
12    everything that would have been presented to the Court would be
13    presented, I am driving blind.

14         THE COURT:  Then you should have filed a motion to
15    continue like all those other motions that were filed that I
16    granted.  You don't come in here and -- we've been talking for
17    an hour and 20 minutes, and now you want to continue the
18    sentencing?

19         I'm telling you, Ms. Hernandez, that I don't doubt your
20    word as an officer of court and as a respected attorney in this
21    courthouse, but I sense, based on everything that has transpired
22    before you were counsel and since, that Mr. Vo is doing every
23    single thing he can to avoid being sentenced for his behavior
24    and conduct for which a jury has found him guilty.

25         MS. HERNANDEZ:  That is not my opinion.  That is not

my opinion. Some of the issues with respect to -- I asked the government to give me exhibits after I read the presentence report. Maybe I should have done it beforehand.

THE COURT: You should have filed for a motion to continue if you weren't ready.

MS. HERNANDEZ: Well, the Court --

THE COURT: No. You are just asking for a continuance an hour and 20 minutes into the hearing, and I'm not going to give it. If there are things Mr. Vo wants to address, he can address them when he -- he can address them to the Court.

MS. HERNANDEZ: If I could put some things on the record, Your Honor. So I think the Court made it very clear when I first came into the case. You spoke fairly similarly to what you're speaking now, which is that you believed there were a lot of delays in this case. You made that very clear. You weren't prepared to consider any more continuances. I heard you.

And so I tried to -- as I do in every case, I try to do all the work that I can in the hours that there are. And I think I've done most of the work. The reason I'm asking for a lot more time is because Mr. Vo is preparing a statement that he wants to provide --

THE COURT: Mr. Vo has had seven months to prepare a statement.

MS. HERNANDEZ: Correct. And --

THE COURT: And he wasn't so pressed for time that he

1  didn't ask for modifications of conditions of release to be

2  allowed to travel, again.

3       MS. HERNANDEZ:  So the issues became more clear once

4  the presentence report gets filed.  The final presentence report

5  was filed seven days ago, as the rules require, but that's when

6  everything really gets focused in terms of what the Court is

7  listing.  So, yes, I guess he could have written the statement

8  in September, but he didn't.

9       With respect to his medical issues, I have a letter from a

10  doctor who had scheduled the --

11       THE COURT:  Medical issues now?

12       MS. HERNANDEZ:  No, no.  You mentioned that there were

13  -- that one of the continuances was based on --

14       THE COURT:  I granted that continuance.

15       MS. HERNANDEZ:  Correct.  So I'm just telling you --

16       THE COURT:  I don't need to go over it again.  I

17  granted the continuance.

18       MS. HERNANDEZ:  What I'm saying, that was not a phony

19  excuse.  I have the letter.  I've seen the letter from the

20  doctor about the cyst, and I saw a photograph of him with the

21  cyst.  That's all I'm saying.

22       With respect to his request for new lawyers, that arose out

23  of the problems with the global discovery.  As the Court -- as I

24  believe happened, when trial started in this case, the defense

25  counsel informed the Court that they had not had an opportunity

1    to review the global discovery.

2           THE COURT:  Ms. Hernandez, please don't spend another

3    moment of time -- we're going forward.  I suggest you use

4    whatever time you have left today to deal with -- we're going

5    forward to sentencing.

6           MS. HERNANDEZ:  The Court has made a number of

7    comments attributing delay, intentional delay, to Mr. Vo, and I

8    believe I have a responsibility to address the accusations that

9    the Court has made.  The reason the relationship between Mr. Vo

10   and his trial counsel, Eugene Ohm, who I know and like very

11   much, and the other AFPD, was over the global discovery.

12          My understanding is he came; he wanted to review it.  At

13   trial the Court chastised the defense counsel when they said

14   they had not reviewed it.  The record reflects that the Court

15   was very upset with them.

16          Mr. Vo is sitting there hearing the Court chastise his

17   lawyers about not doing something, which as a layperson he

18   believes is something that they were supposed to do, and then

19   that he came -- he wanted to review global discovery he was

20   never allowed to review.

21          So all those issues came to a head, and I believe what

22   Mr. Ohm told the Court was that they had to withdraw because

23   there was some concern that Mr. Vo was suggesting that they had

24   failed to do what they were required to do.  Again, part of

25   that understanding that Mr. Vo has is what he observed while

1    the trial was ongoing, which is that the Court said how can you

2    come in here and say you haven't had a chance to review the

3    discovery, and you chastised them for it.

4              THE COURT:  Ms. Hernandez?

5              MS. HERNANDEZ:  Yes.

6              THE COURT:  I admire your diligence, I really do.  And

7    your zeal.  It's in the finest tradition of public defenders, of

8    which I was one.  But you are right now failing to see the

9    forest for the trees.  We have spent an hour and a half talking

10   about things that don't really bear on this sentencing.

11         I've indicated where I have concerns.  I've indicated what

12   my focus would be.  We are now 90 minutes in, and we have not

13   really begun the sentencing.  I don't doubt you have matters

14   that will go to a 23-110 or an ineffective assistance of counsel

15   motion.  I don't have doubts there are issues -- I have granted

16   numerous motions to continue.

17         I'm simply putting on the record that this case is old.

18   There have been numerous motions to continue, and we came in

19   here -- you filed a bunch of motions.  None of them asked for a

20   continuance.  And I'm not so set in my position that I wouldn't

21   have considered whatever factors you raise, as I've said every

22   other time when I've granted a motion to continue, even when

23   I've done so reluctantly.  But you cannot come in --

24             MS. HERNANDEZ:  That's my fault.

25             THE COURT:  -- an hour into the hearing saying you

1    need more time.  We're going forward.  So I suggest you let me

2    continue with the hearing.

3            MS. HERNANDEZ:  Correct.  So Your Honor asked whether

4    he wanted more time, and he said he did.  I have been working

5    with him.  He's been preparing a statement that he wanted to

6    talk to the Court -- that he wanted to present to the Court and

7    that he wanted to submit to the Court, and that's what we're

8    doing there.

9            THE COURT:  I allowed Mr. Vo time to consult with you

10   regarding the sentencing.  I didn't specify what that was for,

11   but I will tell you this:  Mr. Vo can address the Court, as he

12   has a right to do, at the conclusion of your allocution and the

13   government's allocution, and I will hear him then.

14       But we are not -- I am not continuing this to give him

15   additional time when he has had since September of 2023 to

16   prepare whatever statement he wants to prepare.  He can speak

17   to the Court, as he has a right to do, at the conclusion of the

18   allocution.

19           MS. HERNANDEZ:  Correct.  And he has a right to

20   consult with his counsel and get advice from his counsel.

21           THE COURT:  And he has had that.

22           MS. HERNANDEZ:  Well, I am telling the Court that I

23   haven't had enough time to review the statement that I'm trying

24   to help him with.

25           THE COURT:  So when were you planning on raising this

1   issue of not having had enough time to review the statement?

2   When was that going to come up?

3          MS. HERNANDEZ:  As soon as you asked him if he --

4   we've been working on it --

5          THE COURT:  So you didn't know.  You didn't know your

6   client didn't have enough time till I asked him midway through

7   the hearing.  Is that what you're saying?

8          MS. HERNANDEZ:  No.  I guess it's my fault,

9   Your Honor.  If the Court sets a date, I tend to try to comply

10  with it, and I tend -- I tend -- I ask for a lot of continuances,

11  but again I know what the Court -- what the Court expressed

12  today about your dissatisfaction with the number of continuances.

13         THE COURT:  My frustration.

14         MS. HERNANDEZ:  Correct.

15         THE COURT:  Yes.

16         MS. HERNANDEZ:  I perceived that same -- at the

17  initial appearance, I perceived that the Court had those same

18  concerns, and so I have tried not to ask for a continuance.  As

19  I said when we started here, I didn't reply to the government's

20  opposition to the continuance because it appeared to me pretty

21  clear that the Court was not going to grant it, so why waste time.

22      I'm not asking you to continue the sentencing here.  All

23  I'm saying is I would like, I don't know, another half hour.

24  I understand it's a problem for everybody.  I'm just telling the

25  Court --

1           THE COURT:  I understand.

2           MS. HERNANDEZ:  I'm just explaining to the Court

3    where we are.

4           THE COURT:  And one of the things I always have to

5    weigh in making these determinations is a prejudice to the

6    parties, and I can tell you that I find your statement regarding

7    Mr. Vo's desire to present a statement to the Court, any

8    prejudice that will accrue to Mr. Vo for having less time to

9    talk with me about it will be ameliorated and lessened by the

10   fact that Mr. Vo is free to speak to this court, as he has a

11   right to do, at the end of the allocution.  And that's all I'm

12   doing.  We are going forward.  You have made your record.

13       All right.  With regard to the presentence report, per

14   pages 29 to 30 of the presentence report and the defendant's

15   sentencing memorandum, there are a handful of outstanding

16   defense objections.

17       I assume, Mr. Boylan, that you don't have any objection to

18   the factual recitation set forth in the presentence report?

19           MR. BOYLAN:  That's right, Your Honor.

20           THE COURT:  Okay.  Now --

21           MS. HERNANDEZ:  The factual recitation set out --

22           THE COURT:  Ms. Hernandez --

23           MS. HERNANDEZ:  -- in the --

24           THE COURT:  Ms. -- no, no.  You know what?

25           MS. HERNANDEZ:  May I respond?

1          THE COURT:  You may respond, but you need to observe

2     the rules of the courtroom.  I'm pretty loose -- I mean, you

3     know, I'm not going to *not* let people speak, Ms. Hernandez,

4     but this is not just shout out when you feel ready.

5          MS. HERNANDEZ:  Well, the presentence report, as

6     stated by the probation officer, the factual recitation, the

7     factual section is taken from the government.

8          THE COURT:  I understand.

9          MS. HERNANDEZ:  Explicitly.  The probation officer

10    said that.

11         THE COURT:  When I need to hear from you, Ms. Hernandez,

12    I'll ask you.

13         Per pages 29 to 30 of the presentence report and the

14    defendant's sentencing memorandum, there are a handful of

15    outstanding defense objections.  Paragraphs 12 through 28 deal

16    with the offense conduct.  Defense counsel objects to various

17    information contained in these paragraphs as noted in document

18    No. 135, which was filed on CM/ECF on March 25, 2024.

19         In summary, the defendant objects to the allegations that

20    are not relevant to his conduct and intent on January 6, 2021,

21    and the use of statements that were not presented at trial

22    including out-of-court statements made by unknown persons.

23         The defendant further objects to the use of statements made

24    by him which he states were expressions of political opinion

25    that are protected by the First Amendment.  In a supplemental

filing, which is ECF No. 136, the defense provided an alternate version of the offense conduct which has been incorporated into the presentence report at paragraph 32(a).

As noted in the report, the probation office obtained the information in the Offense Conduct section from the memorandum provided by the government to the probation office dated October 24, 2023, and the Criminal Complaint, which is ECF No. 1, filed on July 20, 2021.

The Court, having heard the evidence at trial, believes it is best positioned to determine factual matters concerning the representations made at trial. Questions of fact are to be resolved by a trier of fact; in this case, a jury. This court held a week-long jury trial in September of 2023 regarding Mr. Vo's conduct on January 6.

After short deliberation, the jury returned a verdict of guilty as to all four counts, meaning that the jury found Mr. Vo liable based on the government's evidence presented at trial. Therefore, I'm going to overrule the defense objections and accept the government's recitation of facts which were proven and accepted by the jury at trial.

With regard to paragraphs 32 and 48 through 50, defense counsel objects to the statements that the defendant did not demonstrate acceptance of responsibility, arguing that the defendant sought to enter a guilty plea on March 18, 2022, to Count 4.

1     The probation office's response is that the docket reflects
2     that on March 18 the defendant's plea hearing was continued, and
3     on April 22, the defendant's plea agreement hearing was
4     converted to a status conference.  Ultimately, the defendant
5     elected not to plead guilty and to go to trial, which was his
6     right, and I do not believe in punishing defendants for
7     exercising their constitutional right to jury trial.

8     So the defendant is not going to be given any greater
9     punishment for proceeding to trial because he has every right
10    to put the government to the test, but the defendant will not
11    get acceptance of responsibility for -- and it has nothing to
12    do with his going to trial.  The Court finds the defendant has
13    not accepted responsibility based on the statements he made
14    after the events of January 6 and the statements he has made
15    since his conviction in this case.

16    The Court reminds the parties that during this trial, the
17    Court was informed by Mr. Vo's pretrial compliance officer in
18    Indiana that Mr. Vo was violating his conditions of release by
19    -- Mr. Vo was ordered to stay away from the District of Columbia
20    except for court appearances.  He was here for his trial.  He
21    was still under his pretrial release conditions, and after
22    trial, every day, he was going down to the jail to take part in
23    the protests and rallies for the so-called January 6 "hostages"
24    that were taking place down at the jail.

25    I want to make it very clear that the Court is not finding

that Mr. Vo doesn't have responsibility because of his political views.  Mr. Vo was in violation of the conditions of his pretrial release, and Mr. Vo is fortunate that the Court did not step him back the minute I found out he was violating his conditions of release.

Moreover, Mr. Vo's statements since his conviction in this case convinced this court that he has not accepted responsibility, nor has he shown any remorse for his part and his role in the riots on January 6.

Pursuant to sentencing guideline §3E1.1 note 2, the acceptance of responsibility adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial.  The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.  Therefore, no revisions were made.

This is the response of the probation office to the presentence report pending the Court's resolution, and my resolution is that Mr. Vo has not demonstrated, based on the record before it, any acceptance of responsibility in this matter.

Mr. Vo's assertion that he sought to plead guilty and went to trial only to "assert and preserve issues that do not relate to factual guilt" the Court finds nothing to be more than a creative argument.  Not only do the sentencing guidelines dictate that I don't have to find that that adjustment applies to Mr. Vo

1    as his case proceeded to trial, but also I said, more importantly,

2    from his actions during and following his guilty verdict that he

3    does not hold any remorse or responsibility for his actions.

4        With regards to paragraph 52 to 54, defense counsel objects

5    to the calculation of Mr. Vo's criminal history points, asserting

6    that none of Mr. Vo's prior convictions should count under

7    sentencing guideline §4A1.2(c)(2), as they are misdemeanor and/or

8    petty offenses involving marijuana.

9        Defense counsel further objected to the information

10   contained in the offense description related to possession of

11   firearms since there were no charges filed in relation to the

12   firearms offenses.  Probation office responded to that matter,

13   and the Court will adopt the probation office's recommendation

14   that sentencing guideline §4A1.2 is applicable, as Mr. Vo's three

15   prior sentences meet the guidelines provisions and are not

16   excluded under the guidelines application note 3.

17       The Court notes also that Mr. Vo's participation in the

18   riots, and therefore his participation in the criminal conduct

19   on January 6, was done at a time when he was under admonition in

20   a prior case to be on good behavior.  And while that may not

21   rise to the level of committing a crime on supervised release,

22   the Court certainly notes that Mr. Vo had a heightened

23   responsibility not to be engaging in any law-breaking since he

24   was under an admonition of good behavior and nonetheless flew

25   here and participated in the riots in the Capitol, and therefore

1    I do not believe that it would be appropriate to disregard

2    §4A1.2's application.

3         Furthermore, as to the defense counsel's objection to the

4    information with regard to firearms, while it's true that Mr. Vo

5    was not charged with any firearm offenses, I can, if I choose

6    to, take into consideration any information concerning the

7    background, character, and conduct of the defendant.

8         I'll be perfectly clear, Ms. Hernandez, that I generally

9    don't factor in uncharged conduct, and I'm not factoring the

10   firearm information in my sentencing decision at all.  He wasn't

11   charged with it, as you know the reason he wasn't charged with

12   it, and it bears no role in my determination.

13        With regard to paragraph 99, defense counsel objects

14   to the calculated sentencing range.  The defense argues that

15   pursuant to defense counsel's sentencing guidelines calculation,

16   the appropriate guideline range should be zero to six months.

17   For the same reasons that I've said before which I'm including

18   the prior convictions, I disagree with that guideline range.

19        MS. HERNANDEZ:  The decision by the D.C. Circuit

20   yesterday eliminates one of the arguments as to the base offense

21   level.

22        THE COURT:  One of the government's arguments?

23        MS. HERNANDEZ:  No, my argument asking for application

24   of 2B, so that no longer applies.

25        THE COURT:  And I was -- that's correct.  The defense

1    disagrees with the government's assertion that guideline §2A2.4

2    applies to defendant's conduct, which are the bases of misdemeanor

3    offenses for which he stands convicted.  Defense also disagrees

4    with the government's assertion that defendant willfully violated

5    the conditions of his pretrial release.

6        Probation office has updated paragraph 99 of the report to

7    reflect the amended sentencing guidelines in response to the

8    government's objections with respect to the use of guideline

9    2A2.4 as the prevailing guideline.

10        As the government indicated in their filing yesterday,

11    pointing to *United States v. Nassif*, and as Ms. Hernandez has

12    indicated, the D.C. Circuit affirmed the district court and held

13    in *Nassif* that it correctly applied guideline §2A2.4 to

14    defendant's conviction under 1752(a)(2).  Therefore, the Court

15    will overrule that objection and proceed with §2A2.4.

16        Paragraph 30 of the presentence report states that

17    defendant, in his response to the draft presentence report,

18    emphasized that he did not actually cause any of the alleged

19    damages to the Capitol and therefore asserts he's not liable

20    for restitution.

21        Interestingly enough, when Mr. Vo sought to enter into the

22    plea which he's now arguing I should somehow force acceptance

23    of, he agreed, as part of that plea offer, to pay restitution

24    for damage caused to the Capitol.  So it's an interesting

25    position he's taken now and one with which I am going to disagree.

Mr. Vo does not have to be personally responsible for the

destruction to be liable for restitution.  Yes, Ms. Hernandez.

MS. HERNANDEZ:  So the plea agreement in the January 6

cases, part of the plea offer requires defendants to agree to

$500 restitution.

THE COURT:  And Mr. Vo had agreed to that.

MS. HERNANDEZ:  Correct.  But the plea agreement is

not in force.

THE COURT:  Are you saying I can't order $500 in

restitution or that I shouldn't?

MS. HERNANDEZ:  I'm saying both.  There's case law on

when restitution can be, and I cited the case --

THE COURT:  So are you saying all the plea agreements

that provide for $500 in restitution for misdemeanor cases are

somehow illegal?

MS. HERNANDEZ:  No.  I'm saying that a party can agree

to something that is not required by law or authorized by law.

And those plea agreements, there's been disputes about that, but

there's no question that the parties agreed.  And I believe some

of the judges have indicated that to the extent that's part of

the bargain in the plea agreement, it's permissible to impose it.

But what I am objecting to under what I believe to be relevant

binding case law is that the Court -- that in order to impose a

restitution award, it has to be damages caused -- directly caused

by the defendant.

1          THE COURT:  Okay.  Mr. Boylan, regardless of whether
2     I accept that argument --
3        You certainly don't disagree that I could impose a fine on
4     Mr. Vo.  Is that correct?  I know what Probation has said with
5     regard to his ability to pay a fine because he has court-
6     appointed counsel, but are you suggesting that the Court could
7     not impose a fine in this case?
8          MS. HERNANDEZ:  No.  The Court has different findings
9     to make for a fine.
10          THE COURT:  Mr. Boylan, do you want to say anything
11     further on this?
12          MR. BOYLAN:  Your Honor, I'll be frank.  I'm not
13     terribly familiar with the case law behind Ms. Hernandez's
14     assertion.  I know, as Your Honor has said, that restitution has
15     been ordered in a litany of January 6 cases.  I think the Court
16     would be on firm ground to order it in this case.
17          THE COURT:  All right.  Thank you.  I'll deal with
18     that at the time I impose sentence.
19        Mr. Vo also objects in his sentencing memorandum to the
20     use of the JISN data found in paragraph 134 of the presentence
21     report.  The JSIN data's not pure speculation, as defendant
22     asserts, but rather an accumulation of data for similarly
23     situated defendants.
24        Moreover, Mr. Vo conveniently overlooks that, under
25     this language on the JSIN website, the United States Sentencing

Commission states the following:  The "sentencing data provided
does not reflect the Commission's recommendation regarding the
appropriate sentence to be imposed or represent the Commission's
official position on any issue or case."

"If the court does consider the sentencing information
provided by JSIN as part of its consideration of the factors in
18 U.S.C. § 3553(a) when imposing sentence, it should do so only
after considering the properly calculated guideline range and
any applicable departures provided for in the *Guidelines Manual*,"
that this is one factor of many that the Court *may* take into
consideration in sentencing an individual defendant, and it does
not outweigh any other § 3553(a) factors.

MS. HERNANDEZ:  Your Honor, the argument is not that
the data is always inappropriate.  It's just that because in
this particular case the guideline applies to a range of
offenses, from one-year misdemeanors, as here, to misdemeanors
that carry -- I'm sorry -- to felonies that depending on the --

THE COURT:  I'll make it easier on you, Ms. Hernandez.
I'm not considering it.

MS. HERNANDEZ:  I'm just saying it's not like --

THE COURT:  Okay.  Now, with regard to determination
of the sentencings options, as the PSR indicates, the guidelines
only apply to counts 1 and 2, which are Class A misdemeanors.
Counts 3 and 4 are Class B misdemeanors for which the sentencing
guidelines do not apply.  I've already stated that my sentence

is going to run concurrent, and I've stated for the record that my sentence would be no different had Mr. Vo been convicted only of counts 3 and 4, which are nonguideline offenses.

The guideline as to Count 1 and 2 -- the guideline for Count 1 is §2B2.3, and the guideline for count 2 is §2A2.4. Pursuant to §3D1.2(b), those counts are grouped as they involve the same victim or one or more acts or transactions.

As the PSR states, for counts grouped under §2D1.2(a) to (c), the offense level applicable to a group is the offense which produces the highest offense level. Here, §2A2.4 produces the highest offense level, which applies to Count 2 and has a base offense level of 10.

The presentence report also finds that there are no specific offense characteristics, victim-related adjustment, adjustment for role in the offense, adjustment for obstruction of justice, acceptance of responsibility, and Mr. Vo does not meet the criteria as a zero-point offender under §4C1.1(a)(1). Therefore, Mr. Vo's total offense level is 10. The statutory maximum terms of imprisonment for counts 1 and 2 are one year imprisonment as to each offense.

And I may also impose a term of supervised release of not more than a year. Multiple terms of supervised release shall run concurrently. The guidelines range for supervised release as to counts 1 and 2 is a year. The maximum fine is $100,000, and a special assessment of $25 per count is mandatory.

For counts 3 and 4, each offense carries a maximum term of imprisonment of six months and a fine of no more than $5,000. Because these offenses meet the definition of a petty offense, a term of supervised release is not applicable.  The guidelines do not apply to counts 3 and 4, as I said before, as they are petty misdemeanors.  A special assessment fee of $10 per count is mandatory.

The guidelines provide that the fine range is between $4,000 and $40,000.  Mr. Vo is eligible for up to five years of probation because the offenses are misdemeanors, and this is applicable to all four counts.  Multiple terms of probation, should the Court impose a term of probation, shall run concurrently.

Under the guidelines, if I impose probation as to counts 1 and 2, the term shall be at least one year but not more than five if the offense level is six years or greater.  Since the applicable guideline range is in Zone B of the sentencing table, the Court may impose probation with a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention.

Given Mr. Vo's prior criminal history, the guidelines imprisonment range is 8 to 14 months.  But as noted, pursuant to §5G1.2(b), the statutory maximum term as to counts 1 and 2 is 12 months.

Since the applicable guideline range is in Zone B of

1    the sentencing table, the minimum term may be satisfied by a

2    sentence of imprisonment or a sentence of imprisonment that

3    includes a term of supervised release with a condition that

4    substitutes community confinement or home detention, provided

5    that at least one month is satisfied by imprisonment, or a

6    sentence of probation that includes a condition or combination

7    of conditions that substitute intermittent confinement,

8    community confinement, or home detention for imprisonment.

9         Now, have I stated correctly the statutory and guidelines

10   framework under which we're operating notwithstanding the

11   objections, Ms. Hernandez?

12        MS. HERNANDEZ:  Right.  But there are objections.

13   I object to the Court's -- particular findings of the Court.

14   I don't know if you want me to --

15        THE COURT:  The objections have been made on the

16   record and are noted.

17        MS. HERNANDEZ:  Yeah, but some of the -- in the event

18   that I need to state them for the record, there are objections

19   that I need to make, but I'll wait till the end or however the

20   Court wants me to --

21        THE COURT:  Go ahead and do it now.

22        MS. HERNANDEZ:  Okay.  So the probation officer, in

23   rejecting application -- the criminal history §4A1.2(c),

24   mentioned the firearms, but that applied only to -- there were

25   three separate ones to which 4A1.2(c) by its terms applies, and

1    the statement the probation officer made referred only to one

2    of the three.  So to the extent no decision was made by that,

3    I object.

4         Separate and apart from 4A1.2(c) is the downward departure

5    recommendation by the commission, or note by the commission,

6    regarding simple possession of marijuana, that the Court has to

7    address that, I would submit.  And again, the statement that one

8    of the offenses involved guns has nothing to do with the statutory

9    -- with the guideline language and only applies to one.

10             THE COURT:  I think I've addressed all of those issues

11    prior.

12             MS. HERNANDEZ:  Okay.  I just -- with respect to the

13    Court's findings that Mr. Vo -- I know the Court made a finding

14    during trial that Mr. Vo violated the conditions of pretrial

15    release.  I believe that his -- that it was not a -- I would

16    object.  I would submit to the Court that it was not a willful

17    violation, because the terms of the pretrial conditions

18    indicated that he had to stay away from D.C. except for court.

19         Well, he was in D.C. for court.  What he did -- the

20    conditions of pretrial release did not indicate what he could

21    or could not do while he was in D.C., and the Court itself

22    indicated that, you know, obviously, he could go to dinner and

23    that type of thing.  I submit to the Court it was a prayer

24    meeting.  So he has First Amendment --

25             THE COURT:  Okay, wait.

1          MS. HERNANDEZ:  -- protections.

2          THE COURT:  Are you seriously arguing it was

3   appropriate and Mr. Vo was in compliance of his conditions of

4   release to be in the District of Columbia for the purposes of

5   trial, and when trial was not in session, for him to go down to

6   the D.C. jail not for a prayer session, to sing and support --

7   sing with and support the individuals who were being held in

8   pretrial detention for violent crimes, that was -- that was in

9   keeping with his conditions of release?  I just want to make

10  sure I'm getting this right.

11         MS. HERNANDEZ:  Yes.

12         THE COURT:  Okay.

13         MS. HERNANDEZ:  I'm saying that the conditions of

14  pretrial release do not make clear that was prohibited, and in

15  order to find a willful violation, the conditions have to be

16  clear.  And number two, his attendance there was a peaceful

17  gathering, and his attendance there is protected by the First

18  Amendment.

19     I would submit to the Court that had he been at -- had he

20  gone to the Kennedy Center or to a museum or to watch the cherry

21  blossoms, no one would have argued that he violated his

22  conditions because he was in D.C. -- it's conditions -- if a

23  client had asked me, while I'm in D.C., do I have to run back to

24  my hotel room and can't walk out?  I would say no.  You can go

25  jogging, you can go see the monuments.  So I think it's not a

willful violation.  And further, there are First Amendment
interests in his ability to attend.

THE COURT:  Okay.  Well, we'll just have to agree to
disagree on that one.

The parties are aware of the probation office's recommendation
in this case.  Probation office has recommended two years of
probation as to counts 1 and 2, $500 in restitution, and a $70
special assessment.

So at this point I'll give the parties the opportunity to
address the Court.  Mr. Boylan.

MR. BOYLAN:  Thank you, Your Honor.

Your Honor, the government's recommended a sentence of
11 months of incarceration and 12 months of supervised release
for the defendant.  The government believes that that's an
appropriate sentence for this case, it's not more than
necessary, because of the defendant's characteristics.

He's shown — before January 6, on January 6, and since
his conviction for the crimes he committed that day — that the
defendant believes he is above the law.  He believes he doesn't
have to play by the rules.  He doesn't have to follow the rules.
He doesn't have to follow the law.

I'll start with the events of January 6 and that day.  The
defendant knew that he shouldn't enter the Capitol, and he went
in anyway.  Those are facts that were proved at trial to a jury
that sat in those chairs.  Nevertheless, the defendant continues

1    to dispute those facts.  He went inside.  He knew he shouldn't
2    go inside.  He saw people using a fence as a ladder.  He saw
3    tear gas.  He climbed inside scaffolding.  He filmed a man
4    climbing the outside of the building.  He heard an alarm and
5    looked at the sign, and he went through the doors.
6         Your Honor, I'd like to read some of the text messages
7    and social media messages that were admitted at trial that
8    illuminate not just the defendant's conduct, but his mindset that
9    day.  I'm sure Your Honor's familiar with these, you heard them
10   at trial, but I think that it bears repeating for those reasons.
11        He bragged that he "stormed the fuck out of the Capitol
12   with my mom LOL."
13        "My mom and I stormed it LOL."
14        "My mom and I got to storm the Capitol."
15        Referring to the police officers: "Yeah, they stood down
16   and retreated after we clearly outnumbered them."
17        He sent the same photo of himself and his mother inside
18   the Capitol at least five different times.
19        He said, "Wow, apparently we stopped the vote count for a
20   bit.  My mom and I helped stop the vote count."  He said, "So
21   easy to storm the Capitol with arms.  They had it easy today."
22        Your Honor, these messages, they aren't hyperbole.  They
23   aren't sarcasm.  They're a window into the defendant's mind.
24   He told us what he believed, told us what his intent was.
25   He knew what he wanted to happen, and he knew what did happen.

1    He described them factually.  They stopped the vote count, and

2    he was proud of it.  He bragged about it.

3        All that was on the day of January 6, but the defendant's

4    belief that he was above the law started long before that.

5    We have a criminal history for the defendant that reaches back

6    almost seven years.  Three convictions.  And as the Court has

7    pointed out, he was under an admonition from a court of law to

8    be on good behavior on the day of January 6.

9        And I would note, Your Honor, if we had had this sentencing

10   six months or a year ago, there's a provision in the sentencing

11   guidelines which has changed, the defendant would have been

12   possibly, probably, available for a two-point increase because

13   he was on probation.  I'm not arguing for that, but it shouldn't

14   escape the Court's knowledge.

15       The defendant's mindset that he's above the law hasn't

16   changed since January 6.  As the Court's pointed out, he deified

17   his pretrial release conditions, went to freedom corner.  Even

18   since his conviction in this case, he hasn't stopped disputing

19   his guilt.

20            THE COURT:  I'm sorry.  Is that what it's called now,

21   "freedom corner"?

22            MR. BOYLAN:  That's what I've heard it referred to

23   as, Your Honor, yes.  He's been on multiple podcasts where he's

24   disputed his guilt, he's disputed the facts that the jury found

25   in this case.  He's made several tweets.  He referred to a zero

jury of peers.  He's referred to this court as a kangaroo court.
If you go on his Twitter page right now, or at least as of about
two hours ago when I checked it last, Your Honor, he refers to
himself as a "J6 wrongful convict."

That same mindset has pervaded his filings in this court.
Your Honor can look at the PSR in which he says that he saw no
posted signs; at no time before entering the building was he
told he was not allowed to enter the Capitol.  He believed he
was engaged in First Amendment protected activity.  All of those
are facts that the jury found were not true.

Your Honor, one of the things that's most moving to me is
the defendant's lack of remorse.  He's never accepted -- he's
never shown any remorse for the events that happened that day,
threatened to do it again.  He said it was so easy to storm the
Capitol with arms, he wanted to come back.

He isn't sorry for what happened to other people.
The defendant has never thought about the events of January 6
from anyone's perspective but his own.  He never thought of
the police officers who were inside that building and fought so
hard.  He said, "They had it easy today."  Never thought of the
civil servants who were in that building afraid for their lives.
He hasn't thought of the millions of Americans who could have
been and were affected by the effect on the vote count proceeding
on January 6.  It's only his own perspective that matters.

Your Honor, I want to talk briefly about the comparator

cases that I think are appropriate for this case.  Both of the ones that are cited in the government's sentencing memo are cases before Your Honor — the *Hager* case and the *Alford* case — and I think those cases give an appropriate spectrum from which to judge this case.  The charges were identical in both of those cases.  The facts were strikingly similar.

Hager entered the exact same door as the defendant. Alford received a sentence of 12 months.  Admittedly, he was found to obstruct justice and testified untruthfully, so he got plus 2, so probably more culpable than the defendant here. Hager received seven months, but he had no criminal history. So, from the government's perspective, he falls on the other side of the spectrum.  The government has recommended a sentence of 11 months, which falls squarely between those two.

Your Honor, I'll close with this:  It's true that the defendant didn't participate in destruction.  He didn't assault anyone.  But he's not charged with that, and he's had the benefit of not having done those things.

What the defendant did do is contribute to a mob.  He was one raindrop in a flood.  Like other defendants, he participated in an attack on an American institution, an attack on the democratic process and the peaceful transfer of power.  For those reasons, unless the Court has questions, the government recommends a sentence of 11 months.

THE COURT:  Thank you, Mr. Boylan.

1          MR. BOYLAN:  Thank you, Your Honor.

2          THE COURT:  Ms. Hernandez?

3          MS. HERNANDEZ:  Your Honor, first of all, the jury

4    did not make the findings that the government claims it did.

5    The jury found the defendant guilty.  On what basis the jury

6    found the defendant guilty, we don't know because they were not

7    asked.  I will refer the Court to the cross-examination of Case

8    Agent Henry who, under oath, indicated -- and he's the case

9    agent, so he was familiar with all the evidence, his job to

10   review all the evidence.

11         Under oath, he repeatedly answered that he had reviewed

12   all of the photographs, all the videos in Mr. Vo's phone and

13   generally speaking, and he did not observe any violence around

14   Mr. Vo, in the vicinity of Mr. Vo, which leads to the conclusion

15   that Mr. Vo did not see any violence.  He indicated this --

16         THE COURT:  Ms. Hernandez, are you arguing his

17   culpability?  Because the jury's verdict is the jury's verdict.

18   This is not the place to argue that the jury's verdict was based

19   on insufficient evidence.

20         MS. HERNANDEZ:  That's not what I'm arguing, Your Honor.

21         THE COURT:  He was found to have committed the offenses.

22   Now, if you want to talk about -- address some of the factors

23   the government raised, but --

24         MS. HERNANDEZ:  That's exactly what I'm doing,

25   Your Honor.

1          THE COURT:  Okay.

2          MS. HERNANDEZ:  Exactly.  The government stood up

3     here and said he did this, he did this, he did this, and the

4     jury found it.  No.  The jury didn't find that he saw violence.

5     The jury didn't find that he -- all the different things that

6     the government claims that happened that day and that Mr. Vo

7     saw, the jury did not make findings because no jury has ever

8     been requested to make those kind of specific findings.

9          THE COURT:  Let me see if I can move this along.

10          MS. HERNANDEZ:  I'm addressing what the prosecutor

11     stood up here and told Your Honor.

12          THE COURT:  Let me stop you.  And again, you can do

13     your allocution however you want, but I'm your audience at this

14     point.  And I heard the evidence, and I saw what the videotapes

15     and the photographs depicted.  So I could tell -- you can stand

16     up here and tell me that he didn't see violence or he wasn't

17     aware there was rioting.  I would submit to you that's not the

18     best use of your time, but if that's what you want to argue,

19     go ahead.

20          MS. HERNANDEZ:  Well, I will submit to the Court the

21     testimony on cross-examination of Case Agent Henry.

22          THE COURT:  Which I heard.

23          MS. HERNANDEZ:  At pages 1060 through -- I'd like to

24     make that part of the record.  1060 through --

25          THE COURT:  You do know it is already part of the

1    record, right?

2              MS. HERNANDEZ:  Excuse me?

3              THE COURT:  It is already part of the record.

4              MS. HERNANDEZ:  I want to make it part of the

5    sentencing hearing.

6              THE COURT:  Go right ahead.

7              MS. HERNANDEZ:  Because he was specifically asked

8    whether, in reviewing the evidence, whether he -- I'm trying to

9    -- I don't want to misstate -- whether he -- his testimony was

10   did Mr. Vo -- did any violence take place around Mr. Vo.  His

11   answer was no.  And his answer was based on the extensive review

12   of discovery.  That was his answer.

13       So to the extent -- again, to the extent -- let me back

14   up.  Mr. Vo stands convicted of misdemeanors, Your Honor.

15   Misdemeanors.  The government stands up here and may be -- I

16   guess my experience representing federal defendants is that I

17   have represented a number of violent career offenders and other

18   defendants.  I know that the Court is very compassionate about

19   the persons that appear before Your Honor.  You generally do not

20   impose, you know, severe sentences.

21       Unfortunately for Mr. Vo, I would submit the Court in the

22   January 6 cases is an outlier.  I will -- I mean I've looked at

23   -- for example, in the 5104 cases, there were about 70 of them

24   where the government recommended probation.  Only three times

25   did the sitting judge reject that recommendation and actually

1    impose jail time, and in each of those three occasions it was

2    Your Honor.  I'm --

3                THE COURT:  I know.

4                MS. HERNANDEZ:  And I mean the truth is that there are

5    judges in this courthouse, some of whom impose harsh sentences

6    and some -- you know, there are judges that are harsher and less

7    harsh generally across the board.  I'm just telling the Court

8    that in January 6 cases, Your Honor is an outlier based on the

9    evidence.  And as -- I'm not -- that's the Court's prerogative,

10   right?  The Court has discretion to impose sentencing.  I am

11   just -- I'm just pointing out that fact which is concerning

12   for someone who appears before Your Honor in these -- which is

13   concerning for me as I stand here and try to represent Mr. Vo.

14               THE COURT:  I understand.

15               MS. HERNANDEZ:  Number two, again, the government's

16   argument that Mr. Vo has some extensive criminal history is

17   baffling to me based on my 40 years of federal criminal

18   experience, because he's in criminal history II to begin with.

19   Each of the offenses are misdemeanor offenses, which our

20   president just issued a proclamation pardoning every defendant

21   who's convicted of a federal marijuana possession or D.C.

22   marijuana possession.

23       And yet we're looking at -- and yet that's the record here,

24   and we're being told that it is evidence of his disregard for

25   the rule of law and all sorts of things, misdemeanors, Your

1    Honor, for which he received fines because in America today most

2    of our jurisdictions, including the District of Columbia, look

3    at marijuana possession as a civil fine, right?  It's just like

4    speeding or something like that.  And yet somehow that record is

5    being represented to be some evidence of his lack of respect for

6    the law.

7        So I would ask the Court to take that into account.

8    I requested that the Court -- which the Court rejected, and so

9    did the probation officer -- to apply two provisions, one which

10   specifically addresses downward departures with respect to

11   misdemeanors -- I'm sorry -- with respect to marijuana

12   convictions, and the second is an application of the criminal

13   history under 4A1.2(c), which says these offenses do not get

14   criminal history points unless the defendant got a sentence of

15   a year or -- it has specified provisions.

16       In each of Mr. -- and it tells the Court to use a

17   commonsense approach and consider the offense of conviction,

18   which these -- which we were telling the court not to give

19   criminal history points, and that has not been done in this

20   case, in my opinion.

21       I don't believe that -- I believe Mr. Vo, for the past

22   lengthy period of time -- I guess we're going now almost on

23   three years of pretrial release.  I know that the Court made a

24   finding that he violated the conditions of release, but I do

25   not believe -- and I'm making this argument -- I would make

1    this argument in any case.  I don't believe that that finding is

2    correct, because ordinarily we require a condition to be real

3    clear before the Court would find a violation.  And again, as I

4    say, I'd be hard pressed to believe that if instead of being

5    there he would have gone to the Kennedy Center, for example,

6    that the Court would have said, yeah, you're violating.

7        And the other thing -- and I understand.  It's kind of

8    distressing to me the way -- because I was looking on Twitter

9    the other day, or X.  Apparently some citizen sent a picture of

10   Mr. Vo at the prayer meeting, or the freedom corner or whatever

11   it's called, not committing any crime, not -- there was no

12   violence or anything like that, and sent it to the probation

13   officer.  I kind of find it creepy that we've become a nation

14   where people go out of their way not knowing and then send

15   information to the probation office.  It reminds me, you know,

16   of some Communist countries.  I'm an immigrant in this country.

17   You know, I --

18            THE COURT:  Well, as am I.  Doesn't bother me at all.

19            MS. HERNANDEZ:  Well, it bothers -- I'm being very--

20            THE COURT:  I'm sure.

21            MS. HERNANDEZ:  -- candid.  I'm telling the Court I

22   find it creepy what we've become in terms of -- the political --

23            THE COURT:  Ms. Hernandez, I gotta tell you, your

24   client's charged with being part of a violent -- even though

25   he's not charged -- he's charged with being part of a mob to

1    stop the peaceful transfer of power, and you're telling me why

2    you're concerned with what we've become?

3            MS. HERNANDEZ:  Yes.

4            THE COURT:  That's pretty ironic.

5            MS. HERNANDEZ:  Well, first of all, and I think it's

6    pretty clear from the facts that he came to D.C. for a rally,

7    Officer Henry said there was not a single comment about the

8    Capitol before January 6.  He came here for a political rally

9    protected by the First Amendment.

10       He walked to the Capitol after listening -- a lot of the --

11   let me say this:  A lot of the persons who entered the Capitol

12   didn't go to the rally.  They went directly to the Capitol and

13   started the mayhem.  That is not Mr. Vo's situation.

14       A lot of the defendants who've been charged in January 6

15   came prepared for battle.  By that I mean they brought protective

16   gear, gas masks, pepper spray, makeshift weapons.  That's not

17   Mr. Vo.  Mr. Vo came here with his 67-year-old mother.  He stood

18   at the -- he stood at the speeches, and then he walked peacefully

19   to the Capitol as -- whatever President Trump is responsible for

20   or not responsible for, he explicitly suggested to the crowd

21   that they walk peacefully -- he used that term -- to the Capitol

22   and make their voices heard.

23       There is case law -- every person who demonstrates at

24   the Capitol for any reason — for reasons that we agree with,

25   for reasons that we disagree with — goes there with the express

1    purpose of trying to have the legislature not do what they

2    propose.  That's what they do.

3        During the Kavanaugh hearings, hundreds of women attended

4    the rally and were quoted in the paper.  One of the women was

5    the leader of the Women's March, which I attended, and she was

6    quoted as the reason she came to the capital for the confirmation

7    hearing was to stop it.  And she boasted that she was the first

8    person arrested that day, and she said that they had -- her

9    organization and a number of other organizations had collected

10   funds to pay for the bail of the people.

11       And over 200 women were -- and men, but mostly women --

12   intentionally interrupted the hearings.  And by that I mean they

13   went into the committee hearing one by one.  All they got was

14   fines.  They weren't even charged with a single misdemeanor.

15   All they got were fines.

16       I believe the Court has to take that into account in

17   determining the -- in avoiding unwarranted disparity.  There is

18   a case that I cited -- I don't know if the Court has ever seen

19   the videos of the demonstrations in 2017 when President Trump

20   took office.  They burnt down --

21           THE COURT:  I've seen the video, Ms. Hernandez.

22           MS. HERNANDEZ:  Okay.  They're ugly.  The one

23   gentleman that I cited, because there's a DOJ press release, was

24   convicted of two felonies including assault on a police officer.

25   He came to the protest wearing gas masks, with bats, and

1    everything else.  He got four months in prison.  Those were

2    felonies, and they came prepared for battle.

3         Mr. Vo did not come prepared for battle.  I'm not here to

4    defend those who did.  I'm not here to defend those who broke

5    windows.  I'm not here to defend those who hit police officers

6    or threw things at them.  I am here to defend one young man.

7    There is nothing in any of those pictures where you see him

8    angry, nastily screaming at the police, calling them names,

9    not one picture of that.

10        I will compare that to Mr. Nassif, the case that the D.C.

11   Circuit just decided.  He took the stand, according to the

12   circuit opinion.  He was charged with this.  He went to trial

13   on the same four misdemeanors.  He took the stand, and the judge

14   found him to have perjured himself.  According to the opinion by

15   the D.C. Circuit, he was yelling at the -- confrontational

16   statements, he encouraged people to enter the Capitol.  He got

17   four months in prison.  And he perjured himself.  And he went to

18   trial on the same four misdemeanors.

19        Mr. Vo did not do any of those things.  He didn't take the

20   stand and perjure himself.  He didn't bring any weapons with

21   him.  He didn't do any of those things.  None of those things.

22   There's the case which I cited, which Judge Cooper decided,

23   where five protesters entered the chamber of the Supreme Court

24   during an oral argument, and one by one stood up and interrupted

25   the Court.  One stood up, interrupted the Court, was arrested

1    and sent out.  Five of them.

2        Their express purpose was to interfere with the proceeding.

3    They challenged the constitutionality of the statute as applied

4    to them.  The circuit said it's constitutional.  Judge Cooper

5    gave them 12 months' probation.  Again, those people went in

6    there with the express purpose of interrupting a Supreme Court

7    hearing.

8        Now, I understand that the Court -- this court and I

9    believe almost every judge in this district -- looks at what

10   happened on January 6 as *sui generis*.  But frankly, as an

11   American citizen, as a defense lawyer, I don't think -- I think

12   the judiciary, court hearings, confirmation hearings for judges

13   deserve the same level of respect.

14       And Mr. Vo did not enter the Capitol with the express

15   purpose -- there's nothing in his conduct before or in his

16   text messaging or anything before he entered the Capitol, in

17   contrast to a lot of other January 6 defendants, there's nothing

18   in the record that he came with the express purpose of

19   interfering.  By the time he enters the Capitol, the proceedings

20   had already been suspended at least, I believe, more than a half

21   hour.

22       He entered through a door, in contrast to Nassif, the case

23   that -- where the door -- there were alarms, no question.  But

24   the door was -- it was not one of the doors that had broken

25   glass or that had in his presence any confrontation with police,

1    and there are police officers standing by the side as he's

2    entering the Capitol.

3        Now, I understand the government's arguments, and I

4    understand the jury's findings, but the bottom line is that

5    when someone is doing something and a police officer -- and

6    I understand the testimony because I've been in a number of

7    these trials.

8        A number of the officers -- not the officers necessarily,

9    but the brass, the U.S. Capitol Police, said that they were

10   outnumbered and at certain points they just -- the only thing

11   they could do is back up and let things happen.  But the

12   defendant, Mr. Vo, as he's entering the Capitol, doesn't have

13   all this information.

14           THE COURT:  This isn't closing argument, okay?

15           MS. HERNANDEZ:  No, I'm just --

16           THE COURT:  Ms. Hernandez, you have been talking now

17   for 25 minutes, and you're relitigating the facts of the case.

18           MS. HERNANDEZ:  I'm not relitigating the facts of the

19   case, Your Honor.  I am suggesting to you that you have to --

20   in making a decision as to the 3553(a) factors, the nature and

21   circumstances of the offense, I believe you have to look at what

22   he did.

23           THE COURT:  I am.  And unlike you, I was actually here

24   and saw the evidence.

25           MS. HERNANDEZ:  I am only -- the only thing I can do

1    is read the transcript. And Officer Henry was, to me, very

2    clear on what he believed had happened. And the government

3    is not telling you that -- Mr. Vo did not injure anybody --

4         THE COURT: You know, defense lawyers keep coming in

5    and telling me this in misdemeanor cases, and I'm not sure why,

6    because if he had injured anyone, or fought anyone, or broke

7    anything, or destroyed anything, he'd have been charged with --

8         MS. HERNANDEZ: Correct.

9         THE COURT: So he's already received the benefit

10   of his lack of violent behavior by only being charged with

11   misdemeanors. So it really doesn't advance the ball for you to

12   stand here and tell me he didn't fight. I know that because he

13   would be charged with felonies.

14        MS. HERNANDEZ: Well, for one, it reflects Congress's

15   considered judgment that his conduct is a misdemeanor.

16        THE COURT: It is a misdemeanor. On that we are in

17   complete agreement.

18        MS. HERNANDEZ: A misdemeanor. Had he done any of

19   those other things -- I'll point the Court to -- you sentenced

20   my client and another young man early on. They pled to the

21   5104, the parading charge, two young men. They went in there.

22   The codefendant went in there, stole some papers from some

23   office, and the Court gave him just -- no, I'm sorry. I think

24   the Court gave him 30 months. I'm sorry, 30 days. 30 days.

25   And they stole papers. They stole papers.

1          THE COURT:  I remember that case.

2          MS. HERNANDEZ:  At least that one guy stole paper,

3    not my client.

4          THE COURT:  He was 19 years old.  Your client's 31,

5    with a criminal history.

6          MS. HERNANDEZ:  With misdemeanor simple possession of

7    marijuana.  I just -- I'm --

8          THE COURT:  Three.

9          MS. HERNANDEZ:  Of marijuana.  The president of the

10   United States has pardoned --

11         THE COURT:  Ms. Hernandez, I have disregarded previous

12   convictions of possession when they were long ago, long before

13   the offense, but the thing that really stands out to me and why

14   I refuse to disregard them in this case is he was under admonition

15   for good behavior at the time he did that.

16         MS. HERNANDEZ:  That was the last one.  The first one

17   is from 2017.

18         THE COURT:  Well, you know what?  He doesn't get three

19   chances.  And so, you know, you could talk about that.  I have

20   in the past discarded those kinds of convictions.  I'm not doing

21   it here.  So I know the case you're talking about.  I remember

22   the case of those three young men.

23         MS. HERNANDEZ:  I think it was two young men.

24         THE COURT:  Two young men.  And I took into

25   consideration all the 3553 factors, and you could certainly take

1    exception to my sentences in all these cases, and that's fine.

2    I have a certain amount of discretion that I exercise, but I do

3    consider each case individually.

4         MS. HERNANDEZ:  Correct.  I'm not taking exception.

5    I'm saying the Court is required to avoid unwarranted sentence

6    disparity, and the only way to make that assessment is to submit

7    to the Court comparable cases.  In the case of Mr. Finley, who

8    was the president of the West Virginia --

9         THE COURT:  Proud Boys.

10        MS. HERNANDEZ:  -- Proud Boys.  A very nice young man.

11   He was in his 30s.  He marched with the Proud Boys for two

12   hours.  He never went to the speeches.

13        THE COURT:  He also didn't go inside.

14        MS. HERNANDEZ:  Yes, he did go inside.  Yes, he did

15   go inside.

16        THE COURT:  The Capitol?

17        MS. HERNANDEZ:  Yes.

18        THE COURT:  Oh, yes.  He did go inside.  He was

19   charged with a felony, but he didn't break anything.  But

20   I remember --

21        MS. HERNANDEZ:  He ended up pleading guilty to a

22   misdemeanor.

23        THE COURT:  Yeah, I remember Mr. Finley's case

24   very well.

25        MS. HERNANDEZ:  He was observed -- because he was with

1    the Proud Boys he observed, you know, breaking of windows and

2    destruction of property and violent conduct.  He went into the

3    Capitol for a short time, and after the fact he destroyed his

4    phone, told others to destroy their phones, and the Court gave

5    him, I believe, 75 days.  You know, again, he wasn't charged

6    with obstruction, but he got an obstruction enhancement because

7    he destroyed the contents of his phone and encouraged others to

8    do the same.

9        And all I'm suggesting is none of those -- Mr. Vo did not

10   destroy his phone afterwards.  Mr. Vo didn't do any of these

11   things.  That's all I am saying to the Court.  It's the type of

12   thing that the Court is required to look at and that I know the

13   Court looks at.

14       You look at those pictures of Mr. Vo.  Again, I have seen,

15   as I'm sure the Court has, a number of these cases where the

16   defendants are out of control, screaming, assaulting verbally

17   police and sometimes physically assaulting police.  That's not

18   Mr. Vo.  You can see the picture of him inside the Capitol.

19   He's smiling with his mother.  You can -- as soon as he was told

20   to leave, he left.

21       Maybe he has his head in the sand, maybe he's stupid, but

22   he mistook what was happening.  And again, I don't believe the

23   jury was ever asked to make a finding -- I've looked at the jury

24   instructions multiple times -- as to some of these facts.  I'm

25   not saying there wasn't evidence for them to convict on these

charges, but they weren't asked to make a finding that he knew

he wasn't allowed in or that he saw violence.  That is not what

they were asked to do.  That's none of the elements of any of

these charges.  I know he's being painted as whoever he is.

Let me talk about his postings on -- public postings.  I

don't condone it.  He has a First Amendment right to make those

statements.  The comment about a kangaroo court is --

THE COURT:  I've been called worse.

MS. HERNANDEZ:  Well, let me again -- I don't see that

there's grounds for calling the Court worse, or even a kangaroo

court.  I'm not -- you know.  And I readily recognize that I'm

pushy and I don't shut up.  So it's not like I'm an easy person

not to slap around, as it were, and I know that the Court allows

me a lot of ability to argue for my clients.  So that's not my

opinion, but I will tell the Court the background.

Again, he doesn't appear before the Court every day, so

he doesn't have the evidence to make that judgment.  He, for

whatever reason, was very focused on the goal of discovery.  He

actually came to D.C. to be with his public defenders to review

the global discovery.  They told him he couldn't see it, or they

didn't have it available, I'm not sure exactly.  Whatever it

was, he wasn't allowed to see it.

He comes into court, and the Court was upset with the

federal defenders who told the Court that they had not reviewed

the -- and I think they maybe asked for a continuance.  That's

why the Court said, "What do you mean?"  And the basis for the

continuance -- whatever happened, the Court reamed them out for

not reviewing it, while Mr. Vo is sitting there not knowing

what's going on.  And he sees that the Court thinks that they're

doing -- whatever they did was wrong, and not only was wrong,

but wrong enough that it concerned the Court.  That's what he

sees.  He sees that there's discovery that was produced that

somehow his lawyers didn't look at.

He then also sees, during the trial, that the Court made

evidentiary rulings, as we all know every court makes every day.

But from his point of view, his understanding is the Court is --

the Court is excluding evidence that his lawyers think is

relevant.  That's what happens every day in the courtroom to

me, you know.

And, unfortunately, after the trial he spoke to some

lawyer, as there are a lot of lawyers out there who are willing

to opine — not the federal defenders, not me — who told him

there was this violation, that violation, the other violation,

the other violation, and blah, blah, blah.  And so he says --

makes that stupid, in my opinion, statement.  But that's part

of the nature of social media.  People say stuff on there that

they wouldn't say in person.

The thing about not a jury of his peers, the truth is that

92 percent of D.C. voters voted for President Biden, even in the

Republican primaries.  This year and in 2016, D.C. Republicans

1    did not vote for Trump.  And having sat through three weeks

2    or four weeks of jury selection in the Proud Boys case, I

3    personally was shocked at the antagonism of the jury pool to

4    what happened on January 6.  And I have tried MS-13 cases and

5    other cases where people get killed.  I've tried FARC cases.

6    So the point is, much has been written about how D.C. juries

7    are not like these defendants.

8        They're impertinent statements, particularly the one about

9    the Court, but that's the background of it I'm telling the

10   Court.  It comes from this notion that he understood that his

11   lawyers had failed to do something that they should have done,

12   and that the Court excluded evidence that his lawyers believed

13   was going to come in.  It's indefensible in some ways because,

14   as I've mentioned, he had two very fine court-appointed lawyers.

15           THE COURT:  He did.

16           MS. HERNANDEZ:  Who had a lot of resources.  I read

17   the transcripts.  Yes, the Court at times excluded evidence,

18   but at times it did not.  You know, it's not like one would read

19   that transcript and say, oh, boy, this was really one-sided.

20   It wasn't.

21           THE COURT:  Okay.

22           MS. HERNANDEZ:  But anyway.  I want to finish with

23   the following, Your Honor.  Again, I listed a number of cases

24   where I think a sentence of 11 months is greater than necessary.

25   That's the test, right?  It's sufficient but not greater than

1    necessary.  And here's where I want to finish.

2        If you read the letters that were sent to the Court by a

3    diverse number of people -- and I will say, one of the letters

4    where I didn't identify the person, he identifies himself, he

5    thinks he's Witness No. 2 from the complaint, and so he didn't

6    want to have his name in the public record.  But I'm happy

7    to give the Court and probation and the prosecutor the

8    gentleman's name.

9        If you read those letters, to a person, to a person,

10    they describe a very sweet, compassionate young man.  These

11    are people, some of whom have known him from high school and

12    elementary school and college.  Not a single one of them says

13    anything about violence.  Not a single -- every single one of

14    them talks about his compassion, about his nonviolent nature,

15    about he tries to diffuse situations, about how concerned and

16    good he is with his friends.

17        His parents divorced when he was about six years old.  His

18    father remarried and moved out-of-state.  And yet, when he was

19    15 and his father got cancer, he took a leave of absence to care

20    for his father.  That's the young man -- whatever happened on

21    January 6 is only one part of this young man, and I implore the

22    Court, implore the Court, to read those letters and see the full

23    picture of this young man.

24        He has some -- he has his ideas about the Constitution and

25    about what happened and everything else.  You know, that's the

1    beauty of the United States of America.  And I just ask the

2    Court to consider, when you're being told about him or what

3    happened on that day, bottom line: he didn't destroy property,

4    didn't yell at cops, didn't have any confrontations, he didn't

5    come armed to have a confrontation.  And I implore the Court to

6    consider the letters from people who know him best, who have

7    known him for years, who describe a kind, gentle man.  And

8    nothing in his criminal history indicates any crime of violence

9    of any nature.

10              THE COURT:  Okay.  Thank you, Ms. Hernandez.

11              MS. HERNANDEZ:  So I'm asking for a sentence of

12    probation with home detention is what I'm asking for,

13    Your Honor, and you can impose -- you can put whatever

14    conditions you want over him with home detention.

15        I am concerned.  I mentioned it in the -- he's slight.

16    He's short, not very tall.  Slight.  And there are issues

17    with people like him in prison.  They're susceptible to abuse

18    in prison, there's no question about it.  So I ask the Court

19    to consider misdemeanor, to compare other sentences, to compare

20    the nonviolent nature of his conduct that day and his history.

21              THE COURT:  Thank you.

22              MS. HERNANDEZ:  Thank you, Your Honor.

23              THE COURT:  Mr. Vo, you have an absolute right to be

24    heard at this point.  Was there anything you wished to say?

25              THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Come on up.  If you've written a letter
2     and you want to read it, you can do that.  I'm just going to
3     ask that you slow down as you read it.  But come on up to the
4     podium, please.
5          MS. HERNANDEZ:  He wants to speak to you, but he also
6     wanted to email it to you.
7          THE COURT:  Well, you can submit it after the fact.
8     I'm going to impose sentence today, and if there's anything
9     you would like to say to me before I impose sentence, you're
10    free to do that.
11         THE DEFENDANT:  Yes, Your Honor.
12         THE COURT:  Come on up.
13         THE DEFENDANT:  Thank you.  Hello, Your Honor.
14    Thank you for everything.
15         THE COURT:  Good afternoon.
16         THE DEFENDANT:  Sorry.  I just got -- I just got
17    reminded that today's the anniversary of my dad's passing, so.
18         THE COURT:  Could you move the microphone a little
19    higher?  I'm sorry that's the case.
20         THE DEFENDANT:  I just wanted to say that I'm sorry
21    for everything.  I know I shouldn't have been there that day.
22    I fully recognize that.  It's something I would never -- a
23    situation I would never put myself in again.  I'm sorry I
24    misjudged, like, the law-enforcement officer presence.  I should
25    have known better.  I just -- I don't know.  Some things that

1    hurt me when people, like, say false things.

2         I wasn't there to overthrow any democratic process or

3    anything.  At the Trump -- I'm sorry if I mention him, but at

4    the speech I was told that, you know, it was a matter up to

5    Congress, we're to respect law enforcement, and that we're

6    supposed to be there peacefully, patriotically, and I fully

7    intended to do that.

8         Like I know I had a previous legal matter hanging over my

9    head.  I took the time to look at the police officers as to what

10   was permitted and not permitted, and I even took a picture just

11   to show what I thought was them allowing us.  And I just don't

12   -- I fully accept like everything that, you know, I was a part

13   of.

14        I'm sorry that January 6 happened, and there are a lot of

15   things that happened in court that I want to share in my letter,

16   but like -- and just -- I don't know.  Like I hope that you can

17   read my letter later because I wrote it for you, Your Honor, and

18   like -- I mean, after like all of this, I've tried to follow

19   like all the rules and everything.

20        I remember what -- the going to freedom corner, I actually

21   had talked to my counsel then, and I told them that I was going

22   to attend, and he told me not to appear on camera.

23             THE COURT:  I don't think you want to put --

24             THE DEFENDANT:  I'm sorry.  I'm sorry.  I don't know

25   what to say.

1          THE COURT:  That's okay.  I suggest you don't talk

2    about the conversations you had with your lawyer, because those

3    are privileged and I don't want you to inadvertently waive the

4    privilege of things you told your lawyer.  Those are protected.

5          THE DEFENDANT:  Okay.  But given the chance or

6    whatever you decide today, either way, like I would never put

7    myself into such a situation.  I've tried to be law-abiding, and

8    like I continue to try to be law-abiding to the best of my

9    knowledge.  I'll even like -- I guess I know I should be erring

10   on the side of caution more than I should have on January 6,

11   especially considering my previous legal matter, and I'm really

12   sorry, Your Honor, for everything.

13         THE COURT:  All right.  Thank you, Mr. Vo.

14         THE DEFENDANT:  Thank you.

15         THE COURT:  All right.

16     Now it's my turn.  And as I've said often --

17         MS. HERNANDEZ:  I'm sorry, Your Honor.  I apologize.

18   I know his sisters and his mother came all this way.  I was just

19   wondering if any of them --

20         THE COURT:  Well, frankly, Ms. Hernandez, I have heard

21   and read -- I've read every single letter.  I frankly --

22         MS. HERNANDEZ:  It would be cumulative.

23         THE COURT:  Mr. Vo's mother accompanied him into

24   the Capitol and remained with him in the Capitol, and I'm not

25   really inclined to hear from her.

1          MS. HERNANDEZ:  I would not be asking his mother.

2     She hardly speaks English, but his sisters are here.  But you

3     are correct.  I think they would be cumulative of what --

4          THE COURT:  Mr. Vo's mother is fortunate that she was

5     not charged along with Mr. Vo, and that's all I'm going to say

6     on that.

7          MS. HERNANDEZ:  She's been charged.

8          THE COURT:  Well, then, she definitely doesn't want

9     to come up here and --

10         MS. HERNANDEZ:  No.  Again, no.  I know.

11         THE COURT:  All right.  Thank you.

12     I have to consider all the factors set out by Congress

13     in Section 3553(a) and ensure I impose, and as Ms. Hernandez

14     said, a sentence that is sufficient but not greater than

15     necessary to comply with the purposes of sentencing.

16     And that's a very difficult balance.  I struggle with

17     it in every single case, and I struggle with it in these cases.

18     It may be that I'm an outlier as Ms. Hernandez suggests.  I

19     don't necessarily think I am.  But if you look at my sentences,

20     they have ranged either 7 to 10 days, to 63 months.  So I do

21     consider in each case the factors that I must in Section 3553(a),

22     and I've considered all those factors here.

23     With regard to the nature of the offense, Ms. Hernandez

24     mentioned all the letters that have been written on Mr. Vo's

25     account.  I read every one of them, and what struck me was not

so much that the letter writers describe a kind and helpful person because, believe it or not, I get a lot of letters like that for people, not just January 6 defendants but other people charged with other crimes, and that people are complicated and people are complex, and good people can do bad things. I've always thought that, and it's been shown to me over and over in the years that I've been on the bench.

And so Mr. Vo is like many other defendants who have come in front of me in these cases, which is, in many aspects of his life he has been a good son or a good brother or good friend. What struck me about the letters that I received was none of them seem to really take into consideration the actions that he engaged in on January 6.

Either the letters blew it off and said it was no big deal, he's protesting First Amendment activity — which immediately undercut the weight I gave the letter — or didn't address it at all, which is not helpful because, as I said, I'm not punishing him for what he believes. What I keep saying is I'm not punishing him for his political beliefs. He's entitled to them.

I'm not punishing him because he called me a kangaroo court. There's a reason why I have the job that I have and the protections I have, and -- you know, that comes with being a judge. I have a thick skin. And I, like you, Ms. Hernandez, share an appreciation for living in a country where one is free to say those things. So, I mean, he has his opinion.

1    That's not what I'm punishing him for.  That's not what I'm

2    sentencing him for.

3        But what has struck me about Mr. Vo's case — and he's

4    been in front of me for a long time — is until just now, his

5    absolute and complete lack of remorse.  Not just after, not just

6    in the aftermath of January 6, but even during his trial and

7    after his conviction in this case, he has doubled down on his

8    behavior.  And I don't believe that he really understands that

9    not only what he did was unlawful, but understands the effect

10    it had on others.

11        What I hear from Mr. Vo -- and, unfortunately, what I hear

12    from a number of defendants before me and especially in the

13    January 6 context -- is a regret for the incident that happened

14    or what has happened to them.  What I don't hear is any

15    understanding or awareness of the fear, the terror, that was

16    inflicted upon the occupants of that building because of his

17    participation in that mob.

18        He may not have been breaking things; he may not have been

19    yelling.  Agreed.  The evidence doesn't show that he went in

20    there and yelled at people or broke anything or tore anything

21    down or anything of that.  But by his presence there unlawfully

22    inside that building, with his mother, he contributed to the

23    rioting.

24        And the people who were inside that building doing their

25    jobs, the Capitol Police officers who were outnumbered, as you

1    heard, and trying their best despite being outnumbered by

2    thousands of protesters, there's no awareness or understanding

3    or appreciation for what those actions did to those people, or

4    the rest of the country watching with horror as people are

5    scaling walls -- and I know he didn't scale a wall -- and going

6    in and desecrating the Capitol and stopping the orderly

7    transition of power, the electoral count.

8         And again, it may have stopped by the time he went in

9    there, but he was aware that it was -- he texted or tweeted or

10    whatever, posted some comment, not just "apparently" -- and I

11    would disagree with you, and argue that him using "apparently"

12    means he was proud of it -- but that he knew that his

13    participation and those riots had stopped the electoral count

14    and the transfer of power.  So I don't see any remorse.

15         He apparently has a different view of the Constitution

16    and a different view of the seriousness of his actions.  He's

17    entitled to that view, but what he's being sentenced here today

18    are for his actions.  And I saw and heard the evidence at trial.

19    I saw the pictures.

20         Mr. Vo and his mother did not just, oh, look, we're just

21    walking up to the Capitol; and, look, there's an open door,

22    let's take a look-see and see what is inside; and then, oh,

23    we're not supposed to be here, let's leave.  It wasn't anything

24    like that.

25         Mr. Vo climbed up on scaffolding.  He saw tear gas.  He saw

1    smoke.  He saw police officers.  He heard alarms.  He knew he

2    wasn't supposed to be there.  And for him to argue that he

3    didn't is disingenuous.  And he went in knowing that the reason

4    he was being let in or the reason he was allowed to walk in is

5    because there were so many more protesters than police officers.

6        I sat here and I watched the testimony of the officers who

7    were there that day.  There's one in particular who testified --

8    was that the officer who had been upstairs in the -- yes.  I

9    forget his name, but he had been basically almost killed earlier

10   on.  And he came back downstairs, and I think he was the one

11   that was saying "respect the building"?

12           MR. BOYLAN:  Officer Millard.

13           THE COURT:  He got pilloried online for that.  He was

14   somehow accused of letting protesters in the building, when what

15   he said was, there were so many more of them, all I asked is

16   that they not trash the place.  There was no tacit approval of

17   the fact they were coming in.  This was an officer who was doing

18   his darnedest, who almost got killed for trying to protect that

19   building and the occupants thereof.

20       And as he was testifying, compellingly, I looked at Mr. Vo.

21   And Mr. Vo was smiling.  The jury was visibly moved by the

22   testimony that they heard.  You couldn't help but be moved.

23   One by one, this court and the jury heard from officers who

24   displayed incredible courage and resolution and determination

25   to protect that building and its occupants in the face of

incredible physical danger to themselves, and some of them who

suffered for it.  And in the face of that testimony from one

officer after another, I watched Mr. Vo, and he appeared to

be completely untouched and unbothered by what he was hearing.

There is no way, based on the evidence that I saw and

heard, that Mr. Vo could have possibly thought he was allowed

to be in that building.  At every turn, he was met by visible

signs of law enforcement presence, by alarms and smoke and

unruly crowds, and he kept going in.  And once he was inside

that Rotunda, he took pictures with his mom, very proudly.  And

I believe those pictures of himself with his mother inside the

Rotunda are -- they're still on his -- whatever profile picture,

right?

MR. BOYLAN:  I think they've been taken down now,

Your Honor.

THE COURT:  But they were at some point.

MR. BOYLAN:  Yeah.

THE COURT:  And then Mr. Vo comes to trial.  In the

District of Columbia, he's been ordered to stay away except for

court appearances.  So he comes for trial, and after court and

-- and I think your comparison with the Kennedy Center and the

monuments is really a little, again, disingenuous.  Because he

goes down to "freedom corner" or whatever you want to call it,

the jail, outside the jail -- and I'm familiar with that part of

town -- to show common cause with people who are protesting the

1    incarceration of dangerous, violent defendants.

2        The people who are being held in the D.C. jail or at

3    Central Treatment Facility pending trial are people who have

4    been found to be dangerous.  And there's I think a recent count

5    of them, maybe 15 of them.  It's a small group, but they're

6    being held there because they are dangerous people.  And he was

7    not authorized to be there.

8        He was allowed to be in the city for his trial, and that

9    is where he chose to go after court: down to show his support

10   for people who claim that those individuals who are being held,

11   either pretrial or serving sentence in that jail, are somehow

12   hostages or heroes or people deserving of his support.  And that

13   is -- I find that extraordinary.  So I take that into account

14   when I'm considering his characteristics as an offender.

15       Again, with regard to the nature of the offense, he

16   acknowledged in one message that he and his mother helped stop

17   the vote count for a bit.

18       Mr. Vo has a criminal history.  You're right, it's three

19   misdemeanor offenses for marijuana.  Normally, if those had been

20   years earlier, I would give them very little consideration,

21   maybe none at all, and I have in the past.  But the fact is

22   Mr. Vo was under admonition in his most recent case, having two

23   previous convictions, to be on good behavior.

24       And yet he came here and -- for the rally?  That's totally

25   fine.  But having attended the rally, he marched to the Capitol.

1    And again, free expression.  It's when he decides to go inside

2    that building.  Unlike the thousands of people who stayed

3    outside the building and take pictures and send messages, he

4    violates the law.

5        And then I do consider that his previous convictions

6    because he should have known better.  He had every reason not to

7    get in trouble with the law.  He had every reason not to violate

8    the law because he was under admonition for good behavior.  So I

9    do take that into account.  And he should know better because he

10   is a college graduate.  He is educated.  He has had advantages

11   in life.

12       I've stated regarding the need for general deterrence over

13   and over that there have to be consequences for the people who

14   committed these offenses beyond just probation, and I consider

15   every defendant individually.  And the government mentioned

16   Mr. Alford and Mr. Hager whose trials I presided over.  You

17   mentioned Mr. Finley and the individual you represented whose

18   name escapes me right now.

19       Mr. Finley's case was a case -- probably one of the three

20   cases in which I have rarely seen a defendant express that much

21   remorse and do as much to make up for their actions in that

22   particular case.  And it was a very difficult case, but it was

23   -- the sea change in Mr. Finley from the time he was arrested

24   to the time he was sentenced was remarkable.

25       Mr. Alford, who had no criminal history, he took the

1    stand and frankly, in the Court's opinion, testified falsely.

2    Mr. Hager did not, and had no criminal record, and I took that

3    into account as well.

4         All those defendants received different sentences because

5    of either whether they took the stand or whether they had

6    criminal history and whether they expressed remorse.  And I

7    believe that Mr. Alford did not.  I believe Mr. Hager did.

8    Mr. Finley certainly did.  And I took all of those factors into

9    consideration.

10        I do not believe that Mr. Vo believes the law applies to

11   him.  I think he has, in his actions and his words, including

12   words he said and posted after this offense, indicated he has no

13   respect for this court or for the rule of law, and I think there

14   have to be consequences for that.

15        Ms. Hernandez, your client keeps raising his hand.  I'm

16   not sure; you may want to consult with him.  I have given him

17   an opportunity to speak.

18             MS. HERNANDEZ:  He wanted to have the Court have

19   access to his letter.

20             THE COURT:  I will -- I did not get the letter before

21   today, and therefore I was not able to consider it.  I have

22   heard from you, Mr. Vo, and I have said I will read your letter,

23   but I can tell you that there was a deadline for submitting

24   materials, and I would have -- you know, I was receiving

25   materials up to this morning and last night, but I cannot take

1    a letter, a long letter, that is submitted in the middle of a

2    sentencing hearing.  Moreover, I'm not sure that any letter

3    would at this point, based on the record I have before me,

4    change my sentence.

5         And I will say that my sentence in this case is a sentence

6    I would give because of the evidence that I saw and heard at

7    trial, as well as Mr. Vo's characteristics, previous criminal

8    history, statements pre- and posttrial.  And I've considered all

9    the Section 3553(a) factors in determining his sentence.

10        So if you could stand with your client.

11        (Counsel and defendant comply.)

12        It is the judgment of the Court that you, Antony Vo, are

13   hereby committed to the custody of the Bureau of Prisons for

14   a term of nine months.  You are ordered to serve 12 months of

15   supervised release following your sentence of incarceration.

16        You are further sentenced to pay a fine of $1,000 and a

17   $70 special assessment.  The fine is based on the fact that you

18   currently are, I believe, according to presentence report, live

19   off passive investment income.  You have been able to travel

20   during the pendency of the case including on a trip.  You have

21   two Porsches, an Audi, and a Honda as part of your assets,

22   and therefore it is my belief that you have an ability to pay

23   a fine and should pay a fine in this case.

24        The special assessment and fine are immediately payable

25   to the Clerk of the Court for the U.S. District Court of the

1    District of Columbia.  Within 30 days of any change of address,

2    you shall notify the Clerk of the Court of the change until such

3    time as the financial obligation is paid in full.

4       Ms. Hernandez, do you have any requests for a recommendation?

5    I have -- to you, Mr. Vo, I have allowed every single January 6

6    defendant before me who I have sentenced to incarceration who

7    was not already incarcerated to voluntarily surrender, and I

8    have done so in every case, because in every one of those cases

9    the defendant has been in compliance with their pretrial

10   conditions of release.

11      I find that you did violate your conditions of release when

12   you were here for trial, but since that time, you appear to be

13   in compliance, and notwithstanding the statements that you've

14   posted, I'm going to allow you to remain on release pending

15   voluntary surrender.  I will caution you, though, that if you

16   commit a crime while you are awaiting voluntary surrender, you

17   could be subject to enhanced penalties because that crime was

18   committed while you were awaiting incarceration.

19      If you fail to comply with your conditions of release while

20   you are awaiting voluntary surrender, your conditions of release

21   could be revoked and you could be incarcerated immediately.  You

22   are required to turn yourself in on the day that you are ordered

23   to do so, and a failure to do so could result in another

24   criminal offense, the penalty for which would be consecutive

25   to any sentence in this case.

1          Ms. Hernandez, do you have a sentencing recommendation?

2               MS. HERNANDEZ:  I don't, as I stand here, Your Honor.

3     Can I send something to chambers first?

4               THE COURT:  Yes.  Could you consult with the

5     prosecution first?  But I generally give that recommendation.

6               MS. HERNANDEZ:  Sure.  I would anticipate that we

7     would be asking for bail pending appeal, particularly with the

8     -- I understand the Court indicated that you would have given

9     the same sentence.

10              THE COURT:  I would.

11              MS. HERNANDEZ:  So I will file that motion.

12              THE COURT:  Yes.

13              MS. HERNANDEZ:  Unless the Court wants to grant it

14    without filing a motion.

15              THE COURT:  No, I don't.  Please file it.

16              MS. HERNANDEZ:  Okay.

17              THE COURT:  All right.

18              MS. HERNANDEZ:  Thank you.

19              THE COURT:  Thank you.

20          Mr. Vo, you know, you're younger than you look.  You're

21    31 years old.  You have a supportive family, and you obviously

22    have resources and friends.  And I got many letters from your

23    friends from your tennis club in Florida.  You had character

24    witnesses at trial.  You're still young enough that you can come

25    back from this, that you can continue a life as a productive

1   citizen.

2        I believe, as Ms. Hernandez does, that a person is not

3   the worst thing they've ever done, and therefore you have an

4   opportunity to move beyond this and continue with a law-abiding

5   life.  I encourage you to do that, and I wish you luck in that

6   endeavor.

7        But I really want to encourage you, perhaps, to broaden

8   your base of information.  I know you have very firm beliefs,

9   perhaps grounded in your experience as an immigrant from a

10  country that suffered the ravages of communism.  I understand

11  that.  I heard the testimony at trial.

12       But all the privileges and rights that you've been afforded

13  here, you've had three different lawyers, you've had extensions,

14  continuances, you've been allowed to remain on pretrial release,

15  all those things are part of the Constitution that you believe

16  is not being followed or some view of the Constitution you have.

17  I encourage you to read a little more widely, to listen to

18  opinions that differ from you, perhaps get a broader range of

19  views.  Good luck to you, sir.

20            MS. HERNANDEZ:  Thank you, Your Honor.

21            MR. BOYLAN:  Your Honor, could I ask for the a

22  clarification of the Court's sentence?

23            THE COURT:  Yes.

24            MR. BOYLAN:  I understand that the Court imposed the

25  sentence, and earlier you stated that regardless of the result

1    of *Griffin* --

2              THE COURT:  Six-month maximum, right?

3              MR. BOYLAN:  Six-month maximum for both, but I think

4    what Your Honor said was you would run them concurrently.

5              THE COURT:  Actually, you're right.  They would be

6    consecutive to each other.  Counts 3 and 4 would be six months

7    on count 3 and three months on Count 4, to run consecutive.

8              MR. BOYLAN:  Thank you, Your Honor.

9              THE COURT:  And I don't have any conditions of

10   supervised release, just standard conditions.

11             PROBATION OFFICER:  Your Honor?

12             THE COURT:  Oh, thank you.  Ms. Spicer.

13             PROBATION OFFICER:  Just one request from the

14   probation office:  Would Your Honor be inclined to impose the

15   firearm restrictions since these are misdemeanor convictions?

16             THE COURT:  Oh, yes.  Ms. Hernandez, I am going to

17   impose a firearm restriction.

18             PROBATION OFFICER:  The firearm-restriction language

19   is on page 3, or it's the first page of the sentencing form of

20   the recommendation.

21             THE COURT:  Yes.

22             MS. HERNANDEZ:  Your Honor, I don't believe it's

23   misdemeanors the Court can restrict possession of firearms?

24             THE COURT:  As a condition of supervised release?

25   I think I can impose that.

1          MS. HERNANDEZ:  They're misdemeanors.  I'll research

2     it.  If there's an issue, I'll file something.

3          THE COURT:  Okay.  You do that.

4       Mr. Vo, as a condition of your supervised release,

5     you shall remove all firearms, destructive devices, or other

6     dangerous weapons from areas over which you have access or

7     control until the term of supervision expires.  Do you understand?

8          THE DEFENDANT:  That was part of my pretrial release

9     conditions.

10          THE COURT:  Right.  And they're to continue during

11     your supervised release.

12          PROBATION OFFICER:  And the language regarding the

13     Court's ability to impose the firearm restriction is on page

14     26 of the presentence investigation report in footnote No. 3.

15          MS. HERNANDEZ:  We'll take notice of that, Your Honor.

16          THE COURT:  All right.  Just a minute.

17       Yes.  Thank you.

18          PROBATION OFFICER:  Thank you, Your Honor.

19          THE DEPUTY CLERK:  And the government, the original

20     information, you move to dismiss?

21          MR. BOYLAN:  Yes, Your Honor.  We would move to

22     dismiss the original information.

23          THE COURT:  The motion's granted.

24       All right.  Thank you all.

25       (Proceedings adjourned at 5:08 p.m.)

1        (Case recalled at 5:17 p.m.)

2            THE COURT:  Back on the record, thanks to my ace

3    courtroom deputy, that I had not given a sentence as to counts 1

4    and 2.  My intention is, as I said, my sentence would not change

5    if Mr. Vo had not been convicted of counts 1 and 2.

6        So the sentences on counts 1 and 2, nine months, to be

7    served concurrently with each other and concurrent with counts

8    3, and 4, which is six months on Count 3, three months on Count

9    4, to be served consecutive.  So 3 and 4 are being served

10   consecutively, 1 and 2 are concurrent, and 1 and 2 are

11   concurrent with 3 and 4, for a total sentence of nine months.

12           MS. HERNANDEZ:  I'm sorry.  Would you mind repeating

13   that?

14           THE COURT:  Not at all.  On counts 1 and 2, the

15   sentence would be mine months on each count concurrent with each

16   other.  On counts 3 and 4, it would be six months on Count 3,

17   three months on Count 4, those two counts consecutive, for a

18   total sentence of nine months.  Counts 1 and 2 would be

19   concurrent with counts 3 and 4.

20           MS. HERNANDEZ:  But the total sentence is nine months.

21           THE COURT:  Nine months, yes.

22           MS. HERNANDEZ:  Six and three --

23           THE COURT:  Yes, six and three --

24           MS. HERNANDEZ:  But concurrent --

25           THE COURT:  With 1 and 2.  1 and 2 are concurrent with

1    each other.  Any objection to that formulation of the --

2              MR. BOYLAN:  (Inaudible.)

3              THE COURT:  Yes.  Bring the microphone up.  Okay.

4              MR. BOYLAN:  Your Honor, the issue we run into is with

5    supervised release.  Supervised release is only available for a

6    non-petty offense misdemeanor.

7              THE COURT:  For counts 1 and 2.

8              MR. BOYLAN:  It would only be available for counts 1

9    and 2.  Couldn't impose supervised release for counts 3 and 4.

10             THE COURT:  But I am going to impose the supervised

11   release for counts 1 and 2.  If *Fischer* is decided and they have

12   to be vacated, so will the term of supervised release.

13             MR. BOYLAN:  Understood, Your Honor.

14             MS. HERNANDEZ:  You could impose supervised release

15   on -- you just can't on the petty offenses if you don't impose

16   prison also.

17             THE COURT:  And I am.  I realize I have to vacate

18   supervised release if *Fischer* is decided differently, and we'll

19   deal with that if it becomes an issue.  Anything further?

20             MR. BOYLAN:  No, Your Honor.

21             THE COURT:  Ms. Hernandez?

22             MS. HERNANDEZ:  No, Your Honor.

23             THE COURT:  All right.  Thank you.

24             PROBATION OFFICER:  Your Honor?  Sorry.  Probation has

25   one more question.

1          THE COURT:  Yes.

2          PROBATION OFFICER:  In regards to the mandatory

3    conditions of supervised release, are you inclined to impose the

4    three mandatory drug tests, or are you inclined to suspend those?

5          THE COURT:  Do you have a position, Mr. Boylan?

6          MR. BOYLAN:  I'm sorry.  Could you repeat that?

7          THE COURT:  Mandatory drug testing?

8          PROBATION OFFICER:  The three mandatory drug tests.

9          MR. BOYLAN:  I'll leave it to the Court.

10          THE COURT:  I'll require three tests, and if they are

11    negative, then no further testing necessary.

12          PROBATION OFFICER:  Thank you, Your Honor.

13          THE COURT:  All right.  Thank you, everyone.

14    Hopefully, this is the last time.

15          MS. HERNANDEZ:  I'm sorry.  The only thing, obviously,

16    and I think all the objections I raise are preserved?

17          THE COURT:  They are all preserved for the record.

18          MS. HERNANDEZ:  Thank you, Your Honor.

19       (Proceedings adjourned at 5:20 p.m.)

20

21

22

23

24

25

*  *  *  *  *  *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Bryan A. Wayne
Bryan A. Wayne